Terry Budd (*Admitted Pro Hac Vice*)
BUDD LAW, PLLC
120 Lyndhurst Circle
Wexford, PA 15090
Telephone: 412-613-2541
terry.budd@buddlawglobal.com

Edward P. Sangster (SBN 121041)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220
ed.sangster@klgates.com

Christopher M. Verdini  (*Admitted Pro Hac Vice*)
Anna Shabalov  (*Admitted Pro Hac Vice*)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
christopher.verdini@klgates.com
anna.shabalov@klgates.com

Attorneys for Plaintiff
ENIGMA SOFTWARE GROUP USA, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

ENIGMA SOFTWARE GROUP USA, LLC,

　　　　　Plaintiff,

　　　　v.

MALWAREBYTES INC.,

　　　　　Defendant.

Case No.: 5:17-cv-02915 (EJD)

**SECOND AMENDED COMPLAINT**

Plaintiff Enigma Software Group USA, LLC ("ESG"), by its attorneys, files this Second Amended Complaint against Defendant Malwarebytes Inc., formerly known as Malwarebytes Corporation ("Malwarebytes"), based on, *inter alia*, additional documents and other evidence developed from third parties, which include Malwarebytes' own internal documents, emails, and Skype messages, as well as public statements, testimony, and affidavits from Malwarebytes.  To date, ESG has not obtained any discovery evidence directly from Malwarebytes under the Federal Court rules but anticipates that discovery in this case will reveal additional evidence supporting ESG's claims.  In support of its facts and claims in the Second Amended Complaint, ESG alleges as follows:

## OVERVIEW OF THE CASE

1.      This is an action for civil remedies, including injunctive relief and damages, under the federal Lanham Act and the laws of the State of New York, arising out of the unlawful, predatory and bad faith unfair business practices of Malwarebytes, a direct competitor of ESG—including anticompetitive practices specifically designed by Malwarebytes to target ESG and hurt its business in order for Malwarebytes to increase its profits and gain an improper advantage in the market for anti-malware and cybersecurity software.

2.      Since at least 2003, ESG has been an expert in developing and providing computer users with high quality cybersecurity and anti-malware software products that (i) detect and remove malicious software (*i.e.*, malware) including, *inter alia*, viruses, spyware, adware, ransomware, and Trojans; (ii) enhance users' Internet privacy; (iii) offer users the choice to block "Potentially Unwanted Programs" ("PUPs"); and/or (iv) eliminate security threats and risks from problematic software programs.  ESG's products have included SpyHunter 4 and RegHunter 2, which have protected millions of consumer and business customers for nearly two decades from an array of serious risks, including, *inter alia*, computer hacks, system breaches, identity theft, ransomware attacks, privacy breaches, system corruptions, and other computer and Internet security risks.

3.      Anti-malware software products have become vital to consumers and businesses particularly in recent years because there has been a significant increase in the number of and sophistication of criminal hacker attacks on users' computer systems.  Anti-malware products also have become more critical in recent times because easy-to-use hacker software has become more

1   readily available in the market, allowing identity theft and systems breaches by cybercriminals with

2   only rudimentary computer knowledge.  Additionally, the shift in the use of desktop and personal

3   computers from offices to homes and the dramatically increased usage and dependency on cloud-

4   based computer storage systems have significantly increased the number of attack points for

5   cybercriminals to exploit.  Rapidly increasing and ever-evolving hacker attacks, including infamous

6   malware and ransomware attacks such as WannaCry, CryptoLocker, NotPetya, Locky, and Jigsaw,

7   target these vulnerabilities.  Such hacker and malware attacks have even hit large companies with

8   sophisticated cybersecurity systems, such as CitiGroup, Sony Playstation Network, Equifax, Home

9   Depot, Chase, and J.P. Morgan, but also regularly victimize consumers, small business owners, and

10  families, causing great harm to their personal and professional lives.  As a result, it is critical for

11  consumers and businesses to have an array of cybersecurity products available for selection and

12  combined use, and anti-malware products like ESG's SpyHunter 4 (and privacy protection products

13  like RegHunter 2) play an important role in protecting computer users who do not have access to

14  expensive and sophisticated cybersecurity systems of the kind large corporations deploy.

15          4.      As detailed further below, Malwarebytes' unfair anticompetitive practices against its

16  competitor ESG involved, *inter alia*, unlawfully blocking ESG's customers and users from operating

17  SpyHunter 4 and RegHunter 2 and intentionally misrepresenting to users—who were relying on

18  Malwarebytes' self-proclaimed software security expertise—that SpyHunter 4 and RegHunter 2 were

19  actual "threats" to those users.  Calling an anti-malware software product a "threat" and blocking it

20  on that basis is the most factually inaccurate and disparaging thing that can be said about a software

21  product whose entire purpose is to protect users against cybersecurity "threats."  Malwarebytes also

22  intentionally blocked ESG's website and domains, falsely representing to users that they were

23  "malicious."  As Malwarebytes itself recognizes and previously has acknowledged in sworn court

24  testimony, designating a website as "malicious" in the cybersecurity and privacy software markets

25  communicates to users that the website is harmful and can be disruptive to their computers.

26          5.      Malwarebytes' scheme to increase its corporate profits by purposefully blocking and

27  preventing users from running its competitor ESG's products—which users voluntarily had selected

28  for their personal protection—left users at extraordinary risk of hacker attacks, personal identity theft,

**SECOND AMENDED COMPLAINT**      2      CASE NO. 5:17-CV-02915 (EJD)

ransomware attacks, and cybercrimes. In the face of the increasing sophistication and sheer volume of new cyber-attacks, it has also become all the more important for computer users to deploy a layered approach to cybersecurity protection by utilizing multiple anti-malware products. This is because no single anti-malware product, no matter how well-designed, can guarantee users complete 24/7 protection against malware, ransomware, other malicious programs, and zero-day attacks. In its own public statements and in the advice and recommendations it gives to users, Malwarebytes itself recognizes the need for users to deploy such layered protection, with its CEO, Marcin Kleczynski, repeatedly likening layered protection from multiple cybersecurity products to equipping cars with both "airbags" and "seatbelts" to help ensure safety. Thus, Malwarebytes knew and understood at all relevant times that its purposeful and profit-driven blocking and interfering with users' selection and use of ESG's award-winning products was not only harmful to ESG but, as importantly, was harmful to consumers and business owners who each day face growing computer security risks.

6.     Malwarebytes expressly markets itself as a self-professed industry leader and expert in anti-malware products, in the same market and product lines as ESG. Since 2008, it has provided users with anti-malware and cybersecurity software products that—like ESG's products—are aimed at protecting users' computers from malware, PUPs, privacy risks, and other risky programs.

7.     Malwarebytes sells, markets, and directly competes with ESG in the anti-malware and Internet security market. The flagship Malwarebytes anti-malware products (collectively, "MBAM") directly competed with ESG's flagship anti-malware product known as SpyHunter 4 for the entire time SpyHunter 4 was on the market. Malwarebytes specifically promotes, markets, and sells its MBAM products as consumer and business solutions that detect and remove malware, PUPs, and other potentially threatening programs on users' computers in the United States and worldwide.

8.     Malwarebytes and ESG are competitors as a matter of fact and law, as the Ninth Circuit has already determined. *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, No. 17-17351, Dkt. 42 at *4 (9th Cir. Sept. 12, 2019); Dkt. 72 at * 6 (9th Cir. Dec. 31, 2019).

9.     Malwarebytes' MBAM products, by Malwarebytes' pre-programmed software design, purport to detect PUPs, automatically identify and list those purported PUPs as "threats," and automatically quarantine those programs, blocking their operation and rendering them inaccessible

1  for users.  Below is an example of MBAM "Threat Scan Results" for a computer on which there is

2  malware and purported PUPs.  As the screenshot of Malwarebytes' MBAM illustrates, the user is

3  shown over 700 purported "*threats*"—"Total ***Threats*** Detected"—every one of which is identified

4  and pre-set by Malwarebytes' own coding, selection, and internal decision-making as effectively

5  automatically quarantined, blocked, and rendered inoperative, and preselected for full removal from

6  the user's system:



16  (yellow highlighting and arrows added by ESG for the reader's convenience).

17       10.     For nearly eight years, from Malwarebytes' inception in 2008 (approximately half a

18  decade after ESG was already developing, designing, and selling well-recognized anti-malware

19  products) through October 4, 2016, Malwarebytes directly competed with ESG in the cybersecurity

20  and privacy protection market and during all this time Malwarebytes had not identified ESG's

21  SpyHunter 4, ESG's RegHunter 2 program (which provides users with privacy protection tools and

22  optimizes Windows systems), or any other ESG product as a PUP, a "threat," or any other type of

23  malware, unwanted program, or problematic program and had not quarantined or blocked businesses

24  or consumers from using of any of ESG's products.

25       11.     For the first eight years of Malwarebytes' existence, while Malwarebytes did not

26  designate or block ESG's products as threats or PUPs, consumers and businesses operating MBAM

27  effectively had the freedom of choice to select additional products to use for layered cybersecurity

28  protection, with MBAM products operating alongside the anti-malware products of Malwarebytes'

competitors.  This historical free market condition was great for technological innovation and great for driving product prices down for consumers and businesses.  Malwarebytes, however, dramatically and unlawfully departed from this practice in October 2016, to the detriment of consumer and business users, and started blocking its competitor ESG's cybersecurity and privacy products. *Malwarebytes did so at precisely the time that it was facing a court's subpoena powers legally obligating Malwarebytes to turn over internal company records—and would soon have to provide testimony under oath—that would have exposed Malwarebytes' involvement in an unlawful smear campaign against ESG run in concert with an "affiliate" of Malwarebytes called Bleeping Computer LLC* ("Bleeping Computer").  While functioning as a Malwarebytes sales arm that promoted and generated sales of Malwarebytes' products in exchange for sales commission payments from Malwarebytes, Bleeping Computer held itself out to the public as a supposed independent, objective, non-biased software technology information site.  As detailed further below, as part of the smear campaign against ESG on Bleeping Computer's website, Bleeping Computer employed highly deceptive and misleading practices against unsuspecting users to disparage ESG products in a purposeful effort to unlawfully divert sales from ESG to Malwarebytes, thereby increasing both Malwarebytes' and Bleeping Computer's profits.  It was not a coincidence that Malwarebytes decided to newly list ESG's products as "threats" and PUPs at precisely the moment it was under legal compulsion to turn over evidence that would have exposed its disguised profiteering relationship with Bleeping Computer and involvement in illegal disparagement.

12.     On October 5, 2016, departing from past practice, Malwarebytes unilaterally revised the self-created "criteria" it used to identify PUPs for the first time since 2013 and announced its revisions to the public with the classic marketing and publicity stunt of an official company statement from its CEO Marcin Kleczynski.  Ex. 1.  Malwarebytes' new criteria rejected specific objective or scientific standards in favor of subjective characteristics.  Malwarebytes then implemented its subjective criteria at its own malicious whim to identify SpyHunter 4 and RegHunter 2 as PUPs and "threats," in a direct, targeted effort to hurt ESG's business and drive ESG's sales down while increasing Malwarebytes' sales—even in the face of ESG customers repeatedly demonstrating their desire to use ESG's products to protect themselves and/or their businesses from cybersecurity risks.

13.     Malwarebytes purposefully designed and implemented its new subjective, vague, and self-serving PUP criteria to give itself what it believed would be complete and unfettered power to unilaterally block any product it chose (including those of its competitors), even in bad faith or driven by anticompetitive animus, without ever having to justify its blocking decisions or account for the harm it caused to users or to the companies whose products Malwarebytes chose to designate and block as PUPs and "threats."  Malwarebytes immediately utilized this self-granted power to harm ESG by, *inter alia*, blocking ESG's products, website, and other domains, making it difficult for users to get around Malwarebytes' unlawful blocking, interfering with ESG's current and prospective customer base, and injuring ESG's business.  Malwarebytes' claim that it could block competitors' products without ever having to explain itself or be held legally accountable for the harm it caused— and indeed could even block its competitors' products in bad faith—has been resoundingly rejected by the U.S. Court of Appeals for the Ninth Circuit.  The Supreme Court of the United States, in turn, has rejected Malwarebytes' request for a review of the Ninth Circuit's well-grounded decision.

14.     Within just twenty-four hours of publicly announcing its revised PUP criteria, through which it had granted itself an anticompetitive license to block competitors' products, Malwarebytes specifically decided to designate SpyHunter 4 and RegHunter 2 as "threats" and PUPs and reprogrammed its MBAM products to begin falsely representing to users that ESG's programs were "threats" and PUPs and blocking the operation of those programs by automatically quarantining them.  Malwarebytes did so even though it knew that ESG's highly regarded programs were legitimate and posed no "threat" to users or their computers.  Malwarebytes also knew, based on its experience in the cybersecurity market, that it was factually false to call SpyHunter 4, an anti-malware product, a "threat" when SpyHunter 4 was the complete opposite, and in fact provided users with award-winning protection and safeguards against cybersecurity threats.  Malwarebytes likewise knew that it was factually false to call ESG's products PUPs when those award-winning products were in fact wanted by the millions of users who utilized and purchased paid subscriptions to them.  Malwarebytes also blocked access to ESG's website and other domains and falsely represented to users that the website and domains were "malicious" threats disruptive to their computer security— another disprovable statement Malwarebytes knew to be false.

15.     Soon thereafter, on October 19, 2016, Malwarebytes acquired AdwCleaner, an anti-adware product that purports to identify for removal PUPs, adware, toolbars, and other unwanted software for its users, as part of its overall growth plan to increase its dominance in the cybersecurity and privacy market.  At the time of its acquisition by Malwarebytes, AdwCleaner had never before and did not then identify SpyHunter 4 or RegHunter 2 as PUPs or any other type of threat that needed to be removed from users' computers.

16.     However, on or about October 27, 2016—just one week after Malwarebytes acquired it—AdwCleaner, in its role as an operating arm affiliated with and under the ownership and control of Malwarebytes, began newly identifying, detecting, and pre-selecting for removal SpyHunter 4 and RegHunter 2 as "threats" and PUPs, in furtherance of and to assist in Malwarebytes' purposeful anticompetitive scheme directed at injuring ESG's business.  *See* Ex. 2.  Malwarebytes, through its MBAM products and AdwCleaner products, continued to unlawfully designate and block SpyHunter 4 as a "threat" and PUP and interfere with its operation while it was on the market and continues to unlawfully identify and block the operation of RegHunter 2 as a "threat" and PUP to this day.

17.     This ongoing scheme to divert sales from ESG to Malwarebytes was successful as Malwarebytes grew in the relevant time period from a company with annual revenues of, on information and belief, approximately $90–125 million to a much larger company with publicly announced annual revenues of approximately $190 million.  Malwarebytes knew that one way to grow and increase sales of its MBAM products was to divert customers away from a competing company like ESG which sold competing products like SpyHunter 4 and RegHunter 2.  Malwarebytes knew and intended that its physically interfering with and blocking consumers and businesses from using its competitor ESG's products would help increase sales for Malwarebytes and drive down sales for ESG, thereby securing a stronger, more dominant position for Malwarebytes in the cybersecurity software market.

18.     The fact that ESG's customers have deliberately downloaded, operated, and enjoyed the protection provided by ESG's products and confirmed that they want to pay for SpyHunter 4 and RegHunter 2, both initially and repeatedly upon renewals, completely belies Malwarebytes' false and misleading designation of these ESG products as supposedly "potentially unwanted" and "threats"—

and completely belies Malwarebytes claim that ESG's products are such significant threats that they must be automatically pre-blocked and disabled by Malwarebytes to stop users from utilizing and getting protection from ESG's products.

19.     Malwarebytes knows that detecting, quarantining, and blocking as "threats" and PUPs the products of a competitor, like it did to ESG, causes immediate harm to users by interfering with their freedom of choice, and harm to Malwarebytes' competitor (here ESG), in the form of lost sales lost renewals, brand name tarnishment, and lost business opportunities.  It further causes irreparable harm to the reputation of the competitor's business and products, as a result of being identified as a "threat" that a user should either not install or should remove from the user's computer. Malwarebytes also knows that identifying a competitor's product as a "threat" and PUP, as it did to ESG, creates a substantial risk that other anti-malware companies may follow suit, thereby causing exponentially greater harm to its competitors like ESG.

20.     Malwarebytes' deliberate decision to purposely change its PUP criteria and "threat" designations and to begin falsely identifying SpyHunter 4 and RegHunter 2 as "threats" and PUPs was not coincidental. Malwarebytes made its decision in bad faith specifically to maintain the market advantage of the smear campaign against ESG on Bleeping Computer's website that Malwarebytes had participated in orchestrating and/or directly benefited from.  Malwarebytes also made its bad faith decision to retaliate against ESG for pressing forward with its then-pending factually-related lawsuit against Bleeping Computer for that smear campaign in the U.S. District Court for the Southern District of New York (*Enigma Software Group USA, LLC v. Bleeping Computer LLC et al.*, Case No. 1:16-cv-00057 (PAE) (S.D.N.Y.)) (the "Bleeping Computer Lawsuit").  More specifically, Malwarebytes acted in retaliation for ESG pressing Malwarebytes to reveal under a court subpoena (and in sworn testimony to follow) the true business profiteering relationship between Bleeping Computer and Malwarebytes in the Bleeping Computer Lawsuit ("Subpoena").  The Subpoena required Malwarebytes to produce internal documents and evidence that would have exposed the profiteering scheme and concerted actions of Malwarebytes and Bleeping Computer to enhance their shared profits by unlawfully employing anticompetitive, unfair trade practices against ESG to purposely disparage its products and divert sales from ESG to Malwarebytes.

21.     As detailed further below, through emails and messages clandestinely shared between and/or among Bleeping Computer's CEO Lawrence Abrams and Malwarebytes' CEO Marcin Kleczynski, General Counsel Edward Brown, and other top executives of Malwarebytes, Malwarebytes' relationship with Bleeping Computer dated back to at least 2009, when Mr. Kleczynski, as Malwarebytes' CEO, and Mr. Abrams, as Bleeping Computer's CEO, signed a Joint Confidentiality Agreement between Malwarebytes and Bleeping Computer whereby the companies would share highly sensitive, proprietary business information, including, *inter alia*, (i) customer data, (ii) business planning, (iii) source code and object code, (iv) operational cost information, (v) lists of sales representatives and vendors, (vi) compensation information, and (vii) product designs. The Joint Confidentiality Agreement signed by Malwarebytes' CEO and Bleeping Computer's CEO was significant for the business alignment it opened for the two companies to build each other's operations and profits—often at the expense and in the face of the ignorance of users who looked to Bleeping Computer for independent, objective, non-biased expert cybersecurity advice and to Malwarebytes for its cybersecurity expertise in designing and selling anti-malware software.

22.     In addition to their Joint Confidentiality Agreement, Malwarebytes and Bleeping Computer had and continue to have an affiliate relationship by which Bleeping Computer promotes and sells Malwarebytes' MBAM products for commissions.  Bleeping Computer earns commissions from Malwarebytes when users purchase MBAM products through or in connection with Bleeping Computer's website or marketing efforts.  Bleeping Computer also has been paid over time advertising fees by Malwarebytes for marketing sales of Malwarebytes' products.

23.     In the Bleeping Computer Lawsuit, ESG alleged that the smear campaign on the Bleeping Computer website was a scheme designed to purposefully disseminate false, misleading, and deceptive information about ESG and its SpyHunter 4 (and RegHunter) products—and instruct users not to install, or to uninstall, SpyHunter 4 and instead purchase Malwarebytes' competing MBAM products, under the auspices of presenting users with objective, scientific technological information—thereby promoting Malwarebytes' business interests and earning revenues for Malwarebytes, while also increasing Bleeping Computer's profits and damaging ESG.

24.     The Subpoena ESG served on Malwarebytes in the Bleeping Computer Lawsuit

1    sought internal company documents revealing the purposefully concealed nature and extent of

2    Malwarebytes' involvement in the unlawful smear campaign against ESG.  Facing the Subpoena and

3    the prospect of having to give follow-up testimony under oath about its dealings with Bleeping

4    Computer, Malwarebytes initially attempted to dodge its legal obligations by not complying with the

5    requirements for subpoena responses set forth in the Federal Rules of Civil Procedure.

