HUESTON HENNIGAN LLP
John C. Hueston. State Bar No. 164921
jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Linjun Xu, State Bar No. 307667
lxu@hueston.com
Michael K. Acquah, State Bar No. 313955
macquah@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:    (213) 788-4340
Facsimile:    (888) 775-0898

Attorneys for Defendant
Malwarebytes Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ENIGMA SOFTWARE GROUP USA, LLC, | Case No. 5:17-cv-02915-EJD |
| Plaintiff, | **DEFENDANT MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |
| vs. | |
| MALWAREBYTES INC., | **DATE: March 25, 2021** |
| Defendant. | **TIME: 9:00 AM**<br>**COURTROOM: 4, 5th Floor** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 2

II.   STATEMENT OF FACTS .......................................................................... 4

      A.   Millions of Consumers Rely on Malwarebytes' Critically Acclaimed
           Anti-Virus and Anti-Malware Software to Protect Their Computing
           Activities ........................................................................................... 4

      B.   Enigma Aggressively Suppresses Negative Opinions with Litigation
           Campaigns ......................................................................................... 7

II.   ARGUMENT ............................................................................................... 7

      A.   Legal Standard ................................................................................... 7

      B.   California Law Governs This Dispute Because SDNY Lacked
           Personal Jurisdiction Over Malwarebytes .................................... 8

      C.   Enigma Fails to State a Claim Under Section 43(a) of the Lanham Act
           ......................................................................................................... 11

           1.   Malwarebytes' Classification of Enigma Scareware As
                "Potentially Unwanted Programs" Is A Non-Actionable
                Statement of Opinion ........................................................... 11

           2.   Enigma's Lanham Act Claim Lacks Well-Pled Allegations of
                Any Commercial Advertisement or Promotion by
                Malwarebytes ........................................................................ 13

           3.   Enigma Fails to Plausibly Allege that Malwarebytes' Acts
                Have the Potential to Deceive Its Audience, Let Alone a
                Substantial Segment Thereof ............................................... 15

      D.   Enigma Fails to State a Claim Under New York General Business Law
           Section 349 ....................................................................................... 15

      E.   Enigma's IIPER Claim Must Be Dismissed .................................. 17

           1.   Enigma's Claimed Relationships with Unidentified Third-
                Party Consumers Are Impermissibly Speculative to Support Its
                IIPER Claim ........................................................................... 17

           2.   Enigma Has Failed to Plausibly Plead that Malwarebytes Had
                Knowledge of Such Anonymous Users ................................ 18

           3.   Enigma Fails to Plausibly Allege Economic Harm Proximately
                Caused by Malwarebytes' Conduct ..................................... 19

           4.   Malwarebytes' Alleged Acts of Updating its Detection Criteria
                to Better Identify Malware and Spyware Are Privileged
                Competition ........................................................................... 20

1

TABLE OF CONTENTS (cont.)

2

Page

3

F.      Enigma's Intentional Interference with Contractual Relations (IICR)
        Claim Should Be Dismissed ........................................................................ 22

4

5

        1.      Enigma Fails to Plausibly Allege Any Valid Contractual
                Obligation with Which Malwarebytes Interfered ....................................... 22

6

        2.      Enigma Fails to Plausibly Allege Malwarebytes Had
                Knowledge of Any Valid Contractual Obligation ...................................... 23

7

        3.      Enigma Fails to Allege Any Cognizable Breach or Disruption ................ 23

8

        4.      Because the Alleged Contractual Relationship Is At-Will
                Enigma Must (But Does Not) Sufficiently Plead Any
                Independently Wrongful Act ..................................................................... 25

9

10

IV.     CONCLUSION ........................................................................................................ 25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT PURSUANT TO FRCP 12(b)(6)

5877909

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. City of Beverly Hills*,
911 F.2d 367 (9th Cir. 1990) ........................................................................ 25

*AMA Multimedia, LLC v. Wanat*,
970 F.3d 1201 (9th Cir. 2020) ................................................................... 9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................... 7, 8

*Asurvio LP v. Malwarebytes Inc.*,
2020 WL 1478345 (N.D. Cal. Mar. 26, 2020) ................................. 2, 11, 12, 13

*Atlas MF Mezzanine Borrower, LLC v Macquarie Texas Loan Holder LLC*,
174 A.D.3d 150 (NY 1st Dept 2019)................................................................. 24

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
52 Cal. App. 4th 867 (1997) ...................................................................... 3, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................ 7

*Blatt v. Pambakian*,
432 F. Supp. 3d 1141 (C.D. Cal. 2020) ......................................................... 10

*Bolger v. Young Drug Prods. Corp.*,
463 U.S. 60, (1983)........................................................................................... 14

*Broder v. MBNA Corp.*,
281 A.D.2d 369 (2001)..................................................................................... 15

*Browne v. Avvo Inc.*,
525 F. Supp. 2d 1249 (W.D. Wash. 2007) ..................................................... 12

*Calder v. Jones*,
465 U.S. 783 (1984)............................................................................................. 9

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (NY 2004) .............................................................................. 20, 21

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
16 F. Supp. 3d 1141 (S.D. Cal. 2014)........................................................... 20

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)........................................................................................... 14

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

<u>Page(s)</u>

3

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
4
    173 F.3d 725 (9th Cir. 1999) ................................................................................. 2, 11, 13

5
*Comput. Scis. Corp. v. Comput. Assocs. Int'l, Inc.*,
    1999 WL 675446 (C.D. Cal. Aug. 12, 1999) .................................................................. 20
6

*Davis v. Avvo, Inc.*,
7
    345 F. Supp. 3d 534 (S.D.N.Y. 2018) ....................................................................... 13, 16

8
*Della Penna v. Toyota Motor Sales, USA, Inc.*,
    11 Cal. 4th 376 (1995) .................................................................................................... 21
9

10
*Dolin v. Facebook, Inc.*,
    2018 WL 2047766 (N.D. Cal. May 2, 2018) .................................................. 3, 18, 19, 21

11
*Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*,
12
    2019 WL 8631502 (C.D. Cal. Dec. 16, 2019) ....................................................... 3, 22, 23

13
*Edward Lewis Tobinick, MD v. Novella*,
    848 F.3d 935 (11th Cir. 2017) ......................................................................................... 15
14

15
*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
    946 F.3d 1040 (9th Cir. 2019) ................................................................................... 4, 5, 7

16
*GOLO, LLC v. HighYa, LLC*,
17
    310 F. Supp. 3d 499 (E.D. Pa. 2018) ............................................................................... 15

18
*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
    564 U.S. 915 (2011) ......................................................................................................... 10
19

20
*Gordon v. Invisible Children, Inc.*,
    2015 WL 5671919 (S.D.N.Y. Sept. 24, 2015) ................................................................... 9

21
*Grasshopper House, LLC v. Clean & Sober Media LLC*,
22
    394 F. Supp. 3d 1073 (C.D. Cal. 2019) ............................................................................ 13

23
*Gross v. Bare Escentuals Beauty, Inc.*,
    632 F. Supp. 2d 293 (S.D.N.Y. 2008) ....................................................................... 16, 17
24

25
*I-CA Enterprises, Inc. v. Palram Americas, Inc.*,
    235 Cal. App. 4th 257 (2015) .......................................................................................... 20

26
*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
27
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ........................................................................... 16

28
*Integrated Storage Consulting Servs., Inc. v. Netapp, Inc.*,
    2016 WL 3648716 (N.D. Cal. July 7, 2016) ......................................................... 3, 17, 24

- iv -

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

Page(s)

3

*ISI Brands, Inc. v. KCC Int'l, Inc.,*

4
    458 F. Supp. 2d 81 (E.D.N.Y. 2006) ............................................................... 10

5

*Ixchel Pharma, LLC v. Biogen, Inc.,*
    9 Cal. 5th 1130 (2020) ........................................................................... 4, 25

6

*Kirch v. Liberty Media Corp.,*

7
    449 F.3d 388 (2d Cir. 2006) ........................................................... 17, 22, 25

8

*Kwan v. SanMedica Int'l,*
    854 F.3d 1088 (9th Cir. 2017) ............................................................... 8, 9

9

10

*Lenhoff Enterprises, Inc. v. United Talent Agency,  Inc.,*
    729 F. App'x 528 (9th Cir. 2018) ........................................................ 25

11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*

12
    732 F.3d 161 (2d Cir. 2013) ................................................................ 9

13

*Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC,*
    2009 WL 539928 (S.D. Cal. Mar. 2, 2009) ........................................ 21

14

15

*Matilock, Inc. v. Pouladdej,*
    2020 WL 3187198 (N.D. Cal. June 15, 2020) ..................................... 8

16

*Medcalf v. Walsh,*

17
    938 F. Supp. 2d 478 (S.D.N.Y. 2013) ................................................ 21

18

*MEE Direct, LLC v. Tran Source Logistics, Inc.,*
    2012 WL 6700067 (S.D.N.Y. Dec. 26, 2012) .................................. 9, 10

