Terry Budd (*Admitted Pro Hac Vice*)
BUDD LAW, PLLC
120 Lyndhurst Circle
Wexford, PA 15090
Telephone: 412.613.2541
terry.budd@buddlawglobal.com

Edward P. Sangster (SBN 121041)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: 415 882 8200
Facsimile: 415 882 8220
edward.sangster@klgates.com

Christopher M. Verdini (*Admitted Pro Hac Vice*)
Anna Shabalov (*Admitted Pro Hac Vice*)
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: 412.355.6500
Facsimile: 412.355.6501
christopher.verdini@klgates.com
anna.shabalov@klgates.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENIGMA SOFTWARE GROUP USA, LLC, | Case No. 5:17-cv-02915-EJD |
| Plaintiff, | **PLAINTIFF ENIGMA SOFTWARE GROUP USA, LLC'S OPPOSITION TO DEFENDANT MALWAREBYTES INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |
| -against- | |
| MALWAREBYTES INC., | |
| Defendant. | **DATE: April 22, 2021** **TIME: 9:00 AM** **COURTROOM: 4, 5th Floor** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    ISSUES TO BE DECIDED ....................................................................................5

III.   ALLEGATIONS AND PROCEDURAL BACKGROUND ....................................6

    A.     Allegations ................................................................................................6

    B.     Procedural Background..............................................................................10

IV.    LAW AND ARGUMENT ......................................................................................11

    A.     The Law of the Case Requires Denial of Malwarebytes' Motion. ...........11

    B.     Malwarebytes Ignores the Rule 12(b)(6) Standard. .................................12

    C.     New York Law Applies to ESG's Claims. ...............................................14

    D.     ESG States Claims that Survive a Motion to Dismiss. .............................18

        1.     ESG Pleads Lanham Act Actionable "False and Misleading Statements."..18

        2.     ESG Pleads Lanham Act "Commercial Advertising and Promotion.".........20

        3.     ESG Sufficiently Pleads Deception Under the Lanham Act. ......................21

        4.     ESG Sufficiently Pleads Violations of NYGBL Section 349......................23

        5.     ESG Sufficiently Pleads Interference With Prospective Advantage. ...........25

        6.     ESG Sufficiently Pleads Interference With Contractual Relations..............27

CONCLUSION....................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)..........................................................................20

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
   121 F. Supp. 3d 950 (C.D. Cal. 2015) .........................................................................29

*AMA Multimedia, LLC v. Wanat*,
   970 F.3d 1201 (9th Cir. 2020) ....................................................................................17

*In re Anthem, Inc. Data Breach Litig.*,
   162 F. Supp. 3d 953 (N.D. Cal. 2016) .........................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................11

*Asurvio LP v. Malwarebytes Inc.*,
   371 F. Supp. 3d 652, 664 (N.D. Cal. 2019) ................................................................18

*Asurvio LP v. Malwarebytes Inc.*,
   2020 WL 1478345 (N.D. Cal. Mar. 26, 2020)......................................................5, 18

*Asurvio LP v. Malwarebytes Inc.*,
   2018 WL 2996897 (W.D. Tex. Apr. 23, 2018) ...........................................................18

*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
   818 N.E.2d 1140 (N.Y. 2004).....................................................................................23

*Broder v. MBNA Corp.*,
   281 A.D.2d 369 (N.Y. App. Div. 2001) ......................................................................23

*Buonasera v. Honest Co., Inc.*,
   208 F. Supp. 3d 555 (S.D.N.Y. 2016).........................................................................23

*Casper Sleep, Inc. v. Mitcham*,
   204 F. Supp. 3d 632 (S.D.N.Y. 2016).................................................................23, 25

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
   16 F. Supp. 3d 1141 (S.D. Cal. 2014).........................................................................26

*Comput. Scis. Corp. v. Comput. Assocs. Int'l, Inc.*,
   1999 WL 675446 (C.D. Cal. Aug. 12, 1999)..............................................................27

*Cox v. Microsoft Corp.*,
   8 A.D.3d 39 (N.Y. App. Div. 2004) ............................................................................24

*Dolin v. Facebook, Inc.*,
  2018 WL 2047766 (N.D. Cal. May 2, 2018) ...............................................................26

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013) ..........................................................................................17

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,
  938 F.3d 1026 (9th Cir. 2019) ......................................................................................11

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,
  946 F.3d 1040, 1054 (9th Cir. 2019) ........................................................................2, 11

*Gerena v. Korb*,
  617 F.3d 197 (2d Cir. 2010)..........................................................................................14

*Gonzalez v. Ariz.*,
  677 F.3d 383 (9th Cir. 2012) (en banc), *aff'd sub nom. Ariz. v. Inter Tribal
  Council of Ariz., Inc.*, 570 U.S. 1 (2013) .....................................................................12

*Gordon v. Invisible Children, Inc.*,
  2015 WL 5671919 (S.D.N.Y. Sept. 24, 2015)..............................................................17

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
  774 N.E.2d 1190 (N.Y. 2002) .......................................................................................23

*Gross v. Bare Escentuals Beauty, Inc.*,
  632 F. Supp. 2d 293 (S.D.N.Y. 2008)...........................................................................24

*Gym Door Repairs v. Young Equip. Sales*,
  206 F. Supp. 3d 869 (S.D.N.Y. 2016)...........................................................................29

*Hoang v. Bank of Am., N.A.*,
  910 F.3d 1096 (9th Cir. 2018) ......................................................................................18

*ISI Brands, Inc. v. KCC Intern., Inc.*,
  458 F. Supp. 2d 81 (E.D.N.Y. 2006) ............................................................................17

*Karlin v. IVF Am., Inc.*,
  712 N.E.2d 662 (N.Y. 1999)..........................................................................................23

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P. 3d 937 (Cal. 2003) ...............................................................................................27

*MEE Direct, LLC v. Tran Source Logistics, Inc.*,
  2012 WL 670067 (S.D.N.Y. Dec. 26, 2012) ................................................................17

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990)...........................................................................................................20

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

*N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*,
   953 N.Y.S.2d 96 (N.Y. App. Div. 2012) ...................................................................25

*Nat. Res. Media & Tech. Grp., LLC v. Snoop Youth Football League Found.*,
   2008 WL 728650 (S.D.N.Y. Mar. 14, 2008) ...........................................................28

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013)................................................................................ 22-23

*Pearson Educ., Inc. v. Shi*,
   525 F. Supp. 2d 551 (S.D.N.Y. 2007)......................................................................15

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
   360 F. Supp. 3d 994 (N.D. Cal. 2018) .....................................................................26

*Quelimane Co. v. Stewart Title Guar. Co.*,
   960 P.2d 513 (Cal. 1998), *as modified* (Sept. 23, 1998)........................................29

*Quinn v. Walgreen Co.*,
   958 F. Supp. 2d 533 (S.D.N.Y. 2013).......................................................................23

*Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*,
   317 F. Supp. 2d 301 (S.D.N.Y. 2003).......................................................................25

*RingCentral, Inc. v. Nextiva, Inc.*,
   2020 WL 978667 (N.D. Cal. Feb. 28, 2020) ...........................................................26

*Sabol v. Bayer Healthcare Pharm., Inc.*,
   439 F. Supp. 3d 131 (S.D.N.Y. 2020).......................................................................17

*Salustri v. Dell*, Inc.,
   2010 WL 11596554, at *7 (C.D. Cal. Apr. 27, 2010) ..............................................18

*Schenker v. Assicurazioni Fenerali S.p.A., Consol.*,
   2002 WL 1560788 (S.D.N.Y. July 15, 2002) ...........................................................17

*Schering Corp. v. First DataBank Inc.*,
   2007 WL 1176627 (N.D. Cal. Apr. 20, 2007) ..........................................................14

*Sebastian Intern., Inc. v. Russolillo*,
   162 F. Supp. 2d 1198 (C.D. Cal. 2001) ....................................................................29

*Sidney Frank Importing Co., Inc. v. Beam Inc.*,
   998 F. Supp. 2d 193 (S.D.N.Y. 2014).......................................................................27

*Silicon Valley Test & Repair, Inc. v. Gen. Signal Corp.*,
   1993 WL 373977 (N.D. Cal. Sept. 13, 1993) ...........................................................25

*Sky Fun 1, Inc. v. Schuttloffel*,
   8 P.3d 570 (Colo. App. 2000), *aff'd in relevant part*, 27 P.3d 361 (Colo. 2001)..........................19

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (N.Y. Ct. App. 1986)..............................................................................20

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) ..............................................................................17

*Student Advantage, Inc. v. Int'l Student Exch. Cards, Inc.*,
    2000 WL 1290585 (S.D.N.Y. Sept. 13, 2000)................................................................16

*U.S. v. Houser*,
    804 F.2d 565 (9th Cir. 1986) ..........................................................................................12

*U.S. v. Miller*,
    822 F.2d 828 (9th Cir. 1987) ..........................................................................................12

*UGG Holdings, Inc. v. Severn*,
    2005 WL 5887187 (C.D. Cal. Feb. 23, 2005)................................................................22

*Vasquez v. Torres Negron*,
    434 F. Supp. 2d 199 (S.D.N.Y. 2006)............................................................................15

*Walden v. Fiore*,
    571 U.S. 277 (2014)........................................................................................................16

*Waldman v. Palest. Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)............................................................................................16

*Watison v. Carter*,
    668 F.3d 1108 (9th Cir. 2012) ........................................................................................11

*Winner Intern. v. Kryptonite Corp.*,
    1996 WL 84476 (S.D.N.Y. Feb. 27, 1996)....................................................................24

*Zetes v. Stephens*,
    108 A.D.3d 1014 (N.Y. App. Div. 2013) .......................................................................27

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997)...............................................................................17

**Statutes**

28 U.S.C. § 1404.........................................................................................................10, 14

**Other Authorities**

Fed. R. Civ. P. 12 ................................................................................................... *passim*

Fed. R. Civ. P. 56.......................................................................................................... 1

5B Wright & Miller, *Fed. Practice & Procedure* § 1356 (3d ed. 2017) ..........................12

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1    Plaintiff Enigma Software Group USA, LLC ("ESG") files this Opposition to Malwarebytes

2    Inc.'s ("Malwarebytes") Motion to Dismiss Second Amended Complaint (the "Motion").

## I.      INTRODUCTION

4    In the face of extensive, detailed factual allegations and well-pled legal claims presenting a

5    pattern of Malwarebytes' unlawful, anticompetitive trade practices, Malwarebytes asks this Court to

6    completely dismiss all of ESG's claims under the guise of a Rule 12(b)(6) motion.  Malwarebytes'

7    Motion, however, not only is improper under Rule 12(b)(6), but would be improper even as a Rule

8    56 motion for summary judgment.  In reality, Malwarebytes has filed a trial brief full of outside-the-

9    record evidence that violates the clear strictures of Rule 12(b)(6).  The evidence and argumentative

10   spin on the facts upon which Malwarebytes relies in making its dismissal arguments are not only

11   inadmissible for consideration by the Court in a Rule 12(b)(6) context but would also fail in many

12   respects on inadmissibility grounds at trial.  Relatedly, Malwarebytes' legal arguments are likewise

13   fatally flawed in a Rule 12(b)(6) context for the reasons detailed below.  Because Malwarebytes has

14   focused a great deal on its self-serving version of the facts in its filings, ESG will first review the

15   detailed, properly pled allegations of its Second Amended Complaint ("SAC") and then demonstrate

16   how they establish proper legal claims and why Malwarebytes' Motion must be denied.