6         25.    Then, in furtherance of its scheme to hurt ESG and to act in concert with Bleeping

7    Computer to defeat ESG's claims in the Bleeping Computer Lawsuit, *just one week before*

8    *Malwarebytes was required by law to respond to the Subpoena*, Malwarebytes (i) revised its PUP

9    policy to add new self-serving, subjective criteria to give itself the power to designate as a PUP and

10   block any product that Malwarebytes chose and (ii) implemented that criteria at its own malicious

11   whim to newly designate SpyHunter 4 and RegHunter 2 as "threats" and PUPs.  Not coincidentally,

12   and evidencing the extent to which Malwarebytes and Bleeping Computer were acting in concert,

13   Malwarebytes' new PUP criteria included vague factors such as "predominantly negative feedback or

14   ratings from the user community," which echoed and served to support Bleeping Computer's exact

15   defenses in the Bleeping Computer Lawsuit.  *See* Ex. 3.  For instance, Bleeping Computer had been

16   attempting to defend its unlawful conduct in the Bleeping Computer Lawsuit by asserting that it had

17   made disparaging statements about ESG's products based on supposed negative feedback from some

18   unidentified "user community"—which conveniently included Bleeping Computer's own "staff" and

19   Malwarebytes itself, including its high-level employees, representatives, and executives.

20        26.    Notwithstanding Malwarebytes' attempts to pretend that the timing of its new

21   blocking of ESG's products was merely a "coincidence" and not directly related to the Bleeping

22   Computer Lawsuit and the Subpoena, the Bleeping Computer and Malwarebytes "communities"

23   recognized Malwarebytes' "changed" PUP criteria and "threat" designations for the charades that

24   they were, with "community" members all-but publicly acknowledging and boasting about

25   Malwarebytes' bad faith conduct and its connection to the Bleeping Computer Lawsuit.

26        27.    For example, on October 5, 2016, Malwarebytes published a statement, signed by

27   Malwarebytes' CEO Marcin Kleczynski, on the forums section of its official company website, on

28   which Malwarebytes routinely made official company statements ("Malwarebytes Forum").  The

1    statement announced that Malwarebytes had newly "made some changes to [its] PUP detection

2    criteria." Ex. 3.  The first question in response came from a Malwarebytes "Trusted Advisor" and

3    Bleeping Computer "Special Ops Tech" and Malware Response Team member posting under the

4    name *Aura*, who asked "what was added/removed/edited." *Id.*  In response, an individual posting

5    under the name *celee*—who Malwarebytes specifically designated and appointed under its company

6    policies as a member of "Staff" and selected to serve as a Malwarebytes Forum "Administrator,"

7    rendering the individual a Malwarebytes representative whose could legally speak for and bind

8    Malwarebytes through statements on the Malwarebytes Forum—explained that "[t]he biggest

9    change" in Malwarebytes' PUP criteria was that it now considers "predominantly negative feedback

10   or ratings from the user community" (the very justification Bleeping Computer was peddling in the

11   Bleeping Computer Lawsuit).  *Id.*  *Aura* replied: "Guessed as much[.]"  *Id.*

12           28.     Within hours of Malwarebytes' public announcement of its revised PUP criteria, to

13   help build Bleeping Computer's defenses in the Bleeping Computer Lawsuit, Bleeping Computer's

14   owner and CEO Lawrence Abrams posted a news story on the front page of Bleeping Computer's

15   website lauding Malwarebytes' new PUP policy and copying verbatim Malwarebytes' "updated PUP

16   criteria."  Exs. 4 & 5.  Mr. Abrams was able to post the story so quickly after Malwarebytes'

17   announcement because Ade Gill, a Malwarebytes research executive, had reached out to Mr. Abrams

18   via Skype to secretly notify Mr. Abrams in advance of Malwarebytes' announcement about the PUP

19   criteria and Malwarebytes' specific intention to designate and block ESG's products as PUPs and

20   "threats," which it had not previously done in eight years of direct competition.  Mr. Gill viewed this

21   information as so sensitive and confidential that he expressly asked Mr. Abrams not to discuss it until

22   after Malwarebytes' public announcement.  ***Tellingly, Mr. Gill also revealed that Malwarebytes was***

23   ***moving ahead with newly blocking ESG's products despite the fact that Mr. Gill had expressed his***

24   ***"reservations" about the targeting to Malwarebytes' CEO, Mr. Kleczynski***.  *See* Ex. 6 (Skype log

25   excerpts).  Mr. Gill, as a Malwarebytes employee, agent, and/or representative, at all relevant times

26   has had the express and/or implied authority to speak for and/or legally bind Malwarebytes.

27           29.     Bleeping Computer "Security Colleague" *Angoid* commented on Abrams' front-page

28   news story with a thinly-veiled admission that Malwarebytes' policy was directed specifically at

ESG, given Bleeping Computer's history of attacking ESG and the ongoing Bleeping Computer Lawsuit.  Specifically, *Angoid* stated: "What would be really strange is if anyone can think of any other anti-malware program that fits any one of those descriptions [the PUP criteria] **…. not that I can think of one of course :)**."  Ex. 5 (emoticon in original, emphasis added).

30.     Moreover, on October 27, 2016, following Malwarebytes' acquisition of AdwCleaner, AdwCleaner developer Jérôme Boursier, who had joined Malwarebytes as a company executive, engineer, and researcher, posted the following on Twitter in his new role at Malwarebytes:



Ex. 2 (yellow arrow above added by ESG for the reader's convenience).

31.     Further proving that Malwarebytes' new blocking and classification PUP and threat criteria were being used and applied by Malwarebytes to target ESG specifically, the following day, Malwarebytes Forum "New Member" *rhabdomantist* posted a link to Boursier's October 27, 2016 Twitter post on the official company Forum.  Ex. 7.  Malwarebytes "Expert" *David H. Lipman*— whose Malwarebytes Forum posts reflect Malwarebytes' appointment of him as an "Expert" representative with authority to legally speak on Malwarebytes' behalf and on whose expertise Malwarebytes' customers and Malwarebytes Forum users could rely—responded: "Nice way to exacerbate things when Enigma has already filed suit against Malwarebytes. ***It's one thing quietly removing Enigma'ware.  It is another announcing it, in public, after a suit has already been filed.***" *Id*. (emphasis added).  *rhabdomantist* replied that the Twitter post had been made by AdwCleaner's developer (*i.e.*, Boursier), to which *David H. Lipman* responded:

Right.  **WHY** tweet it?

If there are 15,1000 [sic] PUPs that are current, should we expect 15,000 tweets for each and every one?  It isn't like some major BOTnet takedown or something of that nature.

Why exacerbate the issue after a lawsuit was filed in US Federal Court?

*Id.* (emphasis in original).  Notably, in these statements, Malwarebytes' representative and spokesperson did not in any way attempt to claim that Mr. Boursier's marketing statement about AdwCleaner on Twitter was not a company statement attributable to Malwarebytes or its AdwCleaner operating arm.

32.      The harm caused by Malwarebytes' unlawful blocking of ESG's products and domains and false and misleading statements identifying SpyHunter 4 and RegHunter 2 as PUPs and "threats" and ESG's domains as "malicious," which deceived users and interfered with ESG customers' security and privacy protections and ESG's business and customer relationships, was significant and long-lasting.  ESG brings this lawsuit to seek redress for the harm that Malwarebytes has intentionally and maliciously caused and continues to cause to ESG and ESG's users through its bad faith campaign of unfair, anticompetitive tactics.  ESG's claims herein are asserted against and related to any and all versions of Malwarebytes' products—consumer, business, or otherwise—that detected as "threats," PUPs, or "malicious," interfered with, quarantined, blocked, and/or rendered inaccessible or inoperable any of ESG's products or domains.

33.      Individuals from Malwarebytes and Bleeping Computer involved in or with directly relevant knowledge of the facts and circumstances surrounding the subject of ESG's claims against Malwarebytes include but are not limited to, on information and belief, Marcin Kleczynski, Edward Brown, Lawrence Abrams, Ade Gill, Jérôme Boursier, Louis Stamm, Adam Kujawa, Bruce Harrison, Pedro Bustamante, Mieke Verburgh, Chris Drago Fistonich, Rich Matteo, David Curtner, and Nathan Scott.  Upon information and belief, discovery in the case will reveal the identity of other individuals from Malwarebytes and/or Bleeping Computer with knowledge relevant to ESG's claims.

## THE PARTIES

34.      Plaintiff ESG is a Florida limited liability company, having merged with a Connecticut limited liability company of the same name.  From at least 2016 to the present, ESG has done business in New York, including in the Southern District of New York.

35.     Upon information and belief, Defendant Malwarebytes is a corporation organized under the laws of Delaware and headquartered at 3979 Freedom Circle, 12th Floor, Santa Clara, CA 95054.  Malwarebytes originally was incorporated under the laws of Delaware on January 6, 2014 as Malwarebytes Corporation, and on December 21, 2015, filed a Restated Certificate of Incorporation with the Delaware Secretary of State that amended the company name to Malwarebytes, Inc.

36.     Just as ESG has offices in the United States and its affiliates have offices in Ireland and Eastern Europe (Lithuania and Bulgaria), at all relevant times Malwarebytes and its affiliated companies have had offices located in the United States, Ireland, and Eastern Europe (Estonia).  As Malwarebytes' CEO Marcin Kleczynski has publicly stated: "You go where the talent is."

37.     At least five Malwarebytes employees currently work from New York, with at least four in the greater New York City area, including a Director of Channel Sales and Development, a Senior Sales Engineer, and a Senior Researcher.  As of December 2016, when ESG filed its First Amended Complaint, at least five Malwarebytes employees worked from New York, including a Regional Vice President in the greater New York City area.  *See* Ex. 8.  As of October 6, 2016, just before ESG filed its original complaint, Malwarebytes was seeking to hire a Senior Sales Engineer in New York to work with the Regional Sales Manager to "present[] Malwarebytes['] security solution to prospective customers" and "work closely with customers as their primary point of feedback and resolution of issues."  Ex. 9.  In 2014, press reports indicated that Malwarebytes employed developers in New York, and, upon information and belief, Malwarebytes employed developers in New York as of the filing of ESG's original complaint as well.  Upon information and belief, from 2016 to the present, Malwarebytes has advertised, provided, and sold its software to consumers and businesses in New York, including in the Southern District of New York.

38.     Malwarebytes has been making repeated false representations about ESG and ESG's products and has been misleading and deceiving consumers and businesses in New York, including in the Southern District of New York, by wrongly detecting, quarantining, and blocking SpyHunter 4 and RegHunter 2 as "threats" and PUPs and by falsely stating that ESG's website and other domains were "malicious."  At least thirty-one (31) ESG customers who, upon information and belief, reside in New York have reported to ESG Technical Support that Malwarebytes' products have detected,

quarantined and/or blocked their SpyHunter 4 and/or RegHunter 2 programs as "threats" and PUPs, and some of them have requested refunds from ESG. Upon information and belief, at least nine (9) of those customers reside in the Southern District of New York.

39.    Upon information and belief, discovery will establish additional legal contacts between Malwarebytes' business operations and activities and the State of New York.

## JURISDICTION AND VENUE

40.    This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the laws of the State of New York. U.S. district courts have subject matter jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

41.    Upon information and belief, the Southern District of New York has personal jurisdiction over Malwarebytes because Malwarebytes (i) regularly transacts business in New York and the Southern District of New York; (ii) has committed tortious acts in New York and the Southern District of New York by wrongly detecting, quarantining, and blocking SpyHunter 4 and RegHunter 2 when Malwarebytes' software runs scans on computers physically located in New York and the Southern District of New York and/or by physically removing ESG's products from computers physically located in New York; (iii) has committed tortious acts that have misled and deceived consumers and businesses in New York and the Southern District of New York and have disrupted and disabled use of ESG's programs and should reasonably expect such tortious acts would have consequences in New York; and (iv) derives substantial revenue from international commerce.

42.    Malwarebytes has intentionally availed itself of the privilege of conducting business in New York and the Southern District of New York; purposefully directed activity at New York and the Southern District of New York by providing its software for download and purchase to New York consumers and businesses and detecting, quarantining, blocking, and removing New York consumers' SpyHunter 4 and RegHunter 2 programs; and created sufficient minimum contacts with New York and the Southern District of New York such that Malwarebytes could reasonably and fairly anticipate being haled into the U.S. District Court for the Southern District of New York.

43.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)–(c) because Malwarebytes is subject to personal jurisdiction in, and so resides in, the

Southern District of New York.

44.     On May 12, 2017, Judge Engelmayer of the U.S. District Court for the Southern District of New York, who was then presiding over this case, transferred the case to the U.S. District Court for the Northern District of California solely for convenience pursuant to 28 U.S.C. § 1404. Dkt. 67.  In doing so, Judge Engelmayer expressly declined to reach Malwarebytes' motion to dismiss under Rules 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim.

45.     At oral argument on Malwarebytes' motion to dismiss and transfer, Judge Engelmayer expressed skepticism toward Malwarebytes' claim that the Southern District of New York lacked personal jurisdiction over it, asking Malwarebytes' counsel to confirm that Malwarebytes had sales, marketing and customers in New York.  *See* Ex. 10 at 4-6.

46.     Where a case is transferred for convenience pursuant to 28 U.S.C. § 1404, the Northern District of California applies the law of the transferor court.  Here, because the U.S. District Court for the Southern District of New York transferred the case to this Court solely for convenience pursuant to 28 U.S.C. § 1404, New York law applies.

## ADDITIONAL FACTUAL BACKGROUND

### ESG and Malwarebytes Directly Compete in the Anti-Malware, Internet Security, and Privacy Protection Market

47.     ESG has been led by Alvin Estevez, who previously worked as a high-level computer expert for a military defense contractor of the U.S. Government on, *inter alia*, intelligence matters concerning national security and the protection of American citizens and the U.S. Government.  Mr. Estevez's work as a defense contractor with special clearance from the National Security Administration ("NSA") involved matters including, *inter alia*, electronic warfare, military computer systems, anti-hacking, data analytics, and military counter intelligence systems.  In connection with his work, Mr. Estevez gained vast experience in complex software and data systems and computer security—and learned the importance of cybersecurity as well as the immense risks of cyberattacks to governments, businesses, and consumers alike.  Mr. Estevez has been featured multiple times as a cybersecurity expert in Forbes Magazine and other national publications.

48.     ESG has been designing and developing cybersecurity software to combat malware, ransomware, viruses, Trojans, hackers, and problematic computer system attacks for almost twenty

(20) years.  SpyHunter 4, ESG's flagship anti-malware software program, was an adaptive malware detection and removal tool that provided rigorous protection against the latest malware threats, including spyware, ransomware, Trojans, rootkits, viruses, and other malicious or threatening software.  SpyHunter 4 was available on the market until mid-2018, when ESG's affiliated company, EnigmaSoft Limited ("EnigmaSoft"), introduced a brand new, built-from-the-ground-up anti-malware software program called SpyHunter 5 (after which ESG began phasing out SpyHunter 4).

49.     RegHunter 2 is ESG's advanced PC privacy and optimizer software program. RegHunter 2 enhances users' personal privacy by providing privacy tools, including a powerful built-in File Shredder function that ensures secure deletion and prevents unwanted recovery of deleted files and a privacy scan that provides for removal of web browsing history, temporary files, and other web browsing remnants.  It also optimizes users' experience by repairing and restoring the performance of computers running the Windows operating system, including through scanning, reporting, and enabling removal of potentially invalid and unnecessary data in the Windows Registry and duplicate files and providing real-time monitoring of the Windows Registry that protects against malware.

50.     While SpyHunter 4 was on the market, users could download a free scanning version of SpyHunter 4.  The scanner detected whether a computer had, *inter alia*, malware, spyware, ransomware, Trojans, rootkits, viruses or other malicious or threatening software.  SpyHunter 4 also detected PUPs based on defined objective and cybersecurity industry-based criteria.  Users also had the choice to buy a subscription to the full version of SpyHunter 4, and ESG provided users with a "Buy Now" link.  The full version of SpyHunter 4 included the scanner, tools to remove and remediate malware, and other security protection tools.

51.     ESG previously provided users with a free version of RegHunter 2 that scanned for and detected, among other things, privacy and optimization issues and effected certain repairs.  Users then had the option of upgrading to a paid subscription to access a full version of RegHunter 2, which included privacy tools and registry repair functions, among others.  ESG no longer offers the free version of RegHunter 2, but continues to offer paid subscriptions to the full version of RegHunter 2.  Users, including residents of New York, continue to purchase RegHunter 2.

52.     While it was on the market, ESG enjoyed sales of SpyHunter 4 to millions of

customers, including to residents of New York. Many buyers of ESG's SpyHunter 4 also purchased RegHunter 2. ESG sold subscription licenses to SpyHunter 4 and continues to sell subscription licenses to RegHunter 2 on the Internet, including at its website, www.enigmasoftware.com.

53.      ESG's SpyHunter 4 and RegHunter 2 products have received numerous top industry scores and certifications.

54.      SpyHunter 4 has received favorable scores multiple times from AV-Test GmbH ("AV-Test"), a highly regarded independent third-party testing institute that tests anti-malware software for quality and effectiveness. In a 2016 malware detection and remediation test performed by AV-Test, SpyHunter 4 received a 95% effectiveness score. In separate testing in 2017, SpyHunter 4's score on AV-Test's malware detection and remediation test increased to a perfect 100%.

55.      In 2017, SpyHunter 4 also received a favorable review and recommendation from AV-Comparatives, another independent anti-malware testing laboratory, which highlighted that SpyHunter 4 was effective and easy-to-use.

56.      SpyHunter 4 also has been certified for malware detection and remediation by Checkmark Certified (part of West Coast Labs), a comprehensive testing and certification laboratory for information security products and services. Malwarebytes itself has recognized and its CEO Marcin Kleczynski has stated that Checkmark Certified/West Coast Labs is well-respected and was considered by Microsoft to be the "de facto standard" of whether a product is "good."

57.      In 2016, SpyHunter 4 successfully passed OPSWAT's rigorous test for anti-malware software and was named an OPSWAT "certified partner."

58.      AppEsteem, a company that reviews software to ensure its safety and trustworthiness on specifically consumer-oriented bases, certified RegHunter 2 in 2018 for meeting AppEsteem's more than 125 stringent criteria developed by AppEsteem in partnership with top cybersecurity companies. SpyHunter 4 was undergoing AppEsteem review at the time it was phased out of the market upon SpyHunter 5's release. SpyHunter 5 subsequently received AppEsteem certification.

59.      TRUSTe, a leading online privacy solutions provider, has certified SpyHunter 4 and RegHunter 2 as TRUSTe "Trusted Download" programs and GeoTrust, a well-known digital certificate provider, has certified the safety and legitimacy of ESG's website.

60.     Malwarebytes develops and markets its MBAM products and AdwCleaner products, which detect, quarantine, block, and/or remove malware and PUPs on computers in the United States and elsewhere to offer cybersecurity and privacy protections.

61.     Malwarebytes' MBAM products, in both their consumer and enterprise forms, operate in the same manner as SpyHunter 4 (and SpyHunter 5) in that they scan a user's computer for malware, computer security threats, and PUPs, detecting any such programs, reporting to the user the results of the detection scan, and then automatically quarantining, blocking and taking remedial action, such as preventing a malicious download or removing the detected program from the computer.  Malwarebytes' MBAM products, like SpyHunter 4 (and SpyHunter 5), provide users with continuing anti-malware product updates programmed to automatically quarantine and block malware, threats, and PUPs and updates to improve their software detections, in part, by collecting users' personal computer data to identify malware, threats, and PUPs.

62.     Malwarebytes acquired AdwCleaner, an anti-adware software program, on October 19, 2016.  Malwarebytes announced the acquisition on its website, touting AdwCleaner as "one of the world's most frequently downloaded tools for removing potentially unwanted programs (PUPs), adware, toolbars and other unwanted software" and boasting that AdwCleaner is downloaded by "[c]onsumers and businesses … more than 200,000 times per day, making it one of the most downloaded products on many sites," having been downloaded "around 200 million times[.]"  In its acquisition announcement, Malwarebytes also noted that AdwCleaner co-developers Jérôme Boursier and Corentin Chepeau would be "join[ing] Malwarebytes in engineering and research roles."  Malwarebytes CEO Kleczynski similarly blogged on Malwarebytes' website about its AdwCleaner acquisition.  Boursier blogged on his website, fr33tux.org: "I'm now part of Malwarebytes."