19

20

*Muldoon v. Tropitone Furniture Co.,*
    1 F.3d 964 (9th Cir. 1993) .............................................................. 8, 10

21

*Nelson v. Int'l Paint Co.,*

22
    716 F.2d 640 (9th Cir. 1983) ............................................................ 8

23

*New.Net, Inc. v. Lavasoft,*
    356 F. Supp. 2d 1090 (C.D. Cal. 2004) ............................................ 14

24

25

*ONY, Inc. v. Cornerstone Therapeutics, Inc.,*
    720 F.3d 490 (2d Cir. 2013) ...................................................... 3, 15, 16

26

*Parekh v. Cain,*

27
    96 A.D.3d 812 (N.Y. Ct. App. 2012) ................................................ 18

28

*PC Drivers Headquarters, LP v. Malwarebytes, Inc.,*
    2018 WL 2996897 (W.D. Tex. Apr. 23, 2018) ............................ 3, 12, 13

- v -

1

TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*Philpot v. Kos Media LLC,*

4
2017 WL 2270248 (S.D.N.Y. Apr. 21, 2017) ...................................................................... 10

5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,*
413 U.S. 376 (1973)................................................................................................................ 13

6

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.,*

7
360 F. Supp. 3d 994 (N.D. Cal. 2018)................................................................................... 18

8

*Qube Films Ltd. v. Padell,*

9
2014 WL 3952931 (S.D.N.Y. Aug. 12, 2014)....................................................................... 23

10

*Quelimane Co. v. Stewart Title Guar. Co.,*
19 Cal. 4th 26 (1998)............................................................................................................. 22

11

*RingCentral, Inc. v. Nextiva, Inc.,*

12
2020 WL 978667 (N.D. Cal. Feb. 28, 2020) ........................................................................ 18

13

*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.,*
2 Cal. 5th 505 (2017)........................................................................................................ 17, 19

14

15

*Sands v. Ticketmaster–New York, Inc.,*
207 A.D.2d 687 (1st Dept. 1994) .......................................................................................... 16

16

*Southland Sod Farms v. Stover Seed Co.,*

17
108 F.3d 1134 (9th Cir. 1997) ............................................................................................... 11

18

*Steiner Sports Marketing, Inc. v Weinreb,*

19
88 AD3d 482, 930 N.Y.S.2d 186 (1st Dept 2011) ............................................................... 22

20

*Stutman v. Chem. Bank,*
95 N.Y.2d 24 (2000).............................................................................................................. 16

21

*Tatintsian v. Vorotyntsev,*

22
2019 WL 1746004 (S.D.N.Y. Apr. 18, 2019) ...................................................................... 25

23

*Televisa v. Liberman Broad., Inc.,*
2012 WL 12893444 (C.D. Cal. Dec. 6, 2012)................................................................... 3, 23

24

25

*UGG Holdings, Inc. v. Severn,*
2005 WL 5887187 (C.D. Cal. Feb. 23, 2005) ...................................................................... 15

26

*Walden v. Fiore,*

27
571 U.S. 277 (2014)........................................................................................................ 8, 9, 10

28

*Waldman v. Palestine Liberation Org.,*
835 F.3d 317 (2d Cir. 2016) ......................................................................................... 8, 9, 10

MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT PURSUANT TO FRCP 12(b)(6)

5877909

1

TABLE OF AUTHORITIES (cont.)

2

Page(s)

3
*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.,*
4
    42 Cal. App. 4th 507 (1996) ............................................. 19

5
*Winner Int'l v. Kryptonite Corp.,*
    1996 WL 84476 (S.D.N.Y. Feb. 27, 1996)................................ 3, 17
6

*Winter v. Am. Inst. of Med. Scis. & Educ.,*
7
    242 F. Supp. 3d 206 (S.D.N.Y. 2017) .................................... 3, 15

8
*Youst v. Longo,*
    43 Cal. 3d 64 (1987) ..................................................... 3, 19
9

*Zdenek Marek v. Old Navy (Apparel) Inc.,*
10
    348 F. Supp. 2d 275 (S.D.N.Y. 2004) ..................................... 19

11
*Zetes v. Stephens,*
12
    969 N.Y.S.2d 298 (2013)..................................................... 20

13
*ZL Techs., Inc. v. Gartner, Inc.,*
    2009 WL 3706821 (N.D. Cal. Nov. 4, 2009) .......................... 13
14

*ZL Techs., Inc. v. Gartner, Inc.,*
15
    709 F. Supp. 2d 789 (N.D. Cal. 2010) ................................... 12

16
**Statutes**

17
15 U.S.C. § 1125(a)(1)(B) ...................................................... 11
18
28 U.S.C. § 1404(a) ............................................................. 8
19
Cal. Civ. Code § 1798.140(l)................................................... 6
20
New York General Business Law Section 349.............................. passim
21
**Rules**
22
Federal Rule of Civil Procedure 12(b)(6) ....................................... 1
23

24

25

26

27

28

MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT PURSUANT TO FRCP 12(b)(6)

5877909

**NOTICE OF MOTION AND MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE**

that on March 25, 2021, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Edward J. Davila, U.S. District Court, Northern District of California, Defendant Malwarebytes Inc. will, and hereby does, move to dismiss with prejudice all claims in Plaintiff Enigma Software Group USA, LLC's ("Enigma") Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Request for Judicial Notice, the pleadings and records on file in this action, the argument of counsel, and such other matters as may be presented to the Court.

**ISSUES TO BE DECIDED**

1.      Whether California law applies to Enigma's claims because SDNY transferred the case for convenience and lacked personal jurisdiction over Malwarebytes.

2.      Whether Enigma's First and Second Causes of Action, under Section 43(a) of the Lanham Act and New York General Business Law Section 349, respectively, should be dismissed because Malwarebytes' statement that certain Enigma software is a "potentially unwanted program" is a statement of opinion, is not a commercial advertisement, and is not deceptive.

3.      Whether Enigma's Third Cause of Action for intentional interference with prospective economic relations ("IIPER") should be dismissed because Enigma has not plausibly pleaded (i) any relationships with a probability of economic benefit, (ii) Malwarebytes' knowledge, (iii) proximate causation, or (iv) independently wrongful conduct.

4.      Whether Enigma's Fourth Cause of Action for intentional interference with contractual relations ("IICR") should be dismissed because Enigma has not plausibly pleaded (i) valid contractual obligations, (ii) Malwarebytes' knowledge,  (iii) any cognizable breach or disruption, or (iv) independently wrongful conduct.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Over the course of the past decade, Enigma has peddled to unsuspecting consumers software designed to deceive them into unnecessarily purchasing its Spyhunter 4, Spyhunter 5, and RegHunter 2 programs (collectively, the "Scareware[1] Programs"). To accomplish its goal of selling its Scareware Programs, Enigma relied on insidious scare tactics like intentionally flagging harmless operating system files and cookies to convince users that their systems have issues, only to then charge users to "fix" these false positives. Request for Judicial Notice ("RJN"), Kaba Decl., Ex. I; Dkt. No. 98-9 ("Scott Decl."), Exs. 1–3 (Dkt. Nos. 98-10, -11, -12). Malwarebytes, a legitimate cybersecurity company, rightly sought to protect its users and identified these Enigma programs as "potentially unwanted programs" ("PUPs"). Enigma responded by filing this suit, just the latest litigation in its long-term campaign of threatening and suing those who dare to express skepticism of Enigma's business practices. Kaba Decl., Exs. A–B, D–H. For the reasons discussed herein, the Court should dismiss Enigma's Second Amended Complaint ("SAC") with prejudice.[2]

*First*, Enigma cannot sustain a Lanham Act claim based on Malwarebytes' characterization of Enigma's Scareware Programs and their associated websites as "potentially unwanted programs" for at least three reasons. The statements classifying Enigma's Scareware Products as "PUPs" are (a) non-actionable opinions, (b) not commercial speech, and (c) not plausibly deceptive to the public. *Compare Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("vague and subjective" statements cannot give rise to liability under Lanham Act), *with* SAC ¶¶ 12-13, 25, 111, 195 (alleging "subjective" and "vague" statements as basis of Lanham Act claim); *see also Asurvio LP v. Malwarebytes Inc.* 2020 WL 1478345, at *6 (N.D. Cal. Mar. 26, 2020) (Davila,

---

[1] "Scareware" is "computer software that generates spurious warning messages designed to induce the purchase of a useless or harmful product." "*Scareware*," *Collins English Dictionary*, HarperCollins Publishers (2021).

[2] As discussed herein, because New York lacked personal jurisdiction over Malwarebytes, California law, rather than New York law, applies to this dispute.

J.) (dismissing Lanham Act claim for failure to plausibly allege that statements that programs are "PUPs" "are verifiably false rather than subjective opinions"). Indeed, "[t]he designation itself—'potentially unwanted program'—inherently carries with it the acknowledgment that it is only a guess as to whether the program is or is not unwanted, as made clear by the inclusion of the word 'potentially.' Moreover, the descriptor 'unwanted' looks more like a subjective opinion than a factual assertion." *PC Drivers Headquarters, LP v. Malwarebytes, Inc.*, 2018 WL 2996897, at *5 (W.D. Tex. Apr. 23, 2018).