17   For over four years, Malwarebytes has pursued its unlawful, anticompetitive campaign

18   against its direct competitor ESG, harming both ESG and consumers.  Malwarebytes has applied its

19   "Potentially Unwanted Program" ("PUP") criteria pretextually to designate ESG's legitimate,

20   certified cybersecurity and privacy products—one of which, SpyHunter 4, beat Malwarebytes'

21   flagship anti-malware product, MBAM, in head-to-head testing by an independent lab whose results

22   Malwarebytes itself touts—as both ***PUPs and "threats"*** to users' cybersecurity.  Malwarebytes also

23   automatically "quarantines" and ***blocks*** detected ESG products so that users who attempt to install

24   and use them (many of whom have already purchased subscriptions) cannot do so.  To be clear,

25   Malwarebytes does not simply provide a cautionary list or review of products Malwarebytes looks

26   upon unfavorably, as Consumer Reports might do.  Rather, Malwarebytes' programmers take

27   purposeful action to predetermine and preselect ESG's products to be blocked and electronically

28   disabled, *i.e.*, rendered useless, on users' computers.  Malwarebytes thereby disrupts and disables

1   users' access to their chosen product and prevents users from layering ESG and Malwarebytes

2   products to increase cybersecurity protection, despite the fact that Malwarebytes' own CEO has

3   publicly recommended such security layering, likening it to the common sense act of equipping cars

4   with both "airbags" and "seatbelts" to enhance safety.  SAC ¶¶ 5, 126.  Contrary to Malwarebytes'

5   false claim that it merely provides users with a filtering tool to "choose" themselves whether to

6   quarantine or use ESG's programs, Mot. at 4, Malwarebytes in fact purposely designed MBAM to

7   automatically quarantine and block ESG's products based on Malwarebytes' preselection and offer

8   only a confusing, labyrinthine opt-out process many users cannot navigate.  SAC ¶¶ 9, 117-25.

9        Desperate to avoid accountability for its malicious, anticompetitive targeting of ESG,

10  Malwarebytes now files its third motion to dismiss, rehashing versions of the same arguments it

11  made against ESG's First Amended Complaint ("FAC"), this time directed at even more detailed

12  facts and allegations from ESG.  On appeal of its prior Rule 12(b)(6) motion, Malwarebytes

13  affirmatively argued to the Ninth Circuit that (i) it was immune under Section 230 of the

14  Communications Decency Act and could block with impunity any software for any reason, and,

15  alternatively, (ii) even absent Section 230, ESG had failed to adequately plead its claims.  No. 17-

16  17351, Dkt. 20 (9th Cir. June 1, 2018).  The Ninth Circuit roundly rebuffed both positions, holding

17  (i) that Section 230 did not extend to immunize blocking of direct competitors for anticompetitive

18  reasons, and (ii) that ESG's "claims survive the motion to dismiss."  946 F.3d 1040, 1054 (9th Cir.

19  2019).  Because Malwarebytes affirmatively put its alternative argument before the Ninth Circuit

20  which ruled that ESG's claims survived the Rule 12(b)(6) motion, Malwarebytes' current arguments,

21  asserted on the same claims pled with even more detailed allegations, fail as a matter of law.

22        Significantly, at the Ninth Circuit oral argument, the panel asked Malwarebytes' counsel

23  about a scenario in which internal company evidence indicated that Malwarebytes acted to "cause

24  problems for [its] competitor" and offered "pretextual" reasons for its blocking.  No. 17-17351, Dkt.

25  40 (9th Cir. Feb. 15, 2019).  Malwarebytes' counsel claimed "that's not the facts before the Court."

26  *Id.*  That was incorrect even then, as the Ninth Circuit recognized that the FAC squarely alleged that

27  Malwarebytes used its PUP criteria pretextually to target a direct competitor.  But it is especially off

28  base now in the face of the SAC's extensive allegations, based on Malwarebytes' own internal

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**

1    company records and communications, revealing extensive collaboration between Malwarebytes and

2    its sales affiliate, Bleeping Computer LLC ("Bleeping Computer") that gave rise to Bleeping

3    Computer's initial smear campaign against ESG, Malwarebytes' aiding in the perpetuation of that

4    smear campaign, and Malwarebytes' own anticompetitive blocking of ESG's products.

5         Since at least 2009, when they signed a Joint Confidentiality Agreement covering their

6    sharing of highly sensitive, proprietary business information, Malwarebytes and Bleeping Computer

7    have worked together closely to promote their mutual interests and profits through Bleeping

8    Computer's promotion of Malwarebytes products, for which Malwarebytes paid Bleeping Computer

9    commissions and advertising fees.  SAC ¶¶ 21-22, 85-87.  Through this joint work, Bleeping

10   Computer's CEO had direct access to the highest echelons of Malwarebytes' executive team,

11   including its CEO, its General Counsel, and top researchers.  ¶ 86.  To promote sales of MBAM,

12   Bleeping Computer undertook a concerted smear campaign against ESG, making multiple posts on

13   its site that: (i) made repeated defamatory statements about ESG and its products, (ii) instructed

14   consumers not to install SpyHunter 4 and provided uninstall instructions for those who already had

15   the product, and (iii) directed users to purchase MBAM instead.  ¶¶ 23, 79.

16        Unsurprisingly, when ESG sent Bleeping Computer a cease and desist letter complaining

17   about the smear campaign, Bleeping Computer's CEO, Mr. Abrams, immediately reached out

18   directly to Malwarebytes' CEO, Mr. Kleczynski, who, recognizing the smear campaign's

19   continuation would help Malwarebytes' sales, encouraged Mr. Abrams to leave the disparaging posts

20   unchanged.  ¶ 89.  From there, Malwarebytes and Mr. Kleczynski became ever more involved in

21   Bleeping Computer's defense of ESG's claims, providing strategic input when ESG filed suit against

22   Bleeping Computer in the Southern District of New York (the "Related Case"), making a substantial

23   donation to Bleeping Computer's defense fund, publicly posting encouragement to Malwarebytes'

24   users to do the same, and reaching out privately to other cybersecurity company executives to seek

25   assistance.  ¶¶ 90-95.  Thus, when ESG served a subpoena on Malwarebytes seeking production of

26   company records, Malwarebytes faced the prospect of having to reveal the extent of its involvement

27   in the continuing smear campaign and losing the advantage over ESG that campaign provided.  ¶¶

28   20, 24, 99.  Unwilling to countenance this, ***less than a week before its subpoena response was due,***

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**

1    ***Malwarebytes reprogrammed its MBAM product to falsely designate and block ESG's programs***

2    ***as "threats" and PUPs for the first time ever in eight years of direct competition between***

3    ***Malwarebytes and ESG***.  ¶¶ 102, 104.  In advance of Malwarebytes' public announcement of the

4    newly "revised" PUP criteria it would use as a pretext for its blocking, Malwarebytes research

5    executive Ade Gill even reached out to Bleeping Computer's CEO Mr. Abrams to specifically notify

6    him that Malwarebytes would begin detecting ESG's programs as PUPs, in recognition of the

7    importance of this to Bleeping Computer's defense of the Related Case.  ¶¶ 28, 112-13.  ***Tellingly,***

8    ***Mr. Gill explained that he had "reservations to say the least" about Malwarebytes' decision to***

9    ***block ESG's products, which he expressed to Malwarebytes' CEO, but Malwarebytes was "still***

10   ***going ahead with it."***  ¶ 112.  In the cybersecurity software market, calling a competitor's anti-

11   malware product a "threat" when it is designed to protect against security threats is the greatest

12   falsehood and disparaging statement that can be made.  ¶ 4.

13          Mr. Gill's "reservations" regarding designating ESG's programs as PUPs and "threats" are

14   not surprising in the face of documented evidence detailed in the SAC that Malwarebytes'

15   justifications for its unlawful blocking of ESG's programs are mere pretenses to conceal its

16   anticompetitive animus.  ¶¶ 179-203.  For example, Malwarebytes has pretended its blocking was

17   justified because SpyHunter 4 supposedly at times included "false positives" in its detection results,

18   but Malwarebytes itself has received numerous user complaints that MBAM detection results display

19   "false positives."  ¶¶ 202-03.  Malwarebytes also has pretended that it was justified in blocking

20   SpyHunter 4 because users allegedly complained about uninstall and refund difficulties or automatic

21   renewal subscriptions, but Malwarebytes has had the same user complaints levied against its

22   products.  ¶¶ 188, 198, 203.  Malwarebytes likewise has pretended its blocking was justified because

23   SpyHunter 4 used a spider graphic to "scare" users, but Malwarebytes submitted materials in support

24   of its Motion that reveal Malwarebytes likewise uses spider and bug graphics.  *See, e.g.*, Dkt. 147-

25   10.  ***If Malwarebytes' pretextual justifications for its unlawful blocking of ESG products were***

26   ***objectively supportable, Malwarebytes would have to block itself as a PUP***.  SAC ¶¶ 197-203.