63.     AdwCleaner has legally and operationally been part of Malwarebytes since at least October 19, 2016, and at all times thereafter relevant to this case.  Based on the above public statements from Malwarebytes itself, its CEO, Mr. Kleczynski, and AdwCleaner executives, upon information and belief, AdwCleaner has had the express and/or implied authority to speak for and/or legally bind Malwarebytes through its statements.  Mr. Boursier and Mr. Chepeau have legally been employees, representatives, executives, and/or agents of Malwarebytes since at least October 19,

2016, and at all relevant times thereafter had the express and/or implied authority to make statements for and/or on behalf of Malwarebytes in their capacity as express and/or implied agents, executives, employees and/or spokespeople that are legally binding on Malwarebytes.

64.    Malwarebytes offers free downloads of Malwarebytes' own MBAM products and AdwCleaner products on its website at www.malwarebytes.com/mwb-download/ and www.malwarebytes.com/adwcleaner/, among other places.  Malwarebytes also sells subscriptions to and offers a 14-day free trial of its "Premium" MBAM and other MBAM products on its website at www.malwarebytes.com/premium/.

65.    Malwarebytes advertises its "Premium" MBAM products as having seven key features (e.g., "cleans up an already-infected computer," "protects your identity and privacy from hackers," "protects your documents, financial files from ransomware," and "protects you from malicious and fraudulent websites").  Users can try out the full set of "Premium" features during a 14-day free trial, but after those 14 days, lose all but one of those features (clean-up of an already-infected computer). To retain use of a fully functional version of the Malwarebytes MBAM products and enjoy MBAM's full real-time protection, a user must pay Malwarebytes to buy the Premium MBAM products (or other Malwarebytes for purchase products like its business products) and then regularly pay Malwarebytes on a continuing periodic basis to renew the subscription(s).  Malwarebytes' CEO Marcin Kleczynski has publicly stated and effectively acknowledged that Malwarebytes Free Trial versions are not fully functional—thereby further establishing that the Malwarebytes Free Trial versions are a marketing effort to gain new customers for Malwarebytes.

66.    Further, Malwarebytes' offering its free MBAM products and AdwCleaner products downloads and the 14-day free trial of the Malwarebytes' products expressly allows users who may not yet be customers or subscribers to preview Malwarebytes products' capabilities, thereby serving directly as a marketing mechanism for Malwarebytes to entice users to ultimately purchase the Malwarebytes' products.  In this way, the free and trial versions of Malwarebytes' products are expressly presented to consumers and businesses in the market for or interested in trying cybersecurity products and serve as marketing tools for Malwarebytes' paid products.  For example, the Premium MBAM for pay products are promoted directly within the free and trial-versions of the

MBAM products and AdwCleaner, which encourage users to upgrade to a paid subscription of MBAM products or other possible Malwarebytes' products.  As Malwarebytes' executive Adam Kujawa has previously testified, the majority of the users of Malwarebytes' products are "free users"—making the 14-day free trial of MBAM products an effective marketing tool for Malwarebytes for reaching a broad audience to promote sales of its paid subscriptions.

67.     Malwarebytes has touted AV-Test test results and OPSWAT and Checkmark Certified (West Coast Labs) certifications as evidence of MBAM products' efficacy and quality, even representing on Malwarebytes' company website that those distinctions made Malwarebytes' MBAM products "tech-genius approved."  These marketing proclamations regarding the high quality and effectiveness of their software products by Malwarebytes are similar to those made by ESG.

68.     Malwarebytes is, and has been at all relevant times, a direct competitor of ESG in the anti-malware and Internet security market.  Malwarebytes, in fact, is a direct competitor of ESG as a matter of law and for all legal purposes for this case, as previously held by the U.S. Court of Appeals for the Ninth Circuit.  *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, No. 17-17351, Dkt. 42 at *4 (9th Cir. Sept. 12, 2019); Dkt. 72 at * 6 (9th Cir. Dec. 31, 2019).

69.     Malwarebytes and ESG compete for and market and advertise to the same bases of customers seeking cybersecurity, privacy, performance, and/or optimization software.  Malwarebytes also advertises, markets and sells its products in the same channels of trade as ESG.  Like ESG, Malwarebytes markets its products on the Internet, sells products through sales affiliates, sells users products directly through Malwarebytes' website, sells products in connection with recommendations in computer technology and software informational articles on third-party websites or other forms of media, and sells products by marketing through the purchase and use of search keyword terms on Internet search platforms such as Google and Yahoo.

70.     On information and belief, Malwarebytes has specifically targeted advertising of its products to ESG's potential and existing customers or taken steps to contribute to such targeting, including by selecting and purchasing "SpyHunter" and/or "RegHunter" as marketing outlet/platform keywords, such that when users search terms that contain "SpyHunter" or RegHunter," Malwarebytes ads are prominently displayed in search results, alongside search results for ESG's own website and

products.  *See, e.g.*, Ex. 11.

71.     At all relevant times, Malwarebytes' MBAM anti-malware products competed directly with SpyHunter 4, also an anti-malware product, while SpyHunter 4 was on the market, and, as described further below, now competes directly with SpyHunter 5, an anti-malware product from ESG's affiliated company EnigmaSoft.

72.     In 2017, AV-Test performed head-to-head testing between SpyHunter 4 and several competing anti-malware programs, including Malwarebytes' MBAM, Emsisoft's Anti-Malware, and others.  SpyHunter 4 outperformed all its competitors by several percentage points on all tested metrics, garnering a 98% score, whereas MBAM and Emsisoft received only a 92–93%, and the remaining two competitors scored substantially lower.

73.     Just as ESG has designed and markets RegHunter 2 as a privacy protection product and an optimizer of a user's computer, Malwarebytes touts its AdwCleaner in advertising and product descriptions on its website as a program that Malwarebytes has designed as one that "optimizes performance" and "restores performance" "so your online experience stays optimal and hassle free."

74.     Further, just as ESG has designed and markets RegHunter 2 as a product for protecting users' privacy, Malwarebytes touts its MBAM products and Malwarebytes Privacy VPN as programs that provide users with privacy protection.  Malwarebytes' MBAM products claim to, for example, "secure your PC, files, and privacy 24/7," while Malwarebytes Privacy VPN claims that it "helps protect your online privacy" and "giv[es] you a simple, easy way to take control of your privacy."

**The Bleeping Computer Lawsuit and ESG's Subpoena That Was Set to Expose
Malwarebytes' Close Profiteering Relationship with Bleeping Computer**

75.     On January 5, 2016, ESG filed the Bleeping Computer Lawsuit seeking redress for Bleeping Computer's pattern and practice of purposely making false and misleading statements on its website in a smear campaign targeted at ESG to drive users away from purchasing ESG's products, including SpyHunter 4, and toward purchasing Malwarebytes' products, including its MBAM products, so that Bleeping Computer could amass profits from commissions paid by Malwarebytes to it and Malwarebytes could increase its overall sales.

76.     Bleeping Computer owned and operated a website at www.bleepingcomputer.com ("Bleeping Computer Website") that it specifically advertised to the public as a "premier" destination

for computer users to learn how to use and receive support for their computer and "for the novice user to learn basic concepts about Computer Technology."  Bleeping Computer's CEO and owner, Lawrence Abrams, directly operated and monitored the Bleeping Computer Website, including by creating content, posting on behalf of Bleeping Computer on the Bleeping Computer Website and Forums, selecting and appointing official company staff members for governance roles that included operating and creating content for the Bleeping Computer Website and Forums, reviewing and editing postings made by those individuals speaking on behalf of Bleeping Computer, and selecting which postings would remain on the Website and Forums and which would be removed or edited.

77.    Bleeping Computer held itself out as an expert in reviewing and analyzing software programs, including specifically anti-malware programs like Malwarebytes' MBAM products and ESG's SpyHunter 4, and as a trusted source of technical information delivered in an objective, non-biased, fashion for consumers and businesses at all levels of computer knowledge.  The Bleeping Computer Website purported to provide objective, non-biased, independent information and advice about various computer topics, including cybersecurity, malware, and anti-malware software and purposely presented itself to ***not*** be viewed as a marketing or commercial advertising website for pushing sales of companies' software products.  Bleeping Computer purposely designed its website over time to emphasize its learning and technical advice features in categories such as tutorials, news/tech articles, virus removal guides, and computer learning/certification.

78.    The Bleeping Computer Website was not, in reality, a truly objective, independent, non-biased informational website, as it claimed.  Rather, it was a website organized in many respects around the goal of driving sales for Malwarebytes (and from time to time some other software) so that Bleeping Computer could earn commissions, fees, and profits for itself.  In fact, Bleeping Computer undertook and participated in a carefully designed and purposeful smear campaign against ESG to assist Malwarebytes in gaining product sales over ESG—which was driven by the profit motives of Bleeping Computer and Malwarebytes and which was anything but objective and independent.  Bleeping Computer served as an effective sales arm and sales affiliate for Malwarebytes and was being paid fees and commissions by Malwarebytes for, on information and belief, over half a decade in exchange for marketing and selling Malwarebytes' products including its

MBAM products.  Malwarebytes and Bleeping Computer had a shared interest in disparaging ESG's SpyHunter 4 and ESG's other products and in diverting sales from ESG to Malwarebytes to increase both Malwarebytes' and Bleeping Computer's profits.

79.   The smear campaign on the Bleeping Computer Website was specifically designed to promote sales of Malwarebytes' MBAM products, and included numerous, repeated false and misleading, deceptive, and defamatory statements.  These statements, without any legitimate basis, repeatedly called SpyHunter 4, among other things, a "fraudulent product," a "rogue product," a "scam," a "dubious program," and a "questionable program" and accused it of "aggressive and misleading advertising," "provid[ing] misleading information," and having a "high rate of false positives."  Bleeping Computer and Malwarebytes both knew these deceptive, false and misleading statements were untrue and had no basis in fact, because, among other reasons, SpyHunter 4 was a safe, effective, high-quality product with a well-established, strong customer base, and so was far from being any kind of "rogue product" (*i.e.* a product of unknown, questionable, or dubious value as anti-malware protection).  To increase sales of Malwarebytes' products including the various versions of its MBAM products, the defamatory statements against ESG on the Bleeping Computer Website further specifically directed and encouraged users to *uninstall* SpyHunter 4 and to purchase and install Malwarebytes' MBAM products instead, for which Malwarebytes paid Bleeping Computer commissions.  Bleeping Computer also generated profits by undertaking paid advertising and marketing of Malwarebytes products through Malwarebytes ads on the Bleeping Computer Website.  Malwarebytes at no time took any steps to have deleted or modified the false and misleading statements in the smear campaign from which Malwarebytes benefitted financially.  To the contrary, Malwarebytes acted in its work with Bleeping Computer's CEO Lawrence Abrams to further advance and further the publication of the smear campaign statements that Malwarebytes was aware of in order to increase Malwarebytes' profits and to continue to hurt ESG.

80.   Bleeping Computer took specific purposely designed steps to obscure from users that it was profiting from the smear campaign and acting as a sales and marketing arm of Malwarebytes.  For example, Bleeping Computer did not disclose in the defamatory statements themselves that Bleeping Computer was a Malwarebytes sales affiliate receiving commission payments from

1    Malwarebytes for directing users to purchase Malwarebytes products, including MBAM products.

2    Additionally, Bleeping Computer created the illusion that it was an independent and objective

3    website that existed to provide users objective, non-biased technical information and advice (as

4    opposed to a profit-motive driven site peddling particular software products to earn cash

5    commissions) by offering users an "ad-free" Bleeping Computer Website experience if they

6    registered for a Bleeping Computer account.  Such Bleeping Computer accounts enabled Bleeping

7    Computer to build customer lists and collect customer private data to advance both its own profits

8    interests and, upon information and belief, those of Malwarebytes.

9           81.    These false and misleading statements used as part of the smear campaign appeared

10   high up in online search engine results for ESG and SpyHunter 4 because of their strong negative

11   tone, and played to users' natural concerns regarding negative reviews of a product—thereby

12   generating additional traffic for the Bleeping Computer Website and/or the Malwarebytes website

13   and, in turn, more sales and profits for both Bleeping Computer and Malwarebytes.  Malwarebytes

14   and Bleeping Computer, on information and belief, knew and understood that posting negative

15   reviews and comments about ESG's products likely would cause search engine optimization ("SEO")

16   to push those reviews and comments to the top of users' search results and purposefully designed

17   their tactics and marketing practices to exploit this SEO Internet marketing principle.

18          82.    This purposeful smear campaign was advanced through, *inter alia*, the efforts and

19   direction of Bleeping Computer along with Louis Stamm, a top official company spokesperson whom

20   Bleeping Computer had specially appointed and designated a "Global Moderator" under the Bleeping

21   Computer internal company and website operational structures and website governance policies

22   designed by Bleeping Computer's owner and CEO, Lawrence Abrams.  Louis Stamm, the Global

23   Moderator specifically appointed as a Bleeping Computer official company representative, admitted

24   when pressed under oath during a deposition that he would insert himself into discussions and

25   requests for technical software information or assistance and would make what were, in effect, pre-

26   prepared "canned" postings with disparaging statements about SpyHunter 4 virtually every time he

27   saw Bleeping Computer users even mention SpyHunter 4 in their posts—including on occasions

28   where users were commenting favorably about the high quality of SpyHunter 4.  Moreover, Mr.

Stamm admitted that he performed no testing of SpyHunter 4's performance or effectiveness and had no personal experience with its use.  Instead, he based his false, baseless, and disparaging statements on second-hand, un-researched hearsay and rank speculation.  Significantly, Global Moderator Mr. Stamm admitted that he was appointed to this official Bleeping Computer position and made all of his statements on the Bleeping Computer Website under the authority and power granted to him expressly by Bleeping Computer and its CEO and owner Lawrence Abrams.  Mr. Stamm had express and/or implied authority to speak as a representative, agent and/or spokesperson of Bleeping Computer and Mr. Abrams, as found under the ruling by the U.S. District Court for the Southern District of New York in the Bleeping Computer Lawsuit denying Bleeping Computer's motion to dismiss, and as acknowledged in an email from Mr. Abrams to Malwarebytes CEO Marcin Kleczynski.  Mr. Stamm was not simply some poster on the Bleeping Computer Website.

83.     Malwarebytes directly profited from the false and misleading parade of disparaging statements about ESG which drove customers away from ESG's products and to purchasing Malwarebytes' products.  Bleeping Computer, in turn, profited from their joint false and misleading predatory, anticompetitive tactics through commission payments paid by and marketing fees received from Malwarebytes.  Bleeping Computer continuously and effectively operated as a Malwarebytes' sales arm affiliate and marketing division with a broad reach to trusting customers that Malwarebytes did not typically have access to on a regular basis through its general marketing channels and which included customers who, upon information and belief, believed they were getting objective, non-biased, independent anti-malware technical information and security advice from Bleeping Computer as opposed to biased, profit-driven marketing information peddling Malwarebytes' MBAM products.

84.     Additional details of the smear campaign against ESG are laid out in full in ESG's Second Amended Complaint against Bleeping Computer, attached hereto and expressly incorporated herein as Ex. 12.

85.     The joint profiteering business relationship between Malwarebytes and Bleeping Computer was part of a close and long-standing business working partnership between the two companies aimed at increasing their mutual profits and dated back to at least 2009.  In June 2009, Bleeping Computer and Malwarebytes executed a Joint Confidentiality Agreement that, upon

1    information and belief, has never been formally terminated, given that Bleeping Computer is still an

2    authorized sales affiliate of Malwarebytes that markets and promotes Malwarebytes' products and

3    gets paid by Malwarebytes for those efforts.  As noted, in their Joint Confidentiality Agreement,

4    Bleeping Computer and Malwarebytes agreed to share and protect in confidence valuable, highly

5    sensitive, proprietary business information, including customer lists, computer source code, software

6    development plans, pricing, and affiliates sales information.

7        86.    Pursuant to their Joint Confidentiality Agreement and/or the joint business practices

8    developed over time and employed between Malwarebytes (as the one paying Bleeping Computer

9    marketing fees and commission payments) and Bleeping Computer (as a website holding itself out as

10   objective and independent but which in truth depended on Malwarebytes for meaningful portions of

11   Bleeping Computer's income, on information and belief), Malwarebytes gave Bleeping Computer

12   regular access on an insider basis to confidential and proprietary Malwarebytes' business information

13   regarding Malwarebytes' MBAM products' operation and design and Malwarebytes' confidential

14   proprietary malware and PUP definitions and detections.  Malwarebytes also specifically gave

15   Bleeping Computer inside access to Malwarebytes' business plans and product developments,

16   including business positions and decision-making by Malwarebytes' top executives including, *inter*

17   *alia*, Malwarebytes' CEO Marcin Kleczynski, General Counsel Edward Brown, research executive

18   Ade Gill, and others.  Bleeping Computer, in turn, provided Malwarebytes with input and data on

19   Malwarebytes' malware and PUP research, detection policies, marketing, business planning, and

20   product designs.  Such sharing of sensitive inside business information often included Abrams

21   specifically working with a top Malwarebytes research executive, Ade Gill, among others.  The

22   business dealings between Malwarebytes and Bleeping Computer also included emails, discussions,

23   and information sharing directly between Mr. Kleczynski, Mr. Brown, and other Malwarebytes

24   executives, on the one hand, and Mr. Abrams of Bleeping Computer, on the other hand.

25       87.    By 2013, Bleeping Computer and Malwarebytes were celebrating their joint business

26   and marketing relationship for "5 years of partnering … to crush malware," specifically working

27   together to design a prominent ad campaign on Bleeping Computer's website to announce the

28   milestone and promote even more sales of Malwarebytes' MBAM products to generate more profits

1  for Malwarebytes and further build its dominance in the anti-malware market:



88.     Bleeping Computer's special and close partnership with Malwarebytes, which gave Abrams direct access to Malwarebytes' top C-suite executives and researchers on a continuing basis, went far beyond the relationship between Malwarebytes and its typical sales affiliates.

89.     In July 2015, upon receiving a cease and desist letter from ESG regarding the smear campaign, Bleeping Computer's CEO, Mr. Abrams, immediately reached out directly to Malwarebytes' CEO, Marcin Kleczynski, to seek Mr. Kleczynski's and Malwarebytes' assistance in pushing back against ESG's well-documented claims and otherwise creating defenses for Bleeping Computer to avoid ESG's legal claims.  Mr. Kleczynski responded the very next day, after reviewing the matter and the publicly disseminated smear campaign statements and publications, with strategic advice encouraging Mr. Abrams to ignore the letter and not remove the offending smear campaign statements.  Bleeping Computer's actions thereafter and its continuation of the smear campaign against ESG demonstrate that Bleeping Computer followed Mr. Kleczynski's advice.

90.     In their strategizing emails, starting from the time Bleeping Computer first received ESG's cease and desist letter, Mr. Kleczynski and Mr. Abrams laid plans and developed legal maneuverings on how Bleeping Computer could push back against ESG's legal claims and how Malwarebytes could help Bleeping Computer continue the smear campaign.  In their discussions, Mr. Kleczynski collaborated with Mr. Abrams and advised that—because "everything" in the smear campaign statements was allegedly "backed up by external sources"—Bleeping Computer could ignore ESG's claims.  Mr. Abrams confided that he already had had to re-write the original defamatory statements on the Bleeping Computer Website to try to backfill them with some form of

---

**SECOND AMENDED COMPLAINT**      28      CASE NO. 5:17-CV-02915 (EJD)

source citations (because the content of the original postings were not, in fact, "backed up by external sources"), but admitted to his legal fear that Mr. Stamm, as a Bleeping Computer Global Moderator who posted the parade of disparaging statements harming ESG, was in a position of authority to officially speak for and legally bind Bleeping Computer.  Mr. Abrams also admitted to Mr. Kleczynski that the original disparaging statements published by Bleeping Computer's Global Moderator Mr. Stamm had to be edited because they were "***over the top***" (emphasis added).