*Second*, Enigma fails to state a claim under NYGBL Section 349 for at least three reasons: (a) California law, not New York law, applies to Enigma's claims, *see Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 227–28 (S.D.N.Y. 2017); (b) Section 349 is no broader than the Lanham Act and thus this claim fails for the same reason as Enigma's Lanham Act claim, including because Malwarebytes' characterizations do not materially deceive users, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013); and (c) Section 349 is not intended to and does not protect alleged competitors but is directed only toward conduct that has significant public interest ramifications, *Winner Int'l v. Kryptonite Corp.*, 1996 WL 84476, at *3 (S.D.N.Y. Feb. 27, 1996).

*Third*, Enigma's IIPER claim fails because Enigma has not plausibly pleaded: (a) a non-speculative relationship with a probability of economic benefit with which Malwarebytes interfered, *Dolin v. Facebook, Inc.*, 2018 WL 2047766, at *3 (N.D. Cal. May 2, 2018); (b) Malwarebytes' knowledge of such relationships, *see id.*; (c) economic harm proximately caused by Malwarebytes' conduct, *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987); or (d) that Malwarebytes' statements are "independently wrongful" and not protected by the competition privilege, *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 881 (1997).

*Finally*, Enigma's IICR claim fails for lack of plausible allegations of: (a) a valid contractual obligation with which Malwarebytes interfered, *Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*, 2019 WL 8631502, at *2 (C.D. Cal. Dec. 16, 2019); (b) Malwarebytes' knowledge of any such obligation, *Televisa v. Liberman Broad., Inc.*, 2012 WL 12893444, at *1 (C.D. Cal. Dec. 6, 2012); (c) any cognizable breach or disruption, *Integrated Storage Consulting Servs., Inc. v. Netapp, Inc.*, 2016 WL 3648716, at *6 (N.D. Cal. July 7, 2016) (Davila, J.); or (4) any independently

5877909

wrongful act, *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1148 (2020). To the contrary, Malwarebytes' alleged activities are lawful and transparent.[3]

## II. STATEMENT OF FACTS

### A. Millions of Consumers Rely on Malwarebytes' Critically Acclaimed Anti-Virus and Anti-Malware Software to Protect Their Computing Activities.

Malwarebytes develops and provides internet security software that protects consumers and enterprises from a variety of online threats, including malicious software, also known as malware, adware, and PUPs. SAC ¶¶ 6, 35. Malwarebytes offers free and paid versions of its software to individual users through its website, www.malwarebytes.com. *Id.* ¶ 64. Malwarebytes' users select its software to help them identify malware, adware, and potentially unwanted programs or "PUPs." *Id.* ¶¶ 6-7, 60-61. Malwarebytes identifies software it considers PUPs to users, who can choose to quarantine the PUPs after reviewing them. *Id.* ¶¶ 6-7, 9, 118, 120.

Malwarebytes continuously develops its criteria for detecting PUPs and necessarily updates those criteria as developers change their programs to circumvent detection. *Id.* ¶ 27. To protect its users, on October 5, 2016, as on many previous occasions, Malwarebytes revised and published its criteria for identifying PUPs. *Id.* ¶¶ 12, 27, 108, Exs. 1, 4, 14 (revised criteria). This update included aggressive detection criteria—like whether a program exhibits certain deceptive and misleading behaviors—to keep pace with the constantly evolving PUP landscape. *Id.* ¶ 108, Ex. 14.

A program may be characterized as a PUP under Malwarebytes' detection criteria if it uses scare tactics or misleading alerts that induce users to purchase software or upgrades with the mistaken

---

[3] On appeal, the Ninth Circuit held that allegations of anti-competitive animus may preclude a finding of immunity under the Good Samaritan provision of the Communications Decency Act at the motion to dismiss stage. *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1047 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 13 (2020). Accordingly, for purposes of this Motion to Dismiss, Malwarebytes has focused on other grounds for dismissal as a matter of law. Should this case proceed to summary judgment, however, Enigma will lack any evidence to support its baseless allegations of "anti-competitive animus," such that Section 230 immunity would still apply.

5877909

1   belief that doing so is necessary to secure their computers. Programs of this sort are referred to as

2   "scareware." *See id.* ¶ 108. Scareware takes advantage of Internet users who are less experienced in

3   recognizing and safely navigating online scams, including minors and elderly persons. These

4   deceptive scare tactics exploit consumers' fear about spyware and other threats, even when none

5   exists, to trick them into entering costly subscriptions. Malwarebytes also may identify programs that

6   a user unintentionally installs, such as through bundled software, or that are difficult to uninstall. *Id.*,

7   Ex. 14.  Among its criteria, Malwarebytes also considers actual harm to consumers by reviewing

8   whether users have given a program negative feedback. *Id.*; *see also id.* ¶ 27, Ex. 4.

9   Once users updated their Malwarebytes software with the revised, October 2016 detection

10   criteria, Malwarebytes notified users of PUPs that, in Malwarebytes' opinion, may be deceptive.

11   Many users voiced their approval of Malwarebytes' updated PUP criteria and even requested more

12   aggressive protection from PUPs. *See* Dkt. No. 33 (FAC), Ex. 1 at 2 (commenting that PUPs are

13   "more insidious" than known "nefarious programs"), Ex. 6 at 4 ("PUP's [sic] are malware by every

14   definition"). Consumers have even sued Enigma for some of the very tactics that qualified its

15   Scareware Programs for Malwarebytes' PUP characterization. *See* Kaba Decl., Ex. C ¶¶ 2–4

16   (alleging "Enigma automatically charges consumers' credit cards . . . without [their] authorization,"

17   "charges consumers . . . for additional services even after [they] cancel," fails to "honor consumers'

18   cancellation requests," and "refuses to refund consumers for the unauthorized credit card charges.").

19   Enigma's Scareware Programs exhibit characteristics common to PUPs that fall within the

20   revised criteria Malwarebytes implemented and published in October 2016. SAC ¶¶ 12, 27, 108.

| Malwarebytes Detection Criteria | Enigma Spyhunter 4 Characteristics |
| --- | --- |
| (1) obtrusive, misleading, or deceptive advertising, branding, or search practices; | Detects non-harmful Operating System files and browser cookies as harmful "infections" to scare users into purchasing Spyhunter 4. SAC ¶¶ 48–49, Exs. 1, 12; Scott Decl., Exs. 1, 2, 3 (Dkt. 98-10, -11, -12); Kaba Decl., Ex. G. |
| (2) excessive or deceptive distribution, affiliate or opt-out bundling practices; | Injects advertising into uninstallation procedure, against Windows best practices. SAC ¶ 192. |
| (3) aggressive or deceptive behavior especially surrounding purchasing or licensing; | Uses scare tactics to sell subscription, including displaying intentional false positives to convince users their systems have problems. Scott Decl., Exs. 1-3; Kaba Decl., Ex. G. |
| (4) unwarranted, unnecessary, excessive, | Detects non-harmful Operating System files and |

5877909

| | |
|---|---|
| illegitimate, or deceptive modifications of system settings or configuration (including browser settings and toolbars); | browser cookies as harmful "infections" to scare users into purchasing Spyhunter 4. SAC ¶¶ 48–49, Exs. 1, 12; Scott Decl., Exs. 1, 2, 3. |
| (5) difficulty uninstalling or removing the software; | Injects advertising into uninstallation procedure, against Windows best practices. SAC ¶ 192. |
| (6) diminished user experience; and | User interface employs "dark pattern" misdirection to trick users attempting to uninstall Scareware Programs into paying $10 instead.[4] |
| (7) other practices generally accepted as riskware, scareware, adware, greyware, or otherwise commonly unwanted software by the user community. | Significant negative consumer feedback about Scareware Programs leading up to the October 2016 detection criteria update. See, e.g., Kaba Decl., Exs. C, F, G; SAC, Ex. 14. |

These criteria are illustrated below on a screenshot of Enigma's actual Spyhunter 4 program as it appears to consumers. As reflected below, Spyhunter 4 alerts to false positives, shows common Travelocity browser cookies as multiple threats, and displays spiders (associated by many people with fear and danger) to deceive users into thinking their system is severely infected. *See* Scott Decl., Ex. 1 (annotations added for demonstrative purposes).



**Criteria 1 and 4**
Detection of non-harmful files from Operating System and browser cookies as harmful.

---

[4] "'Dark pattern' means a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice[.]" Cal. Civ. Code § 1798.140(*l*).