27          Thus, even without the benefit of discovery from Malwarebytes, ESG has offered detailed

28   descriptions of Malwarebytes' attacks on ESG, identifying (i) Malwarebytes' particular unlawful

practices, (ii) the timeline of their implementation, (iii) the individuals, including Malwarebytes' CEO and other executives, who committed and directed the unlawful acts, (iv) the harm those acts caused ESG and its customers, and (v) Malwarebytes' motives for its unlawful acts, demonstrating anticompetitive animus.  These allegations move well past the *Twombly/Iqbal* plausibility threshold.

Malwarebytes essentially makes only two attacks on the sufficiency of ESG's pleading, both of which fail.  First, Malwarebytes dismissively calls ESG's claims "conclusory," "baseless," and "speculative," thereby ignoring and misconstruing both the law and ESG's extensive allegations, many of which based on private emails and Skype messages sent by Malwarebytes' own top executives to Bleeping Computer.  Second, Malwarebytes asks this Court to rule here as it did in *Asurvio LP v. Malwarebytes Inc.*, 2020 WL 1478345 (N.D. Cal. Mar. 26, 2020), but does not alert the Court to key differences between the cases.  Unlike in *Asurvio*, the Ninth Circuit has already recognized ESG and Malwarebytes as direct competitors and ESG has pled detailed allegations substantiating its claim of Malwarebytes' anticompetitive targeting.  ESG also bases its claims not solely on a PUP label, but on the combined effect of Malwarebytes calling ESG's programs PUPs *and "threats,"* calling ESG's website *"malicious,"* and affirmatively blocking access to ESG's programs and website, where Malwarebytes invites users to rely on it for cybersecurity expertise, leading users to understand its statements to be ones of fact, rather than mere opinion, and to believe ESG's products are actual malware, viruses, or "threats" (as evidenced by numerous user complaints, SAC ¶¶ 143-64).  Those distinctions require a different outcome in this case. Malwarebytes' third Motion to Dismiss must be denied.

## II.   ISSUES TO BE DECIDED

1.   Whether Malwarebytes' Motion is an improper attempt to relitigate a Rule 12(b)(6) challenge that the Ninth Circuit already rejected on appeal?

2.   Whether New York law applies to ESG's claims when the United States District Court for the Southern District of New York ("SDNY") unquestionably had personal jurisdiction over Malwarebytes and transferred the case to this Court solely for convenience?

3.   Whether ESG has properly pled its Lanham Act claim by alleging that Malwarebytes made false and misleading statements of fact about ESG products in commercial advertising or promotion?

4.   Whether ESG has properly pled its New York General Business Law ("NYGBL") Section 349 claim where it alleged that Malwarebytes' consumer-oriented deceptive statements about ESG's products materially misled consumers and harmed both consumers and ESG and the fact-bound question of what constitutes deceptive practices must be decided by the factfinder?

5.   Whether ESG has properly pled its tortious interference claims by alleging relations with which Malwarebytes interfered, their breach/disruption, and Malwarebytes' knowledge and intent?

## III.   ALLEGATIONS AND PROCEDURAL BACKGROUND

### A.   Allegations

ESG is an established cybersecurity company started in 2003 that was led by Alvin Estevez, who previously worked as a high-level cybersecurity expert (with top National Security Administration clearance) for a military defense contractor of the U.S. Government on special projects involving electronic defense, anti-hacking, and military counterintelligence.  SAC ¶¶ 2, 47. ESG's flagship anti-malware product SpyHunter 4 protected millions of consumers and businesses from malware, system breaches, ransomware, hackers, and identity theft.  ¶¶ 2, 52.  SpyHunter 4 and RegHunter, ESG's advanced privacy and optimizer program, have received top industry certifications and test scores.  ¶¶ 48-49, 53-59.  Malwarebytes competes with ESG in the cybersecurity market, even advertising to the same customer base.  ¶¶ 7, 68-71.  Its flagship product, MBAM, competed directly with SpyHunter 4, offering the same anti-malware features, and now competes directly with ESG affiliate EnigmaSoft Limited's newly built SpyHunter 5.  ¶¶ 7, 61, 71. AV-Test, a respected independent testing lab whose results Malwarebytes itself touts as evidence of the high quality of its products, has even compared MBAM and SpyHunter 4 in head-to-head testing and found SpyHunter 4 to be the more effective anti-malware product.  ¶ 72.  Like ESG's RegHunter, Malwarebytes also offers privacy and computer performance optimization features through MBAM, Privacy VPN, and AdwCleaner, a product Malwarebytes acquired in October 2016 just after it began designating ESG's programs as PUPs and "threats."  ¶¶ 73-74.  Through its website, Malwarebytes offers both free versions of its programs and a "Premium" version of MBAM, for which users must purchase a subscription after a free 14 day-trial to retain full functionality for ongoing cybersecurity protection.  ¶¶ 64-65.

1    Malwarebytes markets and promotes MBAM through, *inter alia*, an affiliate program, in

2    which it pays its affiliates commissions for sales of MBAM through the affiliates' websites.  ¶¶ 11,

3    69, 200.  Bleeping Computer is one of Malwarebytes' affiliates.  ¶ 22.  On January 5, 2016, ESG

4    filed the Related Case against Bleeping Computer, seeking redress for Bleeping Computer's

5    deliberate dissemination of false information about ESG and SpyHunter 4.  ¶ 75.  Bleeping

6    Computer operated a website claiming to be an independent, objective source of cybersecurity

7    information, including anti-malware product reviews.  ¶¶ 76-77.  In reality, however, Bleeping

8    Computer acted as a sales arm for Malwarebytes, receiving commissions for sales of MBAM it

9    originated on its website.  ¶¶ 22, 78.  To build business benefiting itself and Malwarebytes, Bleeping

10   Computer undertook a concerted smear campaign against ESG through defamatory postings on its

11   site.  ¶¶ 23, 79.  Bleeping Computer earned commissions on MBAM sales it generated through those

12   posts, and Malwarebytes directly profited through increased sales and greater exposure on a well-

13   regarded and ostensibly independent website.  ¶ 83.  In recognition of their long-standing

14   profiteering partnership, ¶¶ 21-22, 85-88, Malwarebytes even offered strategic advice and funded a

15   portion of Bleeping Computer's defense costs in the Related Case.  ¶¶ 89-95.

16       As part of discovery in the Related Case, ESG served Malwarebytes with a Rule 45 subpoena

17   issued from the Northern District of California seeking documents about Malwarebytes' relationship

18   with Bleeping Computer and their collaboration to divert sales from ESG to Malwarebytes

19   ("Subpoena").  ¶¶ 11, 20, 24, 99.  On October 5, 2016, *less than a week before its response to the*

20   *Subpoena was due*, Malwarebytes—facing the prospect of having to produce documents and testify

21   under oath regarding its involvement in Bleeping Computer's smear campaign and at risk of losing

22   the competitive advantages the smear campaign provided—publicly announced that it had amended

23   the "criteria" it used to define PUPs to include a series of factors that tracked Bleeping Computer's

24   defenses and counterclaim allegations in the Related Case.  ¶¶ 11, 20, 25, 100-02, 108-10.  Contrary

25   to Malwarebytes' false claim that it "revised and published" updated PUP criteria "on many previous

26   occasions," Mot. at 4, this October 2016 revision was the first since 2013 and the only one given

27   such a high public profile by the company.  SAC ¶ 12.  In parallel, rather than honor its obligations

28   under the properly served Subpoena, Malwarebytes chose to stonewall ESG, serving objections

weeks after they were due (in violation of this Court's rules), ultimately producing only a single document, and admitting it had not even searched for other responsive documents. ¶ 104.

With its announcement of its "revised" PUP criteria, Malwarebytes for the first time began to characterize ESG's programs as PUPs and "threats." ¶¶ 11, 25, 102, 111, 117.  Notably, from Malwarebytes' inception in 2008 until October 6, 2016—during eight years of direct competition— Malwarebytes never identified ESG's programs as PUPs or any type of "threat." ¶¶ 10, 106. MBAM, in turn, began, also for the first time in its existence, to block users' installation and use of ESG's products. ¶¶ 111, 117.  Users (many of whom had already paid for ESG's products) attempted unsuccessfully to opt out of Malwarebytes' disabling "quarantine" of ESG's products, but were trapped by MBAM in unproductive cycles of repeated blocking. ¶¶ 118-24.

Malwarebytes' pretextual use of its "revised" PUP criteria to target ESG was transparent. When, within hours of Malwarebytes' announcement, Bleeping Computer posted a front-page article about the "revised" PUP criteria, a user commented: "What would be really strange is if anyone can think of any other anti-malware program that fits any one of those descriptions [the PUP criteria] …. not that I can think of one of course :)." ¶ 29.  One Malwarebytes employee (an AdwCleaner developer) even specifically called out ESG, and only ESG, in a public tweet about Malwarebytes' "revised" PUP approach: "#AdwCleaner by @Malwarebytes now fully detects and removes #SpyHunter from Enigma Software Group #PUP." ¶¶ 30, 114.  The following day, a user of Malwarebytes' forum website posted a link to that tweet. ¶ 31.  A Malwarebytes "Expert," whose Malwarebytes forum posts established Malwarebytes' appointment of him as a representative with authority to speak on Malwarebytes' behalf and on whose expertise users could rely, responded: "Nice way to exacerbate things when Enigma has already filed suit against Malwarebytes.  It's one thing quietly removing Enigma'ware.  It is another announcing it, in public, after a suit has already been filed." *Id.*  He then highlighted the targeted nature of Malwarebytes' attack: "***WHY*** tweet it?  If there are 15,1000 [*sic*] PUPs that are current, should we expect 15,000 tweets for each and every one?  It isn't like some major BOTnet takedown or something of that nature.  Why exacerbate the issue after a lawsuit was filed in US Federal Court?" *Id.* (alteration in original).

Malwarebytes' intentional, unjustifiable, and anticompetitive targeting of ESG was made

even more apparent when ESG sought to mitigate the harm from Malwarebytes' interference by releasing an alternative installer for SpyHunter 4 for those users seeking to disable MBAM to allow use of SpyHunter 4 ("Countermeasure").  ¶ 165.  Immediately upon ESG's issuance of a press release announcing its Countermeasure, ***Malwarebytes began to block access to ESG website domains***—including the publicly available company website and the domains ESG's products use to communicate with back-end servers to ensure users receive automatic product and malware detection list updates and can access the customer support interface—and Malwarebytes displayed to users messages calling those ESG domains "malicious websites." ¶¶ 166-68.  This domain blocking, which could not have any practical impact on user safety since Malwarebytes was already blocking ESG's programs, was gratuitous retaliation for the Countermeasure that Malwarebytes stopped only after an extended period, without any changed circumstances or explanation.  ¶¶ 169-70.