91.     Bleeping Computer's and Mr. Abrams' continuation of the smear campaign after ESG made its requests for Bleeping Computer to cease its disparagement left ESG no choice but to seek redress in court and necessitated the filing of the Bleeping Computer Lawsuit in January 2016.  The same day that Bleeping Computer and Mr. Abrams were served with ESG's complaint, Mr. Abrams immediately reached out to Malwarebytes' CEO Mr. Kleczynski, again based on their special relationship, to request from Malwarebytes and Mr. Kleczyski strategic input and "resources for [himself and Bleeping Computer] in the event [they] decide to fight it."  Malwarebytes' CEO responded on the same day and then subsequently provided his views both on ESG's legal claims and on factual issues to assist Mr. Abrams and Bleeping Computer in their challenging ESG's legal claims.  *See* Ex. 13.

92.     Shortly after those initial strategy communications regarding the filing of the Bleeping Computer Lawsuit, Malwarebytes' CEO also brought Malwarebytes' General Counsel, Edward Brown, into his strategic discussions with Mr. Abrams, and both Malwarebytes executives worked with Mr. Abrams to discuss and develop ideas for designing legal defense strategies to push back on ESG's claims.  Although Bleeping Computer and Mr. Abrams already had their own long-standing lawyer from a top-10 ranked U.S. law firm (and although that lawyer brought another lawyer into the case who claimed to specialize in media and Internet law), in response to Mr. Abrams' specific request that Mr. Kleczynski help line up "resources" for Bleeping Computer to fight ESG's claims, Mr. Kleczynski offered to have Malwarebytes' legal counsel review the case and offer assistance to Mr. Abrams and Bleeping Computer.  Mr. Kleczynski particularly expressed to Mr. Abrams that Malwarebytes' legal counsel would be able to offer "ideas" to help Mr. Abrams and Bleeping Computer on legal strategy—although significantly Malwarebytes legal counsel was not Mr.

1   Abrams' or Bleeping Computer's legal counsel and, upon information and belief, had never been

2   retained as or served as their legal counsel in any capacity.  *See* Ex. 13.

3       93.     In a transparent effort to attempt to pretend it was not properly subject to ESG's legal

4   claims or liable for disparagement and unfair trade practices in connection with its promotion of

5   Malwarebytes' products, Bleeping Computer started as part of its defense strategy a GoFundMe

6   campaign in which it further made disparaging statements about ESG.  Once Bleeping Computer

7   launched its GoFundMe campaign asking for donations to raise money for its defense, Malwarebytes'

8   CEO Mr. Kleczynski immediately contributed thousands of dollars.  Mr. Kleczynski also instructed a

9   Malwarebytes employee to write and disseminate through Malwarebytes' company website a formal

10  company statement announcing Malwarebytes' donation to the defense fund and encouraging

11  Malwarebytes' users to make their own donations to also help Bleeping Computer.

12      94.     Malwarebytes' CEO Mr. Kleczynski also volunteered to reach out directly himself to

13  his contacts at other anti-malware and anti-virus companies to solicit further donations to Bleeping

14  Computer's defense fund.  He then sent emails to at least ESET, AVG and Avira requesting such

15  donations, in which he made false and derogatory comments against ESG and its software products,

16  including accusing ESG of having "shady marketing tactics" and claiming users were "out there …

17  getting screwed by these guys."  These baseless and defamatory remarks were made at a time when

18  ESG's SpyHunter 4 already had scored high grades from AV-Test, the very same independent, third-

19  party testing lab that Malwarebytes has touted to its customers to support its claim that

20  Malwarebytes' MBAM products are high-quality products.  These baseless, false, and defamatory

21  comments from Mr. Kleczynski also were made at a time when ESG already had obtained OPSWAT

22  certification, another accolade that Malwarebytes touts for its MBAM products.  Additionally, these

23  comments, upon information and belief, were never withdrawn by Mr. Kleczynski or Malwarebytes

24  even though only a few months later, in head-to-head anti-malware product effectiveness testing by

25  AV-Test, ESG's product SpyHunter 4 beat Malwarebytes' MBAM products, as well as several other

26  anti-malware programs.  These baseless, false, and defamatory remarks made by Mr. Kleczynski,

27  upon information and belief, also were never withdrawn even after ESG's SpyHunter 4 was awarded

28  Checkmark Certified (West Coast Labs) certification for the high quality of SpyHunter 4—the same

certification Malwarebytes touts in its marketing materials as proof that MBAM products are a high-quality product and that Mr. Kleczynski has expressly stated is considered the "de facto standard" for a "good" product by Microsoft.  The foregoing disparaging statements by Mr. Kleczynski about ESG and contradictions of facts known to be untrue by Mr. Kleczynski are but one measure of the anticompetitive animus Malwarebytes and/or Mr. Kleczynski held towards ESG.

95.     Continuing to have concerns about the impact of the Bleeping Computer Lawsuit and exposure for Malwarebytes, Malwarebytes' CEO Mr. Kleczynski later directly reached out to Mr. Abrams, unprompted, for an update on the progress of the Bleeping Computer Lawsuit, as several other Malwarebytes executives and/or representatives also did.  Mr. Kleczynski thereby betrayed, upon information and belief, his fears that the Bleeping Computer Lawsuit might result in a loss of competitive advantage for Malwarebytes in the market and/or exposure of Malwarebytes' long-standing profiteering business partnership with Bleeping Computer and Malwarebytes' involvement in the ongoing defamatory smear campaign and unfair predatory practices.

96.     As part of its legal defenses in the Bleeping Computer Lawsuit, Bleeping Computer made several public pronouncements that ESG's legal claims for the disparaging smear campaign used on the Bleeping Computer website as a marketing tool to jointly raise profits for Bleeping Computer and Malwarebytes were meritless and would be thrown out by the U.S. District Court for the Southern District of New York.  Bleeping Computer also publicly repeatedly claimed that its false and misleading statements disparaging ESG could never constitute marketing or advertising. Significantly, Bleeping Computer did not ever attempt to deny that it was being paid (and had been paid for an extended period of time) commissions and fees by Malwarebytes for promoting, advertising, and selling Malwarebytes' MBAM products—or that Mr. Abrams had an ongoing working for-profit relationship with Mr. Kleczynski and other Malwarebytes' executives.

97.     On July 8, 2016, in a well-researched, scholarly, and thoughtful 51-page legal opinion, Judge Engelmayer of the U.S. District Court for the Southern District of New York rejected Bleeping Computer's dismissal arguments in the Bleeping Computer Lawsuit and ordered that ESG could proceed on its legal claims for the harm caused by the disparaging smear campaign—as well as proceed with discovery for documents and under oath testimony from witnesses.

98.     In his Opinion, Judge Engelmayer specifically found that Bleeping Computer's alleged false and misleading statements from the disparaging smear campaign "unmistakably constitute advertisements" for Malwarebytes' products (Bleeping Computer Lawsuit ECF No. 45). The Opinion also held that Mr. Stamm in his role as Global Moderator of Bleeping Computer (as appointed by Mr. Abrams) made statements that were expressly and/or impliedly made by Bleeping Computer and legally binding on Bleeping Computer.

99.     On September 7, 2016, as part of fact discovery, ESG served Malwarebytes with the Subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure.  The Subpoena, specifically authorized by discovery procedures in the Bleeping Computer Lawsuit, sought the production of internal Malwarebytes' company documents and information that would reveal the true nature of Malwarebytes' deep business relationship with Bleeping Computer and the extent of its involvement in the continuing smear campaign against ESG.

100.     In accordance with the Subpoena's legally authorized request for compliance within thirty-five (35) days of service, Malwarebytes was required by law to produce documents and information responsive to the Subpoena by October 12, 2016.  To the extent it had objections to the Subpoena, Malwarebytes had fourteen (14) days under the Court's rules to provide those written objections to ESG.

101.     Malwarebytes knew, upon information and belief, that, as is typical in litigation of this type, ESG would serve additional subpoenas for sworn deposition testimony on Malwarebytes as a company and on its CEO Marcin Kleczynski and other company executives once Malwarebytes had made its document production under the Subpoena.  In November 2016, ESG did serve subpoenas for deposition testimony on Malwarebytes and Mr. Kleczynski.

102.     Faced with the prospect of having to disclose its extensive behind-the-scenes involvement with Bleeping Computer in generating sales of Malwarebytes' MBAM products at ESG's expense—and faced with the further risk of losing the significant commercial marketing and sales advantage it gained through the smear campaign on the Bleeping Computer website— Malwarebytes chose to stonewall ESG on any substantive response to the Subpoena to avoid having to reveal and admit to its profiteering relationship with Bleeping Computer or its extensive joint

1    marketing efforts and sharing of proprietary, confidential business information about its customers

2    and anti-malware products with Bleeping Computer.  Rather, Malwarebytes chose to design and

3    employ new and additional anticompetitive business tactics targeted at ESG by using "revised" self-

4    serving, subjective Malwarebytes' criteria for identifying PUPs as a pretext to newly detect,

5    quarantine, and block ESG's products as PUPs and "threats" and to interfere with their use—thereby

6    providing cover for Bleeping Computer's targeting ESG with the smear campaign and cover for

7    Malwarebytes' direct anticompetitive targeting of ESG.

8         103.    When Malwarebytes chose to undertake these new anticompetitive tactics against

9    ESG, Malwarebytes' CEO, Marcin Kleczynski, was specifically aware of ESG's Subpoena, which

10   had been sent directly to him in September 2016 by overnight mail.

11        104.    On October 11, 2016, three weeks *after* the legally-imposed rules deadline for

12   objections from Malwarebytes to the Subpoena had already passed, Malwarebytes had still taken no

13   proper action as required by law to respond to the ESG Subpoena and continued to stonewall ESG.

14   Only one day before Malwarebytes' production of documents responsive to the Subpoena was due,

15   Malwarebytes served objections on ESG that were legally meaningless under the law, as

16   Malwarebytes knew.  Malwarebytes had not contacted ESG to request additional time to object—a

17   request ESG naturally would have granted—and had not responded in any fashion as required by the

18   Court rules.  Ultimately, Malwarebytes continued its practice of acting as though it were above the

19   law and had no obligation to follow Court rules, producing only a single document in response to the

20   Subpoena and admitting that it had not even searched for other responsive documents.

21        105.    As a result, ESG was forced to file a motion to compel Malwarebytes' production of

22   documents responsive to the Subpoena.  ESG's motion to compel was still open to be pressed in court

23   by ESG in early 2017, when Bleeping Computer and ESG settled the Bleeping Computer Lawsuit,

24   with Bleeping Computer agreeing to remove the parade of smear campaign statements from its

25   website and not make any further false or misleading statements about ESG or its products.

26   **Malwarebytes' Deliberate Use of Its "Revised" PUP Criteria to Target ESG to Hurt ESG's**
     **Business and to Assist Bleeping Computer's Defenses**

27        106.    Before October 5, 2016, Malwarebytes had not designated SpyHunter 4, RegHunter 2,

28   or any other ESG program as a "threat" to any users' computer or their security, as a PUP, or as any

1   other type of problematic program for which Malwarebytes' products scanned or blocked, despite the

2   fact that MBAM products and ESG's SpyHunter 4 and RegHunter 2 had coexisted and competed in

3   the market for over eight years at that time and despite the fact that Malwarebytes had a policy or

4   practice of designating and blocking PUPs from at least 2013, if not earlier.  Thus, by Malwarebytes'

5   own actions and pronouncements, SpyHunter 4 and RegHunter 2 did not qualify as "threats" or PUPs

6   under the policies Malwarebytes itself had developed, implemented, and had in place prior to October

7   5, 2016, and to the extent any of the PUP criteria announced by Malwarebytes on October 5, 2016

8   were used by Malwarebytes prior to that date, SpyHunter 4 and RegHunter 2 never met those criteria.

9   Significantly, Malwarebytes was specifically aware of and had knowledge of ESG and its products as

10  early as 2008, when Malwarebytes was formed—and Malwarebytes' executives had personal

11  knowledge of ESG and its products dating back even earlier.

12      107.   ***Less than a week before Malwarebytes was legally obligated to respond to the***

13  ***Subpoena*** (thereby being forced under the law to reveal the extent of its joint business interests and

14  profiteering relationship with Bleeping Computer), Malwarebytes began deliberately and directly

15  interfering with ESG's relationships with its existing and prospective customers and knowingly

16  making false, misleading, and deceptive statements about ESG's SpyHunter 4 and RegHunter 2

17  products under the guise of Malwarebytes' newly "revised" PUP criteria.  Malwarebytes undertook

18  this interference despite that fact that ESG's products had not changed in any substantive way at that

19  time that might justify Malwarebytes' new PUP and "threat" designation and blocking.

20      108.   On October 5, 2016, Malwarebytes announced that it had changed its PUP criteria to

21  consist of: (1) "obtrusive, misleading, or deceptive advertising, branding, or search practices"; (2)

22  "excessive or deceptive distribution, affiliate or opt-out bundling practices"; (3) "aggressive or

23  deceptive behavior especially surrounding purchasing or licensing"; (4) "unwarranted, unnecessary,

24  excessive, illegitimate, or deceptive modifications of system settings or configuration (including

25  browser settings and toolbars)"; (5) "difficulty uninstalling or removing the software"; (6)

26  "predominantly negative feedback or ratings from the user community"; (7) "diminishes user

27  experience"; and (8) "other practices generally accepted as riskware, scareware, adware, greyware, or

28  otherwise commonly unwanted software by the user community."  Ex. 14; *see also* Exs. 1 & 3.

**SECOND AMENDED COMPLAINT**        34        CASE NO. 5:17-CV-02915 (EJD)

109.     Malwarebytes further "reserve[d] the right to adjust, expand and update [its] criteria" for PUP identification "without prior notice or announcements."  Ex. 14.  Malwarebytes thereby declared its right to unilaterally decide for itself at any time, without any notice requirement or explanation, that it could detect, quarantine, and block any software product it wanted, including the products of its competitors, for any reason—including for bad faith or anticompetitive reasons.  Malwarebytes, in fact, took this position for years in court proceedings and public pronouncements.  The U.S. Court of Appeals for the Ninth Circuit has resoundingly rejected this position, and the Supreme Court of the United States has declined to review that rejection.

110.     Malwarebytes repeatedly has falsely claimed in its public pronouncements that its revised PUP criteria, which Malwarebytes continues to use, are "solely … objective and technical" and a reflection of standard industry practice on PUP identification, despite Malwarebytes knowing those claims to be false and untrue.  Malwarebytes' announced new PUP criteria in fact tracked the key defenses Bleeping Computer was asserting against ESG in the Bleeping Computer Lawsuit.

111.     Malwarebytes utilized its vague and unbounded criteria as a pretense to begin blocking users' access to SpyHunter 4 and RegHunter 2 at its malicious whim and for anticompetitive purposes, to damage ESG's business and to bolster Bleeping Computer's defenses in the Bleeping Computer Lawsuit, while increasing Malwarebytes' profits.  Upon information and belief, Malwarebytes sought effectively to force ESG to stop pursuing the Bleeping Computer Lawsuit, so Malwarebytes could preserve the competitive advantage it enjoyed from the smear campaign.

112.     In recognition of the help Malwarebytes' newly "revised" PUP criteria would effectively provide to Bleeping Computer in its defense of the Bleeping Computer Lawsuit, Ade Gill, a top Malwarebytes research executive, contacted Mr. Abrams via Skype to notify Mr. Abrams of Malwarebytes' upcoming revised PUP criteria announcement and intention to specifically designate ESG's programs for the first time as "threats" and PUPs.  In a string of Skype messages exchanged *just as Malwarebytes' response to the Subpoena was coming due*, Mr. Gill told Mr. Abrams that Malwarebytes was "going ieven [*sic*] more agressive [*sic*] against greywares" (otherwise known as PUPs) and "*Enigma [ESG] are going in the DB [database]*" (emphasis added).  Mr. Gill told Mr. Abrams that *he had "reservations to say the least," which he expressed to Malwarebytes' CEO, but*

1   ***Malwarebytes was "still going ahead with it"*** (emphasis added).

2         113.    Recognizing the value of Malwarebytes' new PUP policy and designation of ESG's

3   products as "threats" for Bleeping Computer's legal defenses, Mr. Abrams asked Mr. Gill for details

4   so, as he explained in their Skype messages, Bleeping Computer could, as soon as possible, post a

5   new article about Malwarebytes' new PUP policy and "threat" designations.  Mr. Gill's confidential

6   advanced notice to Bleeping Computer of Malwarebytes' new PUP criteria announcement enabled

7   Bleeping Computer to run an early news story on the announcement and add to Bleeping Computer's

8   defense arguments in the pending Bleeping Computer Lawsuit.  Bleeping Computer placed

9   Malwarebytes' newly changed criteria on the front page of its website, www.bleepingcomputer.com,

10  on the very same day that Malwarebytes made its announcement. *See* Exs. 4 & 5.  Bleeping

11  Computer titled that main story: "Malwarebytes going to battle with PUPs and Adware." *Id.*

12        114.    Further, AdwCleaner developer and Malwarebytes engineer and researcher Mr.

13  Boursier, in his role as an employee, executive, researcher, spokesperson, and/or agent of

14  Malwarebytes, made clear in his October 27, 2016 public statements the true intent of Malwarebytes'

15  revised PUP criteria.  Boursier publicly broadcast with enthusiasm across the globe on the Internet:

16  "#AdwCleaner by @Malwarebytes now fully detects and removes #SpyHunter from Enigma

17  Software Group. #PUP." Ex. 2.  Significantly, in all its time in existence before being acquired by

18  Malwarebytes, AdwCleaner had not, to ESG's understanding, information, and belief, identified or

19  listed SpyHunter 4 as a PUP or any type of program that should be detected or removed as a threat.

20  AdwCleaner's new designation of SpyHunter 4 was a direct result of Malwarebytes' revised PUP

21  criteria and new listing and blocking of ESG's SpyHunter 4 as a "threat" and PUP.

22        115.    Numerous anti-malware products offered by companies other than ESG have been

23  unaffected by Malwarebytes' newly changed PUP criteria.  Upon information and belief, at least as of

24  the time of the original filing of this lawsuit, Malwarebytes and its MBAM products did not detect as

25  a PUP or "threat" any of the following anti-malware products, which have or have had similar

26  characteristics to ESG's SpyHunter 4 product and therefore would be expected to have similar PUP

27  detection results by Malwarebytes: Ad-Aware, AhnLab-V3, Avast, AVG, Avira, Bkav, Baidu,

28  Bitdefender, CAT-QuickHeal, ClamAV, Comodo, DrWeb, eScan, Emsisoft, ESET, F-Prot, F-Secure,

1  Fortinet, G DATA, HitmanPro, IKARUS, Jiangmin, K7AntiVirus, Kaspersky, Kingsoft, McAfee,

2  NANO-Antivirus, nProtect, Panda, Qihoo-360, Rising, Sophos, SUPERAntiSpyware, Symantec,

3  Tencent, TrendMicro, Trend Micro HouseCall, Vipre, Windows Defender, and Zillya.

4          116.    Malwarebytes identifying SpyHunter 4 as a "threat" and PUP while not detecting

5  similar anti-malware products with the same or similar design displays and features shows that

6  Malwarebytes' designation of SpyHunter 4 as a "threat" was driven by anticompetitive animus and

7  purposely done to hurt ESG.  Relatedly, none of the well-recognized anti-malware programs have

8  had a pattern or practice of listing SpyHunter 4 or RegHunter 2 as a "threat" to users or as a PUP—

9  including Norton/Symantec, McAfee, Sophos, Avast, Microsoft Defender and AVG.

10  **MBAM Products Begin Maliciously Detecting, Quarantining, and Blocking ESG's Programs**

11          117.    Immediately following its announcement of its new PUP criteria on October 5, 2016,

12  Malwarebytes purposefully programmed its MBAM products to automatically identify, quarantine,

13  and block SpyHunter 4 and RegHunter 2 as "threats" and PUPs, denying ESG's users—including

14  paying customers—access to cybersecurity protection from ESG's products.