5877909

That said, Malwarebytes users who wished to run both Malwarebytes' software and PUPs (like Enigma's Scareware Programs) side by side could do so easily, e.g., by unchecking the detection and choosing "ignore." SAC, Ex. 15 at 19, 22–23, 25–26, 30–31, 46; Ex. 16 at 19, 21–22, 34, 42. Users can decide to keep Enigma's software, or take an affirmative step to delete it. SAC ¶¶ 118, 120. They also may stop using Malwarebytes if they do not like what it identifies as a PUP. Consumers thus ultimately decide whether to use Enigma's scareware in response to Malwarebytes' notice that the programs are "potentially unwanted." *Id.*

B.   **Enigma Aggressively Suppresses Negative Opinions with Litigation Campaigns.**

Though Enigma likens itself to non-deceptive anti-virus/anti-malware ("AV/AM") software developers, *see* SAC ¶¶ 115-16, many legitimate AV/AM companies have identified Enigma's products as threatening or deceptive over the years. Kaba Decl., Exs. B, D, E. Enigma has tried to hide its deceptive practices through over a decade's worth of lawsuits and publicly available threat letters targeting those who took issue with Enigma's Scareware Programs. Other AV/AM companies, when faced with Enigma's threats of suit, have capitulated and excluded Enigma's scareware from detection to avoid ongoing vexation and expense. *See* Kaba Decl., Exs. D, E. Enigma has even threatened to sue minors who have dared to post critical reviews of Enigma's Scareware Programs on the Internet. *Id.*, Exs. F, G, H. Even after the minor identified himself as such and removed the YouTube video, Enigma persisted in its intimidation tactics, threatening to "examine any future reviews [the minor] post[ed] of ESG products for compliance with the law governing false advertising, trade libel, and unfair competition" and sue the minor's parents. *Id.*, Ex. H. This lawsuit is Enigma's latest effort to stop legitimate security software companies from offering filtering tools that help consumers protect themselves against Enigma's deception.

## II. ARGUMENT

A.   **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

5877909

*Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "Conclusory allegations of law and unwarranted inferences . . . are insufficient to avoid dismissal." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (citation and internal quotation marks omitted). "Plaintiff may not sidestep these obligations by asserting that its conclusory allegations are made 'on information and belief.' [The plaintiff] must still plead sufficient facts to make a claim plausible as opposed to merely speculative." *Matilock, Inc. v. Pouladdej*, 2020 WL 3187198, at *4 (N.D. Cal. June 15, 2020).

B.  **California Law Governs This Dispute Because SDNY Lacked Personal Jurisdiction Over Malwarebytes**

Because the Southern District of New York lacked personal jurisdiction over Malwarebytes, California law applies to this dispute. *Nelson v. Int'l Paint Co*., 716 F.2d 640, 643 (9th Cir. 1983) (following transfer under 28 U.S.C. § 1404(a), the substantive law of the transferee state applies to state common law claims where the transferor court lacked personal jurisdiction over the defendant).

Judge Engelmeyer transferred this case pursuant to Section 1404(a) without deciding whether SDNY had personal jurisdiction over Malwarebytes, leaving Malwarebytes' challenge to personal jurisdiction in New York intact. *Muldoon v. Tropitone Furniture Co*., 1 F.3d 964, 967 (9th Cir. 1993) ("Although the [transferor court] purported to transfer the case under § 1404(a) for the convenience of the parties, its characterization of the transfer is not controlling."). Significantly, as here, "[i]f the transfer had the effect of curing a defect in personal jurisdiction . . . then the choice-of-law rules of the transferee jurisdiction should be applied." *Id*.

SDNY lacked personal jurisdiction because Malwarebytes does not have sufficient minimum contacts with New York to satisfy due process. "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). Importantly, personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State," and "not the defendant's contacts with persons who reside there" or "between the plaintiff (or third parties) and the forum State." *Walden*, 571 U.S. at 284–85 (emphasis in original) (citations omitted). "The same principles apply" to out-of-state,

1  allegedly intentional tortious conduct, *id.* at 1123, and jurisdiction is proper only if the defendant

2  "expressly aimed" its conduct at the forum, *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,

3  732 F.3d 161, 173 (2d Cir. 2013) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).[5]

4       Enigma fails to allege that Malwarebytes has had sufficient minimum contacts with New

5  York. Malwarebytes is a Delaware corporation with its principal place of business in Santa Clara,

6  California, where most of its employees and business records are based. SAC ¶ 35; Dkt. No. 39

7  (Harris Decl.) ¶ 4, Ex. A. Malwarebytes does not maintain an office or data center in New York.

8  Harris Decl. ¶ 5. While Malwarebytes offers free and paid versions of its security software to users

9  through its website, www.malwarebytes.com, this website is not specific to any state or geography;

10 it is generally accessible to any Internet user. *Id.* ¶ 6. Malwarebytes' web pages for its consumer and

11 business products do not mention New York. *Id.* ¶ 11, Ex. C.

12      As with the First Amended Complaint, Enigma again asks the Court to find that SDNY had

13 personal jurisdiction over Malwarebytes by virtue of allegations that some *customers* purchase and

14 download software from the Malwarebytes website in the state of New York. SAC ¶¶ 38, 41, 42, 51,

15 52, 159, 162. But such third-party conduct cannot confer jurisdiction absent plausible allegations that

16 Malwarebytes expressly targeted New York. *See Waldman*, 835 F.3d at 337–40 (rejecting

17 jurisdiction where the forum was not "the focal point of the torts alleged"); *see also AMA Multimedia,*

18 *LLC v. Wanat*, 970 F.3d 1201, 1212 (9th Cir. 2020) (finding no jurisdiction where the forum "was

19 not 'the focal point' of the website 'and of the harm suffered'" (quoting *Walden*, 571 U.S. at 287)).

20      At most, Enigma's allegations imply that Malwarebytes knew that it had customers in New

21 York, but "mere knowledge" of possible effects in the forum is not enough. *Waldman*, 835 F.3d at

22 338; *see also Gordon v. Invisible Children, Inc.*, 2015 WL 5671919, at *7 (S.D.N.Y. Sept. 24, 2015)

23 (defendant's appeals "to people throughout the world" did not suggest that conduct was "'expressly

24 

---

25 [5] "[W]here a defendant 'rebuts [plaintiffs'] unsupported allegations with direct highly specific,

26 testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that

27 evidence—the allegation may be deemed refuted.'" *MEE Direct, LLC v. Tran Source Logistics, Inc.*,

28 2012 WL 6700067, at *2 (S.D.N.Y. Dec. 26, 2012).

5877909

aimed' at New York residents, even where foreseeable effects occurred in New York). Finding personal jurisdiction on this basis "would create 'nationwide (indeed, worldwide) personal jurisdiction over anyone and everyone who establishes [a commercial] website.'" *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 90 (E.D.N.Y. 2006); *see also Wanat*, 970 F.3d at 1211 (affirming that "[n]ot all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every [forum] in which it is accessed" because that "would run afoul of the Supreme Court's directive in *Walden*" that minimum contacts must be based on the defendant's own conduct). Because Enigma has not alleged (and cannot allege) that Malwarebytes expressly aims its consumer-facing conduct at New York, *see* Harris Decl. ¶ 5, New York lacked personal jurisdiction.

Perhaps recognizing the inadequacy of Malwarebytes' contacts with consumers in New York, Enigma added allegations that five of Malwarebytes' more than 300 employees work from the state of New York. SAC ¶ 37. Although that allegation is inaccurate, the "mere presence" in New York of a small number of employees does not confer jurisdiction absent a nexus to the claims asserted. *See Philpot v. Kos Media LLC*, 2017 WL 2270248, at *6, *9 (S.D.N.Y. Apr. 21, 2017), *report and recommendation adopted*, 2017 WL 2269531 (S.D.N.Y. May 23, 2017) (rejecting jurisdiction where plaintiff did not allege the challenged conduct "involved any of defendant's New York-based personnel"); *see also Waldman*, 835 F.3d at 331 ("[S]pecific jurisdiction depends on in-state activity that '*gave rise to the episode-in-suit*.' (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 923 (2011))). Enigma has not alleged that these five employees, who work remotely from home, Harris Decl. ¶ 10, had any involvement in developing or applying Malwarebytes' PUP-detection criteria or otherwise interacted with consumers in ways related to Enigma's claims. Indeed, four of these employees are tasked specifically with sales to *enterprises*, and none of the employees played any role in developing the PUP criteria at issue. *Id.* ¶ 10; SAC ¶ 37, Ex. 8.

Enigma's allegations, therefore, do not establish personal jurisdiction in New York because Malwarebytes' negligible contacts do not have a nexus to Enigma's claims. *See MEE Direct*, 2012 WL 6700067, at *2. The Court should thus apply California law to this dispute. *Muldoon*, 1 F.3d at 967; *see also Blatt v. Pambakian*, 432 F. Supp. 3d 1141, 1166 (C.D. Cal. 2020) ("[California's] choice of law analysis embodies the presumption that California law applies unless the proponent of

5877909

1   foreign law can show otherwise.").