Malwarebytes took a similarly unprincipled, anticompetitive approach to EnigmaSoft Limited's SpyHunter 5.  ¶¶ 171, 178.  For the first two months SpyHunter 5 spent on the market, Malwarebytes' products did not detect it in any way.  ¶ 172.  Malwarebytes then began to designate SpyHunter 5 a PUP and "threat" and MBAM began to quarantine and block it, although SpyHunter 5 had not materially changed since being released two months earlier and lacked any of the characteristics Malwarebytes had pretextually claimed as justifications for its blocking of SpyHunter 4.  ¶¶ 172, 175.  MBAM continued detecting SpyHunter 5 as a PUP and "threat" for five more months until it abruptly stopped, again without material changes to the program.  ¶ 176.  Meanwhile, proving Malwarebytes' unrelenting maliciousness, ***Malwarebytes' AdwCleaner product continued to designate SpyHunter 5 as a PUP for over a year longer, despite the fact that in removing SpyHunter 5 from MBAM's detection list, Malwarebytes had admitted SpyHunter 5 did not qualify as a PUP or "threat" under its own application of its PUP criteria***.  ¶ 177.

As Malwarebytes' actions reveal, Malwarebytes blocked ESG's products and domains despite knowing they were legitimate, posed no security threat to users' computers, and were not harassing.  ¶¶ 14, 181.  Malwarebytes had, and has, no objective, good-faith basis to claim that ESG's products—that users have chosen to download and purchase—are "potentially unwanted" or a "threat" or that ESG's website is "malicious." ¶¶ 179-84.  No such basis exists and Malwarebytes'

undertook its actions in bad faith.  *Id*.  Indeed, **every** purported justification Malwarebytes offers for its blocking illustrates that Malwarebytes applied its PUP criteria inconsistently, maliciously, and pretextually, because Malwarebytes' own website and publicly available records show that each complaint Malwarebytes makes about ESG has been repeatedly levied against Malwarebytes' own programs (which Malwarebytes, of course, does not designate as PUPs and "threats").  ¶¶ 185-203.

Malwarebytes' anticompetitive targeting of ESG through its false statements that ESG's programs are PUPs and "threats" and its websites are "malicious," its blocking of those programs and websites based on its own pre-determinations, and its tortious interference with ESG's existing and prospective customer relationships have caused substantial harm.  ¶ 15.  ESG has received hundreds of user complaints about Malwarebytes' interference, and Malwarebytes itself received complaints from its users about its blocking of ESG's products.  ¶¶ 143-63.  Users reported believing that ESG's products constituted serious cybersecurity threats and were even viruses or malware.  *Id.*  Even users who continued to want ESG's products reported finding it impossible or too difficult to exclude them from Malwarebytes' block and therefore, in various instances, canceled or declined to renew their ESG subscriptions and/or demanded subscription fee refunds.  *Id*.  Malwarebytes' predatory conduct caused ESG's sales of product subscriptions to decline and Malwarebytes' interference with RegHunter continues to negatively impact ESG's revenues.  *Id.*  ¶¶ 209-11.

Significantly, the above-described evidence and allegations are based on a record developed largely from third parties and without any federal court discovery from Malwarebytes, who chose to stonewall ESG rather than comply with ESG's validly served Subpoena in the Related Case.

### B.    Procedural Background

ESG originally filed this case in the SDNY, where Malwarebytes moved to dismiss the FAC for lack of personal jurisdiction and failure to state a claim and to transfer the case pursuant to 28 U.S.C. § 1404.  Dkt. 1, 37-42.  Judge Engelmayer granted **only** a transfer for convenience, expressly "declin[ing] to reach the motion to dismiss," including the personal jurisdiction challenge.  Dkt. 67 at 2, 11.  At oral argument, Judge Engelmayer expressed skepticism regarding that jurisdictional challenge, asking Malwarebytes' counsel to confirm that Malwarebytes had sales, marketing, and customers in New York.  SAC ¶ 45, Ex. 10 at 4:24-6:25.  After transfer of the case, on November

11, 2017, this Court entered an Order granting Malwarebytes' renewed Rule 12(b)(6) motion to dismiss on Section 230 immunity grounds.  Dkt. 97-103, 105.  ESG appealed that Order, resulting in a September 12, 2019 opinion from the Ninth Circuit panel reversing and remanding the Order, holding that Section 230 does not immunize blocking a competitor for anticompetitive reasons, and finding ESG's allegations withstood a Rule 12(b)(6) motion.  938 F.3d 1026 (9th Cir. 2019).  Following Malwarebytes' petition for panel and *en banc* rehearing, on December 31, 2019, the Ninth Circuit denied Malwarebytes' petition for rehearing *en banc* and entered an amended opinion ("Ninth Circuit Op."), reversing and remanding on the same reasoning.  946 F.3d 1040.  Following Malwarebytes' unsuccessful petition to the U.S. Supreme Court for a writ of certiorari, denied on October 13, 2020, 141 S. Ct. 13 (2020), the case was remanded to this Court for further proceedings.

## IV.   LAW AND ARGUMENT

On a Rule 12(b)(6) motion, a court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the plaintiff," *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012), denying the motion when the plaintiff states a claim "plausible on its face" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009).

### A.   The Law of the Case Requires Denial of Malwarebytes' Motion.

In its third motion to dismiss on Rule 12(b)(6) grounds, Malwarebytes seeks yet another bite at the apple—one that would require this Court to disregard the Ninth Circuit's binding ruling that ESG's allegations withstand a motion to dismiss.  In its prior motion to dismiss the FAC, Malwarebytes relied on the same theories as its current Motion to argue that ESG did not adequately plead its claims.  Dkt. 97.  Malwarebytes voluntarily elected to affirmatively raise those grounds on appeal as an alternative basis to Section 230 for the Ninth Circuit to affirm dismissal of ESG's claims.  No. 17-17351, Dkt. 20 at 11, 38-51.[1]  The Ninth Circuit declined to affirm on either basis and reversed the dismissal, specifically holding that "***Enigma's claims survive the motion to***

---

[1] Indeed, Malwarebytes explicitly included in its Statement of the Issues before the Ninth Circuit "[w]hether Enigma's Lanham Act, New York General Business Law § 349 and tortious interference claims should be dismissed for failure to state a claim."  *Id.* at 4.

1   *dismiss*." *Id.* at 1052, 1054 (emphasis added).  That holding is now the binding law of this case.

2   "[T]he mandate of an appeals court precludes the district court on remand from reconsidering

3   matters which were either expressly or implicitly disposed of upon appeal."  *U.S. v. Miller*, 822 F.2d

4   828, 832 (9th Cir. 1987); *U.S. v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986) ("A trial court may not

5   … reconsider a question decided by an appellate court.  [An appellate court's] rulings, unless

6   reversed by it or a superior court, bind the lower court." (internal quotations omitted)).[2]

7         ESG's SAC contains the same legal claims as were in the FAC and argued on appeal, but

8   with even more detailed facts and allegations.  Because the Ninth Circuit ruled that ESG's FAC

9   survived a Rule 12(b)(6) motion, *a fortiori* ESG's more extensive SAC record on the same legal

10  claims must survive the Motion.  Malwarebytes should not be permitted to walk away from its

11  strategic choices on appeal, to ignore the Ninth Circuit, and to relitigate already-rejected arguments.

12  Malwarebytes' Motion can, and must, be denied on law of the case grounds alone.

13        **B.**      **Malwarebytes Ignores the Rule 12(b)(6) Standard.**

14        Malwarebytes also flagrantly disregards the limited scope of a Rule 12(b)(6) challenge.  Rule

15  12(b)(6) is intended "to test the formal sufficiency of the statement of the claim for relief" and "is

16  not a procedure for resolving a contest between the parties about the facts or the substantive merits

17  of the plaintiff's case."  5B Wright & Miller, *Fed. Practice & Procedure* § 1356 (3d ed. 2017).  Yet,

18  unable to argue the law in the face of the SAC's indicting picture of Malwarebytes' behind-the-

19  scenes scheming and unfair trade practices, Malwarebytes instead improperly cites evidence outside

20  the SAC and makes unsubstantiated claims contradicting ESG's factual allegations, including:

21        • Claiming that ESG "has peddled to unsuspecting consumers software designed to deceive
22          them into unnecessarily purchasing its … programs," Mot. at 1, a gratuitous smear on ESG
            directly contradicted by ESG's factual allegations that (i) SpyHunter 4 received better
23          scores than MBAM from an independent testing lab that Malwarebytes itself recognizes as
            highly respected, (ii) Malwarebytes knows ESG's products are legitimate and not
24          deceptive, and (iii) users complained about Malwarebytes' blocking because they wanted
            to use ESG's products, SAC ¶¶ 14, 67, 72, 181, 143-64;

25

26  ─────────────────────

27  [2] *See also Gonzalez v. Ariz.*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Ariz. v.*

28  *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) (holding that exceptions to the general law of

    the case doctrine do not apply to the stricter "law of the circuit" variant applicable here).