15          118.    For example, if a user already had downloaded, installed, and paid for SpyHunter 4

16  and ran an MBAM scan, MBAM displayed a "***Total Threats Detected***" window, informing the user

17  that SpyHunter 4, a single program, was posing ***73 separate*** "***threats***" to the user's computer:



27  (yellow highlighting and arrow added by ESG for the reader's convenience).  By design and without

28  any user input or selection, Malwarebytes' MBAM products effectively operated to automatically

---

**SECOND AMENDED COMPLAINT**          37          CASE NO. 5:17-CV-02915 (EJD)

1    quarantine and block from operating the detected files.

2        119.    The "Total Threats Detected" window could be expanded to list the 73 separate

3    "*threat*" entries for SpyHunter 4 files, processes, registry keys, and registry values:



1    Significantly, if the user's machine was also infected with actual malware or had on it other programs

2    designated as PUPs, as is often the case, the SpyHunter 4 programs and files detected as "threats"

3    would be buried amongst hundreds or even thousands of other identified "threats."  *See* ¶ 5 *supra*.

4         120.    A big blue "Remove Selected" button at the bottom of the "Total Threats Detected"

5    window prompted the user to remove the detected SpyHunter 4 files and other items, which the

6    MBAM products automatically preselected for removal.  Besides clicking "Remove Selected," the

7    user's only option with respect to the detected "threats" was to ignore them by closing out of the

8    "Total Threats Detected" window.  Even if the user closed out of the "Total Threats Detected"

9    window without electing to remove the "threats," MBAM blocked the user's future attempts to

10   launch SpyHunter 4.  Only if the user then opened MBAM's "Quarantine" window—which the user

11   may not even know to do considering that MBAM has not notified the user of the quarantine in the

12   scan results—would the user see that MBAM quarantined the user's SpyHunter 4 program.  The

13   quarantine window explains to the MBAM user that the "***threats***" placed in quarantine (*i.e.* legitimate

14   and non-malicious SpyHunter 4 files) "do not pose a ***threat*** when quarantined" and if "deleted from

15   quarantine will be permanently removed from [the user's] computer" (emphases added):



25   (yellow highlighting added by ESG for the reader's convenience).  Thus, Malwarebytes' MBAM

26   products specifically represent that SpyHunter 4 ***does pose a threat*** to users if users take SpyHunter 4

27   out of the Malwarebytes' pre-programmed "quarantine" in order to use it.  This statement is factually

28   false and inaccurate in multiple respects and Malwarebytes knows it is false and a misrepresentation.

121.    From the "Quarantine" window, the user could attempt to "Restore" the quarantined SpyHunter 4 files by clicking the grayed out "Restore" button (deemphasized relative to the bright blue "Delete All" button), but subsequent attempts by the user to re-launch the SpyHunter 4 program would result in SpyHunter 4 again being automatically quarantined by Malwarebytes' design.  Even if the user restarted the computer, the user would still be unable to launch SpyHunter 4 upon reboot because Malwarebytes would continue to block the operation of necessary SpyHunter 4 files.

122.    The user could theoretically re-enable SpyHunter 4 by adding the SpyHunter 4 folder as a "Malware Exclusion" in the settings of the MBAM products.  This, however, is counterintuitive as the user may not know that the user must, or even can, exclude certain items from detection by the MBAM products.  Indeed, even when users asked Malwarebytes why MBAM products were blocking ESG's programs—and the users told Malwarebytes they desired to use both ESG's and Malwarebytes' programs—Malwarebytes did not provide exclusion instructions or provided them in a way that was confusing and unhelpful to the user.  Even if the user managed to figure out how to add the SpyHunter 4 folder as a "Malware Exclusion" in MBAM, subsequent MBAM scans continued to detect certain SpyHunter 4 files and other items as "***threats***" and PUPs.

123.    Malwarebytes similarly interfered with and disrupted a user's ability to choose to download and install SpyHunter 4 when that user already had an MBAM product installed on the user's computer.  In those instances, the MBAM products would automatically quarantine the SpyHunter 4 installer file, preventing it from running, and would display for a brief period of time a small pop-up on the user's screen that stated "Malwarebytes has ***blocked*** a potentially unwanted program" (emphasis added).  If the user clicked on the pop-up PUP warning during the brief time it was displayed—which a user may not know to do considering that the MBAM products provided no indication, let alone an explicit instruction, that clicking on the pop-up would lead to further information or was even an option—MBAM then displayed the "Quarantine" window, which listed the SpyHunter 4 installer file as quarantined and gave the user the same dire warnings described *infra* in Paragraph __.  From the "Quarantine" window, the user could attempt to "Restore" the SpyHunter 4 files out of quarantine.  But even after clicking "Restore" (again grayed out and deemphasized relative to the bright blue "Delete All" button), if the user downloaded the SpyHunter 4 installer

again, the pop-up PUP warning/quarantine process began all over again, placing the user in a frustrating and unproductive cycle of restoring and re-downloading the installer file only to have it blocked and quarantined each time.  Even if a user thought to add the domain of the website from which the user was attempting to download SpyHunter 4 to MBAM's "Web Exclusions," the MBAM products continued blocking the download and installation of SpyHunter 4.

124.    MBAM products similarly quarantine and block RegHunter 2, and make RegHunter 2's exclusion from the quarantine and blocking nearly impossible, using the same general mechanisms described for SpyHunter 4 above.

125.    Malwarebytes' blocking of ESG's products was at all times unlawful.  Malwarebytes exacerbated the harm it caused ESG because Malwarebytes could have programmed its MBAM products to allow users to easily exclude ESG's programs from MBAM's detection, quarantine, and blocking and to continue to use those programs, but Malwarebytes purposely chose not to do so. Malwarebytes' own users have complained to Malwarebytes directly that they cannot follow or navigate MBAM's exclusion process, even following instructions from Malwarebytes.

126.    Numerous cybersecurity materials and experts suggest that operating multiple anti-virus and anti-malware programs on the same computer provides enhanced, more comprehensive cybersecurity.  Malwarebytes itself has recognized the value of such combined layering protection, as it has advised and recommended in product user guides that MBAM products have the "capacity to function as … as secondary protection (in parallel with the operation of an antivirus software already in operation on the computer)" and its own CEO has spoken publicly of the benefits of layered protection.  Yet MBAM's quarantining and blocking, and its intentionally difficult exclusion process, makes it very challenging if not almost impossible for users to operate both an MBAM product and SpyHunter 4 on the same computer.  As a result, Malwarebytes prevents users from combining their chosen cybersecurity protections, leaving them more exposed to numerous cybersecurity risks.

## Malwarebytes Purposely Designed and Programmed
## MBAM Products To Automatically Quarantine and Block ESG Products

127.    Malwarebytes' detection, quarantining, and blocking of ESG's programs described above is the direct result of Malwarebytes' intentional design and programming of default settings. Malwarebytes' MBAM products are anti-malware programs designed by Malwarebytes to be run

"straight out of the box"—that is, MBAM products are pre-programmed by Malwarebytes to be easily downloaded and installed by users and to then allow users to automatically run scans, using settings pre-determined by Malwarebytes, to detect malware, PUPs, and other "threats," so-designated based on Malwarebytes' own pre-selection, and automatically quarantine and block them from operating, again by Malwarebytes' pre-design.  Malwarebytes has designed its MBAM products to be operable in a "turnkey" fashion that does not require users to set or configure any parameters, settings, or configurations for malware, PUPs, "threats," or potentially problematic programs in order to enjoy the products' benefits, features, and cybersecurity and privacy protections.

128.   Malwarebytes' MBAM products are *not* products that require users themselves to choose what specific programs they want to have blocked as malware, PUPs, or "threats."  MBAM products are *not* simply tools Malwarebytes provides to users to filter content of users' own specific choice.  Users do *not* decide what programs Malwarebytes includes on the detection lists it implements in its products, do *not* select programs to be blocked by MBAM, and typically do *not* populate their own personalized filters (although users may add certain programs they select to a custom block list if they can figure out how to do so).  As Malwarebytes' CEO Marcin Kleczynski has stated, Malwarebytes purposely designed MBAM to be used by people like his mother who do not have much software knowledge.  Malwarebytes only purports to allow users to exclude programs from Malwarebytes' own detection and filter lists, but as set forth herein, Malwarebytes' exclusion processes are flawed (by design, according to some user complaints) and many users have expressed an inability to successfully navigate them, even following instructions from Malwarebytes.

129.   Many, many users of MBAM products typically operate MBAM, by using the automatic default settings Malwarebytes provides under its pre-set configurations, rather than manually reconfiguring settings themselves.  Manual configuration of settings or parameters for anti-malware products, including MBAM products, typically requires knowledge of computer security and software issues that the average lay user of anti-malware software generally does not possess.

130.   Malwarebytes itself recommends users use the default settings, rather than manually configure scan and quarantine settings.  Malwarebytes' own User Guide - Version 2.2.1, dated March 18, 2016 ("2016 Guide"), and User Guide - Version 3.0, dated January 25, 2017 ("2017 Guide"),

1  demonstrate this.  *See* Exs. 15 and 16.

2  131.  On pages 3-4 of the 2016 Guide and page 4 of the 2017 Guide, Malwarebytes explains

3  the simple steps a user takes to install, activate, and run MBAM products.  None of the listed steps

4  require a user to set any parameters or configure any settings to operate MBAM products and receive

5  the products' scanning, quarantining, and blocking cybersecurity protection.

6  132.  On page 11 of the 2016 Guide and the 2017 Guide, Malwarebytes explains to users

7  how to perform a scan using MBAM products.  Malwarebytes directs the average user to run a scan

8  by clicking the "Threat Scan" option, designated in a highly visible blue color in the 2016 Guide

9  (contrasting with the low-visibility white color of the other two options) and in a bold green color in

10  the 2017 Guide (contrasting with the grayed-out color of the other two options).  In both Guides,

11  Malwarebytes describes the "Threat Scan" option as the "most comprehensive" scan that captures all

12  programs treated as "malware" in "all the places malware is known to hide" and indicates that it is

13  the scan option specifically "***Recommended***" by Malwarebytes for its users.



2017 Guide

2016 Guide

1   (yellow highlighting added by ESG for the reader's convenience).  The "Threat Scan" option does

2   not require users to set any configurations or parameters themselves.

3        133.    As page 14 of the 2016 Guide and page 12 of the 2017 Guide demonstrate,

4   Malwarebytes preset all MBAM scans for PUP detections to "treat detections as malware" by default:



**2016 Guide**

**2017 Guide**

25  (yellow highlighting added by ESG for the reader's convenience).

26        134.    As page 36 of the 2016 Guide and page 29 of the 2017 Guide make clear,

27  ***Malwarebytes in turn preset malware detections to be automatically quarantined and blocked,***

28  ***without the need for any user configuration***.  As a result, in the Malwarebytes-"Recommended"

1  Threat Scan option, programs Malwarebytes designated as PUPs, such as SpyHunter 4 and

2  RegHunter 2, are treated by MBAM as malware and automatically quarantined and blocked.

3      135.    Malwarebytes' executive Adam Kujawa has previously testified under oath in court

4  that MBAM products are preset by Malwarebytes to automatically quarantine and block programs

5  detected as PUPs.  Mr. Kujawa also testified that most users do not alter Malwarebytes' pre-set PUP

6  blocking decisions, and Malwarebytes has specifically recommended that they not to do so unless

7  they are "advanced users," which many users are not.  Indeed, on page 25 of the 2016 Guide,

8  Malwarebytes specifies that its "detection and protection" settings, where users can adjust

9  Malwarebytes' default setting of treating PUP detections "as malware," are only "recommended for

10  advanced users."

11      136.    Malwarebytes's design of its MBAM products is consistent with the common practice

12  over time among anti-virus and anti-malware software providers to preset configurations, allowing

13  users to run their programs "straight out of the box."  Like Malwarebytes, numerous other companies

14  including ESG, Norton, McAfee, AVG, Avast, and Trend Micro pre-set their programs' settings to

15  allow users to download and automatically operate them to quarantine and block malware and PUPs,

16  without requiring user-driven configuration.

17      **AdwCleaner Begins Unlawfully Detecting ESG's Programs as PUPs and "Threats"**

18      137.    In addition to programming its MBAM products to quarantine and block SpyHunter 4

19  and RegHunter 2, just a week after Malwarebytes acquired AdwCleaner, Malwarebytes directed,

20  programmed, and/or approved AdwCleaner to detect SpyHunter 4 and RegHunter 2 as "threats" and

21  PUPs, despite the fact that, upon information and belief, AdwCleaner had never done so before.  The

22  AdwCleaner program then began flagging ESG's programs as "threats" and PUPs in the scan reports

23  it displayed to users.  AdwCleaner preselected all files associated with those programs for removal

24  from the user's computer and encouraged the user to remove the ESG products designated "threats"

25  and PUPs by prominently displaying a blue "Clean & Repair" button, requiring the user to manually

26  unselect the files to proceed through the "Clean & Repair" process without deleting ESG's products.

27  The "Clean & Repair" phrasing suggests to a user that the detected products have somehow tainted

28  and/or broken the user's computer, such that leaving them in place without undertaking the "repair"

---

**SECOND AMENDED COMPLAINT**          45          CASE NO. 5:17-CV-02915 (EJD)

1   would impair the computer's operation and integrity and/or leave the user at risk.  Malwarebytes had

2   no reasonable basis to believe SpyHunter 4 or RegHunter 2 created any such risks for users or their

3   computers, and in fact knew SpyHunter 4 and RegHunter 2 did not constitute any such risk.

**Malwarebytes and Its Agents Make False, Deceptive and Misleading Statements In**
4   **Connection with Malwarebytes' Designation of ESG's Programs as "Threats" and PUPs**

5        138.    The MBAM products' detection and blocking of SpyHunter 4 and RegHunter 2 as

6   "threats" and PUPs have been the subject of multiple discussions on the Malwarebytes official

7   company website, including on the Malwarebytes Forum part of the website that Malwarebytes itself

8   specifically designed, set up, operates, controls, and advertises as, *inter alia*, a place users can "get

9   advice from tech experts" and "[g]et personalized help removing adware, malware, spyware,

10   ransomware, trojans, viruses and more from tech experts."  Malwarebytes' company representatives,

11   spokespersons, and/or agents regularly post on the Malwarebytes Forum to market, advertise and

12   promote Malwarebytes' products (as Malwarebytes' CEO Marcin Kleczynski did when announcing

13   the company's revised PUP criteria) and have used the Malwarebytes Forum to deliberately make

14   deceptive, false, and misleading statements about ESG.

15        139.    For example, on October 8, 2016, Malwarebytes Forum "New Member" *pplcunha*

16   posted on the Forum: "Since two days ago, Malwarebytes is flagging Spyhunter as a potentially

17   undesired program.  Any problems here?"  Malwarebytes "Elite Member" *pondus* responded that a

18   PUP is a program that "comes bundled with some extra unwanted crap."  *pondus* continued:

19   "Anyway, why use SpyHunter when you have Malwarebytes?"

20        140.    Contrary to *pondus'* suggestion, ESG did not bundle SpyHunter 4 with unwanted

21   software, utilities, toolbars, or other features, and Malwarebytes knew that ESG did not bundle its

22   programs with other software or "unwanted crap" and that SpyHunter 4 did not include any improper,

23   concealed, or undisclosed utilities, toolbars, or features.

24        141.    Later on October 8, 2016, Malwarebytes "Trusted Advisor" *Aura* (also a Bleeping

25   Computer "Special Ops Tech" and "Malware Response Team" member) wrote on the Malwarebytes

26   Forum: "Malwarebytes is now flagging SpyHunter products following a more aggressive stance

27   against PUP. … If you read the link provided by @pondus, SpyHunter fits in many of the criterias

28   [sic] listed, so it's only normal for it to be classified as such."  *pplcunha* responded: "Thanks Aura for

---

**SECOND AMENDED COMPLAINT**          46          CASE NO. 5:17-CV-02915 (EJD)

1   your reply and clarification.  I still have a subscription with SpyHunter, but it will go off soon.  I will

2   be removing it soon."  *Aura* then replied: "Make sure that your subscription gets cancelled for real

3   when you do, since there's been a lot of report[s] in the past (and even today) of users still being

4   charged by ESG for SpyHunter[.]"  These official legally binding comments from Malwarebytes

5   deliberately and intentionally directed, encouraged, and induced an existing ESG customer to cancel

6   a contract with ESG.

7       142.   Malwarebytes itself designates its Malwarebytes Forum "Trusted Advisors," including

8   *Aura*, as Malwarebytes' representatives, spokespeople, agents and/or advisors who "can be trusted to

9   provide [users] with safe removal of Malware" and are experts "trained in Malware removal."  In

10  fact, Malwarebytes prohibited those without official Malwarebytes Forum designations from "posting

11  Malware advice of any kind on the [Malwarebytes] Forum" and explained "any such **unauthorized**

12  posts will be deleted" by Malwarebytes (emphasis added).  Malwarebytes further warned users

13  against taking advice from Malwarebytes Forum members without official Malwarebytes

14  designations, indicating that anyone following such advice would "do so at [their] OWN risk" and

15  that the advice would not be official, reliable advice from Malwarebytes such as users would get from

16  Malwarebytes' official "Trusted Advisors."  By Malwarebytes' own statements, actions, policies, and

17  conduct, *Aura* was, and was held out to the public by Malwarebytes as, a Malwarebytes

18  representative, agent, and/or spokesperson, with the express and/or implied authority to make legally

19  binding statements for and/or on behalf of Malwarebytes.

20  **ESG Receives Complaints and Refund Requests from New and Existing Customers**

21      143.   Beginning on October 6, 2016, ESG Technical Support was hit with an onslaught of

22  hundreds of complaints from customers about Malwarebytes' improper, anticompetitive interference

23  with its SpyHunter 4 and RegHunter 2 programs.  In their complaints, among other things, customers

24  (i) reported concerns that Malwarebytes' designation of ESG's programs as "threats" and PUPs

25  meant ESG's programs were dangerous malware, (ii) demanded refunds of their subscriptions fees,

26  requested immediate cancellation of their program subscriptions, or stated their intent not to renew

27  their subscriptions, and/or (iii) explained that they could not get around Malwarebytes' designation,

28  quarantining and blocking and could not successfully "whitelist" ESG's programs in MBAM

---

**SECOND AMENDED COMPLAINT**      47      CASE NO. 5:17-CV-02915 (EJD)

products and AdwCleaner products.  A representative sample of such complaints is set forth below.

144.     On October 7, 2016, an ESG customer reported to ESG Technical Support that "Malwarebytes [was] removing SpyHunter" and provided a copy of an e-mail exchange with Malwarebytes' Support agent Tom Mercado.  The ESG customer had e-mailed Malwarebytes Support earlier that day under the subject "False Positive for SpyHunter v4":

> I have been using your Premium product for a long time and have 149 days left.
>
> Last night's Malwarebytes scan determined that another Product that also runs everynight [*sic*] - SpyHunter v4 Malware Security Suite from Enigma Software is a Potentially Unwanted Product.  They have been running together without issue for many, many months.
>
> On one machine I wasn't even able to deselect the threats, being told that items scheduled to be deleted upon reboot can't be deselected.  And upon reboot all of my SpyHunter product is gone, even from Add & Remove products.
>
> What would cause this sudden change in perception and what do your [*sic*] recommend[?]

Mr. Mercado responded: "Add it to our exclusions.  We detect it as a PUP."  He then provided links to Malwarebytes articles purporting to, *inter alia*, provide "explanation on the PUP.Optional detection category" and instruct a user "how to add an IP\website or program to exclusion[.]"

145.     The ESG customer replied to Malwarebytes Support:

> Thank you for your response.  However, it is clear (as of last night and not before) that Malwarebytes consider SpyHunter (*a competing Malware protection program*) a PUP.  You say, "We detect it as a PUP".  Gee, I guess I already know that.  But the fact is not until yesterday.
>
> Could you please address the part of my question… What changed?  I have been running these two programs side-by-side for over a year.  NEVER a problem.   Then last night- BANG.  *And in one case Malwarebytes proceeded to completely remove SpyHunter.  Wouldn't even let me make SpyHunter an exclusion, as I explained.  I am sure you are familiar with the error message - can't keep items that are scheduled to be removed upon reboot.  UGH.*
>
> Either you folks changed your definitions or they changed their product during an update, and the indication is that it was Malwarebytes that made the change.
>
> Please explain why sometime between October 5-7 things changed.  Because something sure did.