2        C.     **Enigma Fails to State a Claim Under Section 43(a) of the Lanham Act.**

3        Enigma's allegation that Malwarebytes made "false and misleading statements about ESG"

4   fails to state a claim under the Lanham Act (15 U.S.C. § 1125(a)(1)(B)). SAC ¶ 214. To state a claim

5   for violation of Section 1125(a)(1)(B), Enigma must allege Malwarebytes made (1) a false statement

6   of fact in a commercial advertisement, (2) that actually deceived or has the tendency to deceive a

7   substantial segment of its audience, (3) that the deception is material, (4) that the false statement was

8   made in interstate commerce, and (5) that the plaintiff has been or is likely to be injured as a result

9   of the false statement. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

10  Enigma's Lanham Act claim fails for multiple reasons, any one of which is sufficient to dismiss.

11            1.     <u>Malwarebytes' Classification of Enigma Scareware As "Potentially Unwanted</u>

12                  <u>Programs" Is A Non-Actionable Statement of Opinion.</u>

13       The Court should dismiss Enigma's Lanham Act claim with prejudice because, assuming the

14  truth of the pleadings, the dispute Enigma raises here amounts to nothing more than a difference of

15  opinion regarding how Enigma's Scareware Programs should be labeled. It is settled law that "vague

16  and subjective" statements that are not "specific," "measurable," or "capable of being proved false

17  or of being reasonably interpreted as a statement of objective fact" cannot give rise to liability under

18  the Lanham Act. *Coastal Abstract Serv.*, 173 F.3d at 731.

19       Malwarebytes' labeling of software like Enigma's Scareware Programs as a "PUP" is an

20  expression of opinion that is exactly the type of "vague and subjective" statement that the Lanham

21  Act does not cover. To wit, Malwarebytes applies industry trends and its criteria common to many

22  PUPs or malicious programs and exercises its judgment in designating programs according to those

23  allegedly "subjective" criteria.  SAC, Ex. 14 (providing a list of criteria and stating "we use our

24  judgment" to identify potentially unwanted software).

25       Multiple courts have found that potential threat flags, like those Malwarebytes uses, are non-

26  actionable opinions. For example, this Court recently addressed a similarly defective Lanham Act

27  claim in *Asurvio*, 2020 WL 1478345, at *6 (Davila, J.). Just as this Court concluded in *Asurvio*,

28  Enigma's Lanham Act claim fails because Enigma has not sufficiently pleaded that Malwarebytes'

5877909

1    alleged statements that the Scareware Programs are "PUPs" and/or "potential threats" "are verifiably

2    false rather than subjective opinions." *Id*. Enigma's repeated accusations that Malwarebytes made

3    "false" statements by detecting Enigma's Scareware Programs are conclusory and thus cannot save

4    this claim. *See id*. ("Asurvio has failed to allege sufficient facts to show that the statements at issue

5    (*e.g.* that Asurvio's products are PUPS,[ ]) are verifiably false rather than subjective opinions.

6    Asurvio's allegation that the statements are 'categorically false'[ ] is conclusory and need not be

7    accepted as true."); *PC Drivers Headquarters*, 2018 WL 2996897, at *5 ("'[P]otentially unwanted

8    program'—inherently carries with it the acknowledgment that it is only a guess as to whether the

9    program is or is not unwanted, as made clear by the inclusion of the word 'potentially.' [T]he

10   descriptor 'unwanted' looks more like a subjective opinion than a factual assertion.").

11          Enigma itself alleges that these flags and their associated detection criteria are "subjective."

12   *See* SAC ¶ 12 ("Malwarebytes' new criteria rejected specific objective or scientific standards in favor

13   of subjective characteristics."); *id*. ¶ 13 (describing Malwarebytes' detection criteria as "subjective

14   [and] vague"); *id*. ¶ 195 (same); *id*. ¶ 25 (describing Malwarebytes' detection criteria as "vague");

15   *id*. ¶ 111 (same). While Enigma disagrees with Malwarebytes' opinion that the Scareware Programs

16   and associated website are PUPs, *see id*. ¶¶ 214-15, such differences of opinion are not actionable

17   under the Lanham Act. *See ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789, 795, 797-98 (N.D.

18   Cal. 2010) (an information technology analyst's assessment and ranking of a software company in

19   an industry report distributed to potential customers of the software company is a "non-actionable

20   opinion"); *Browne v. Avvo Inc.*, 525 F. Supp. 2d 1249, 1251-52 (W.D. Wash. 2007) (website's

21   attorney ratings are "subjective opinions" and "the rating system is an abstraction," rather than a

22   statement of fact that can sufficiently be proved or disproved.").

23          Enigma also alleges in conclusory fashion that "[u]sers view Malwarebytes' statements that

24   ESG programs are 'threats' and PUPs and that ESG's domains are 'malicious' as statements of fact

25   rather than opinions." SAC ¶ 218. In so alleging, Enigma ignores both the context of such statements

26   and the very label it challenges, which makes clear that a program is "*potentially* unwanted." As to

27   the former, Malwarebytes provides its users an explanation on the types of behaviors that trigger the

28   characterization. *See, e.g.*, SAC, Ex. 15 at 22; Kaba Decl., Exs. I, J. As such, users are aware of why

5877909

1  Malwarebytes opines that a given program may be "potentially unwanted" based on Malwarebytes'

2  publicly-disclosed criteria.[6] That *some* users may interpret those statements as factual cannot

3  overcome the reality that these statements are "incapable of being proven false" and that "[a]

4  reasonable consumer would view [a Malwarebytes] rating as just that – the defendant's evaluation."

5  *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541 (S.D.N.Y. 2018).

6       As to the latter, any user using AV/AM software understands that a "potentially unwanted"

7  label is the opinion of the software developers. Indeed, in addition to this Court, at least one other

8  court has found that such a designation in the context of AV/AM programs is an opinion, not a

9  verifiable fact. *See Asurvio LP v. Malwarebytes Inc.* 2020 WL 1478345, at *6 (N.D. Cal. Mar. 26,

10  2020) (Davila, J.); *accord PC Drivers Headquarters*, 2018 WL 2996897, at *5.

11       Because "the [statements Enigma attributes to Malwarebytes] as such are non-actionable

12  statements of opinion, and obviously no amendment can change the statements themselves[,]" the

13  Court should dismiss Enigma's Lanham Act claim with prejudice. *ZL Techs., Inc. v. Gartner, Inc.*,

14  2009 WL 3706821, at *13 (N.D. Cal. Nov. 4, 2009).

15            2.    Enigma's Lanham Act Claim Lacks Well-Pled Allegations of Any
                   Commercial Advertisement or Promotion by Malwarebytes.
16

17       Enigma's SAC also fails to satisfy the commercial advertisement element of its Lanham Act

18  claim. "A Lanham Act cause of action accrues only in connection with false or misleading statements

19  of fact 'in commercial advertising or promotion.'" *See Grasshopper House, LLC v. Clean & Sober*

20  *Media LLC*, 394 F. Supp. 3d 1073, 1094 (C.D. Cal. 2019). To satisfy this prong under the Lanham

21  Act, the alleged statements must be: (1) commercial speech; (2) made by a defendant in commercial

22  competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods

23  or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute

24  advertising or promotion in that industry. *Coastal Abstract Serv.*, 173 F.3d at 734.

25       "[S]peech is not rendered commercial by the mere fact that it relates to an advertisement."

26  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 384 (1973). Rather,

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [6] Malwarebytes publishes high-level summaries of its detection criteria, but not the specific detail.

5877909

1   to qualify as "commercial speech," the alleged statements must be an "expression related solely to

2   the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub.*

3   *Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). The "core notion" of commercial speech is that it

4   proposes a commercial transaction. *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66, (1983).

5        Here, Enigma alleges two types of statements: (1) those made by Malwarebytes and (2) those

6   made by third parties. *See, e.g.*, SAC ¶¶ 138-42, 214, 221-24. But neither proposes a commercial

7   transaction or constitutes an advertisement. As to Malwarebytes' alleged statements, Enigma claims

8   that Malwarebytes identifies PUPs through "free and trial versions of MBAM products, AdwCleaner,

9   product advertising in its subscription products, public statements on the Malwarebytes company

10   website, including the Malwarebytes Forum, affiliate sellers' sites, and various other media and/or

11   channels through which Malwarebytes distributes to users across the United States." *Id.* ¶ 215. Those

12   statements do not constitute actionable commercial advertisements because Malwarebytes' software

13   flags Enigma's Scareware Programs as PUPs *after* a user already has Malwarebytes' software.

14   Malwarebytes' software simply does what a user expects it to do—i.e., to identify PUPs. Indeed,

15   such statements "occur[ing] after the conclusion of the 'transaction'" "are similar to those that would

16   appear in a review published in a magazine whose focus is the evaluation of consumer goods[.]"

17   *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1111 (C.D. Cal. 2004). Thus, they do not qualify as

18   "commercial speech." *Id.* ("[W]hen users initiate the Ad-aware program, review the results of its

19   search of the user's hard-drive and initiate the Ad-aware uninstall feature, they are not making a

20   decision to purchase anything—rather, they are managing the content of their computer[.]").