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**

- Offering a chart purporting to show that SpyHunter 4 met Malwarebytes' PUP criteria that relies almost entirely on material outside the pleadings and for one element lacks any citation whatsoever, Mot. at 5-6, which is contradicted by ESG's detailed explanations of the pretextual nature of Malwarebytes' blocking justifications illustrating that if Malwarebytes applied its PUP criteria consistently and objectively, it would have to block its own products as PUPs, SAC ¶¶ 185-203;

- Accusing ESG of "insidious scare tactics" like "intentionally flagging harmless … cookies to convince users that their systems have issues," Mot. at 1, 5-6, when ESG pled that cookies are not "harmless" and present privacy risks (making their detection a valid feature specifically sought by some users),[3] SAC ¶ 187;

- Claiming repeatedly that users retain the full ability to configure Malwarebytes' programs to choose whether to keep or remove ESG's programs, Mot. at 4, 7, 22, when ESG has expressly pled that users have been unable, or found it too difficult, to exclude ESG's programs from Malwarebytes' automatic and pre-determined blocking, and extensively quoted cancellation, non-renewal and refund requests from users unable to prevent or get around Malwarebytes' blocking, SAC ¶¶ 121-24, 143-64;

- Arguing, in a transparent and objectionable attempt to further its smear campaign and vilify ESG, that ESG "has tried to hide its deceptive practices through over a decade's worth of lawsuits and publicly available threat letters," Mot. at 7, on the basis of exhibits that are not properly subject to judicial notice, *see* Opp. to Request for Judicial Notice, and which show only that false detections occur and communications with other companies normally clear up such inadvertent detections, but ESG has on occasion had to resort to the legal system to protect its rights;[4] and

---

[3] Indeed, the screenshot Malwarebytes offers, Mot. at 6, shows ESG's reasoned, measured approach to cookie detection, with a 5-level, color-coded bar classifying risk level and the Travelocity cookie designated by a single yellow bar, the lowest risk level. *Id.*  ESG also provides the user a description specifying that the detected cookie poses a privacy risk because it tracks online activity. *Id.*  Travel site cookies can be of particular concern because they capture sensitive information about a user's travel plans (which could, for example, be tied to medical treatments or pregnancy and reveal personal health information), and Travelocity allows third party advertisers to collect information about users through cookies on its site.  *See* www.travelocity.com/lp/lg-privacy.  There is generally an increasing recognition of the privacy risks cookies pose, with major web browsers even banning or restricting third party cookies.  *See, e.g.*, https://gizmodo.com/why-your-web-browser-is-declaring-war-on-cookies-and-ho-1844792609.  Given the serious privacy risks cookies can pose to users, the proper question is not why ESG detects certain cookies, but why Malwarebytes ***does not***.

[4] The security companies who listed ESG's products revisited their evaluation, delisted the products, and, unlike Malwarebytes, have not had a pattern or practice of listing ESG's products.

13

- Referencing a host of exhibits to the Scott and Kaba Declarations, Mot. at 2, 5-7, that are not properly subject to judicial notice, *see* Opp. to Request for Judicial Notice, to assert self-serving factual claims unauthorized by Rule 12(b)(6).

If Malwarebytes wishes to rely on a factual record, it is welcome to try to make a case for summary judgment after discovery, but this Court should not permit Malwarebytes to pervert the motion to dismiss procedure by introducing extensive improper evidence into the record.

### C.    New York Law Applies to ESG's Claims.

The law is clear that "[w]hen a case is transferred on grounds of convenience pursuant to 28 U.S.C. 1404(a)," the transferee court must apply the transferor court's law.  *Schering Corp. v. First DataBank Inc.*, 2007 WL 1176627, at *3 (N.D. Cal. Apr. 20, 2007); *see also Gerena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010).  Malwarebytes does not and cannot dispute that SDNY transferred this case solely on grounds of convenience pursuant to 28 U.S.C. § 1404(a).  *See* Mot. at 8.

Instead, Malwarebytes argues that California law applies to ESG's claims based on a false premise—that despite transferring for convenience, SDNY actually lacked personal jurisdiction over Malwarebytes. Mot. at 8-10.  Despite *four* rounds of briefing in front of two district courts and the Ninth Circuit, Malwarebytes still has not and cannot refute or deny the key jurisdictional facts at both the time ESG initially filed suit and when it filed its SAC:

- Malwarebytes generates revenues from sales to New York users;
- Malwarebytes employs New York residents, including as sales representatives;
- New York users visit and interact with Malwarebytes' website and forum webpages;
- New York users purchase its MBAM and AdwCleaner programs on its website;
- New York users download MBAM and AdwCleaner from Malwarebytes' website onto computers located in New York;
- Malwarebytes reaches into New York on a daily basis through MBAM and AdwCleaner operating on computers in New York to provide subscribers with ongoing cybersecurity protection, including routinely updated detection lists and customer support; and
- Malwarebytes' MBAM and AdwCleaner have detected and blocked ESG's programs as PUPs and "threats" on the computers of New York users.

SAC ¶¶ 37-42, 159, 162.[5]

---

[5] Without citation or support, Malwarebytes calls ESG's allegation of five Malwarebytes employees in New York "inaccurate," Mot. at 10, but does not deny that it has New York employees.  And its argument that those employees are irrelevant because they sell to enterprises and did not develop Malwarebytes' PUP criteria misunderstands ESG's claims.  ESG expressly pled claims against any

ESG's allegations are legally sufficient to establish personal jurisdiction under three separate prongs of New York's long-arm statute, and where long-arm jurisdiction can be exercised "the [due process] constitutional standard is satisfied."  *Vasquez v. Torres Negron*, 434 F. Supp. 2d 199, 201 (S.D.N.Y. 2006).  First, personal jurisdiction exists under CPLR § 302(a)(1) as Malwarebytes "transacts … business" or "contracts … to supply goods or services" in New York.  *See Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 555 (S.D.N.Y. 2007) ("proof of one transaction" is sufficient "even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.").  Malwarebytes repeatedly transferred its software onto computers located in New York, including pursuant to paid subscriptions, interfering with New York residents' use of ESG's products.

Second, Malwarebytes is subject to jurisdiction under CPLR § 302(a)(2), because it "commit[ted] a tortious act within [New York]."  Malwarebytes purposefully and wrongfully detected and blocked ESG's programs as PUPs and "threats" on users' devices in New York, thereby falsely advertising and tortiously interfering with ESG's business in New York.

Third, Malwarebytes is subject to jurisdiction under CPLR § 302(a)(3), because it "commit[ted] a tortious act without [New York] causing injury to person or property within [New York]" and either (i) "regularly does or solicits business … or derives substantial revenue from goods used … or services rendered[] in" New York, or (ii) "should reasonably expect the act to have consequences in [New York] and derives substantial revenue from interstate or international commerce."  The SAC identifies cancellation, non-renewal and/or refund requests ESG received

---

and all Malwarebytes products, including consumer and business/enterprise versions, that unlawfully interfere with ESG's products.  SAC ¶¶ 32, 61.  And ESG's claims are directed to Malwarebytes' application of its PUP criteria to and blocking of ESG's programs on individual users' computers—made possible by Malwarebytes' product sales and distribution.  That Malwarebytes may have drafted its generic PUP criteria outside of New York is irrelevant when it applied that PUP criteria to harm users and ESG in New York.  Apple, for example, cannot escape New York jurisdiction when it sells a defective iPhone at a New York Apple store, even if it designed the iPhone in Cupertino.

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**

1   from customers residing in New York who were unable to use ESG's programs because of

2   Malwarebytes' false identification and blocking of the programs as "threats" and PUPs.  *See* ¶¶ 38,

3   159, 162; *see also* ¶¶ 41-42 (alleging Malwarebytes business in New York).

4          Unable to dispute the core jurisdictional facts, Malwarebytes instead argues two unavailing

5   points.  First, Malwarebytes claims that it did not create contacts with New York consumers, Mot. at

6   9, when, in fact, it (i) advertises its products in New York, (ii) sells its products ***directly*** to New York

7   consumers, (iii) collects and processes the credit card information of New York consumers for initial

8   payments and automatic subscription renewals, (iv) no doubt receives payments from some banks

9   based in New York, (v) transmits its software ***directly*** onto computers located in New York, where it

10  operates 24/7, (vii) routinely sends software updates and detection lists ***directly*** to computers in New

11  York, (viii) provides technical and customer service support to New York users, (ix) uses detection

12  information gathered from New York users to enhance its detection database, and (x) maintains

13  records on New York users.  All of these facts are either expressly alleged in the SAC or are

14  reasonable inferences therefrom.  This targeting distinguishes this case from Malwarebytes' case

15  law.  *See Walden v. Fiore*, 571 U.S. 277, 284-85 (2014) (no jurisdiction over car distributor where

16  distributor did not supply cars to the state and plaintiff merely drove one of distributor's cars into

17  that state); *Waldman v. Palest. Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (no jurisdiction

18  over foreign defendants for Jerusalem terror attack where U.S. citizens among those injured).

19         Second, Malwarebytes asserts that a nationally available website does not confer jurisdiction.

20  Mot. at 9-10.  But Malwarebytes does not dispute that, through its website, New York users have

21  interacted with Malwarebytes by posting on its Forum and purchased and downloaded products onto

22  computers physically located in New York, where those products have interfered with the operation

23  of ESG's programs.  Malwarebytes' intentional distribution of products to New York through "[its]

24  own 'interactive' website" subjects Malwarebytes to personal jurisdiction in New York.  *See Student*

25  *Advantage, Inc. v. Int'l Student Exch. Cards, Inc.*, 2000 WL 1290585, at *4 (S.D.N.Y. Sept. 13,

26  2000) (explaining although "'passively' making information available on a website" "does not create

27  personal jurisdiction," "allowing people to exchange information with the website's operator,"

28  "clearly doing business through a website (e.g. by transmitting computer files to customers)," and

using a "website to make sales in a state" does); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (finding jurisdiction where "defendant enters into contracts with residents" involving "knowing and repeated transmission of computer files over the Internet").  The case law Malwarebytes cites for its opposing position is inapposite.  *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1205, 1212 (9th Cir. 2020) (video website that generated revenue solely through advertising and did not take payments from users or install software onto users' computers); *Gordon v. Invisible Children, Inc.*, 2015 WL 5671919, at *8 (S.D.N.Y. Sept. 24, 2015) (passive posting of video with no connection to New York); *ISI Brands, Inc. v. KCC Intern., Inc.*, 458 F. Supp. 2d 81, 90 (E.D.N.Y. 2006) (display of infringing trademark on website, with tort committed where website is created or maintained and not at the location of the user's computer).