(emphasis added).  Mr. Mercado replied by merely providing a link to another Malwarebytes article and stating: "[T]hat software [SpyHunter 4] has always had dodgy, aggressive affiliate activities

1   since as far back as I can recall and I've been at this for well over a decade."

2   146.   Malwarebytes offers technical support and self-proclaimed cybersecurity expert advice

3   to users of both the free and paid versions of MBAM products, through a technical support team

4   comprised of Malwarebytes staff members, agents, and/or representatives authorized by Malwarebytes

5   to speak directly and/or impliedly on Malwarebytes behalf and held out to Malwarebytes' users,

6   website visitors, and/or customers as Malwarebytes' representatives, agents, and/or spokespersons who

7   can provide reliable and trustworthy technical information and assistance.   At the time of the

8   communications above, and, upon information and belief, at all relevant times, Mr. Mercado was a

9   Malwarebytes staff member on Malwarebytes' technical support team officially appointed by

10  Malwarebytes and, thus, was an express or implied Malwarebytes' agent, representative, and/or

11  spokesperson with both express and implied authority to speak for and legally bind Malwarebytes.

12  147.   On October 7, 2016, one ESG customer reported to ESG Technical Support that "Spy

13  hunter will not load" and "Malware bites [*sic*] says it is an infection," while another customer reported

14  the "'malware bytes' program keeps detecting malware every time I try to download your software."

15  148.   A third ESG customer contacted ESG Technical Support that same day to chronicle his

16  unsuccessful attempt to work around Malwarebytes' interference:

17  For some unknown reason, Malwarebytes Anti-Malware Premium has
18  determined that the above referenced files are now classified as
    "PU[P].Optional.SpyHunter."

19  (1) My SpyHunter desktop icon will no longer open the application.

20  (2) I am unable to open any files associated with SpyHunter as it keeps
    creating another PU[P] notation.

21  *(3) I tried reinstalling SpyHunter but Malwarebytes will not allow me*
22  *to complete the action and creates another PU[P] notation in the*
    *Quarantine folder.*

23  *(4) I added the "SpyHunter Program Files" folder to the Malware*
24  *Exclusions to no avail.*

25  *(5) In addition, Malwarebytes has now deleted all folders and files*
    *related to SpyHunter and RegHunter.*

26  (emphasis added).

27  149.   On October 8, 2016, an ESG customer contacted ESG Technical Support to ask

28  "[w]hy is my Malwarebytes application detecting numerous SpyHunter and RegHunter Files, Folders

---

**SECOND AMENDED COMPLAINT**   49   CASE No. 5:17-cv-02915 (EJD)

and Registry Keys as PUP.Optional.SpyHunter and PUP.Optional.RegHunter malware threats?  Has

my Enigma Software applications which I am subscribed to and payed [*sic*] $69.98 for another 6-

month subscription … been comprimised [*sic*]? … Please advise why your SpyHunter and

RegHunter applications ***are being detected as malware***" (emphasis added).

150.    On October 9, 2016, another ESG customer contacted ESG Technical Support to

cancel her subscriptions and obtain a refund:

> Can you please cancel both of my prescriptions [*sic*] of spy hunter and
> reg hunter and refund my money as soon as possible …
>
> Both of them have just been removed by another antivirus software as it
> has picked up 380 viruses in both hunters after spy hunter updated and
> had to remove it/uninstall them both to completely get rid of these
> viruses. …
>
> ***I am very disappointed about all of this, because I did like your***
> ***programs and they have worked well for me in the past.***

(emphasis added).  This customer, like many others, requested a cancellation and refund due to

Malwarebytes' unlawful blocking, despite the fact that the ESG customer liked ESG's products.

151.    On October 10, 2016, an ESG customer contacted ESG Technical Support to complain

that "I have malwarebytes anti-malware on my computer.  For some reason it found a lot of things

(700 items) on a scan and put them in quarantine.  I didn't read, or give any thought and deleted

items.  Noticed my shortcut missing from desktop, then noticed items listed that had been removed

were Reghunter, and tried to restore them, the shortcut is back but states that Reghunter has been

changed or moved, so no longer works."  This user's experience highlights that Malwarebytes

purposely designed its products to detect, block, and remove ESG's products without calling users'

attention to Malwarebytes' interference.

152.    On October 12, 2016, another ESG customer, who previously had to re-install his

SpyHunter 4 due to Malwarebytes identifying it as a PUP and uninstalling it, forwarded to ESG

Technical Support his e-mail exchange with a Malwarebytes Support Agent.  He explained that he

had e-mailed Malwarebytes Support to "complain[] about their software calling SpyHunter 4 a type

of virus or PUP[.]"  The Malwarebytes Support agent responded: "I can't really comment on this.  All

I can say is that they meet our revised PUP criteria."  The ESG customer replied: "I understand what

you are saying.  But for the life of me I cannot understand why in the world would your software

---

**SECOND AMENDED COMPLAINT**          50          CASE NO. 5:17-CV-02915 (EJD)

consider Spy Hunter as some sort of bad software or PUP.  This is one of the most recognized

detection software available and has worked wonderfully for me for more than 3 years."

153.    On October 13, 2016, an ESG customer wrote to ESG Technical Support: "I cannot use spyware hunter, ***malware bytes treats it like malware***[.] … I would like to cancel my order please" (emphasis added).  Another customer that same day wrote to ESG Technical Support: "For both reghunter and spyhunter, I can't download them because I'm getting PUP.Optional.Reghunter and PUP.Optional.Spyhunter threats.  What's going on.  The installer is being blocked because of these files.  Are they malware?  If so, I want a full refund."  On December 14, 2016, another ESG customer reported that "Malwarebytes blocks the installation of Spyhunter - it says the Spyhunter is malware." These exchanges show that average computer users understood or perceived Malwarebytes' statements and actions to be declaring and attesting, based on Malwarebytes self-proclaimed cybersecurity expertise, that ESG's products were "malware" and a threat to users' computers and personal safety when Malwarebytes knew that to be untrue, deceptive and false.

154.    On October 27, 2016, an ESG customer forwarded to ESG Technical Support his email exchange with Tom Mercado, the same Malwarebytes Support Agent who had previously communicated with another ESG customer.  In the exchange, the customer wrote to Malwarebytes Support under the subject "Malwarebytes Malware Settings to Protect SpyHunter":

> I have been running SpyHunter, RegHunter and Malwarebytes Anti-malware all together for sometime now and 2 days ago, SpyHunter and RegHunter were suddenly gone from my system.
>
> I contact SpyHunter/RegHunter support and they got me going again and added that they were in dialogue with you - I hope the 2 of you can resolve this soon.
>
> In the meantime is there anything you can provide me with a fix?

Mr. Mercado, in his official role as a representative spokesperson, technical staff member, technical support agent, and/or agent of Malwarebytes, provided the same false and inaccurate response he provided to the other ESG customer, advising that SpyHunter 4 and RegHunter 2 were programs that presented a "threat" to users, directing the customer to add the programs to MBAM's "exclusions" if the customer still sought to use them, and referring the customer to several Malwarebytes articles.

155.    When forwarding the e-mail exchange to ESG Technical Support, the customer made clear that Malwarebytes' response was "not very helpful for a non-techie like [him]," stating: "It is

not clear to me how to add Spyhunter and Reghunter to the Malwarebytes as PUP exclusion." This exchange again proves that Malwarebytes purposely acted to make it difficult, if not nearly impossible, for users to get around Malwarebytes' unlawful blocking of ESG's products.

156.    On November 1, 2016, an ESG customer shared a copy of an e-mail from a Malwarebytes Support Agent, who, acting in his official role as a representative, spokesperson and/or agent of Malwarebytes, stated, in response to a direct question from that customer about Malwarebytes' claim that ESG programs are "threats," that "[w]e [Malwarebytes] do not recommend those programs or programs like that. We have flagged the program/s [*sic*] because they meet the standards set out on www.malwarebytes.com/pup[.]"

157.    On June 29, 2017, an ESG customer wrote to ESG Technical Support:

> Malwarebytes is the one reporting your software as PUPs…
>
> But these days you have to understand the urgent concern about data safety.
>
> Because of this I am going to have to ask for a refund.
>
> This might be unfair to your company but I just a user who's trying to protect his family.

This user message underscored the knowledge and understanding users generally possessed of the heightened risks of cybersecurity threats and the critical need to utilize anti-malware products to protect themselves and their families—and the absolute unfairness of Malwarebytes unlawfully blocking ESG's products.

158.    On July 22, 2019, an ESG customer wrote to ESG Technical Support to ask about Malwarebytes' detection of RegHunter 2. He reported that it was "impossible to use or install the software RegHunter" because, based on Malwarebytes' representations, he understood that RegHunter 2 "has a malware." This user complaint evidences that users understood and perceived Malwarebytes to be blocking ESG's competing product RegHunter (which provided, *inter alia*, privacy protection to users just like Malwarebytes' products) as a "malware," even though Malwarebytes knew at all relevant times that RegHunter was no such thing.

159.    Additionally, multiple ESG customers, who, upon information and belief, specifically reside in New York, contacted ESG Technical Support to complain regarding Malwarebytes' interference with ESG's products, including on October 7, 2016, October 11, 2016, October 15, 2016,

1   October 21, 2016, November 5, 2016, and November 10, 2016.  These customers, *inter alia*,

2   complained that Malwarebytes "keeps booting [SpyHunter] out as a 'potential **threat**'" (emphasis

3   added), clearly believing Malwarebytes' demonstrably false and inaccurate representation that

4   SpyHunter 4 was a "threat," and demanded cancellations and renewals.

5       160.    ESG also received multiple user complaints regarding Malwarebytes' designation and

6   blocking of ESG's domains as "malicious."  For example, on December 27, 2016, a user wrote to

7   ESG Technical Support that Malwarebytes "had blocked Spyhunter web site access," rendering

8   SpyHunter "unable to check some files against your database."  He then explained that he "tried to

9   use your Help function but access was similarly blocked" and was unable to work around the block

10  because "[t]he process within MWB [Malwarebytes] to stop blocking an IP address is convoluted."

11      161.    Malwarebytes' interference with SpyHunter 5 likewise prompted user complaints.  For

12  instance, on September 2, 2018, a SpyHunter 5 user wrote to ESG's affiliate EnigmaSoft that "I have

13  had both malewarebytes premium and spyhunter running now malewarebytes keeps removing my

14  spyhunter I keep addi[n]g it as an exclusion then it won[']t let me redownload the program.  Getting

15  frustrated."  On September 27, 2018, another user wrote "I recently installed Malwarebytes and it

16  does not like SpyHunter or your software is corrupt?  It will not let me execute SpyHunter.  PUP is

17  known to be spyware.  Why is Spyhunter part of PUP?  Is your download corrupt?"  On November

18  10, 2018, a user reported that "Malware bytes removed your program after identifying it as

19  malware!"

20      162.    ESG has been contacted about Malwarebytes' unlawful interference with SpyHunter 4

21  and/or RegHunter 2 by hundreds of customers, at least thirty-one (31) of which, upon information

22  and belief, reside in New York.  Some of those customers have requested refunds and cancellation or

23  nonrenewal of their subscriptions and ESG is informed and believes that untold numbers of other

24  potential customers have simply not purchased subscriptions to SpyHunter 4 or RegHunter 2 because

25  of Malwarebytes' unlawful conduct described herein.

26      163.    Malwarebytes' own users have complained directly to Malwarebytes, including on the

27  company website, that they disapproved of Malwarebytes' anticompetitive application of its PUP

28  criteria and objected to Malwarebytes' interference with their paid subscriptions to other products.

1    These complaints from Malwarebytes' own users prove the falsity of Malwarebytes' claim that its

2    revised PUP criteria and "threat" designations were well received by users.  For example, in the

3    comments to Malwarebytes' October 5, 2016, official company post from CEO Marcin Kleczynski

4    announcing Malwarebytes' revised PUP criteria, a user posting under *Draco* wrote "And this has

5    nothing to do with the lawsuit Spyhunter made against Malwarebytes? ......I'm getting sick of

6    Malwarebytes digging to [*sic*] deep."  User *615Keith* responded:

7
8
> I am having the same issue and just complained to Malwarebytes.  My
> SpyHunter gets deleted every scan.  This is defensive anticompetitive
> behavior and reflects very badly on the CEO.  Malwarebytes it a great
9
> program.  So is Spyhunter.  They should battle it out on their own merits.
> The deceptive letter from the CEO is the worst kind of business practice:
10
> It assumes that his customers are idiots. It inconveniences his customers.
> It creates bad will. And, unfortunately, it is his employees who suffer
11
> and look bad. Silicon Valley started out as a playing field of the best
> people in the United States: open and giving. It has become the last
> refuge to which a scoundrel clings.

12   Another user, *Shamir Blkviper Kwahlif*, later posted that he had used SpyHunter 4 to remove a

13   particularly difficult PUP and was pleased with its performance because "it really went in deep, it

14   waz [*sic*] far more thorough than any software I'd seen up 2 that point including (MBAM)."  He then

15   explained that he had downloaded Malwarebytes' AdwCleaner "which listed (SpyHunter) as a (PUP),

16   immediately I waz panicked & used (REVO UNINSTALLER) which by the way is (HELLAFIED)

17   good, removed every bit of (SpyHunter)."  Having read comments to the Malwarebytes blog post,

18   however, "I now know that (SpyHunter) is not a (PUP) … After finding out all of this sh*t about

19   (MBAM), I am saddened beyond wordz, bcuz like a lot of people who have spoken here, have been a

20   loyal customer of (MBAM) 4 quite a # of yrz now, but sadly I don't believe I'll be able 2 get over

21   these findingz.  And they r all actionz (MBAM) under took themselvez, & the CEO had the gall 2

22   talk about deception & deceptive practicez, he should never use those wordz again."

23        164.    The user statements cited throughout this Second Amended Complaint show that

24   Malwarebytes' false, deceptive, and misleading statements and actions led users (i) to believe that

25   ESG's products were a "threat," (ii) to cancel their use of and/or subscriptions to ESG's products, and

26   (iii) to demand refunds from ESG.  They further prove that—despite Malwarebytes' claim that it

27   simply offers users a free choice regarding whether to use ESG's products and that Malwarebytes'

28   products can be configured to exclude ESG's products from quarantine and blocking—numerous

---

**SECOND AMENDED COMPLAINT**          54          CASE NO. 5:17-CV-02915 (EJD)

1  users were not able to navigate Malwarebytes' exclusions processes to allow ESG's products to

2  operate, even when following Malwarebytes' express instructions.

### ESG Attempts to Mitigate the Harm from Malwarebytes' Unlawful Interference and Malwarebytes Retaliates

3  165.    After Malwarebytes began identifying and automatically blocking ESG's products as

4  "threats" and PUPs in October 2016, ESG attempted to mitigate the harm caused by Malwarebytes'

5  unlawful conduct by providing users with a means to choose to download and use ESG's products,

6  which Malwarebytes otherwise illegally had taken away from users.  To do so, ESG provided its

7  customers with an option—completely at the user's choice—to download an alternative SpyHunter 4

8  installer that disabled Malwarebytes' MBAM products and allowed the user to use SpyHunter 4

9  instead (the "Countermeasure").

10  166.    ESG issued a press release on December 20, 2016, to announce that it had launched

11  the Countermeasure ("Press Release").  In the Press Release, ESG specifically noted that the

12  Countermeasure fully respects user choice: "ESG is notifying its customers that it has developed an

13  alternative SpyHunter installer that will enable those customers who wish to use SpyHunter instead

14  of MBAM to do so.  The installer disables MBAM, with user consent, and allows customers to install

15  and use SpyHunter."

16  167.    Immediately after the issuance of the Press Release, Malwarebytes continued its

17  predatory, unfair business tactics against ESG and mounted an additional line of anticompetitive

18  attack to interfere with the ESG Countermeasure.  Specifically, Malwarebytes' MBAM products

19  began blocking all *.enigmasoftware.com domains, informing the user of each block with the

20  following pop-up, which prominently designated the blocked domain, listed in red, as a "***Malicious***

21  ***Website***" and labeled it with a red frowning face icon:



22  168.    Malwarebytes' blocking of *.enigmasoftware.com domains encompassed both ESG's

23  publically available website at www.enigmasoftware.com and domains through which ESG enabled

1    its programs to communicate with ESG's back-end servers so that, for example, users could receive

2    critical functions like automatic product updates, access to the interface through which users

3    contacted ESG's Customer Support Team for assistance, and updated detections lists for SpyHunter 4

4    to combat newly released malware and PUPs.

5    169.    Malwarebytes' retaliatory blocking of ESG's domains did not protect Malwarebytes'

6    users, especially because ESG's programs, once identified and quarantined by MBAM products as

7    "threats" and PUPs, were disabled and not communicating with any *.enigmasoftware.com domains

8    anyway.  Blocking those domains served only to harm ESG and its users by preventing the users

9    from accessing ESG's website and downloading ESG's Countermeasure so they could use ESG's

10   programs and/or manually overriding Malwarebytes' blocking of ESG programs as "threats" and

11   PUPs.  If a user sought to manually override MBAM products' quarantine and block and could figure

12   out how to add ESG's programs to MBAM's "Malware Exclusions" such that they could be operated,

13   the MBAM products' blocking of *.enigmasoftware.com domains still rendered ESG's programs

14   largely non-operational despite the exclusion, frustrating the user's choice of cybersecurity protection

15   and leaving the user's computer vulnerable.

16   170.    Malwarebytes continued its identification and blocking of *.enigmasoftware.com

17   domains as "malicious" for an extended period, until it abruptly stopped without providing any

18   explanation, thereby admitting that its blocking of ESG's domains had been improper,

19   anticompetitive, and unlawful.  There were no material changes made to the *.enigmasoftware.com

20   domains between when Malwarebytes began to identify and block them and when Malwarebytes

21   stopped doing so.

### Malwarebytes Continues its Predatory Campaign Against ESG By Attacking EnigmaSoft and SpyHunter 5

22
23   171.    On June 21, 2018, a separate Irish affiliated company of ESG's, EnigmaSoft, released

24   SpyHunter 5, an advanced adaptive malware detection and removal software newly built from the

25   ground up and specifically designed to target a wide range of threats and potential problems to

26   protect users' cybersecurity.

27   172.    For two months after EnigmaSoft debuted SpyHunter 5, Malwarebytes did not

28   designate SpyHunter 5 as a PUP and the MBAM products did not detect, quarantine, or block

---

1  SpyHunter 5 as a PUP or "threat."  On August 16, 2018, however, Malwarebytes abruptly began to

2  designate SpyHunter 5 a PUP and "threat" and the MBAM products began to automatically detect,

3  quarantine and block SpyHunter 5 as a PUP and "threat."

173.   Upon learning of Malwarebytes' new interference with SpyHunter 5, EnigmaSoft

5  contacted Malwarebytes to ask it to stop its unlawful actions and provide an explanation of the basis

6  for its designation of SpyHunter 5 as a PUP and "threat."  After a short time, having changed nothing

7  about its detection, quarantining, and blocking of SpyHunter 5 and having failed to provide any

8  explanation, Malwarebytes responded with a generic message stating that it hoped it had addressed

9  the issue to EnigmaSoft's satisfaction.  EnigmaSoft replied that Malwarebytes had not, in fact,

10  addressed the concern EnigmaSoft had raised and demanded that Malwarebytes cease its continuing

11  unlawful blocking of SpyHunter 5.  Malwarebytes never responded.

12  174.   Around that time, MBAM products also began to block access to certain third-party

13  websites that advertised SpyHunter 5.  When one such third-party website complained to

14  Malwarebytes on the Malwarebytes Forum about the blocking and requested an explanation, a

15  Malwarebytes "staff" member, appointed by Malwarebytes and authorized to speak on

16  Malwarebytes' behalf, provided a single explanation: "Unfortunately, the block has been added

17  because your [*sic*] advertising SpyHunter."  When this third-party website pushed back against

18  Malwarebytes' improper blocking by pointing out that Malwarebytes did not block or interfere with

19  other websites also advertising SpyHunter 5, Malwarebytes, faced with its own inconsistent,

20  contradictory, and predatory practices, effectively admitted it was wrong and stopped its improper

21  blocking of this third-party website.