21        As to third party statements, Enigma has not identified any statement by third parties

22   authorized to speak for Malwarebytes that constitutes commercial speech. Enigma points to a Twitter

23   post allegedly made by an AdwCleaner developer "who joined the Malwarebytes team" and who

24   stated "#AdwCleaner by @Malwarebytes now fully detects and removes #SpyHunter from Enigma

25   Software Group. #PUP." SAC ¶ 114. But this alleged statement merely describes Malwarebytes'

26   functionality and does not propose a commercial transaction to purchase Malwarebytes.

27        Statements by third parties on websites and forums also do not constitute commercial speech

28   because they do not solicit a purchase of Malwarebytes' products. *Id.* ¶¶ 138-42. As multiple courts

1  have held, blog or website posts (like those alleged here) are not commercial advertisements. *See,*

2  *e.g.*, *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 951 (11th Cir. 2017) (finding that a

3  doctor's blog posts criticizing another doctor's practice and treatments were noncommercial speech

4  because of absence of commercial transactions being proposed or products for sale); *GOLO, LLC v.*

5  *HighYa*, LLC, 310 F. Supp. 3d 499, 505 (E.D. Pa. 2018) (review of weight loss products not

6  actionable under Lanham Act, despite website's affiliation with sellers of exercise equipment,

7  because it "did not propose any form of commercial transaction nor [did] it embody the typical

8  characteristics of an advertisement"). Because Enigma has failed to plausibly allege any commercial

9  statement, its Lanham Act claim fails.

10              3.     Enigma Fails to Plausibly Allege that Malwarebytes' Acts Have the Potential
                       to Deceive Its Audience, Let Alone a Substantial Segment Thereof.
11

12      Enigma also fails to plausibly allege how Malwarebytes' statements of opinion could deceive

13  unidentified consumers. Multiple courts have found that public disclosure of information underlying

14  the statements at issue defeats a Lanham Act claim. *UGG Holdings, Inc. v. Severn*, 2005 WL

15  5887187, at *10 (C.D. Cal. Feb. 23, 2005) (Plaintiff's use of the "UGG Australia" mark to sell

16  products not manufactured in Australia was not deceptive because plaintiff disclosed the true

17  geographical origin to the consumer); *see also Broder v. MBNA Corp.*, 281 A.D.2d 369, 371 (2001)

18  (no deception claim "when the allegedly deceptive practice was fully disclosed"); *see also ONY, Inc.*,

19  720 F.3d at 498 (2d Cir. 2013) (finding non-actionable opinion where conclusions "are presented

20  alongside an accurate description of the data taken into account and the methods used").

21      So too, here, Malwarebytes publishes its detection criteria to the public, thereby providing

22  the alleged audience with more than enough information to discern that its statements are premised

23  on criteria Malwarebytes has developed.  SAC, Ex. 14.  These alleged public disclosures are the

24  opposite of "deception" and therefore, Enigma's Lanham Act fails.

25      **D.    Enigma Fails to State a Claim Under New York General Business Law Section
               349.**
26

27      The Court also should dismiss Enigma's New York General Business Law § 349 ("Section

28  349") claim for at least three independent reasons. *First*, New York law does not apply here, *see*

    *supra* Section II.B, so Enigma's Section 349 claim should be dismissed. *See Winter*, 242 F. Supp. 3d

5877909

1    at 227–28 (refusing to apply Section 349 after determining New Jersey law applied).

2    *Second*, Enigma recycles the same set of allegations underlying its untenable Lanham Act

3    claim for its Section 349 claim.  SAC ¶¶ 227-33. But the strictures of Section 349 are even narrower

4    than the Lanham Act, and thus Enigma's state law allegations fail at least for similar reasons.  *ONY,*

5    *Inc.*, 720 F.3d at 498 ("There is thus no reason to believe that the New York Court of Appeals would

6    interpret state law to provide for more expansive liability than does the Lanham Act[.]"). "A plaintiff

7    must prove three elements to recover under § 349: [1] that the challenged act or practice was

8    consumer-oriented; [2] that it was misleading in a material way; and [3] that the plaintiff suffered

9    injury as a result of the deceptive act." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865

10    F. Supp. 2d 1002, 1049 (C.D. Cal. 2011) (citing *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)).

11    Enigma cannot plausibly state a claim based on the allegation that Malwarebytes' opinions

12    are deceptive to consumers or misleading in any material way. *Sands v. Ticketmaster–New York,*

13    *Inc.*, 207 A.D.2d 687, 687 (1st Dept 1994) (affirming dismissal of Section 349 claim where allegedly

14    deceptive practice was disclosed). As discussed above, Malwarebytes explains the criteria it uses to

15    classify a program as a PUP. SAC, Ex. 14. As such, Enigma has failed to plausibly allege any attempt

16    to deceive or mislead consumers.

17    At most, there is a difference of opinion about the proper characterization of Enigma's

18    Scareware Programs. This difference, however, is not sufficient to state a claim under Section 349.

19    *ONY, Inc.*, 720 F.3d at 496-98 (statements of opinion are not actionable under the Lanham Act or

20    under N.Y. GBL § 349); *Davis*, 345 F. Supp. 3d at 540 ("an opinion that is not actionable under the

21    Lanham Act is also not actionable under NYGBL § 349").

22    *Third*, Section 349 aims not to protect an alleged "competitor" from another, *see, e.g.*, SAC

23    ¶¶ 1, 19-23, 32, 181, 183, 229-232, but rather to protect consumers. *Gross v. Bare Escentuals Beauty,*

24    *Inc.*, 632 F. Supp. 2d 293, 299 (S.D.N.Y. 2008) ("[b]usiness competitors can bring a claim" under

25    the N.Y. GBL only "where the public interest" is at issue).  Enigma's Section 349 claim fails because

26    it does not plausibly allege that Malwarebytes' alleged conduct has "significant ramifications for the

27    public at large." *Id.* (citation omitted). Only certain, existing Malwarebytes users receive the alleged

28    statement that the Scareware Programs are PUPs, far from reaching the public at large. *See, e.g.*, SAC

¶¶ 239-41. While Enigma complains of purported harm resulting from competition between Enigma and Malwarebytes, "[c]ourts routinely reject such attempts to fashion Section 349 . . . claims from garden variety disputes between competitors." *Winner*, 1996 WL 84476, at *3. Thus, Enigma's claim fails. *Gross*, 632 F. Supp. 2d at 299 ("[T]he gravamen of the complaint must be consumer injury or harm to the public interest.").

### E.   **Enigma's IIPER Claim Must Be Dismissed.**

To bring an IIPER claim under California law, Plaintiff must allege: (1) an economic relationship with some third party, with the probability of future economic benefit to Plaintiff; (2) knowledge of that relationship; (3) intentional conduct designed to disrupt that relationship; (4) actual disruption of the relationship; and (5) economic harm to Plaintiff proximately caused by Malwarebytes' conduct. *See Netapp*, 2016 WL 3648716, at *6; *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, 2 Cal. 5th 505, 512 (2017).[7] Enigma's IIPER claim fails under both California and New York law for multiple, independently sufficient reasons.

### 1.   <u>Enigma's Claimed Relationships with Unidentified Third-Party Consumers Are Impermissibly Speculative to Support Its IIPER Claim.</u>

Enigma has failed to plead any cognizable, existing economic relationship with a probability of economic benefit with which Malwarebytes allegedly interfered. The tort's requirements "presuppose the relationship existed *at the time* of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise." *Roy Allan Slurry Seal*, 2 Cal. 5th at 518.  As a result, the claim will not survive when "either the economic relationship with a third party is too attenuated or the probability of economic benefit too speculative." *Id.* at 515.  Both problems plague Enigma's IIPER claim.

---

[7] To plead a tortious interference with business relations claim under New York law, a plaintiff must similarly allege: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).

5877909

1    Here, there is no allegation that free users of Enigma's Scareware Programs will (or even

2    *probably* will) convert to paid users. And Enigma has not alleged that it engaged in any negotiations

3    with these undefined, potential third-party customers. Rather, Enigma alleges in conclusory fashion

4    that there are unidentified consumers that "*may* enter into a paid business relationship with ESG."

5    SAC ¶ 245 (emphasis added). That an unidentified customer may one day form an intent to purchase

6    one of Enigma's Scareware Programs is far too attenuated an economic relationship to justify a

7    protectible expectancy. *See RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 978667, at *3 (N.D. Cal.

8    Feb. 28, 2020) (dismissing IIPER claim where allegations "improperly assume[d] that prospective

9    customers would choose its service over its competitors'") ; *Prostar Wireless Grp., LLC v. Domino's

10   Pizza, Inc.*, 360 F. Supp. 3d 994, 1017 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020)

11   ("expressions of interest are insufficient to create an economic relationship").