Because ESG has made more than a prima facie showing that Malwarebytes is subject to personal jurisdiction in SDNY, and Malwarebytes fails to show a lack of contacts with SDNY, this Court should continue to apply New York law.  Malwarebytes asks this Court to ignore ESG's well-pled jurisdictional allegations to declare that SDNY lacked personal jurisdiction over Malwarebytes, but the Court, *as a matter of well-settled law, cannot do so without first permitting jurisdictional discovery and holding a jurisdictional hearing*.  *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 949 (N.D. Cal. 2015); *Sabol v. Bayer Healthcare Pharm., Inc.*, 439 F. Supp. 3d 131, 141 (S.D.N.Y. 2020).  Indeed, Malwarebytes even falsely states that the Court may "deem[] refuted" any "unsupported [jurisdictional] allegations" that Malwarebytes "rebuts … with highly specific, testimonial evidence," Mot. at 9, but fails to point out to the Court that the Second Circuit *has expressly abrogated the case on which Malwarebytes relies* for that proposition.  *See MEE Direct, LLC v. Tran Source Logistics, Inc.*, 2012 WL 670067, at *2 (S.D.N.Y. Dec. 26, 2012) (quoting *Schenker v. Assicurazioni Fenerali S.p.A., Consol.*, 2002 WL 1560788, at *2 (S.D.N.Y. July 15, 2002), *abrogated by Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013)).  In *Dorchester*, the Second Circuit expressly held that unless and "until an evidentiary hearing is held, 'a *prima facie* showing suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion."  722 F.3d at 86 (emphasis altered, quotation omitted).  Thus, resolving disputed jurisdictional facts in the defendant's favor without conducting "a full-blown evidentiary

hearing," rather than merely evaluating whether the plaintiff has made a *prima facie* showing of jurisdiction, is reversible error. *Id.* And if, after jurisdictional discovery and a hearing, the Court decides to apply California law instead but determines that ESG has not adequately pled its claims, ESG respectfully requests it be permitted to amend its SAC, which currently pleads under New York law. *See Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) ("A party may amend its pleading with the court's leave, which the court should freely give ... when justice so requires. … This policy is to be applied with extreme liberality." (internal quotations and citation omitted)); *Salustri v. Dell*, Inc., 2010 WL 11596554, at \*7 (C.D. Cal. Apr. 27, 2010) (permitting plaintiff to amend complaint "to state claims pursuant to Texas law" after deciding to apply Texas law).

### D.     ESG States Claims that Survive a Motion to Dismiss.

#### 1.     ESG Pleads Lanham Act Actionable "False and Misleading Statements."

Malwarebytes' detection and blocking of ESG's programs as PUPs and "threats" is ***not***, as Malwarebytes contends, non-actionable opinion for at least five reasons. Mot. at 19-21. ***First***, Malwarebytes purposely mischaracterizes ESG's claims, pretending they are based solely on Malwarebytes calling ESG's programs "PUPs," when in fact ESG expressly pled that it also covers Malwarebytes' repeated statements that ESG's programs are "threats" and ESG's website is "malicious." *See, e.g.,* SAC ¶¶ 214-23. That alone distinguishes this case from *Asurvio*, where plaintiff complained only of Malwarebytes' designation of its program as a "system optimizer" and "PUP."[6] 2020 WL 1478345, at \*6; 371 F. Supp. 3d 652, 664 (N.D. Cal. 2019). Incredibly, in its only argument in connection with the "threat" or "malicious" label, Malwarebytes falsely pretends, in direct contradiction of the SAC's screenshots of MBAM (*see* ¶¶ 118-20), that it called ESG's programs only "***potential*** threats," rather than "threats" in repeated, unqualified, declarative

---

[6] Malwarebytes oversells the import of *Asurvio*, claiming "[m]ultiple courts have found that potential threat flags … are non-actionable opinions" but citing only two decisions in *Asurvio*. Mot. at 12. This Court's *Asurvio* decision not address the "threat" and "malicious" labels pled in ESG's claims, and the earlier opinion from the Western District of Texas was in a preliminary injunction context, rather than a final determination on the merits. 2018 WL 2996897 (W.D. Tex. Apr. 23, 2018).

18

statements.  Mot. at 12.  This is, no doubt, because Malwarebytes knows it cannot plausibly contest that calling an anti-malware program a "threat" to a user's computer and a website "malicious" are actionable, falsifiable statements of fact.  *See, e.g.*, *Sky Fun 1, Inc. v. Schuttloffel*, 8 P.3d 570, 575 (Colo. App. 2000), *aff'd in relevant part*, 27 P.3d 361 (Colo. 2001) (holding statement that employee was "threat to passengers" to be "sufficiently factual to be susceptible of being proven false or true and a reasonable person would conclude that the assertions were statements of fact").

**Second**, the context of Malwarebytes' statements plausibly supports the conclusion that consumers would—and did—understand those statements as ones of fact, not opinion.  As a self-professed leader in the anti-malware and cybersecurity industry, Malwarebytes informs the public, including novice computer users, that ESG's programs are threats to users' computer security.  SAC ¶¶ 4, 5, 146.  Malwarebytes explicitly encourages users to rely on its cybersecurity expertise, and, as Malwarebytes' own high-level executive has testified, users do in fact rely on Malwarebytes to identify PUPs and threats for them.  ¶ 217.  Malwarebytes also does not simply designate ESG's programs as PUPs; rather, it automatically quarantines and blocks the operation of those programs, and tells the user that it is doing so because the programs are PUPs and "threats," thereby conveying that the designation and blocking is a pressing matter of cybersecurity, not simply Malwarebytes' opinion.  *See, e.g.*, ¶ 120 (screenshot of MBAM "Quarantine" window, displaying message that quarantined SpyHunter 4 files "do not pose a threat when quarantined" and can be "permanently removed from your computer" straight from quarantine).  The consumer complaints the SAC quotes confirm that users understood Malwarebytes' statements about ESG to be factual and believed ESG's products were actual "malware," "viruses," and security threats.  ¶¶ 143-64.[7]

**Third,** that Malwarebytes detects and blocks ESG's programs as "***potentially***" unwanted, Mot. at 12-13, does not make the misrepresentation any less susceptible to proof of falsity or less

---

[7] Any suggestion by Malwarebytes that some fine print in MBAM about the program's malware or threat detections could mitigate the falsity of its statements that ESG's programs are actual "threats" is eviscerated by its prominent use of the unqualified "Threats" title in displaying its detection scan results and the user complaints detailed in the SAC, *see id.*, especially in a Rule 12(b)(6) context.

19

likely to mislead consumers.[8]  Consumers plausibly would be influenced not to do business with ESG on the mere suggestion that ESG's programs might pose a security threat or be "unwanted" by that consumer.  *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) ("Simply couching such statements in terms of opinion does not dispel these implications [of false assertions of fact]; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'").  Indeed, at a minimum, Malwarebytes' statements are actionable "mixed opinions."  *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (N.Y. Ct. App. 1986) ("[When a] statement of opinion implies that it is based upon facts which justify the opinion but are unknown to [the audience], it is a 'mixed opinion' and is actionable." (citations omitted)).

  ***Fourth***, ESG alleges that Malwarebytes ***intentionally*** misleads consumers by representing that ESG's programs are PUPs and "threats" when Malwarebytes ***knows*** they are not.  SAC ¶¶ 120, 180-84, 231.  An opinion is "actionable if the speaker ***does not genuinely and reasonably believe it*** or if it is ***without a basis in fact***."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) (emphasis added).  Unlike here, Malwarebytes' cited cases do not involve allegations that a defendant ***knew*** its representations were false when made.

  ***Finally***, Malwarebytes' reference to ESG calling Malwarebytes' PUP criteria "vague" and "subjective" is a red herring, and Malwarebytes knows it.  Mot. at 12.  ESG's Lanham Act claim is based on Malwarebytes' designation of ESG's programs as PUPs and "threats" and its website as "malicious"—***not the contents of Malwarebytes' general PUP criteria***.  As expressly alleged in the SAC, Malwarebytes fashioned vague, subjective, and self-serving PUP criteria as cover for its bad faith, anticompetitive targeting of ESG, which it undertook by disseminating statements across the Internet to the general public and specifically to users of Malwarebytes' and ESG's products that were objective and verifiably false as applied to ESG's programs.  SAC ¶¶ 13, 25, 102, 111.

   **2. ESG Pleads Lanham Act "Commercial Advertising and Promotion."**

  Malwarebytes' false argument that it did not act in "commercial advertising and promotion" because "Malwarebytes' software flags [ESG's programs] *after* a user already has Malwarebytes'

---

[8] Indeed, in its simplest form, the statement that a dog is "potentially" a cat can be proven false.

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**

software" purposely ignores two irrefutable realities.  Mot. at 14.  First, ESG alleges Lanham Act liability based, in part, on false statements on Malwarebytes' own website, *e.g.*, SAC ¶ 224, which is publicly available (not just to Malwarebytes' existing customers) and used as a promotional sales tool.  Second, just because a user already has a Malwarebytes product downloaded does ***not*** mean the user is a paid Malwarebytes customer.  Malwarebytes' sales model relies on AdwCleaner and the MBAM 14-day free trial and free versions ***functioning as advertisements*** for product capabilities (*e.g.*, allowing free users to run threat scans to detect and block programs Malwarebytes designates as "threats," including ESG's programs) to induce users to purchase the paid Premium MBAM.  *Id*. ¶¶ 64-66.  Malwarebytes has stated under oath that the majority of its users are free users and it explicitly advertises its paid products in its free and free-trial software, encouraging free users to upgrade.  *Id*.  Even for paid customers, demonstrating the continued efficacy of Premium MBAM through artificially bloated lists of detections is critical to ensuring subscription renewals.  *Id*.

Purposely ignoring the SAC, Malwarebytes also falsely suggests ESG's claims are based on statements from "third parties" not "authorized to speak for Malwarebytes."  Mot. at 14-15.  ESG made detailed, concrete allegations based on Malwarebytes' own materials that identify speakers as agents of Malwarebytes making legally binding, false statements about ESG in the context of marketing Malwarebytes products.  *See, e.g.*, SAC ¶¶ 138-42, 144-46, 154, 156.  For instance, for the "AdwCleaner developer" Malwarebytes references, Mot. at 14, ESG pled that (i) Mr. Boursier "joined Malwarebytes as a company executive, engineer, and researcher," (ii) he posted his statement "on Twitter in his new role at Malwarebytes" after its AdwCleaner acquisition, (iii) his "marketing statement" was a "company statement attributable to Malwarebytes or its AdwCleaner operating arm," and (iv) he was an agent of Malwarebytes with "legal authority to speak for and bind Malwarebytes."  SAC ¶¶ 30-31, 63, 114, 224.  In his Twitter post, which is reproduced in full in the SAC, Mr. Boursier was promoting and advertising what he considered a significant new feature of Malwarebytes' AdwCleaner—that it "fully detects and removes" SpyHunter 4 as a "PUP."  *Id*. ¶ 30.