22  175.   EnigmaSoft had not made any material alterations to SpyHunter 5 between June 21,

23  2018, when SpyHunter 5 was released, and August 16, 2018, when Malwarebytes began to designate

24  it as a "threat" and PUP, that would have justified Malwarebytes' new malicious blocking.

25  Moreover, at all times since SpyHunter 5's release, SpyHunter 5 did not even have any of the

26  characteristics Malwarebytes pretextually claimed as justifications for its blocking of SpyHunter 4.

27  176.   As part of Malwarebytes' unfair anticompetitive practices designed to hurt ESG,

28  Malwarebytes' MBAM products continued to improperly target ESG's affiliated company

EnigmaSoft by designating, quarantining, and blocking SpyHunter 5 as a "threat" and PUP for over five months, until it abruptly stopped doing so in early February 2019.  Again, EnigmaSoft had not made any material alterations to SpyHunter 5 between August 16, 2018, when Malwarebytes began to designate SpyHunter 5 as a PUP, and early February 2019, when it decided to stop doing so.

177.   Malwarebytes' "threat researcher" Dr. Fistonich represented to the Paris Commercial Court in a separate French legal proceeding that Malwarebytes stopped designating SpyHunter 5 as a PUP in early February 2019, because SpyHunter 5 then no longer qualified as a PUP under Malwarebytes' own PUP criteria.  ***Yet despite Malwarebytes own admission that at least as of February 2019, SpyHunter 5 did not qualify as a PUP under Malwarebytes' criteria, Malwarebytes' AdwCleaner product continued to detect SpyHunter 5 until late June 2020, stopping only on the eve of a hearing before the Paris Commercial Court to address Malwarebytes' unlawful interference with SpyHunter 5***.

178.   Malwarebytes' interference with SpyHunter 5 and its false and misleading statements that SpyHunter 5 is a "threat" to users and their security shows the malicious motives of Malwarebytes behind its long-running anticompetitive targeting of ESG.

### Malwarebytes' Purported Bases to Identify SpyHunter 4 and RegHunter 2 as "Threats" and PUPs are Entirely False and Pretextual and are Driven By Anticompetitive Animus

179.   SpyHunter 4, RegHunter 2, and ESG's other products and ESG's domains are legitimate and safe.  They pose no threat to a user's computer or safety and are not disruptive, harassing, threatening, malicious, or unwanted in any way, and there is no objective or good faith basis to believe they are.

180.   Malwarebytes has no good faith basis to claim that ESG's products are "threats" or "potentially unwanted programs," as it knows they are no such thing.  Malwarebytes acted in bad faith and as a result of its anticompetitive animus when it made its false, deceptive, and misleading statements to users that SpyHunter 4 and RegHunter 2 were a "threat" and PUP.

181.   As the user complaints identified above illustrate, users who have already downloaded (and paid for), or are trying to download, SpyHunter 4 or RegHunter 2 ***want*** those programs on their computer, a fact Malwarebytes knows.  At a minimum because of user complaints made to Malwarebytes itself, Malwarebytes knew that (i) users believed SpyHunter 4 and RegHunter 2 were

1   good, effective products that users wanted to use to protect themselves and their computers from,

2   *inter alia*, cybersecurity and privacy risks, and (ii) users wanted to use ESG's products in layered

3   combination with Malwarebytes' products.  Additionally, any user who paid for SpyHunter 4 or

4   RegHunter 2 had, at all times, available to them a complete 30-day "no questions asked" "money

5   back guarantee" refund right under ESG's Refund Policy.  Under ESG's Refund Policy, any user

6   could obtain a complete refund within thirty days of any purchase of an ESG product, for any reason

7   whatsoever and without having to provide any explanation for the refund request to ESG.  Thus, any

8   user dissatisfied with ESG's programs for whatever reason or concerned about the protections and

9   features ESG's programs offered could obtain a full refund, even after having used the programs and

10   enjoyed their cybersecurity and privacy protections for a month.  Thus, users' purchase and renewal

11   of subscriptions to ESG's products proves that Malwarebytes had no basis to falsely represent that

12   ESG's products were "threats" and PUPs.

13        182.   Moreover, in actual head-to-head competitive quality testing performed by the highly

14   respected independent testing lab AV-Test, SpyHunter 4 beat MBAM on all performance metrics

15   tested.  Malwarebytes touts its own AV-Test scores in its marketing materials as indicative of

16   Malwarebytes' quality effectiveness, and legitimacy, but purposely ignores those scores achieved by

17   ESG when they stand in the way of Malwarebytes' malicious and bad faith targeting of ESG.

18   Particularly in light of SpyHunter 4 earning top scores from AV-Test and beating MBAM in head-to-

19   head testing, Malwarebytes knew that SpyHunter 4 was not a "threat" or PUP and Malwarebytes had

20   no credible or good faith basis to make any such claims to users about SpyHunter 4.

21        183.   Malwarebytes also lacked any good faith basis to claim that ESG's website and

22   domains were a threat or "malicious," and acted in bad faith and as a result of anticompetitive animus

23   when it knowingly made its false and misleading statements to users that ESG's websites and

24   domains were a threat or "malicious."

25        184.   None of the other recognized anti-virus and anti-malware software publishers, such as

26   Microsoft Defender, Norton/Symantec, McAfee, Avast, Avira, AVG, and Sophos, have, or had, a

27   pattern or practice of designating, quarantining, or blocking ESG's products or domains as PUPs,

28   threats, malware, malicious, or otherwise.

185.     Malwarebytes has attempted to offer a variety of supposed justifications for its malicious and anticompetitive targeting of ESG.  As detailed below, none of Malwarebytes' pretenses can explain Malwarebytes' targeting of ESG or provide a valid justification for Malwarebytes' unlawful anticompetitive conduct.

186.     For example, Malwarebytes has pretended to complain that SpyHunter 4 uses the color red to designate detected items in its scan results.  Yet many other anti-virus and anti-malware programs, like McAfee Total Protection, Avast Premium Security, HitmanPro, AVG Guard Detection, and Emsisoft, do or have done the same, and Malwarebytes has not blocked them or listed them as "threats" or PUPs, to ESG's knowledge and belief.  Moreover, SpyHunter 4 did not designate all detections in red.  Instead, it used a five-tiered, color-coded threat designation system that ranged from bright red for the most serious threats to green for the least.  This tiered system reflects ESG's intention to provide transparency and enable users to make a nuanced threat assessment, rather than, as Malwarebytes has falsely suggested, to coerce users through fear-mongering.

187.     Malwarebytes has pretended to complain that SpyHunter 4 detected and offered remediation of certain cookies.  Cookies, however, can present privacy risks to users.  For instance, some cookies silently collect users' personal data in a form of "data mining" done by websites or software programs, without users' awareness or full consent.  As a result, some users find it very valuable to have a cookie detection and removal feature in their cybersecurity software and accordingly, a number of cybersecurity programs, including HitmanPro and SUPERAntiSpyware, detect and remove cookies (similarly to SpyHunter 4).  Yet, upon information and belief, Malwarebytes does not designate those programs as PUPs and "threats."  Malwarebytes also has pretended to complain specifically that SpyHunter 4 called cookies "threats" in its scan results, but continued to designate SpyHunter 4 as a PUP long after SpyHunter 4 had begun to display cookies as only detected "items" or "objects."

188.     Malwarebytes has pretended to complain that users may have difficulties uninstalling SpyHunter 4 but has provided no evidence of any significant, repeated or unresolvable uninstall problems with SpyHunter 4's uninstall mechanism.  Malwarebytes knows that many, many software programs receive some complaints about uninstall problems and, upon information and belief,

1    Malwarebytes does not have a practice of blocking all those programs.

2        189.    Malwarebytes has pretended to complain that RegHunter 2 is a "registry cleaner" and

3    Malwarebytes supposedly is categorically opposed to registry cleaner programs.  Malwarebytes also

4    has complained that RegHunter 2 does not provide users with information regarding performance

5    gains from its use.  Yet Malwarebytes does not designate as PUPs numerous other programs,

6    including CCleaner, Avast CleanUp, and AVG TuneUp, even though they are registry cleaners and

7    likewise do not offer the performance gain information Malwarebytes claims is necessary.  In fact,

8    despite claiming that registry cleaners are supposedly categorically a threat to users, Malwarebytes

9    has no qualms about boosting its profits by allowing its sales affiliates and business partners, such as

10   Bleeping Computer, to market Malwarebytes' products alongside registry cleaner products like

11   CCleaner.  Malwarebytes' products, for instance, have been also displayed and promoted on Yahoo, a

12   large platform with a far-reaching audience, in conjunction with System Mechanic, a program very

13   similar to ESG's RegHunter 2 that, by Malwarebytes' own definition, is a "registry cleaner" and that

14   MBAM itself previously detected, quarantined, and blocked as a PUP and "threat":

15

16

17

18

19

20

21

22       190.    Because registry optimizer products target Windows registries, Microsoft itself is

23   highly motivated to identify and flag as dangerous any specific registry optimizer products that

24   diminished the performance of Windows or posed a threat to registry operation.  Microsoft has never

25   had a pattern or practice of identifying or blocking RegHunter 2 as malware or a PUP, or otherwise

26   designated it as a threat.

27       191.    Malwarebytes has pretended to complain that ESG uses an affiliate program through

28   which ESG products are advertised on third-party cybersecurity websites, but affiliate programs are

1  used by many reputable anti-virus and anti-malware companies that Malwarebytes does not block.

2  192.   Malwarebytes has pretended to complain that ESG offered discount coupons to users

3  of the free version of SpyHunter 4 who initially chose not to subscribe to the program's paid version.

4  The juncture at which a potential customer is completing the free trial and is still interacting with the

5  program through the uninstall process is a natural marketing inflection point at which to offer a

6  discount coupon.  Such an offer does not interfere in any way with the user's choice not to purchase

7  the software, but can provide value to the user if price was an initial deciding factor for the user in not

8  upgrading.  A number of programs, including SUPERAntiSpyware, offer coupons to users during the

9  uninstall process, but Malwarebytes does not block those programs.

10  193.   Malwarebytes has pretended to complain that SpyHunter 4 and a prior version of

11  RegHunter 2 offered users a free scan but charged for remediation of detected items.  A free scan and

12  charge for remediation, however, is a legitimate business model in the anti-malware industry.

13  Moreover, the free scans provided by SpyHunter 4 and RegHunter 2 provided information that

14  allowed users to manually perform remediation if they so desired, without having to purchase ESG's

15  products or pay any money to ESG.  Alternatively, users could check the results against those of

16  other anti-malware programs that did offer free remediation, such as the MBAM products, and

17  supplement their protection.  Thus, users could remediate their systems without upgrading their ESG

18  programs and were in no way coerced into paying for full versions of SpyHunter 4 and RegHunter 2.

19  194.   Malwarebytes has pretended to complain that ESG has, from time to time, sent cease

20  and desist letters to third parties regarding defamatory statements against ESG and detections and

21  blocking of ESG's programs, and, in certain instances, has had to file suit against the cease and desist

22  letter recipient.  ESG has taken such steps to protect and preserve its valid legal rights, as many other

23  similarly situated companies do and as the law requires to protect legal rights surrounding software

24  products.  ESG's legal actions do not bear on the function, efficacy, or safety of ESG's programs, and

25  so have no relevance to any PUP or threat assessment actually based on the interests of users.  Upon

26  information and belief, Malwarebytes has itself from time to time sent cease and desist letters to other

27  companies or individuals, as will be proven in discovery in this case.

28  195.   Malwarebytes has pretended to complain that ESG supposedly satisfies Malwarebytes'

1   PUP criteria of "predominantly negative comments or ratings from the user community."  This is a

2   facially vague and subjective criteria that does not define, among other things, what makes a

3   comment or rating "predominantly" negative or who constitutes the relevant "user community."

4   Upon information and belief, this criteria was specifically designed and/or applied by Malwarebytes

5   to provide it with ready justification for *any* blocking it chose to undertake, because on certain

6   internet comment and review sites, practically every software on the market has some poor ratings

7   and largely negative comments.  If negative user reviews provided a legitimate basis for a PUP

8   designation, Malwarebytes should have designated many, many other well-known, high-respected,

9   trusted and quality anti-malware products, such as Microsoft Defender, McAfee, Norton, Sophos,

10  Avast, Avira, Kaspersky, and AVG, as PUPs long before October 2016, but Malwarebytes did not.

11      196.   That Malwarebytes' pretended complaints about ESG's programs are pretextual is

12  further evidenced by the fact that SpyHunter 5 was, in practically all respects, significantly different

13  from SpyHunter 4 and did not have the SpyHunter 4 features that Malwarebytes had claimed were

14  objectionable, and yet Malwarebytes still decided to block SpyHunter 5 as a PUP and "threat."

15      197.   ***Indeed, if Malwarebytes were consistently and objectively applying its "revised"***

16  ***PUP criteria to designate ESG's programs, as it claims, Malwarebytes would have to designate and***

17  ***block its own programs as PUPs.***

18      198.   For instance, Malwarebytes' MBAM products has, in some instances, left traces on

19  users' computers following execution of its uninstall mechanism, and users have made public

20  complaints regarding difficulties they faced uninstalling Malwarebytes' MBAM products.  Thus, if

21  uninstall difficulties qualify a program as a "threat" and PUP under Malwarebytes' PUP criteria,

22  Malwarebytes would need to designate its MBAM products as a "threat" and PUP and block it.

23      199.   Malwarebytes also only offers the entirety of its MBAM products' functionality

24  during a 14-day trial, after which its free version provides substantially less functionality to a user.

25  Thus, if providing only limited functionality in a free version qualifies a program as a PUP under

26  Malwarebytes' PUP criteria, Malwarebytes would need to designate MBAM products as a PUP.

27      200.   Additionally, Malwarebytes itself runs affiliate programs, in which it offers

28  commissions to third parties for sales those third parties generate of Malwarebytes' software through

their third-party websites.  As a result, Malwarebytes' software is advertised through third-party cybersecurity websites, just as ESG's software is, and some of the third-party websites advertising Malwarebytes' software are intentionally designed to appear to users as objective informational sites. In fact, as part of its affiliate program, Malwarebytes offered and paid fees and commissions to Bleeping Computer in exchange for Bleeping Computer marketing and selling MBAM products to consumers and businesses on the Bleeping Computer Website.  Thus, if advertising in connection with affiliate or third-party websites qualifies a program as a PUP under Malwarebytes' PUP criteria, Malwarebytes would need to designate its own MBAM products as PUPs.

201.    Malwarebytes further regularly provides discount coupons and special pricing on its products to users, including on its own website, through PC World, and through Bleeping Computer. *See, e.g.,* www.malwarebytes.com/for-home/; www.pcworld.com/couponcodes/malwarebytes.  Thus, if discount pricing is coercive to a user and qualifies a program as a PUP under Malwarebytes' PUP criteria, Malwarebytes would need to designate its own programs as PUPs.

202.    As covered extensively by the tech media, Malwarebytes has several times issued updates to its software that severely negatively impacted the operation of users' computers and the experience of its users.  In one particularly egregious instance in 2013, Malwarebytes issued a botched product update that caused MBAM to designate as malicious core Windows system files, thereby crashing Windows operating systems across the globe (including in 911 call centers and hospital emergency rooms) and requiring Malwarebytes to issue a public apology for the havoc it wreaked.  *See* blog.malwarebytes.com/malwarebytes-news/2013/04/yesterdays-database-update-issue/; www.theregister.com/2013/04/19/malwarebytes_false_positive/.  This was far from an isolated incident, with additional issues requiring company apologies occurring in 2016 and 2018. *See, e.g.*, www.computerworld.com/article/3029612/malwarebytes-still-fixing-flaws-in-antivirus-software.html; forums.malwarebytes.com/topic/219996-important-web-blocking-ram-usage-issue/; forums.malwarebytes.com/topic/220112-important-web-blocking-ram-usage/.  Thus, if the fact that a program "diminishes user experience" qualifies a program as a PUP under Malwarebytes' PUP criteria, Malwarebytes would need to designate its own MBAM products as PUPs.

203.    Like many other software companies, Malwarebytes has negative ratings and reviews

on numerous websites, including on its own company website, Malwarebytes' Amazon product pages, Pissed Consumer, the Better Business Bureau, Consumer Affairs, and Trustpilot.  Negative reviews of Malwarebytes complain about a host of the same issues Malwarebytes has claimed as pretenses for designating ESG's programs as "threats" and PUPs, including unauthorized charges and billings to users' credit cards, making it difficult to get refunds or cancelling subscriptions, being a "scam" and "fraudulent" product, subjecting users to unwanted advertising, having poor technical support services, making it difficult to get around Malwarebytes blocking other programs, and displaying repeated "false positives."  *See, e.g.*, Ex. 17.  Thus, if "predominantly negative" reviews qualify a program as a "threat" and PUP under Malwarebytes' PUP criteria, Malwarebytes, under its own PUP criteria, would need to designate its own MBAM products as a "threat" and PUP.

204.    Despite Malwarebytes' numerous issues, and despite the fact that other anti-virus and anti-malware providers have flagged Malwarebytes' programs from time to time, ESG has never designated or flagged any Malwarebytes program as a threat, a PUP, or otherwise.  This is because ESG has always believed that users should have free choice in deciding and selecting among recognized, effective, legitimate anti-malware software products to build layered cybersecurity.  ESG also believes that determinations to block programs should be based on objective, technologically sound factors that can be explained and that are applied in a good faith, consistent manner—and not for anticompetitive reasons.  ESG has always rejected Malwarebytes' claim that it can block any competitor's product it likes—including in bad faith—because such a business practice makes consumers and businesses less safe and less secure against hackers, malware attacks, ransomware attacks, and other illicit activities by cybercriminals.  Malwarebytes' anticompetitive practices (which are akin to Apple, which offers iPhones, blocking and interfering with the operation of Android phones offered by Samsung) if taken up by others in the cybersecurity industry would mean each cybersecurity and anti-malware product could block each and every one of its competitors' products without any good faith basis or in bad faith, thereby leaving consumers and businesses in a vulnerable position of only being able to use one anti-malware program to protect themselves.  Because no one anti-malware program can offer full and complete anti-malware protection against every cyber threat, Malwarebytes' practice of unilaterally interfering with and blocking consumers' and businesses'

freedom to choose their own self-selected cybersecurity program configurations harms users and stifles free markets, product innovation, and competitive pricing.

205.    As the unsupportable, pretextual nature of Malwarebytes' supposed justifications demonstrates, Malwarebytes listed ESG's products as "threats" and PUPs and its domains as "malicious" in a targeted anticompetitive attempt to harm ESG and its market position, to ultimately benefit Malwarebytes and as retaliation against ESG's legitimate attempts to protect its rights.

206.    Malwarebytes has never had any valid basis, privilege, legal immunity, or right to make its deceptive, false, and misleading statements about ESG, ESG's products, or ESG's domains.

207.    Malwarebytes' unlawful conduct is willful and malicious and has been done based on anticompetitive animus.

### Malwarebytes Has Harmed, and Continues to Harm, ESG

208.    Malwarebytes' unlawful conduct has caused, is causing, and will continue to cause harm to ESG.  ESG has taken reasonable countermeasures to try to reduce the harm it has suffered, and continues to suffer, as a result of Malwarebytes' unlawful conduct, but the continuing harm remains significant.

209.    As a result of Malwarebytes unlawfully identifying SpyHunter 4 and RegHunter 2 as "threats" and PUPs, ESG suffered a drop in its sales and renewals of subscriptions for SpyHunter 4 and RegHunter 2.

210.    Additionally, by recommending to users who had already purchased a SpyHunter 4 or RegHunter 2 subscription and installed the programs that they delete SpyHunter 4 and RegHunter 2 because they are a "threat" and PUP, Malwarebytes caused and will continue to cause ESG customers to request cancellations and/or refunds for their previously-purchased subscriptions.

211.    Malwarebytes' designation and blocking of *.enigmasoftware.com domains has maliciously compounded the harm caused by Malwarebytes' listing, quarantining, and blocking of ESG's programs as "threats" and PUPs by further interfering with users' access to ESG's programs, thereby decreasing sales and causing ESG customers to seek cancellations and refunds.