12   In reality, many AV/AM products were available to potential consumers when Malwarebytes

13   changed its detection criteria in 2016. *See* SAC ¶¶ 115-16 (alleging existence of "[n]umerous anti-

14   malware products offered by companies other than ESG"). Enigma has not plausibly alleged that

15   potential consumers would (or even probably would) choose to purchase its Scareware Programs

16   over Malwarebytes' software, let alone over the thousands of legitimate AV/AM products on the

17   market. *Id*. Potential customers may install multiple free trials of various products and have broad

18   discretion to reject each and every product they try—including all of Enigma's Scareware Programs.

19   Thus, "[a]t most, [Enigma's] allegations show that [it] aspires to form an economically

20   beneficial relationship with these individuals in the future—not that one currently exists or is likely

21   to come into existence." *Dolin*, 2018 WL 2047766, at *3; *see also Parekh v. Cain*, 96 A.D.3d 812,

22   816 (N.Y. Ct. App. 2012) (dismissing claim "since the complaint did not identify the third party with

23   whom the plaintiff was engaging in business relations"). Enigma's IIPER should be dismissed.

24       2.   <u>Enigma Has Failed to Plausibly Plead that Malwarebytes Had Knowledge of
25   Such Anonymous Users.</u>

26   "A tortious interference claim requires that the defendant have knowledge of the prospective

27   economic relationship with which it is alleged to have interfered." *Dolin*, 2018 WL 2047766, at *4.

28   A "speculative assertion [of knowledge], however, is insufficient to state a claim." *Id*. Enigma fails

1   to identify specific third parties with whom it had a plausible, *existing* relationship with a probability

2   of economic benefit, much less plead that Malwarebytes had knowledge of these third parties.

3   Rather, Enigma appears to aver that—by mere virtue of being an AV/AM software

4   developer—Malwarebytes has constructive knowledge of every other software developer's potential

5   business relationships with "potential users." *See, e.g.*, SAC ¶ 14. Such a theory is insufficient as a

6   matter of law. *See Dolin*, 2018 WL 2047766, at *4 ("Plaintiff contends that because [defendant] was

7   aware of his shopping platform, it must have also known about his economic relationship with his

8   'users.' [ ] This type of speculative assertion, [ ] is insufficient to state a claim."); *Westside Ctr.*

9   *Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996) (reaffirming IIPER plaintiff

10  must plead that defendant had knowledge of specific third parties); *see also Zdenek Marek v. Old*

11  *Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (dismissing IIPER claim for "failure

12  to allege any knowledge on the part of defendants of any business relationships with which they

13  allegedly interfered"). Because Enigma has failed to plausibly plead that Malwarebytes had

14  knowledge of Enigma's users, its IIPER claim fails. *Dolin*, 2018 WL 2047766, at *4.

15          3.    Enigma Fails to Plausibly Allege Economic Harm Proximately Caused by
16                Malwarebytes' Conduct.

17  An IIPER claim requires "economic harm proximately caused by the defendant's action."

18  *Roy Allan Slurry Seal*, 2 Cal. 5th at 512. In other words, a plaintiff must overcome a threshold

19  causation requirement, such that "it must be reasonably probable that the prospective economic

20  advantage would have been realized *but for defendant's interference*." *Youst*, 43 Cal. 3d at 71

21  (emphasis added). The SAC does not meet this threshold requirement.

22  Enigma has not plausibly alleged (nor can it) that, but for Malwarebytes' characterization,

23  potential consumers would purchase Enigma's Scareware Programs over Malwarebytes' programs,

24  let alone over the myriad other legitimate AV/AM products on the market. SAC ¶ 17 (conclusory

25  assumption of two-player market); *id*. ¶ 19 (conclusory statement of harm); *id*. ¶ 32 (same); *id*. ¶ 32

26  (conclusory assumption of causation); *id*. ¶ 209 (same); *see also id*. ¶¶ 115-16 (alleging existence of

27  "[n]umerous anti-malware products offered by companies other than ESG"). Consumers can install

28  as many free trials of software as they wish and are free to buy the paid versions of all, some, or none

5877909

1  of them. Enigma does not provide any plausible allegation why its Scareware Programs would have

2  been selected by *Malwarebytes'* users.  Indeed, Enigma does not identify a single Malwarebytes'

3  user who would have entered into an economically beneficial relationship with Enigma but for

4  Malwarebytes' PUP characterization.  This failure is fatal to Enigma's IIPER claim.  *See Celebrity*

5  *Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1157-58 (S.D. Cal. 2014) (dismissing claims

6  for IICR and IIPER because the complaint failed to explain "why Macy's, rather than other forces,

7  was the cause" of the breaches and disruption to the relationship); *Comput. Scis. Corp. v. Comput.*

8  *Assocs. Int'l, Inc.*, 1999 WL 675446, at *23-25 (C.D. Cal. Aug. 12, 1999) (finding no proximate

9  causation where the proposed expectancy was "nowhere near the verge of closing . . . at the time of

10  [the] alleged interference" and whether it "would have closed absent the alleged interference is

11  anybody's guess"); *see also Zetes v. Stephens*, 969 N.Y.S.2d 298, 304 (2013) (requiring plaintiff to

12  identify specific customer that it would have obtained but for defendant's wrongful conduct).

13              4.    <u>Malwarebytes' Alleged Acts of Updating its Detection Criteria to Better</u>
14                    <u>Identify Malware and Spyware Are Privileged Competition.</u>

15        Accepting Enigma's allegations that the parties are competitors dooms Enigma's intentional

16  interference claims. *See, e.g.*, SAC ¶¶ 1. "Under [the competition] privilege, 'a competitor is free to

17  divert business to himself as long as he uses fair and reasonable means.'" *I-CA Enterprises, Inc. v.*

18  *Palram Americas, Inc.*, 235 Cal. App. 4th 257, 292-93 (2015). "[T]he crux of the competition

19  privilege is that one can interfere with a competitor's prospective contractual relationship with a third

20  party as long as the interfering conduct is not independently wrongful[.])" *Bed, Bath & Beyond*, 52

21  Cal. App. 4th at 881 (1997).[8]

22        Thus, to adequately plead its IIPER claim, Enigma must allege, "as an element of the cause

23  of action itself, that the defendant's conduct was independently wrongful and, therefore, was not

24  _____

25  [8] New York's highest court similarly has explained that "competition, by definition, interferes with

26  someone else's economic relations" and thus "[t]he existence of competition may often be relevant,

27  since it provides an obvious motive for defendant's interference other than a desire to injure the

28  plaintiff[.]" *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191 (NY 2004).

5877909

1    privileged[.]" *Id*. "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by

2    some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Dolin*,

3    2018 WL 2047766, at *4 (internal punctuation and citation omitted).**9**

4        The thrust of Enigma's intentional interference theory is that Malwarebytes' updates to its

5    detection criteria interfere with Enigma's business because they ultimately persuade users to

6    purchase Malwarebytes' software over Enigma's Scareware Programs. *See* SAC ¶¶ 5, 17. But

7    Malwarebytes' revisions to its detection criteria are acts common to AV/AM software developers,

8    including (assuming the truth of the SAC's allegations), Enigma itself. *See, e.g.*, *id*. ¶ 50 (alleging

9    that Scareware Program detects PUPs based on certain criteria). Likewise, Enigma cannot state an

10   IIPER claim on the premise that Malwarebytes is providing its users the precise benefits—through

11   Malwarebytes' proprietary detection criteria—that prompt users to download Malwarebytes AV/AM

12   programs over less comprehensive protection offered by other developers in the first place.

13       Enigma may argue its Lanham Act and Section 349 allegations suffice to establish

14   "independently wrongful" conduct. As discussed above, however, these statutory claims fail as a

15   matter of law and thus are insufficient to save Enigma's IIPER claim. *See*, *supra*, Section II.C, II.D;

16   *Della Penna v. Toyota Motor Sales, USA, Inc*., 11 Cal. 4th 376, 393 (1995).

17       At best, Enigma's alleged theories describe nothing more than run of the mill competition.

18   Accordingly, Malwarebytes' changes to its detection criteria are privileged and insufficient to

19   maintain intentional interference claims. Given that dismissal with prejudice is appropriate for

20   Enigma's statutory claims, the interference claims similarly are irreparably flawed for lack of

21   independently wrongful conduct and should be dismissed with prejudice.  *Dolin*, 2018 WL 2047766

22   at *5 (dismissing IIPER claim for lack of allegations of independently wrongful conduct); *see also*

23   *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (dismissing claim for failing to show

24

25   _____

26   **9** New York law requires the same. *See Macquarie Grp. Ltd. v. Pac. Corp. Grp., LLC*, 2009 WL

27   539928, at *11 (S.D. Cal. Mar. 2, 2009) ("New York defines 'improper means' to mean the conduct

28   'must amount to a crime or an independent tort.'").

MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT PURSUANT TO FRCP 12(b)(6)

5877909

that defendant plausibly acted with "sole purpose of inflicting intentional harm" on the plaintiff).[10]

### F. Enigma's Intentional Interference with Contractual Relations (IICR) Claim Should Be Dismissed.

To state a claim for IICR, Enigma must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage*." Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998).[11]   Enigma's IICR claim fails for several independent reasons.