### 3.   ESG Sufficiently Pleads Deception Under the Lanham Act.

Finally, Malwarebytes claims users cannot be deceived because of its supposed "public disclosure of information underlying the statements at issue," *i.e.*, its publication of its PUP criteria.

21

1    Mot. at 15.  Malwarebytes, however, admits that it provides only "high-level summaries of its

2    detection criteria, … not the specific detail," *id.* at 13 n.6, and Malwarebytes publishes its PUP

3    criteria only on its website.  SAC Exs. 1, 3, 14.  As the SAC screenshots show, Malwarebytes does

4    not display its PUP criteria in its programs' scan results or quarantine screens, nor does it provide a

5    link to that criteria.  Most critically, those screens provide the user ***no substantive information***

6    ***whatsoever*** about the supposed criteria under which ESG's programs warrant a PUP or "threat"

7    label.  *Id.* ¶¶ 118-20.  Malwarebytes' detection results often display hundreds of entries, none of

8    which provide an explanation for the detection or even offer an ⓘ icon to click for additional

9    information.  *Id.* ¶¶ 9, 118-19.  Malwarebytes also lists dozens of items for a single program, burying

10   any given detection in a long, dense list.  *Id.*  It simply is not credible for Malwarebytes to claim that

11   it fully discloses its PUP criteria or detection analysis for ESG's products, especially in a Rule

12   12(b)(6) context.  Malwarebytes' claim that its Kaba Declaration Exhibit I qualifies as an adequate

13   SpyHunter-specific "disclosure" is particularly outlandish.  As detailed in ESG's Opposition to

14   Malwarebytes' Request for Judicial Notice, Exhibit I shows that, as recently as January 2021,

15   Malwarebytes published a webpage calling "SpyHunter" a "PUP" that used "intentional false

16   positives" and "false pretenses" to lure customers.  Dkt. 147-10.  Yet SpyHunter 4 has not been on

17   the market since June 2018 and Malwarebytes determined SpyHunter 5 did not qualify as a "PUP"

18   and removed SpyHunter 5 from its MBAM detection list a full two years ago.  Exhibit I also falsely

19   calls SpyHunter a "system optimizer," when it is an anti-malware program (a fact Malwarebytes has

20   not disputed in over four years of litigation).  What good faith basis could Malwarebytes have for

21   continuing to disparage a product that has been off the market for over two years?  Thus, Exhibit I

22   further proves, rather than disproves, ESG's anticompetitive animus claims against Malwarebytes.

23        Malwarebytes' own case law shows that publication of criteria completely divorced from

24   where Malwarebytes makes its statement about ESG's products or any specifics about its reasons for

25   blocking ESG's products falls far short of a disclosure that could obviate the deceptiveness of

26   Malwarebytes' statements.  *See UGG Holdings, Inc. v. Severn*, 2005 WL 5887187, at *10 (C.D. Cal.

27   Feb. 23, 2005) (finding use of UGG Australia mark with products not made in Australia not

28   deceptive because every product bore a tag identifying the actual country of manufacture); *ONY, Inc.*

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**

*v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013) ("[W]hen the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the methods used, the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline …"); *Broder v. MBNA Corp.*, 281 A.D.2d 369, 370-71 (N.Y. App. Div. 2001) (finding question of fact as to deceptiveness of promotional offer given defendant's method of credit card payment allocation, even where separate credit card agreement expressly stated defendant would determine payment allocation).  At a minimum, ESG's allegations raise substantial questions of fact, which preclude the granting of Malwarebytes' dismissal request.

### 4. ESG Sufficiently Pleads Violations of NYGBL Section 349.

Malwarebytes' two primary arguments for dismissal of ESG's NYGBL claim—(i) that New York law does not apply and (ii) that the claim is inadequately pled for the same reasons ESG's Lanham Act claim is, Mot. at 15-16—fail for the reasons set forth above.  Where ESG asserted the existence of anticompetitive practices by Malwarebytes and secret scheming between Malwarebytes and Bleeping Computer executives to harm ESG, described various internal company documents recording the unfair trade practices, and identified the individuals involved, the relevant timeframes, and resulting harm to consumers, business owners, and ESG alike, the determination of liability under Section 349 is "a question of fact better suited for the jury" that generally "cannot be resolved on a motion to dismiss."  *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016); *see also Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013).  Malwarebytes' claim that "the strictures of Section 349 are even narrower than the Lanham Act," Mot. at 16, also flies in the face of New York law, which applies Section 349 as a "broad, remedial statute" applicable "to virtually all economic activity" to "provide[] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers."  *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1144 (N.Y. 2004); *Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002); *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 644 (S.D.N.Y. 2016) (declining to dismiss Section 349 claim where conduct was not actionable under the Lanham Act "because the relevant question under § 349 is whether defendants are engaged in a deceptive act or

practice and not whether they have plausibly engaged in false advertising under the Lanham Act").

In the face of extensive allegations of documented unfair trade practices, Malwarebytes resorts to the farcical position that ESG's Section 349 claim is merely a "garden variety" dispute among competitors, lacking any aspect of consumer harm. Mot. at 16-17. ESG's allegations make abundantly clear that Malwarebytes' anticompetitive targeting of ESG's programs is *not* solely a problem for ESG. Malwarebytes' deceptive practices diminished consumer choice and left consumers more vulnerable to cybersecurity attacks, disabling users' chosen programs and preventing layering of cybersecurity protections, which Malwarebytes itself recommends to users. SAC ¶¶ 126, 204, 232. This is not hypothetical—in the SAC, ESG referenced and quoted numerous complaints users made to both ESG and Malwarebytes about Malwarebytes' blocking of ESG's programs as PUPs and "threats," reflecting the substantial disruption and difficulty Malwarebytes caused consumers. *Id.* ¶¶ 143-64. One user even told ESG that "***Malwarebytes is … reporting your software as PUPs… But these days you have to understand the urgent concern about data safety. Because of this I am going to have to ask for a refund. This might be unfair to your company [ESG] but I['m] just a user who's trying to protect his family.***" *Id.* ¶ 157 (emphasis added).

This is exactly the kind of consumer harm that supports a Section 349 claim by a competitor, even under Malwarebytes' cited cases. *See Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 293, 299 (S.D.N.Y. 2008) ("Injury or harm that satisfy this standard include potential danger to the public health or safety." (internal quotations omitted)); *Winner Intern. v. Kryptonite Corp.*, 1996 WL 84476, at *2 (S.D.N.Y. Feb. 27, 1996) (claim appropriate where "defendant's conduct harms consumers or causes injury to the public interest"); *see also, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 992 (N.D. Cal. 2016) (finding consumer-oriented conduct where Anthem's cybersecurity practices left consumers' personal and health information at risk of data breach); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div. 2004) (finding Section 349 claim stated where Microsoft "enter[ed] into secret agreements with computer manufacturers and distributors to inhibit competition and technological development, and creat[ed] an 'applications barrier' … that, unbeknownst to consumers, rejected competitors' Intel-compatible PC operating systems, [resulting] in artificially inflated prices for defendant's products and denial of consumer

24

access to competitors' innovations, services and products").  Any suggestion from Malwarebytes that a heightened standard applies to ESG's showing of consumer harm is simply incorrect under the law.  *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102-03 (N.Y. App. Div. 2012) ("[A] plaintiff need only show an 'impact' on consumers … [T]he threshold requirement of consumer-oriented conduct may be satisfied where the allegedly deceptive acts are standardized such that they potentially affect similarly situated consumers." (internal quotations and citation omitted)); *Casper Sleep*, 204 F. Supp. 3d at 643  ("[T]he elevated requirements that some district courts have apparently engrafted onto the 'consumer-oriented' element of § 349 claims lack a basis in governing New York law.").  Thus, the Court must deny dismissal of ESG's NYGBL claim.

### 5.   ESG Sufficiently Pleads Interference With Prospective Advantage.

Malwarebytes' three challenges to ESG's pleading of interference with prospective business advantage fail as a matter of law.  ***First***, Malwarebytes erroneously claims that ESG's allegations of economic relationships with which Malwarebytes interfered and Malwarebytes' knowledge thereof are too "speculative."  Mot. at 17-18.  This move straight out of the standard defense playbook is refuted completely by the SAC's detailed allegations.  ESG specifically alleged that Malwarebytes interferes with ***each*** prospective ESG customer who attempts to install and use ESG's products but is prevented from doing so by Malwarebytes' automatic, pre-programmed blocking based on its own PUP pre-determinations.  *See* SAC ¶¶ 123, 246.  Malwarebytes knows such prospective customers exist or it would not have bothered blocking ESG's programs as PUPs, and users themselves contacted Malwarebytes to complain about its interference with ESG's programs.  *Id.* ¶¶ 144-45, 152, 154-56, 163, 236-37, 245.  ESG's pleadings are more than adequate on a motion to dismiss under both New York and California law.  *See Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) (holding it "would be unreasonable to require" identification of specific contracts lost "prior to discovery"); *Silicon Valley Test & Repair, Inc. v. Gen. Signal Corp.*, 1993 WL 373977, at *5 (N.D. Cal. Sept. 13, 1993) (finding adequate allegations of interference "with prospective economic advantages between [plaintiff] and certain of its customers and potential customers on a repeated basis" as plaintiff "was not required to plead with the particularity Defendants demand" and "Defendants can obtain the details through discovery").

Malwarebytes' cases on this point are inapplicable.  *See RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 978667, at *3 (N.D. Cal. Feb. 28, 2020) (plaintiff alleged only that defendant's negative views steered away an abstract, ill-defined class of as yet unknown "potential customers"); *Dolin v. Facebook, Inc.*, 2018 WL 2047766, at *3 (N.D. Cal. May 2, 2018) (plaintiff alleged only that he "hopes to meet someday [with third parties] to discuss the possibility of working together"); *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1017 (N.D. Cal. 2018) (on a post-discovery summary judgment motion, plaintiff failed to present evidence that it "would have earned profits from any specific number of … franchisees" for a "Solution" "still in development").  ESG has identified a specific class of individuals who choose to download ESG's established, market-tested programs but are physically prevented from installing and using them by Malwarebytes' unlawful blocking.  SAC ¶¶ 48-59, 123, 246.  These allegations are sufficient on a motion to dismiss, and in discovery ESG expects to present further evidence of lost business from prospective customers, including through sales, subscriptions, and renewals data and conversion rate statistics.