212.    ESG has no adequate remedy at law for certain of the relief requested below.

1

**FIRST CAUSE OF ACTION**

2

(Violations of Lanham Act § 43(a))

3     213.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully

4   set forth herein.

5     214.    Malwarebytes' use in commerce of false and misleading statements about ESG and its

6   products—including but not limited to statements that SpyHunter 4 and RegHunter 2 are "threats"

7   and/or "potentially unwanted programs" and that ESG's website and domains are "malicious" and

8   disruptive—constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

9     215.    Malwarebytes has disseminated its false and misleading statements about ESG,

10  SpyHunter 4, RegHunter 2, and ESG's website and domains in commercial advertisements and

11  promotions through, *inter alia*, its free and trial versions of MBAM products, AdwCleaner, product

12  advertising in its subscription products, public statements on the Malwarebytes company website,

13  including the Malwarebytes Forum, affiliate sellers sites, and various other media and/or channels

14  through which Malwarebytes distributes to users across the United States.

15    216.    Malwarebytes' use in commerce of false and misleading statements about ESG,

16  SpyHunter 4, RegHunter 2, and ESG's website and domains is likely to deceive consumers as to the

17  nature, quality and efficacy of SpyHunter 4, RegHunter 2, and/or ESG's website and domains,

18  including causing consumers to believe that SpyHunter 4, RegHunter 2, and/or ESG's website and

19  domains are malicious or a threat.

20    217.    Consumers look to Malwarebytes, as with other anti-malware software providers, as

21  an expert in the field of cybersecurity on which consumers can rely to accurately identify and

22  effectively protect against cybersecurity threats.  Malwarebytes encourages this reliance in its

23  advertising and marketing materials and its user guides, calling itself "one of the most trusted names

24  in cybersecurity" and recommending users operate Malwarebytes' products using Malwarebytes' pre-

25  determined default settings rather than user-set custom parameters.  Malwarebytes has presented

26  sworn testimony in court that users effectively rely upon Malwarebytes for Malwarebytes' selection

27  or programs to block as threats and PUPs and that users typically do not change or personally decide

28  to override Malwarebytes' blocking decisions that it automatically implements in MBAM.

---

1    218.   Users view Malwarebytes' statements that ESG's programs are "threats" and PUPs

2 and that ESG's domains are "malicious" as statements of fact rather than opinions, because, *inter*

3 *alia*, users view Malwarebytes as an authority on what programs and websites constitute

4 cybersecurity threats.  Indeed, Malwarebytes repeatedly has publicly pronounced that the revised

5 PUP criteria under which it designated ESG's programs are "solely … objective and technical,"

6 making PUP designations pursuant to those criteria statements of fact.  Malwarebytes further

7 compounds users' understanding of Malwarebytes' statements as factual by not only calling ESG's

8 programs "threats" and PUPs and its domains malicious, but also by automatically quarantining the

9 programs, blocking their installation, and preselecting files for removal, and blocking users' access to

10 the domains.  Malwarebytes thereby informs consumers that the "threat" posed by ESG's programs

11 and domains is so serious that Malwarebytes must immediately neutralize it through additional,

12 invasive steps, even causing users to believe that ESG's products are "malware," as various users

13 expressed in complaints to both ESG and Malwarebytes.  Malwarebytes then makes excluding ESG's

14 programs from detection and quarantine so difficult, if not impossible, that it further informs users

15 that ESG's products pose such a serious risk that Malwarebytes must disallow their use in disregard

16 of the consumer's express desire and attempts to access the ESG products (which the consumer has

17 demonstrated by actually purchasing and renewing subscriptions to those products).

18    219.   Such deception is material as it is likely to influence consumers not to purchase

19 SpyHunter 4 or RegHunter 2 and/or do business with ESG and, instead, to continue to utilize and

20 subscribe to Malwarebytes' products.  Malwarebytes' false designation of ESG's products as

21 "threats" and PUPs and its domains as "malicious" is likely to convince consumers not to use or

22 purchase ESG's products or to do business with ESG because ESG promotes its products as

23 legitimate and quality cybersecurity, optimization, and privacy tools, and Malwarebytes falsely

24 represents that ESG's products are the precise opposite—cybersecurity "threats" and unwanted

25 programs.  Malwarebytes' false statements lead users and potential users of ESG's products to doubt

26 or otherwise not trust ESG about its products, particularly in a context where users are making

27 critically important decisions regarding their cybersecurity and safety.  In fact, SpyHunter 4 protects

28 users from threats and PUPs, so Malwarebytes calling SpyHunter 4 a "threat" and PUP, the precise

1 things it is intended to protect against, causing users to believe ESG's products are "malware" as

2 various users specifically stated to Malwarebytes, and directly associating it with "malicious"

3 domains, is among the most damaging statements a competitor could make.

4       220.    Malwarebytes' false and misleading statements have actually deceived or have the

5 capacity to deceive a substantial portion of their intended audience, *i.e.*, users of MBAM and/or

6 AdwCleaner who are also existing and/or prospective customers of ESG and users of SpyHunter 4

7 and/or RegHunter 2. Malwarebytes' products disseminated to at least eight different categories of

8 users the false and misleading statements that SpyHunter 4 and RegHunter were PUPs and "threats":

9           a.     Users who had downloaded free versions of Malwarebytes' products

10                and, while using that software, tried to install the free versions of

11                SpyHunter 4 or RegHunter 2;

12           b.     Users who had downloaded free versions of Malwarebytes' products

13                and, while using that software, tried to install the paid versions of

14                SpyHunter 4 or RegHunter 2;

15           c.     Users who subscribed to paid versions of MBAM products and then

16                tried to install the free version of SpyHunter 4 or RegHunter 2;

17           d.     Users who subscribed to paid versions of MBAM products and then

18                tried to install the paid version of SpyHunter 4 or RegHunter 2;

19           e.     Users who downloaded the free version of SpyHunter 4 or RegHunter 2

20                and then installed free versions of Malwarebytes' products;

21           f.     Users who downloaded the free version of SpyHunter 4 or RegHunter 2

22                and then installed paid versions of MBAM products;

23            g.     Users who subscribed to the paid version of SpyHunter 4 or RegHunter

24                2 and then downloaded free versions of Malwarebytes' products; and

25           h.     Users who subscribed to the paid version of SpyHunter 4 or RegHunter

26                2 and then downloaded paid versions of MBAM products.

27       221.    In each one of these categories, Malwarebytes published and publishes to users'

28 computers through MBAM products and AdwCleaner products the false, misleading, and disparaging

1    statements that SpyHunter 4 and RegHunter 2 are "threats" and PUPs.

2        222.    This designation operates continually through the programming of Malwarebytes'

3    detections; that is, those statements were published to users *each and every time* MBAM products

4    executed a scan and detected ESG files or each time an MBAM products user attempted to download

5    SpyHunter 4 or RegHunter 2, twenty four hours a day, seven days a week.

6        223.    Malwarebytes also, for an extended period of time, published to users of both the free

7    and paid versions of MBAM products the false and misleading statements that ESG's website and

8    other domains, were "malicious" every time the MBAM products user attempted to access ESG's

9    website or other domain.  Malwarebytes' blocking of users from reaching ESG's domains

10   exacerbated the damages ESG suffered because users were blocked from contacting ESG to receive

11   assistance to work around Malwarebytes' unlawful blocking of ESG's products.

12       224.    Additionally, Malwarebytes' false and misleading statements are shown to the

13   consuming public, including persons not currently using MBAM products and/or AdwCleaner

14   products, via various statements on the Malwarebytes website and Forum and via the public

15   announcement on Twitter by one of AdwCleaner's developers, a Malwarebytes engineer and

16   researcher who had legal authority to speak for and bind Malwarebytes at all relevant times.

17       225.    Malwarebytes' false and misleading statements are part of an organized

18   anticompetitive campaign by Malwarebytes—already in its fourth year—to strengthen its position in

19   the market for anti-malware and Internet security products by unfairly driving consumers away from

20   ESG, SpyHunter 4, and RegHunter 2 and to Malwarebytes' products, including to its paid Premium

21   MBAM products and business products.

22       226.    As a direct and proximate result of Malwarebytes' unlawful acts, ESG has suffered

23   and will continue to suffer significant monetary and reputational injury, including losses of sales and

24   a lessening of goodwill associated with its products, in amounts that will be proven at trial but that

25   exceed $75,000, exclusive of interest and costs.

**SECOND CAUSE OF ACTION**

(Violations of New York General Business Law § 349)

27       227.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully

set forth herein.

228.    Section 349 of New York's General Business Law prohibits the use of deceptive acts or practices in the conduct of business, trade, or commerce, or in the furnishing of any service in the State of New York.

229.    Malwarebytes' unfair competition tactics as described throughout this Second Amended Complaint, including, *inter alia*, the wrongful detection and blocking of SpyHunter 4 and RegHunter 2 as "threats" and PUPs and the blocking of ESG's website and domains as "malicious," constitute deceptive and unfair trade practices.

230.    Each time a user who has MBAM products and/or AdwCleaner installed and running on his or her computer attempts to download, install, or operate SpyHunter 4 or RegHunter 2, MBAM and AdwCleaner display to the user the false and deceptive statement that SpyHunter 4 and/or RegHunter 2 are "threats" and PUPs.  MBAM automatically quarantines existing SpyHunter 4 and RegHunter 2 files and block new attempts at installation.  AdwCleaner preselects detected SpyHunter 4 and RegHunter files for deletion.  In many instances, users are not able to navigate excluding SpyHunter 4 or RegHunter 2 from designation, quarantine, and blocking by Malwarebytes' products.  Additionally, for a lengthy period of time, whenever a user that had MBAM products installed and running and attempted to access ESG's website or other domains, MBAM products displayed to the user the false and deceptive statement that ESG's website or domain was "malicious" and blocked the user's access to that website or domain.

231.    Malwarebytes' statements that SpyHunter 4 and RegHunter 2 are "threats" and PUPs and ESG's domains as "malicious," its quarantining and blocking of program files and blocking of user access to the domains, and its representatives' and/or agents' disparaging public statements regarding ESG and its products following Malwarebytes' announcement of its revised PUP criteria are materially misleading to consumers because these acts wrongly suggest that SpyHunter 4 and RegHunter 2—two legitimate and highly regarded programs—and ESG's website and domains are malicious or threats to users' personal security and devices.  SpyHunter 4 and RegHunter 2 are not "threats" or PUPs and ESG's domains are not "malicious" and do not contain malicious material.  As Malwarebytes knows, ESG's domains are legitimate and ESG's programs are quality products

certified by well-respected industry organizations whose certifications Malwarebytes itself touts for its own products.  In fact, SpyHunter 4 has beaten MBAM in direct head-to-head performance testing by respected independent test lab AV-Test.

232.    As a result, consumers are harmed by being misled on false pretenses into not downloading and using effective anti-malware software and by being prevented without their consent from installing the software or even accessing ESG's website.  Malwarebytes also intentionally misleads consumers into (i) giving up ESG's security protections based on Malwarebytes' false representations that those protections are actually "threats" and (ii) believing that they cannot use combined layering cybersecurity protection with MBAM products and SpyHunter 4, despite cybersecurity experts and even Malwarebytes itself recommending the use of combined layered protection and despite consumers' right of free choice for selecting anti-malware products.  In some instances, those consumers, users and/or business people have already paid for the use of ESG's programs and are prevented from use to which their payment has entitled them.  Consumers, users and/or business people prevented from using ESG's programs are left less safe from a cybersecurity and privacy standpoint, including because they are prevented from using SpyHunter 4 as their cybersecurity solution of choice or RegHunter 2's privacy protection features and from layering ESG products with MBAM products for increased protection.

233.    ESG has been and continues to be injured as a result of Malwarebytes' deceptive and unfair trade practices, including through losses of sales and a lessening of goodwill associated with its products and brand names, in amounts that will be proven at trial but that exceed $75,000, exclusive of interest and costs.

**THIRD CAUSE OF ACTION**

(Tortious Interference with Contractual Relations)

234.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

235.    At all relevant times, ESG has contractually licensed the SpyHunter 4 and RegHunter 2 software to numerous customers through subscriptions and binding terms of service and use.

236.    Malwarebytes knows that prior to beginning its false detection, quarantining, and

blocking of SpyHunter 4 and RegHunter 2 as PUPs and "threats" and its blocking of ESG's domains as "malicious," certain users of MBAM products and AdwCleaner products simultaneously used SpyHunter 4 and/or RegHunter 2.  Among other things, Malwarebytes and ESG are direct competitors marketing to the same customers—indeed, Malwarebytes specifically targets ESG's potential and existing customers in its advertising—and Malwarebytes itself recognizes that users may seek to layer multiple cybersecurity software solutions for added protection.  Malwarebytes also knows from its own users' statements directly to Malwarebytes that there are Malwarebytes users that also use ESG's products and seek to operate both simultaneously on their computers.

237.    Malwarebytes knows that since it began falsely detecting, quarantining, and blocking SpyHunter 4 and RegHunter 2 as PUPs and "threats" and blocking ESG's domains as "malicious," certain MBAM and AdwCleaner users (i) desire to, and have attempted to, download, install, and use SpyHunter 4 and/or RegHunter 2, and/or (ii) desire to, and have attempted to, continue simultaneous use of SpyHunter 4 and/or RegHunter 2 and have expressly stated to Malwarebytes that they desire to use both Malwarebytes' and ESG's products but are prevented from doing so by Malwarebytes' blocking and intentionally difficult-to-implement exclusion process.

238.    It is common practice in the industry for anti-virus and anti-malware software to be distributed pursuant to subscription agreements and/or contractual terms of service and use, as both ESG's and MBAM's products are.

239.    By displaying messages that SpyHunter 4 and RegHunter 2 are PUPs and "threats" to users of MBAM and AdwCleaner products that either also have SpyHunter 4 or RegHunter 2 installed on their computer, or are seeking to install SpyHunter 4 or RegHunter 2, by automatically quarantining SpyHunter 4 and RegHunter 2, by automatically blocking the installation of SpyHunter 4 and RegHunter 2 without user consent, by preselecting SpyHunter 4 and RegHunter 2 for deletion and encouraging users to make the deletion, and by blocking ESG's website and domains, which are associated with SpyHunter 4 and RegHunter 2, as "malicious," Malwarebytes has intentionally and maliciously (i) induced users to choose not to install SpyHunter 4 and RegHunter 2 or to delete SpyHunter 4 and RegHunter 2 and (ii) disabled SpyHunter 4 and RegHunter 2 programs that ESG customers have already paid to install and use, causing confusion and anger among ESG's customers.

240.    By making false and misleading statements that SpyHunter 4 and RegHunter 2 are PUPs and threats and/or recommending that users cancel their SpyHunter 4 and RegHunter 2 subscriptions or seek refunds from ESG, directly and/or through representatives and/or agents via the Malwarebytes company website, including the Malwarebytes Forum, and via public announcement on Twitter by one of AdwCleaner's developers, a Malwarebytes engineer and researcher who legally speaks for Malwarebytes, Malwarebytes has intentionally and maliciously induced consumers to choose not to install SpyHunter 4 and RegHunter 2 or to delete SpyHunter 4 and RegHunter 2.

241.    ESG has received customer complaints and requests for refunds, cancellations, and nonrenewals as a result of Malwarebytes' unlawful conduct.

242.    As a result of Malwarebytes' tortious interference, ESG has been damaged at least through loss of subscription fees in amounts that will be proven at trial but exceed $75,000, exclusive of interest and costs.

**FOURTH CAUSE OF ACTION**

(Tortious Interference with Business Relations)

243.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

244.    Certain consumers who use or seek to download and install SpyHunter 4 or RegHunter 2 are prospective customers of ESG who have not yet paid the SpyHunter 4 or RegHunter 2 license fees required to obtain full product functionality.

245.    Malwarebytes knows that consumers using or seeking to download and install SpyHunter 4 or RegHunter 2 may enter into a paid business relationship with ESG.

246.    By displaying messages to users of MBAM products and AdwCleaner products that are using or seeking to download and install SpyHunter 4 or RegHunter 2 that SpyHunter 4 and RegHunter 2 are PUPs and "threats," by automatically quarantining SpyHunter 4 and RegHunter 2 files, by blocking the installation of SpyHunter 4 and RegHunter 2 without user consent, and by blocking users' access to ESG's domains and to third-party websites advertising ESG's products as "malicious," Malwarebytes has intentionally interfered with the prospective business relationships between those users and ESG by inducing the users not to complete the installation and/or not to

purchase licenses to SpyHunter 4 and/or RegHunter 2.

247.   By making false and misleading statements to the consuming public, including persons not currently using MBAM products and/or AdwCleaner products, via various statements on the Malwarebytes company website, including the Malwarebytes Forum, and a public announcement on Twitter by one of AdwCleaner's developers, a Malwarebytes engineer and researcher who legally speaks for and binds Malwarebytes, that SpyHunter 4 and RegHunter 2 are PUPs and threats, Malwarebytes has intentionally and maliciously induced consumers to choose not to install SpyHunter 4 and RegHunter 2 or to delete SpyHunter 4 and RegHunter 2.

248.   Malwarebytes has acted solely out of malice in wrongfully and misleadingly informing consumers that SpyHunter 4 and RegHunter 2 are PUPs and "threats," and automatically quarantining their files and blocking their installation without user consent.

249.   Malwarebytes' wrongfully and misleadingly informing users that SpyHunter 4 and RegHunter 2 are PUPs and "threats," and automatically quarantining their files and blocking their installation without user consent, is an improper and illegitimate means of competition that Malwarebytes undertook for the sole purpose of inflicting intentional harm upon ESG.

250.   As a result of Malwarebytes' tortious interference, ESG has been damaged at least through loss of subscription fees in amounts that will be proven at trial but that exceed $75,000, exclusive of interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, ESG respectfully requests that the Court enter judgment in its favor as follows:

        a.     Declaring that Malwarebytes' conduct violates the Lanham Act;

        b.     Declaring that Malwarebytes' conduct violates New York General Business Law § 349;

        c.     Declaring that Malwarebytes' conduct constitutes tortious interference with contractual relations under the laws of the State of New York;

        d.     Declaring that Malwarebytes' conduct constitutes tortious interference with business relations under the laws of the State of New York;

e.      Permanently enjoining Malwarebytes from programming MBAM products and AdwCleaner products to detect, label, and/or characterize in any way SpyHunter 4 and RegHunter 2 as PUPs, threats, or any similar type of designation, or to act in any manner to notify users of the same false representations;

f.      Permanently enjoining Malwarebytes from programming MBAM products and AdwCleaner products to prevent in any way the installation and/or operation of SpyHunter 4 and RegHunter 2;

g.      Awarding ESG damages in an amount proven at trial and in excess of $75,000, plus interest;

h.      Awarding ESG punitive damages;

i.      Awarding ESG its attorneys' fees and costs incurred in bringing this action; and

j.      Awarding such other and further relief as the Court deems proper.

## **JURY TRIAL DEMANDED**

ESG demands a trial by jury of all issues so triable in this action.

1
2

Dated: November 30, 2020

Respectfully submitted,

3

By: */s/ Terry Budd*
Terry Budd (*Admitted Pro Hac Vice*)
BUDD LAW, PLLC
120 Lyndhurst Circle
Wexford, PA 15090
Telephone: 412-613-2541
terry.budd@buddlawglobal.com

4
5
6
7

Edward P. Sangster (SBN 121041)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220
ed.sangster@klgates.com

8
9
10
11

Christopher M. Verdini  (*Admitted Pro Hac Vice*)
Anna Shabalov  (*Admitted Pro Hac Vice*)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
christopher.verdini@klgates.com
anna.shabalov@klgates.com

12
13
14
15
16
17

Attorneys for Plaintiff
ENIGMA SOFTWARE GROUP USA, LLC

18
19
20
21
22
23
24
25
26
27
28

1

## **NOTICE OF SERVICE**

2       I certify that on November 30, 2020, the foregoing was filed electronically using CM/ECF.

3   Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

4

5                                                   */s/ Terry Budd*
                                                    Terry Budd
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT**                          CASE NO. 5:17-CV-02915 (EJD)