#### 1. Enigma Fails to Plausibly Allege Any Valid Contractual Obligation with Which Malwarebytes Interfered.

To adequately plead an IICR claim, Enigma must identify a specific contractual obligation with which Malwarebytes interfered.  *Dongguan Beibei*, 2019 WL 8631502, at *2. Enigma has not done so, nor could it because a user has no contractual obligation to use Enigma's software or continue its subscriptions after the software is installed. *See* SAC ¶¶ 181, 188. In fact, Malwarebytes provides instructions to users to choose what to do with the programs that are flagged as PUPs. Kaba Decl., Ex. J (providing link to instructions to "[e]xclude detections in Malwarebytes on Windows devices"); SAC, Ex. 15 at 22–23, 30–31, 46 (providing instructions for how to ignore detected threats); SAC, Ex. 16 at 19, 21, 34, 42 (same). These instructions include the option to run both

---

[10] Considering Plaintiff's allegations that Malwarebytes acted to further its own financial interests, SAC ¶¶ 5, 17, the conclusory accusations in Paragraphs 248-49 cannot plausibly allege that Malwarebytes "acted solely out of malice." *See Steiner Sports Marketing, Inc. v Weinreb*, 88 A.D.3d 482 (1st Dept 2011) (affirming dismissal of tortious interference with business relations claim due to allegations that counter-defendant acted in its own economic interests).

[11] To state a tortious interference with contract claim under New York law, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch*, 449 F.3d at 401-02 (internal quotation marks and citation omitted).

1  programs in parallel, which plainly would not breach any obligation a user had to Enigma. *Id.*

2  Because Enigma fails to adequately allege a cognizable contractual obligation with which

3  Malwarebytes purportedly interfered, the IICR claim should be dismissed. *Dongguan Beibei*, 2019

4  WL 8631502, at *2 ("[C]onclusory allegations are insufficient. Nowhere does [plaintiff] identify

5  specific contracts that were disrupted, the terms of the contracts, the parties involved, and how

6  [defendant]'s actions disrupted the contracts.").

7       2.   Enigma Fails to Plausibly Allege Malwarebytes Had Knowledge of Any Valid
            Contractual Obligation.

8

9  Enigma also fails to plausibly allege that Malwarebytes knew of any contractual obligation

10  any unidentified users may have owed Enigma and intentionally interfered with that obligation. *See*

11  *Dongguan Beibei*, 2019 WL 8631502, at *2 (dismissing IICR claim for lack of plausible allegations

12  of defendant's knowledge of contracts). To adequately plead this element, Enigma must allege that

13  Malwarebytes had knowledge of a particular contractual obligation prior to the alleged breach. *See*

14  *Televisa*, 2012 WL 12893444, at *1. An "assert[ion] that Defendant[] should have known" of such

15  an obligation is insufficient. *Id.*

16  Here, there is no plausible allegation that Malwarebytes could even discern between

17  subscribed users of Enigma's Scareware Programs and consumers who had downloaded largely

18  inoperative, free trial versions of these programs, much less that Malwarebytes could intentionally

19  disrupt the unidentified contractual obligations of those users.  Enigma's speculative, conclusory

20  inference that Malwarebytes had constructive knowledge of Enigma's contracts with unknown third

21  parties by the mere fact that other AV/AM developers sell software to the public is insufficient as a

22  matter of law to satisfy this element. *See Televisa*, 2012 WL 12893444, at *1 ("Nor does the apparent

23  fact that some Mexican television performers are under exclusivity agreements mean that Defendants

24  can be charged with constructive knowledge of the specific exclusivity clause between Plaintiffs and

25  Kristoff."); *Qube Films Ltd. v. Padell*, 2014 WL 3952931, at *8 (S.D.N.Y. Aug. 12, 2014)

26  ("[C]onstructive knowledge is not enough; [p]laintiffs must allege actual knowledge.").

27       3.   Enigma Fails to Allege Any Cognizable Breach or Disruption.

28  Even after multiple amendments, Enigma still fails to identify any cognizable breach or

- 23 -

5877909

1    disruption of its purported subscription agreements with supposed paying users of the Scareware

2    Programs. A plaintiff cannot premise an IICR claim upon an arrangement that a third party is "free

3    to terminate . . . unilaterally." *Netapp,* 2016 WL 3648716, at *6 (Davila, J.). This is because, where

4    the third parties have not allegedly "agreed to purchase services exclusively from [p]laintiff[,]" there

5    are "no continuing obligations that [the defendant] could disrupt." *Id*. In *Netapp*, this Court dismissed

6    a similar claim where the plaintiff asserted merely that it entered into an agreement with a third-party

7    for the provision of services and that the defendant knowingly diverted the third-party to another

8    service provider but did not allege any term or obligation of the contract that was disrupted. *Id.* at *6.

9         Similarly here, Enigma's alleged licensing/subscription agreements with users were not

10   exclusive, and those third-parties did not have any "continuing obligations" to Enigma that

11   Malwarebytes could disrupt. SAC ¶¶ 5, 11, 126, 181, 204, 236 (alleging users commonly install

12   multiple AV/AM products for layered protection). As in *Netapp*, Enigma merely alleges that

13   Malwarebytes' actions have caused some of Enigma's customers to choose not to install the

14   Scareware Programs or express a desire to delete or discontinue use of the same. *Id.* ¶ 148, 153, 161,

15   162, 164, 239. But users of Enigma's Scareware Programs can cancel their subscriptions and/or

16   uninstall the programs at their discretion (though users have stated publicly that the Scareware

17   Programs make cancellation and removal exceedingly difficult). *See, e.g.*, Kaba Decl., Ex. C.

18        Importantly, while Enigma (presumably) has cherry-picked its strongest "representative

19   sample of [user] complaints," conspicuously absent from Enigma's pleadings is any allegation of

20   actual cancellation of the purported agreements between Enigma and the unnamed third parties. *See*

21   SAC ¶¶ 148, 153 (alleging a *request* for cancellation, but not that cancellation actually occurred); *id*.

22   ¶ 157 (no allegation user actually ended relationship); *id.* ¶ 161 (alleging user expressed frustration,

23   but no actual cancellation or refund); *id.* ¶ 162 (alleging requests, but no actual refunds, cancellation,

24   or nonrenewal); *id.* ¶ 164 (conclusory allegation that comments show users canceled subscriptions

25   or requested refunds). And entirely absent from the pleadings is any allegation that any third party

26   breached any provision of their alleged subscription agreement by demanding a refund from Enigma.

27        Enigma's IICR claim fails for lack of a cognizable breach or disruption of these alleged non-

28   exclusive, at-will contracts. *Netapp*, 2016 WL 3648716, at *6; *see also Atlas MF Mezzanine*

- 24 -

*Borrower, LLC v Macquarie Texas Loan Holder LLC*, 174 AD3d 150 (NY 1st Dept 2019) (dismissing claim for tortious interference with loan agreement for lack of allegation of breach); *Kirch*, 449 F.3d at 402 (allegation that third-party "abandoned" or "walked away" from a project was insufficient to plead breach of a contract). For this reason, Enigma's IICR claim must be dismissed.

                4.    <u>Because the Alleged Contractual Relationship Is At-Will Enigma Must (But Does Not) Sufficiently Plead Any Independently Wrongful Act.</u>

A claim for intentional interference with an at-will contract requires a plaintiff to "allege that the defendant engaged in an independently wrongful act"—i.e., an act proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard that induced the breach. *See Ixchel Pharma*, 9 Cal. 5th at 1148; *see* SAC ¶ 188 (implying that Scareware Program users are able to uninstall these programs at their discretion).

For the reasons explained above in connection with Enigma's IIPER claim, Enigma fails to plead any independently wrongful conduct. *See*, *supra*, Section II.E.4. Accordingly, Enigma's IICR claim, too, must be dismissed on this basis. *Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 532 (9th Cir. 2018) (affirming dismissal of both IICR and IIPER claims on the basis that plaintiff had failed to allege independently wrongful conduct); *see also Tatintsian v. Vorotyntsev*, 2019 WL 1746004, at *3 (S.D.N.Y. Apr. 18, 2019) ("It is well-settled in New York that '[a] contract terminable at will cannot be the basis for a tortious interference with contract claim' because 'there can be no breach of contract, a necessary element for tortious interference with contract, when the contract may be terminated at will.'").

## IV. CONCLUSION

Dismissal with prejudice is appropriate where, as here, amendment would be futile. Enigma has had multiple opportunities to plead its claims, yet they still fail to pass muster under either California or New York law. Accordingly, for the foregoing reasons, the Court should dismiss the SAC with prejudice. *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

5877909

1 | Dated:  January 12, 2021

HUESTON HENNIGAN LLP

2

3

By:  _____

4

Moez M. Kaba
Hueston Hennigan LLP
Attorneys for Defendant
MALWAREBYTES INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MALWAREBYTES INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT PURSUANT TO FRCP 12(b)(6)

5877909