***Second***, Malwarebytes claims that the existence of multiple anti-malware and anti-virus products is somehow fatal to ESG's claim that Malwarebytes' interference caused it economic harm. Mot. at 19-20.  ESG, however, does not rely on a generic universe of consumers simply looking for ***some*** form of cybersecurity software; ESG alleges Malwarebytes, in a purposeful, targeted fashion, interfered with specific consumers that had already expressed substantial interest specifically in ***ESG's programs*** by taking affirmative steps to download them (and in some instances immediately purchasing subscriptions upon installation, without first trying the free version).  *See, e.g.*, SAC ¶¶ 123, 246.  It is entirely plausible that because users look to Malwarebytes for its cybersecurity expertise, Malwarebytes' malicious targeting of ESG's programs as supposed PUPs and "threats" on those users' own computers, preventing those users from installing and using ESG's programs, would induce those users to decide not to move forward with a trial or subscription to ESG's programs.  *Id.* ¶ 246.  These allegations go far beyond those held inadequate in Malwarebytes' cited cases.  *See, e.g.*, *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1157 (S.D. Cal. 2014) (rejecting boilerplate allegation that failed to "identif[y] what acts Macy's purportedly undertook to induce third parties to breach their contracts with Plaintiffs, or why Macy's, rather than

26

other forces, was the cause of said breach(es)"); *Comput. Scis. Corp. v. Comput. Assocs. Int'l, Inc.*, 1999 WL 675446, at *23-24 (C.D. Cal. Aug. 12, 1999) (determining, on a motion for summary judgment, that party had failed to offer sufficient evidence of causation on tender offer not closing, in the face of numerous other unfulfilled conditions to closing and an admission from the party's general counsel that fulfillment of those conditions was "no more than speculation"); *Zetes v. Stephens*, 108 A.D.3d 1014 (N.Y. App. Div. 2013). Malwarebytes' arguments are, in essence, a dispute over proof of damages, not liability, and so are inappropriate as a grounds for dismissal.

**Finally**, Malwarebytes argues its interference qualifies as "privileged competition," as if the word "competition" undoes decades of case law prohibiting anticompetitive, unfair trade practices. But as Malwarebytes itself admits, competition is privileged only where it uses "fair and reasonable means," not "independently wrongful" ones. Mot. at 20-21. Because ESG sufficiently pleads that Malwarebytes' interference violates the Lanham Act and NYGBL Section 349, the SAC sufficiently pleads "independently wrongful" means. *See Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193, 211-12 (S.D.N.Y. 2014) (finding "wrongful means" where, *inter alia*, defendant's conduct is an "independent tort")[9]; *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P. 3d 937, 954 (Cal. 2003) ("[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."). In a bid to avoid this obvious conclusion, Malwarebytes mischaracterizes ESG's claims as based on Malwarebytes' supposedly "run of the mill" action of promulgating "proprietary detection criteria." Mot. at 21. As ESG has properly pled, it is Malwarebytes' pretextual application of its PUP criteria to maliciously target ESG, rather than the general criteria itself, that takes Malwarebytes' actions well beyond the realm of privileged competition and into actionable misconduct.

### 6.   ESG Sufficiently Pleads Interference With Contractual Relations.

Malwarebytes pretends to contest the adequacy of ESG's pleading of interference with

---

[9] ESG also pleads that Malwarebytes "engage[d] in conduct for the sole purpose of inflicting intentional harm on" ESG. SAC ¶ 249; *see Sidney Frank*, 998 F. Supp. 2d at 211-12 (defendant uses "wrongful means" where it acts "for the sole purpose of inflicting intentional harm" on the plaintiff).

contractual relations on the basis that ESG allegedly has not asserted a valid contractual obligation that was breached or disrupted.  Mot. at 22-25.  ESG, however, has alleged that (i) it contractually licenses its software to customers for set terms through an autorenewing subscription model (like Malwarebytes itself uses), (ii) Malwarebytes unilaterally and automatically blocks the operation of ESG's programs without first obtaining users' express, affirmative, specific consent and tells users continued use of ESG's programs would threaten their security, (iii) relying on Malwarebytes' self-proclaimed cybersecurity expertise, users are thereby misled into believing ESG's programs are malware or cyberthreats that need to be quarantined and blocked, as reflected in the user complaints quoted in the SAC, (iv) Malwarebytes intentionally makes it exceedingly difficult, and even impossible for some users, to notice Malwarebytes' blocking of ESG's products or to opt out of Malwarebytes' blocking, (v) as a result, certain customers, after encountering Malwarebytes' block on ESG's programs, requested refunds, cancelled their subscriptions prior to the expiration of their term, and/or rescinded authority to autorenew, despite having used and been otherwise satisfied with ESG's programs, and (vi) consequently, ESG's number of subscriptions and resulting revenues decreased.  *See* SAC ¶¶ 50-52, 117-35, 141, 143-64, 209-11, 235, 241-42.  As a matter of law, this is sufficient to plead breach.  *See Nat. Res. Media & Tech. Grp., LLC v. Snoop Youth Football League Found.*, 2008 WL 728650, at *3 (S.D.N.Y. Mar. 14, 2008) (holding that complaint language stating third party "withdrew" and "served written notice of cancellation" was "synonymous with a breach").  Malwarebytes offers the tortured argument that although ESG cited numerous exemplary user complaints demanding cancellations, ESG made no allegations of "actual cancellation."  Mot. at 24.  This is simply untrue; leaving aside the plain inference of the user complaints—those demanding cancellation obtained that cancellation—ESG also explicitly alleged that users did cancel subscriptions.  *See, e.g.*, SAC ¶ 164.  Moreover, ESG alleged that Malwarebytes actively encouraged ESG users to cancel their subscriptions and push for refunds.  *Id.* ¶¶ 141-42.  Under Rule 12(b)(6), Malwarebytes' pretense of an argument is simply not credible.

Moreover, California law, which Malwarebytes argues for, "does not [even] necessarily require evidence of any 'breach'"; there ***need be only a disruption***, which exists where a defendant's "intentional actions resulted in greater expense or burden on the performance of [plaintiff's]

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**

1   contractual obligations with third parties." *Sebastian Intern., Inc. v. Russolillo*, 162 F. Supp. 2d

2   1198, 1204-05 (C.D. Cal. 2001); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,

3   121 F. Supp. 3d 950, 982 (C.D. Cal. 2015).  It cannot be reasonably disputed that providing refunds

4   makes fulfilling a contract more expensive, or that fielding complaints and requests to support staff

5   to address Malwarebytes' interference makes contract fulfillment more burdensome.  Malwarebytes'

6   claim that there can be no breach because subscriptions can be terminated, Mot. at 25, would, if

7   accepted, eviscerate the ability of a plaintiff to seek redress in Court for interference with any

8   contract containing termination provisions (including the vast majority of consumer contracts).

9       Malwarebytes also points to the purported absence of an allegation "that Malwarebytes could

10  … discern between subscribed users of [ESG's programs] and consumers who had downloaded …

11  free trial versions."  Mot. at 23.  But ESG pled that Malwarebytes knew ESG had customer

12  contracts, including because (i) "Malwarebytes and ESG are direct competitors marketing to the

13  same customers," (ii) certain of Malwarebytes' own users told Malwarebytes directly that they are

14  simultaneously ESG customers and have complained to Malwarebytes about its blocking of ESG's

15  programs, and (iii) at an absolute minimum, Malwarebytes was on notice once ESG filed this suit

16  against it, just days after Malwarebytes began its unlawful blocking.  SAC ¶¶ 236-38; Dkt. 1.  ESG

17  also pled that Malwarebytes intentionally designed its programs to automatically interfere with use

18  of ESG's programs by both existing and prospective ESG customers, SAC ¶¶ 239-40, 246-47,

19  making it irrelevant whether Malwarebytes could tell the specific status of a given individual user.

20  Additionally, although independently wrongful conduct is not generally a requirement under New

21  York or California law, *see Gym Door Repairs v. Young Equip. Sales*, 206 F. Supp. 3d 869, 908

22  (S.D.N.Y. 2016); *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 530 (Cal. 1998), *as*

23  *modified* (Sept. 23, 1998), ESG has adequately pled that element as set forth *supra* at Section IV.d.5.

## **CONCLUSION**

25      ESG respectfully requests that the Court deny in its entirety Malwarebytes' Motion and allow

26  this case to proceed to discovery, which will reveal the full record of Malwarebytes' scheming to

27  target ESG and deny consumers their choice of cybersecurity protection.  If, however, the Court

28  rules that any of ESG's claims are insufficiently alleged, ESG requests leave to amend its pleading.

Dated:   February 17, 2021                     Respectfully submitted,

                                      By:   /s/ Terry Budd
                                            Terry Budd (*Admitted Pro Hac Vice*)
                                            BUDD LAW, PLLC
                                            120 Lyndhurst Circle
                                            Wexford, PA 15090
                                            Telephone: 412-613-2541
                                            terry.budd@buddlawglobal.com

                                            Edward P. Sangster (SBN 121041)
                                            K&L GATES LLP
                                            Four Embarcadero Center, Suite 1200
                                            San Francisco, CA 94111
                                            Telephone: (415) 882-8200
                                            Facsimile: (415) 882-8220
                                            ed.sangster@klgates.com

                                            Christopher M. Verdini  (*Admitted Pro Hac
                                            Vice*)
                                            Anna Shabalov  (*Admitted Pro Hac Vice*)
                                            K&L GATES LLP
                                            K&L Gates Center
                                            210 Sixth Avenue
                                            Pittsburgh, PA 15222
                                            Telephone: (412) 355-6500
                                            Facsimile: (412) 355-6501
                                            christopher.verdini@klgates.com
                                            anna.shabalov@klgates.com

                                            *Attorneys for Plaintiff*

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**

1

## NOTICE OF SERVICE

2

3          I certify that on February 17, 2021, the foregoing was filed electronically using CM/ECF.

4   Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

5

6                    */s/ Terry Budd*
                    Terry Budd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**