1  **HUESTON HENNIGAN LLP**
   Moez M. Kaba, State Bar No. 257456
2  *mkaba@hueston.com*
   Michael H. Todisco, State Bar No. 315814
3  *mtodisco@hueston.com*
   523 West 6th Street, Suite 400
4  Los Angeles, CA 90014
   Telephone:     (213) 788-4340
5  Facsimile:     (888) 775-0898

6  Attorneys for Defendant
   Malwarebytes Inc.

7

8              **UNITED STATES DISTRICT COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

11  ENIGMA SOFTWARE GROUP USA, LLC,          Case No. 5:17-cv-02915-EJD

12               Plaintiff,                  **DEFENDANT MALWAREBYTES INC.'S
                                             RENEWED NOTICE OF MOTION AND**
13          vs.                              **MOTION TO DISMISS SECOND
                                             AMENDED COMPLAINT PURSUANT TO**
14  MALWAREBYTES INC.,                       **FEDERAL RULE OF CIVIL PROCEDURE
                                             12(b)(6)**
15               Defendant.
                                             **DATE:**          January 18, 2024
16                                           **TIME:**          9:00 AM
                                             **COURTROOM:** Courtroom 4
17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

Page

3    I.       INTRODUCTION ...................................................................................................... 2

4    II.      STATEMENT OF FACTS ....................................................................................... 4

5             A.       Factual Background ..................................................................................... 4

6             B.       Recent Procedural History .......................................................................... 6

7    III.     LEGAL STANDARD ............................................................................................. 7

8    IV.      ARGUMENT............................................................................................................ 7

9             A.       Malwarebytes' designations of Enigma's products are not mere
                       commercial advertisements or promotions subject to the Lanham Act
10                     or NYGBL ................................................................................................... 7

11            B.       Given Malwarebytes's extensive disclosures about its designations,
                       those designations are not materially deceptive as a matter of law ........ 14
12
              C.       Enigma's tortious interference claim fails under both New York and
13                     California substantive law ....................................................................... 17

14   IV.      CONCLUSION....................................................................................................... 20

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MALWAREBYTES INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS SECOND
AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)

6511259

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................7

5

6

*Asociacion De Productores v. California Avocado Comm'n*,
2009 WL 10698881 (C.D. Cal. Apr. 2, 2009) ...................................................................10

7

8

*Babcock v. Jackson*,
12 N.Y.2d 473 (1983)......................................................................................................20

9

10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................7

11

*Benetech, Inc. v. Omni Financial Group*,
116 A.D. 3d 1190 (N.Y. App. Div. 2014) ........................................................... 14, 15, 17

12

13

*Bildstein v. MasterCard Int'l Inc.*,
329 F. Supp. 2d 410 (S.D.N.Y. 2004) ..............................................................................14

14

15

*Carafano v. Metrosplash.com Inc.*,
207 F. Supp. 2d 1055 (C.D. Cal. 2002) ............................................................................12

16

*Chiste v. Hotels.com L.P.*,
756 F. Supp. 2d 382 (S.D.N.Y. 2010) ..............................................................................14

17

18

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*,
1982 WL 121559 (S.D.N.Y. June 9, 1982) ......................................................................16

19

20

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)..........................................................................................................13

21

*E. Bay L. v. Ford Motor Co.*,
2016 WL 777831 (N.D. Cal. Feb. 29, 2016) ....................................................................17

22

23

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
69 F.4th 665 (9th Cir. 2023) .....................................................................................passim

24

25

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019) ............................................................................... 2, 4, 10

26

*Exeltis USA Inc. v. First Databank, Inc.*,
520 F. Supp. 3d 1225 (N.D. Cal. 2021)............................................................................10

27

28

*Fin. One Pub. Co. v. Lehman Bros. Special,*
*Fin.*, 414 F.3d 325 (2d Cir. 2005)....................................................................................19

1

TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ............................................................................................ 14

4

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*,
   449 F.3d 377 (2d Cir. 2006) ........................................................................................... 20

5

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
   2021 WL 1236106 (S.D.N.Y. Mar. 1, 2021) .................................................................. 17

6
7

*Kwan v. SanMedica Int'l*,
   854 F.3d 1088 (9th Cir. 2017) .......................................................................................... 7

8
9

*Lacoff v. Buena Vista Pub., Inc.*,
   183 Misc. 2d 600 (N.Y. Sup. Ct. 2000) ........................................................................... 9

10

*New York Pub. Int. Rsch. Grp., Inc. v. Ins. Info. Inst.*,
   554 N.Y.S.2d 590 (App. Div. 1990) ........................................................................... 8, 11

11
12

*New.Net, Inc. v. Lavasoft*,
   356 F. Supp. 2d 1090 (C.D. Cal. 2004) ................................................................... passim

13
14

*Nissan Motor Co. v. Nissan Computer Corp.*,
   378 F.3d 1002 (9th Cir. 2004) ........................................................................................ 12

15

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013) ........................................................................................ 3, 15

16
17

*Padula v. Lilarn Props. Corp.*,
   84 N.Y.2d 519 (1994) ..................................................................................................... 19

18
19

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) ....................................................................................... 7, 8

20

*Sahebdin v. Khelawan*,
   2022 WL 4451005 n.5 (E.D.N.Y. Sept. 24, 2022) ......................................................... 18

21
22

*Sands v. Ticketmaster–New York, Inc.*,
   207 A.D.2d 687 (N.Y. App. Div. 1994) .......................................................................... 14

23
24

*SB Diversified Prod., Inc. v. Murchinson*,
   2013 WL 3831315 (S.D. Cal. July 23, 2013) ................................................................. 12

25

*Schultz v. Boy Scouts of Am., Inc.*,
   65 N.Y.2d 189 (1985) ..................................................................................................... 19

26
27

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) .......................................................................................... 7

28

6511259

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

Page(s)

3

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ...................................................................... 3, 14

4

5

*Steinmetz v. Energy Automation Sys., Inc.*,
    43 Misc. 3d 1210(A) (N.Y. Sup. Ct. 2014) ................................................ 3, 8, 9

6

*Townsend Farms Inc. v. Goknur Gida Maddeleri*,
    2016 WL 10570246 (C.D. Cal. Nov. 21, 2016) ........................................ 11, 12

7

8

*UGG Holdings, Inc. v. Severn*,
    2005 WL 5887187 (C.D. Cal. Feb. 23, 2005) ........................................ 3, 14, 17

9

10

*Vidillion, Inc. v. Pixalate, Inc.*,
    2019 WL 13071961 (C.D. Cal. Mar. 15, 2019)........................................ 8, 9, 13

11

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
    549 F. Supp. 2d 1168 (N.D. Cal. 2007).......................................................... 11

12

13

*Whaley v. Belleque*,
    520 F.3d 997 (9th Cir. 2008) ...................................................................... 3, 10

14

15

*Zetes v. Stephens*,
    969 N.Y.S.2d 298 (App. Div. 2013).............................................................. 4, 18

16

**<u>Statutes</u>**

17

15 U.S.C. § 1125(a)(1)(B) ................................................................................ 3

18

28 U.S.C. § 1404......................................................................................... 19

19

New York General Business Law (NYGBL) § 349 ............................................. passim

20

**<u>Rules</u>**

21

FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) .................................................. 1

22

23

24

25

26

27

28

6511259

**NOTICE OF MOTION AND RENEWED MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on January 18, 2024, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Edward J. Davila, U.S. District Court, Northern District of California, Defendant Malwarebytes Inc. ("Malwarebytes") will, and hereby does, move to dismiss with prejudice the First and Second Causes of Action in Plaintiff Enigma Software Group USA, LLC's ("Enigma") Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6). This motion is based upon this Notice of Motion and Renewed Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice and associated declaration and exhibit, the pleadings and records on file in this action, the argument of counsel, and such other matters as may be presented to the Court.

**ISSUES TO BE DECIDED**

1.     Whether Enigma's claims under the Lanham Act and New York's General Business Laws (NYGBL) should be dismissed because Malwarebytes' challenged statements are not commercial advertising.

2.     Whether Enigma's Lanham Act and NYGBL claims should be dismissed because Malwarebytes' challenged statements are not materially deceptive.

3.     Whether Enigma's tortious interference with prospective business relations claim should be dismissed either for failure to specifically identify the loss of a prospective customer in New York (if substantive New York applies) or for lack of an independently wrongful act (if substantive California law applies).

Dated: October 16, 2023                    HUESTON HENNIGAN LLP

By: _____
Michael H. Todisco
Hueston Hennigan LLP
Attorneys for Defendant
MALWAREBYTES INC.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

For the better part of a decade, Plaintiff Enigma Software Group peddled software that was designed to deceive consumers.  Like other "scareware" programs, Enigma's software used scare tactics (such as flagging harmless files as "infections") to pressure consumers into paying for unnecessary security software.  (*See, e.g.*, Dkts. 98-10, 98-11, 98-12, 147-4.)[1]  And Enigma's questionable pressure tactics didn't end there.  When its business practices were criticized or questioned, Enigma has attempted to coerce silence by suing or threatening to sue. (*See* Dkts. 147-3, 147-5, 147-6, 147-7, 147-8, 147-9.)

In 2016, Defendant Malwarebytes Inc., a leading cybersecurity company, updated its software and began notifying its customers that Enigma's scareware programs qualified as "potentially unwanted programs," or PUPs.  (SAC ¶ 12; Dkt. 140-1; Dkt. 140-14.)  Rather than answer Malwarebytes in the marketplace, Enigma (following its prior pattern) responded by filing this lawsuit.  In a 75-page complaint, Enigma accused Malwarebytes of "clandestinely" conspiring with a nonparty blog website and using the PUP designation to orchestrate "an unlawful smear campaign."  (SAC ¶¶ 20–21.)  From those allegations, Enigma asserted that Malwarebytes committed violations of both Lanham Act § 43(a) and New York General Business Law (NYGBL) § 349 and also tortiously interfered with Enigma's contracts and prospective business relationships.

That was 2017.  For the last six years, Enigma's misguided and implausible allegations against Malwarebytes have survived by the thinnest of margins.  Twice dismissed by this Court, Enigma's complaint has been twice resuscitated (over forceful dissents) in fractured Ninth Circuit panel decisions.  *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.* [*Enigma II*], 69 F.4th 665, 681 (9th Cir. 2023) (Bumatay, J., dissenting) ("[T]his should have been an easy affirm."); *also Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1054 (9th Cir. 2019) [*Enigma I*] (Rawlinson, J., dissenting) ("The majority's policy arguments are in conflict with . . . the language of the statute.").  But Enigma's appellate victories are Pyrrhic at best.  The arguments

---

[1] This Court took judicial notice of Dkts. 98-10–12 and 147-3–11. (*See* Dkt. 162 at 7–9.)

1  advanced by Enigma during appeal—and ultimately adopted by the Ninth Circuit—now provide a

2  binding roadmap for dismissing  Enigma's complaint once and for all.  *See Whaley v. Belleque*, 520

3  F.3d 997, 1002 (9th Cir. 2008) ("Judicial estoppel, sometimes also known as the doctrine of

4  preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one

5  position, and then seeking a second advantage by taking an incompatible position." (cleaned up)).

6          Enigma's complaint should be dismissed for <u>three</u> independent reasons:

7          *First*, Enigma's Lanham Act and NYGBL claims fail because those business statutes reach

8  only commercial advertisements about a defendant's own products. *See* 15 U.S.C. § 1125(a)(1)(B)

9  (Lanham Act limited to "commercial advertising or promotion"); *Steinmetz v. Energy Automation*

10 *Sys., Inc.*, 43 Misc. 3d 1210(A), 11 (N.Y. Sup. Ct. 2014) (dismissing NYGBL claim where

11 challenged statement did "not propose any offer of sale or other commercial transaction to

12 consumers").  Far from being mere advertising about Malwarebytes' products, the challenged

13 Malwarebytes designations are part and parcel of the essential functioning of Malwarebytes' software

14 products themselves. (*See, e.g.*, SAC ¶¶ 9, 14, 16, 61, 239.)  This is not a close call.  As explained

15 in a similar case "between two downloadable software providers," the designations that that a

16 defendant's software affixes to a plaintiff's programs are "not commercial speech within any

17 commonly understood meaning of that term." *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1111,

18 1108 (C.D. Cal. 2004) (dismissing tort and unfair competition claims based on defendant's "Ad-

19 Aware" software labelling plaintiff's program a "data miner").

20         *Second*, Enigma's Lanham Act and NYGBL claims also fail because Malwarebytes'

21 challenged classifications were accompanied by full disclosures and, therefore, cannot be materially

22 deceptive as a matter of law.  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th

23 Cir. 1997).  As this Court has previously recognized, Enigma's "allegations ignore that users of

24 Malwarebytes are aware of *why* it opines" that certain designations are assigned to certain software

25 programs. (Dkt. 162 at 19.)  This independently warrants dismissal.  *See, e.g.*, *UGG Holdings, Inc.*

26 *v. Severn*, 2005 WL 5887187, at *10 (C.D. Cal. Feb. 23, 2005) (use of "UGG Australia" mark to sell

27 products not manufactured in Australia was not deceptive when true geographical origin was

28 separately disclosed); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497–98 (2d Cir.

1   2013) (allegations of deception are "weakest" where the speakers disclose "the methods used . . .

2   [and] the potential shortcomings of their methodology").

3   *Third*, once Enigma's Lanham Act and NYGBL claims are dismissed, Enigma's tortious

4   interference with prospective business relations claim fails under substantive California law "because

5   Enigma does not allege any other independently wrongful conduct."  (Dkt. 162 at 19.)  Even if

6   substantive New York law governs, Enigma's claim fails because it has not identified "a specific

7   [prospective] customer" *in New York* that it lost due to Malwarebytes's alleged conduct.  *Zetes v.*

8   *Stephens*, 969 N.Y.S.2d 298, 304 (App. Div. 2013).

9   **II.**    **STATEMENT OF FACTS**

10          **A.**    **Factual Background**

11          Malwarebytes develops and provides cybersecurity software to inform users of potential

12   malware and other cybersecurity risks and protect them from those risks. (SAC ¶¶ 6, 35.)  Enigma's

13   claims have focused on one particular cybersecurity risk identified by Malwarebytes's software:

14   "Potentially Unwanted Programs," or PUPs.  *See Enigma I,* 946 F.3d at 1048 (summarizing Enigma's

15   complaint as "claim[ing] that Malwarebytes had used its PUP-modification process" to harm

16   Enigma); Dkt. 67 [Transfer Order] at 14 ("The crux of Enigma's allegations is that Malwarebytes

17   revised its PUP criteria in bad faith.").

18          Malwarebytes explicitly discloses to consumers that PUPs are a form of "Non-Malware."

19   (*See, e.g.*, Dkt. 140-15 at 21, 25, 41.)  Indeed, Malwarebytes discloses that a program may qualify as

20   a PUP based on a range of diverse criteria. (Dkt. 140-14 (disclosing that identify PUPs "is a complex

21   problem" and sharing "some of the criteria we use")).  For instance, a program may be a PUP based

22   on "difficulty uninstalling or removing the software" or unwanted "modifications of system settings

23   or configuration (including browser settings and toolbars)." (*Id.*)

24          When Malwarebytes identifies software it considers PUPs to users, it alerts users that a

25   "threat" has been detected. (*See, e.g.*, SAC ¶ 9.)  While some "threats" are categorized as "malware,"

26   PUPs are explicitly described as "non-malware." (*Id.* ¶¶ 118–120 ("Non-Malware Detected"); *accord*

27   Dkt. 140-15 at 42 (notifications of "threat(s)" include "Non-Malware" such as "a Potentially

28   Unwanted Program").)  Malwarebytes then allows customers to make the ultimate choice whether to

quarantine or unquarantine the PUP after reviewing it. (*Id.* ¶¶ 9, 118–120; Dkt. 140-15 at 17–18 (disclosing that "[w]hen threats are detected during a scan, the user must decide how these threats should be handled," and providing instructions on how to ignore threat detections); *see id.* at 36, 41.)

Like any responsible cybersecurity software provider, Malwarebytes continuously develops and updates its criteria for detecting PUPs and other potentially risky programs to avoid efforts by developers to circumvent detection. (*See, e.g.*, Dkt. 140-1; Dkt. 140-14.)  Thus, to protect its users, on October 5, 2016, as on many previous occasions, Malwarebytes revised and published its criteria for identifying PUPs. (SAC ¶ 12; Dkt. 140-1; Dkt. 140-14.) This update included more aggressive detection criteria—like whether a program exhibited certain deceptive and misleading behaviors— to keep pace with the constantly evolving PUP landscape. (SAC ¶ 108; Dkt. 140-14.)

Under these revised criteria, Malwarebytes' products began detecting certain of Enigma Software Group's programs as PUPs. (*See, e.g.*, SAC ¶¶ 14–16.)  Far from being the first or only time Enigma's products have been identified as exhibiting characteristics of PUPs, there have been repeated instances of consumers complaining or even suing Enigma on account of such characteristics. (*See, e.g.*, Dkt. 147-4 ¶¶ 2–4 (consumer lawsuit from January 2013 alleging that "Enigma automatically charges consumers' credit cards . . . without [their] authorization," "charges consumers . . . for additional services even after [they] cancel," fails to "honor consumers' cancellation requests," and "refuses to refund consumers for the unauthorized credit card charges").)

On October 7, 2016, within just *two days* of Malwarebytes updating its PUP criteria and beginning to detect Enigma programs, Enigma sued.  (Dkt. 1.)  While Enigma's allegations have shifted with time, Enigma has not alleged that Malwarebytes' products ever identified any of Enigma's programs as malware or as any "Threat Type" other than PUP.  (*See, e.g.*, SAC ¶¶ 9, 118– 20; Dkt. 1 ¶¶ 3–4, 7, 62.)   Rather, Enigma's allegations demonstrate that each time Malwarebytes notified its customers that an Enigma program was a "threat," the notification clearly and explicitly specified that it was characterized as a "threat" because it had been detected as a "Potentially Unwanted Program," even using yellow (rather than red) font and noting that Enigma was "non-malware." (*See* SAC ¶¶ 9, 118–20.)

In addition to its claims based on "PUP"-category "threats," Enigma also added to its most

1   recent complaint the allegation that Malwarebytes is liable for an unspecified number of instances in

2   which Malwarebytes' products identified Enigma's website and domains as "malicious." (*See, e.g.*,

3   SAC ¶ 160.)   Just like its disclosures of the PUP criteria, Malwarebytes disclosed to users what

4   "malicious" means and how the designation is applied.  (*See* RJN Ex. 1 at 1–2.)  In an August 2016

5   disclosure—just months prior to the allegations in this case—Malwarebytes explained to users that

6   "malicious website" is a broad designation that could be applied to "pretty much every application

7   that pulls in data from the internet or [does] something as simple as checking for updates to itself."

8   (*Id* at 2.)  Or put in "laymen's terms," Malwarebytes may apply the "malicious" designation to a

9   range of websites if Malwarebytes believes they are "dangerous or extremely annoying."  (*Id.*)

10  Significantly for this case given Enigma's software's PUP designation, the "Malicious Website"

11  notification is employed for domains involved in the "hosting [of] PUPs."  (*Id.* at 2; *see also* Dkt.

12  140-15 at 42 (disclosing that a "Malicious Website" notification means that a website is "suspected"

13  to carry potentially unwanted risks).)   As with PUP detections, Malwarebytes discloses that the

14  "malicious" website "notification provides information which may help [users] determine whether

15  the connection should or should not be allowed" and provides instructions on how "to allow access."

16  (Dkt. 140-15 at 42.)

17       Pursuant to these allegations, Enigma brought claims against Malwarebytes for violations of

18  the false advertising provision of the Lanham Act, the New York General Business Law ("NYGBL")

19  § 349, intentional interference with contract, and intentional interference with business relations.

20       **B.      Recent Procedural History**

21       In August 2021, this Court granted Malwarebytes' motion to dismiss Enigma's First and

22  Second Causes of Action in its Second Amended Complaint, including on the grounds that

23  Malwarebytes' statements constituted protected opinions rather than actionable assertions of

24  verifiable fact. (Dkt. 162 at 16–18.) On appeal, a panel of the Ninth Circuit reversed, holding that

25  Enigma's pleadings contained sufficient allegations that Malwarebytes' statements referring to

26  Enigma's programs as "threats" and websites or domains as "malicious" plausibly "could be found

27  to be statements of objective fact, subject to being found false." *Enigma II*, 69 F.4th at 674.  The

28  panel, however, affirmed the Court's conclusion that Malwarebytes' use of the term "potentially

1    unwanted program" was protected opinion, since that classification was "too vague" to support

2    liability.  *Id.* at 672 n.3.  The panel also affirmed the Court's dismissal of Enigma's tortious

3    interference with contractual relations claim, but reversed the dismissal of Enigma's intentional

4    interference with business relations claim.  *Id.* at 676–78.

5            But in issuing that ruling, the panel expressly remanded several pleading issues to this Court.

6    Specifically, the panel did not consider whether the challenged statements constituted "commercial

7    speech" or whether they "deceive[d] a substantial segment of the relevant audience," instead

8    "remand[ing] those issues to the district court to consider in the first instance."  *Id.* at 671 n.2.

9    Likewise, although the panel reversed this Court's holding that NYGBL was inapplicable because

10   New York lacked personal jurisdiction and because Malwarebytes' statements were non-actionable

11   opinions, it did not consider whether Enigma had adequately stated a claim as to the other elements

12   required for NYGBL liability.  *Id.* at 676.  In doing so, the panel "assume[d]," without any analysis,

13   "that New York's choice-of-law rules require application of that state's substantive law to Enigma's

14   state-law claims, save for the claims based on Malwarebytes's transactions with customers located

15   elsewhere."  *Id.* at 679 (Baker, J., concurring).

16   **III.        LEGAL STANDARD**

17           To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to

18   state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

19   (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court

20   to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

21   (2009).  "Conclusory allegations of law and unwarranted inferences . . . are insufficient to avoid

22   dismissal."  *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (cleaned up)).

23   **IV.       ARGUMENT**

24           **A.        Malwarebytes' designations of Enigma's products are not mere commercial**

25           **advertisements or promotions subject to the Lanham Act or NYGBL.**

26           The Lanham Act and NYGBL extend only to statements made in "commercial advertising or

27   promotion."  *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled in part*

28   *on other grounds*, *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051

(9th Cir. 2020) (en banc); *Steinmetz v. Energy Automation Sys., Inc.*, 43 Misc. 3d 1210(A), 10–11 (Sup. Ct. 2014) (dismissing NYGBL claim where challenged statements did "not propose any offer of sale or other commercial transaction to consumers"); *New York Pub. Int. Rsch. Grp., Inc. v. Ins. Info. Inst.*, 554 N.Y.S.2d 590, 592 (App. Div. 1990) (NYGBL § 349 applies only to "purely commercial speech"). Enigma's own allegations—along with the binding admissions it advanced at the Ninth Circuit—provide <u>two</u> separate and independent reasons why it cannot meet this standard.

**First,** Malwarebytes's challenged designations are not mere advertising, but are part of Malwarebytes's actual software products themselves. *See Vidillion, Inc. v. Pixalate, Inc.*, 2019 WL 13071961, at *1 (C.D. Cal. Mar. 15, 2019) (dismissing Lanham Act complaint where defendants' "alleged representations" were made within "Defendant's products," since a "statement that is part of the product itself is generally not a commercial advertisement or promotion"); *Rice*, 330 F.3d at 1181 (concluding "[t]he alleged false statements" were "part of the show itself" and therefore "not actionable as commercial advertising or promotion under the Lanham Act"). Enigma's sole theory of liability is that "Malwarebytes anti-malware products" are wrongfully "pre-programmed" to flag Enigma's products.[2] (SAC ¶¶ 7, 9.) Indeed, Enigma's complaint includes countless screenshots showing the operation of Malwarebytes's products. (*See* SAC ¶¶ 9, 118, 119, 120, 132, 133, 167.) Enigma's challenge to the very operation of Malwarebytes's products falls well beyond the reach of the business statutes it invokes. *See New York Pub. Int.*, 554 N.Y.S.2d at 592 (explaining that

---

[2] The only arguably relevant allegation not tied directly to the functioning of Malwarebytes' products is an isolated Twitter post purportedly made by an AdwCleaner developer who had allegedly "joined the Malwarebytes team." (SAC ¶ 114.) But that post referred to Enigma's program SpyHunter not as a "threat" or "malicious," but instead as a "PUP," (*id.*)—the precise classification that the Ninth Circuit held is not actionable in this case, *Enigma II*, 69 F.4th at 672 & n.3. And in any event, this post by a third party on his personal Twitter account cannot be imputed to Malwarebytes, did not propose a commercial transaction, and is not commercial speech. *See, e.g.*, ¹*New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) ("[S]tatements by third parties certainly cannot be construed as advertising by [defendant].").

1   NYGBL § 349 has been "only been applied to frauds . . . arising out of commercial transactions,"

2   not to statements "not aimed at promoting particular products or services");  *Vidillion*, 2019 WL

3   13071961, at *1  & n.2 ("[S]tatements that are, or are in, Defendant's products. . . [are] clearly not

4   what either Congress or the courts mean by 'advertising or promotion' [under the Lanham Act].").

5         In *New.Net, Inc. v. Lavasoft*, a Central District court applied this very distinction in factually

6   similar circumstances.  356 F. Supp. 2d 1090, 1111 (C.D. Cal. 2004).  Like here, *New.Net* was a

7   dispute "between two downloadable software providers" where the plaintiff alleged that the

8   defendant's software "falsely label[ed]" its software (with purportedly inaccurate designations

9   including "data miner" and "misc.") and improperly "prompt[ed] the user to remove it."  *Id.* at 1095,

10  1108.  Dismissing the plaintiff's Lanham Act and unfair competition claims, the court explained that

11  when consumers used the defendant's software, they were "not making a decision to purchase

12  anything—rather they are managing the content of their computer's hard drive."  *Id.* at 1111.  Thus,

13  the defendant's statements were "not commercial speech within the meaning of the Lanham Act," or

14  "within *any* commonly understood meaning of that term."  *Id.* at 1111, 1117 (emphasis added).

15        So here too.  The challenged labels deployed by Malwarebytes's software "focus not so much

16  on the marketing or any particular software program. . . , but primarily on the larger issue of

17  [potentially unwanted] computer programs."    *New.Net*, 356 F. Supp. 2d at 1111.    And

18  Malwarebytes's "statements about Plaintiff" help users decide "whether they want various software

19  to remain on their computer," not whether to buy Malwarebytes's products.  *Id.* at 1117–18.  In other

20  words, *New.Net* recognizes and illustrates what many other cases hold: that Lanham Act and state

21  unfair competition claims are limited to statements "reasonably [] characterized as 'advertising'" for

22  a product, *not* to the product itself.  *Id.* at 1118; *see also Vidillion*, 2019 WL 13071961, at *1; *Lacoff*

23  *v. Buena Vista Pub., Inc.*, 183 Misc. 2d 600, 608 (N.Y. Sup. Ct. 2000) (dismissing NYGBL claims

24  claims because "[t]he Book here is noncommercial speech—it was clearly not designed to sell

25  another product").[3]

26

27  ────────────────────────

    [3] *See also, e.g.*, *Steinmetz*, 43 Misc.3d 1210(A) at 11 (dismissing NYGBL claims because defendants'

28                                                                                              (Continued...)

6511259

Enigma cannot dispute that the challenged designations are part and parcel of Malwarebytes's products—that was, after all, the premise of Enigma's first appeal to the Ninth Circuit. *See Enigma I*, 946 F.3d at 1044 ("Each claim is based on the allegation that [Malwarebytes] configured its software to block users from accessing Enigma's software."). Based on meritless allegations of "anticompetitive animus," Enigma succeeded in arguing that, by "flagging Enigma's most popular programs" as threats, Malwarebytes's technology itself was designed to give Malwarebytes an unfair edge in the marketplace. *Id.* at 1048; *see also id.* at 1051 ("Congress wanted to encourage the development of filtration technologies, not to enable software developers to drive each other out of business.").[4]   Having staved off dismissal advancing this theory on appeal, Enigma "cannot now reverse its position in order to suit its current objectives." *Whaley*, 520 F.3d at 1002.

**Second**, even if the challenged designations about Enigma could be considered some sort of advertising or promotion by Malwarebytes, they are not actionable because they do not promote *Malwarebytes's* own products. *See Asociacion De Productores v. California Avocado Comm'n*, 2009 WL 10698881, at *9 (C.D. Cal. Apr. 2, 2009) (rejecting plaintiffs' Lanham Act claims based

---

"ratings systems do not propose any offer of sale or other commercial transaction to consumers,"); *Exeltis USA Inc. v. First Databank, Inc.*, 520 F. Supp. 3d 1225, 1227–28, 1235 (N.D. Cal. 2021) (rejecting Lanham Act and unfair competition claims based on allegation that defendant "falsely characterized [plaintiff's] vitamins" in its "pharmaceutical database" because "the database itself is Defendant's product").

[4] Based on these allegations that Malwarebytes's products' "filtering practices [were] aimed at suppressing competition," the Ninth Circuit held that § 230 immunity did not apply. *Id.* at 1051. Should this case proceed to discovery and summary judgment, however, Enigma will be unable to prove these baseless allegations of "anticompetitive animus" and, therefore, § 230 will again apply to bar Enigma's claims. *See id.* at 1052 (holding that "Enigma's claims survive the motion to dismiss" arguments based on § 230 "because Enigma has specifically alleged that the blocking here was anticompetitive.").

on defendant's critical statements about plaintiffs' goods because such statements did not promote "<u>defendant's</u> goods or services" (emphasis in original)).  Malwarebytes's statements labeling Enigma's programs and website as "threats" or "malicious" were made to *existing* Malwarebytes' users and did not even mention—much less promote—Malwarebytes's own products.  (SAC ¶¶ 9, 14, 16, 61, 239; *see also New.Net*, 356 F. Supp. 2d at 1118 (dismissing Lanham Act claim where "statements about [plaintiff] appear only after [defendant's software] has been downloaded and the scan has been run on the user's drive").)[5]  Courts routinely dismiss claims like Enigma's that are based on alleged false statements about the *plaintiff's* product, rather than statements about "the pricing, availability, or quality of [defendant's] product." *Townsend Farms Inc. v. Goknur Gida Maddeleri*, 2016 WL 10570246, at *3 (C.D. Cal. Nov. 21, 2016), *aff'd*, 793 F. App'x 493 (9th Cir. 2019); *see also New York Pub. Int.*, 554 N.Y.S.2d at 591–92 (rejecting GBL claims based on paid advertisements by insurance trade group that criticized "explosion of civil lawsuits," since such advertisements were "not specifically directed at potential purchasers of [defendant's] product").

In short, the very harm alleged by Enigma shows why its statutory claims must fail. According to Enigma, Malwarebytes's "threat" and "malicious" designations communicate negative information to consumers about Enigma's products.  (*E.g.*, SAC ¶ 4 ("[D]esignating a website as 'malicious' . . . communicates to users that the website is harmful."); *id.* ("Calling an anti-malware software product a 'threat' . . . is the most factually inaccurate and disparaging thing that can be said.").)  But as the Ninth Circuit has recognized, "negative commentary"—by its very nature—

_____

[5] For this same reason, Malwarebytes's statements about Enigma—all of which were made only to a subset of existing Malwarebytes customers *who also* happened to access Enigma's software or website—were not "disseminated sufficiently to the relevant purchasing public [of cybersecurity services] to constitute advertising or promotion" under the Lanham Act.  *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) (citation omitted); *New.Net*, 356 F. Supp. 2d at 1118 (alleged "reference[s] to Plaintiff" in defendant's software "were not and cannot be alleged to be disseminated sufficiently to the relevant purchasing public to constitute 'advertising'" because the challenged "statements [were] made after the goods were delivered").

MALWAREBYTES INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS SECOND
AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)
6511259

1  "does more than propose a commercial transaction and is, therefore, non-commercial." *Nissan Motor*

2  *Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004); *see also SB Diversified Prod.,*

3  *Inc. v. Murchinson*, 2013 WL 3831315, at *1, 4 (S.D. Cal. July 23, 2013) (dismissing Lanham Act

4  claim in case between two competitors where defendants' "disparaging comments" about plaintiff's

5  products "criticize[d] Plaintiff's product but d[id] not propose any commercial transaction").

6       Again, Enigma cannot now disclaim this theory.  Enigma's amended complaint specifically

7  alleges that the "threat" and "malicious" designations convey negative factual information to

8  consumers.  (SAC ¶ 218 ("Users view Malwarebytes' statements that the ESG's programs are

9  'threats' and . . . 'malicious' as statements of fact.").)  Enigma then prevailed on this point on appeal,

10  successfully arguing that the challenged designations were not opinions protected by the First

11  Amendment, but "statements of fact" that "disparaged Enigma's products." *Engima II*, 69 F.4th at

12  674.  Enigma even succeeded in its argument that Malwarebytes disparaged Enigma's products "for

13  the *sole purpose* of inflicting intentional harm upon Enigma."  *Id.* at 678 (emphasis added).  But

14  while advantageous arguments for Enigma on appeal, these same points now compel dismissal of its

15  complaint.  Indeed, as a matter of law and logic, if Enigma was correct that the *sole* purpose of

16  Malwarebytes's statements was to harm Enigma, then the promotion of Malwarebytes's products

17  could only have been, at most, "an incidental effect" of Malwarebytes's statements. *See Townsend*,

18  2016 WL 10570246, at *3 (dismissing such claims as "not within the reach of the Lanham Act").

19       When the parties have previously briefed these same issues, Enigma has had no sound answer

20  to Malwarebytes's arguments that the challenged designations are not commercial advertising.   The

21  sole rationale Enigma has offered is that because the majority of Malwarebytes customers use the

22  free rather than paid version of Malwarebytes' products, all content contained within the "free trial"

23  programs serve "as a marketing mechanism . . . to entice users to ultimately purchase the

24  Malwarebytes products." (SAC ¶ 66.)  But this theory is legally incorrect and factually implausible.

25       Starting with the law, courts have squarely held that Enigma's "free trial" theory is "without

26  merit." *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1074 (C.D. Cal. 2002) (rejecting

27  argument that defendant's business model of "enticing free trial members to become paying

28  members" could "transform the speech at issue into commercial speech").  If anything, the fact that

1   most Malwarebytes users never enter a commercial transaction with the company makes

2   Malwarebytes' statements even less like the commercial advertising subject to Enigma's statutory

3   claims. *See New.Net*, 356 F. Supp. 2d at 1111 (finding no commercial speech or promotion where

4   "the statements on Defendant's homepage [do not focus] on the marketing of any particular software

5   program (the basic Ad-aware program is given away for free)").

6           Turning to the facts, Enigma offers no plausible theory as to why the specific statements at

7   issue—i.e., the categorization of Enigma's products as "threats" and "malicious"—would incentivize

8   Malwarebytes' free-trial users to becoming paying customers.  Enigma does not allege, for instance,

9   that Malwarebytes limits its free versions to merely *identifying* "threats" and "malicious" programs,

10  then forces users to buy paid versions to *fix* those problems.  (*Cf.* SAC ¶ 193 (admitting that *Enigma's*

11  products "offer[] users a free scan but charge[] for remediation of detected items"); Dkts. 98-10, 98-

12  11, 98-12 (showing the same).)   And even if, for some reason, Malwarebytes's statements about

13  Enigma could convince a Malwarebytes free user to purchase the paid version, that would still not

14  suffice.  "The mere fact that Defendant may include certain content in its products that they hope

15  will encourage customers to buy the product does not make that content. . . . 'advertising or

16  promotion.'"  *Vidillion*, 2019 WL 13071961, at *1 n.2.  Such a rule would convert much of the

17  modern internet into actionable commercial advertising.  After all, many of the world's most popular

18  services (Facebook, Gmail), games (Fortine, Wordle), and content (YouTube, Wall Street Journal

19  articles) are offered by for-profit companies on a "freemium" basis, with the incidental goal of later

20  selling related or complimentary products.  This far-reaching result would stretch these "inherently

21  limited" business statutes well past their intended breaking point.  *Dastar Corp. v. Twentieth Century*

22  *Fox Film Corp.*, 539 U.S. 23, 29 (2003).

23          In sum, the settled law, admitted facts, and sound policy all compel a single result:

24  Malwarebytes's designations of Enigma's products are "not commercial speech within any

25  commonly understood meaning of that term."  *New.Net*, 356 F. Supp. 2d at 1111.  Enigma's Lanham

26  Act and NYGBL claims should thus be dismissed.

27

28

6511259

**B.     Given Malwarebytes's extensive disclosures about its designations, those designations are not materially deceptive as a matter of law.**

Enigma's Lanham Act and NYGBL claims fail for another reason: the Malwarebytes designations that Enigma challenges are not materially deceptive. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (Lanham Act requires a statement to have the tendency to materially deceive to a substantial segment of the relevant audience); *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 413 (S.D.N.Y. 2004) ("A plaintiff under section 349 must prove . . . that [the challenged act] was misleading in a material way."). Because the relevant question is whether the *reasonable* consumer would be deceived, there can be no actionable deception where the purportedly deceptive practice is disclosed. *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289–90 (9th Cir. 1995) (noting "the reasonable person standard is well ensconced in the law," including "for false advertising and unfair competition under the Lanham Act," and finding that disclosures rendered challenged statements not deceptive); *UGG Holdings, Inc. v. Severn*, 2005 WL 5887187, at *10 (C.D. Cal. Feb. 23, 2005) (use of "UGG Australia" mark to sell products not manufactured in Australia was not deceptive under the Lanham Act because the true geographical origin was disclosed to the consumer); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 404 (S.D.N.Y. 2010) ("There can be no claim for deceptive acts or practices [under the NYGBL] when the alleged deceptive practice was fully disclosed."); *Sands v. Ticketmaster–New York, Inc.*, 207 A.D.2d 687, 687 (N.Y. App. Div. 1994) (affirming dismissal of § 349 claim where allegedly deceptive practice was disclosed).

The decision in *Benetech, Inc. v. Omni Financial Group*, 116 A.D. 3d 1190, 1191 (N.Y. App. Div. 2014), illustrates this rule. In that case, the plaintiff retirement plan provider claimed that its defendant competitor violated the NYGBL by deceptively concealing the administrative fees associated with its "Preferred Provider Program," or "P3." *Id.* at 1190. Rejecting these allegations of deception, the court explained that that "by reviewing the contents of defendant's website and following the hyperlinks contained therein . . . anyone with Internet service would have been able to access defendant's 'Evaluation Matrix,'" which described the "various qualification used in determining [who could] participate in P3." *Id.* at 1192. Because these online materials "disclosed the payment structure of P3 to [defendant's] clients," there could be no reasonable "assertion that

1  defendant engaged in deceptive practices." *Id.* at 1192–93; *id.* (affirming dismissal of complaint).

2  Malwarebytes's disclosures, which far surpass those made in *Benetech*, conclusively "refut[e]

3  any assertion that [Malwarebytes] engaged in deceptive practices." *Id.* at 1192.  Malwarebytes not

4  only disclosed to consumers its definitions for "threat" and "malicious," but also provided the

5  specific criteria used to reach those designations.  (*See supra* Section III.A; SAC ¶¶ 9, 118–20; Dkt.

6  140-15 at 42; RJN Ex. 1.)    In fact, unlike in *Benetech* where consumers needed to independently

7  navigate to the "defendant's website" and then follow a series of "hyperlinks," 116 A.D. 3d at 1192,

8  Malwarebytes proactively and repeatedly disclosed important information about its designations to

9  users: (1) through announcements on user forums, where Malwarebytes's CEO posted "urg[ing]"

10  users "to take a look" to the revised "detection criteria" (SAC ¶ 27 & Dkt. 140-3); (2) in the

11  Malwarebytes user guide (Dkt. 140-15 at 25–26 (explaining the PUP designation)); and (3) through

12  "user notifications" provided directly within Malwarebytes's software itself. (SAC ¶¶ 118–20; Dkts.

13  140-15 at 41–43 & 140-16 at 41–43 (appendices of "user notifications," including  yellow

14  notifications for the detection of PUPs, which are "non-malware," and red notifications for detection

15  of "malware").)    Malwarebytes even openly disclosed that its designation decisions are often

16  imperfect and, accordingly, urged users to independently review and make their own choices.  (Dkt.

17  1940-14 at 1; *see also id.* ("While we work hard not to, sometimes we get it wrong.").)    These

18  comprehensive disclosures—both individually and collectively—are simply inconsistent with any

19  assertion that Malwarebytes' designation system was materially deceptive to consumers. *See ONY,*

20  *Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497–98 (2d Cir. 2013) (dismissing Lanham Act

21  and NYGBL claims and explaining that allegations that statements are misleading are "weakest"

22  where the speakers provide "an accurate description of the data taken into account[,] the methods

23  used, . . . [and] the potential shortcomings of their methodology").

24  While the Court previously recognized that Malwarebytes's "disclosed criteria" are important

25  context for rejecting Enigma's claims (Dkt. 162 at 19), following the Ninth Circuit's reasoning in

26  *Enigma II*, Malwarebytes's disclosures now directly compel the dismissal of Enigma's remaining

27  theories of liability.  Specifically, in  *Enigma II*, the Ninth Circuit limited Enigma's claims in two

28  important ways: (1) by dismissing any claims based on the "PUP" designation, since that term "is

6511259

too vague to be considered a factual assertion," 69 F.4th at 672 n.3; and (2) by accepting Enigma's allegation that the terms "malicious" and "threat" are both "plausibly interpret[ed]" to mean "malware," *id.* at 672–73 & n. 4 (citing SAC ¶¶ 133–34, 147, 149)).  When assessed alongside Malwarebytes's factual disclosures about its designation criteria generally and about Enigma specifically, each of those two holdings decisively forecloses any attempt by Enigma to allege actionable consumer deception.

*First*, Malwarebytes has always disclosed that the consumer was receiving a "threat" notification about Enigma *because* Enigma's program had been detected as a "Potentially Unwanted Program"—i.e., the exact classification that the Ninth Circuit held is not actionable.  (SAC ¶¶ 9, 118–20; Dkt. 140-15 at 17, 41, 42; Dkt. 140-16 at 36, 41; Dkt. 140-14.)  Malwarebytes also disclosed that a website will be flagged as "malicious" for the "hosting [of] PUPs."  (RJN Ex. 1 at 1.)  Enigma's complaint admits the same: that it was the underlying *PUP designation* that caused its programs to be flagged as "threats" and led its website domain to be blocked as "malicious."  (*See* SAC ¶ 9 (alleging that Malwarebytes's programs "*automatically* identify and list . . . purported PUPs as 'threats'"); *id.* ¶ 13 (alleging that Malwarebytes used its "self-serving *PUP criteria*" to block ESG's "products, website, and other domains") (emphases added).)  Thus, regardless of whether the terms "threat" and "malicious" as used *generally* in "the cybersecurity field" could be actionable as implicit accusations of "malware," Malwarebytes's *specific* disclosures here reject that inference and simply conveyed that Enigma had been classified as a PUP – a classification that is "too vague" to be actionable.  *Enigma II*, 69 F.4th at 672–74 & n. 3; *see also Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 1982 WL 121559, at *2 (S.D.N.Y. June 9, 1982) ("[I]n evaluating whether an ambiguous advertisement is misleading[,] [a court] views its 'entire mosaic' rather than 'each tile separately.'").

*Second*, Malwarebytes repeatedly disclosed that Enigma's products are *not* malware.  For instance, within the Malwarebytes software itself, the "threat" scan is accompanied by a disclosure that Enigma's products are "non-malware."  (SAC ¶¶ 118-20 (screenshots of Malwarebytes's software identifying Enigma as a PUP and notifying users: "Scan Complete: Non-Malware Detected").)  Malwarebytes also discloses in its user guide that PUPs like Enigma's products are a "class[] of *non-malware.*"  (Dkt. 140-16 at 29 (emphasis in original).)  This disclosure makes the

6511259

1   "deceptiveness" analysis simple.  Because Malwarebytes *explicitly* discloses that Enigma is not

2   malware—including in the very notifications that Enigma complains about—the reasonable

3   consumer would not interpret Malwarebytes's statements as *impliedly* stating that they are.  *See E.*

4   *Bay L. v. Ford Motor Co.*, 2016 WL 777831, at *3 (N.D. Cal. Feb. 29, 2016), *aff'd,* 697 F. App'x

5   533 (9th Cir. 2017) ("[T]he plain language of the Vehicle Brochure demonstrates that no reasonable

6   consumer would have interpreted the Vehicle Brochure as Plaintiff did."); *UGG Holdings*, 2005 WL

7   5887187, at *10 (finding that "UGG Australia" was not deceptive even when applied to "products

8   not manufactured in Australia," because UGG also "mark[ed] the country of manufacture on a tag

9   affixed to every product");  *Benetech*, 116 A.D. 3d at 1192 (rejecting allegations of deception that

10  were "refuted by . . . the contents of defendant's website").

11       Viewed in their proper context, Malwarebytes's  designations are based on transparently

12  disclosed criteria and are surrounded by explicit disclosures that refute any impliedly deceptive

13  interpretation.   Under these circumstances, Malwarebytes's statements cannot be reasonably

14  interpreted as deceptive (much less *materially* deceptive) to any consumer (much less to a *substantial*

15  segment of *reasonable* consumers).  *E.g.*, *Int'l Code Council, Inc. v. UpCodes, Inc.*, 2021 WL

16  1236106, at *8 (S.D.N.Y. Mar. 1, 2021) (finding that a disclaimer on defendant's website supported

17  conclusion that no reasonable buyer would be deceived by allegedly misleading advertising

18  language).  For this reason alone, Enigma's Lanham Act and NYGBL claims should be dismissed.

19  *See UGG Holdings*, 2005 WL 5887187, at *10; *Benetech, Inc.*, 116 A.D. 3d at 1191–92.

20       **C.**    **Enigma's tortious interference claim fails under both New York and California**

21            **substantive law.**

22       The Court previously dismissed Enigma's tortious interference with business relations claim

23  because Enigma failed to allege "independently wrongful conduct," as required under California law.

24  (Dkt. 162 at 19.)   The Ninth Circuit reversed, stating that because "New York ha[d] personal

25  jurisdiction over Malwarebytes," presumptively "New York law applied" to the tortious interference

26  claims insofar as they involved prospective customers located within New York state.  *Enigma II*, 69

27  F.4th at 676–78 ("We do not decide whether New York law applies to Malwarebytes's transactions

28  with other customers outside the state of New York.").

Here, even assuming New York substantive law applies (as discussed below, it does not), Enigma's tortious interference claim must be dismissed.  Specifically, Enigma's complaint does not "identify a specific [prospective] customer" *in New York* who would have purchased Enigma's products "but for [Malwarebytes's] conduct." *Zetes v. Stephens*, 969 N.Y.S.2d 298, 304 (App. Div. 2012). While Enigma claimed to have "[a]t least thirty-one" *current* customers residing in New York (SAC ¶ 38), it identifies no specific *prospective* customers in New York who were deterred by Malwarebytes's alleged conduct.  (*See* SAC ¶¶ 244–46 (alleging the existence of certain prospective customers who merely "use or seek to download [its programs]" without yet paying for them, but failing to specify those prospective customers' locations).)

This lack of New York-specific conduct is fatal.  New York law—including "New York common law claim[s]"—presumptively apply "only within the state." *Sahebdin v. Khelawan*, 2022 WL 4451005, at *9 n.5 (E.D.N.Y. Sept. 24, 2022) (citations omitted).  Thus, while Enigma may have identified *some* prospective consumers *somewhere* in the country, Enigma's failure to identify a specific prospective consumer impacted *in New York* defeats its tortious interference claim under substantive New York law.  *See Zetes*, 969 N.Y.S.2d at 304.

In any event, New York substantive law does *not* apply under New York's choice of law test or the law of this case.  Although the parties' briefing before the Ninth Circuit focused on the gateway question of which state (New York or California) had jurisdiction over the dispute, the parties did not preemptively address the potential follow-up question of *if* New York law governed, *whether* "New York's choice-of-law rules require[d] application of that state's substantive law to Enigma's state-law claims." *Enigma II*, 69 F.4th at 678–79 (Baker, J., concurring).  Because that choice-of-law issue was not presented for resolution by the parties, the opinion simply "assume[d]" without analysis that New York's choice-of-law rules would call for the application of substantive New York law.  *Id.* (Baker, J., concurring). Moreover, that assumption extended only to claims regarding prospective customers *within* New York, not "to Malwarebytes's transactions with other customers outside the state of New York." *Id.* at 676.  Those choice-of-law questions, while previously unnecessary to resolve to fully dispose of Enigma's claims, are now determinative of Enigma's tortious interference allegations.  And application of New York's choice-of-law test dictates that

1   California, rather than New York, substantive law applies to Enigma's tortious interference with

2   business relations claim.

3   Under New York's choice-of-law rules, in the event of a conflict between state laws, courts

4   must apply the substantive law of the state with the "greatest interest" in regulating the behavior at

5   issue. *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994).[6] The most important considerations

6   under this standard are "the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of*

7   *Am., Inc.,* 65 N.Y.2d 189, 197 (1985).

8   In applying this test, this Court is not starting from a blank slate. To the contrary, in

9   transferring this case from S.D.N.Y. to this District under the discretionary transfer standards of 28

10  U.S.C. § 1404, Judge Engelmeyer already balanced the two States' competing interests in hearing

11  this suit. (Dkt. 67 at 7, 11–18.) As Judge Engelmeyer found, California's direct interest in

12  adjudicating this suit dwarfs any (potential) interest New York may have. For starters, all of the "the

13  key facts giving rise to Enigma's claims occurred in California," including the facts at the "crux" of

14  Enigma's suit: "California [was] where the PUP criteria was developed and added to Malwarebytes'

15  software." (*Id.* at 14.) In contrast, New York was not home to *any* of the "relevant operations" of

16  the parties and was not the resident state of even "a single witness" identified by the parties. (*Id.* at

17  13–14.) Moreover, while "neither party [was] located" in New York, "Malwarebytes is based in the

18  Northern District of California." (*Id.* at 15; *see also id.* ("Enigma is based in Florida.").) Considering

19  these factors holistically, the "center of gravity of this case . . . is *clearly* the Northern District of

20  California," not New York. (*Id.* (emphasis added).) That is particularly the case with respect to

21  ────────────────

22  [6] Here, there is plainly a conflict between state laws. As the Ninth Circuit recognized, California law

23  requires independently wrongful conduct to sustain an intentional interference with business relations

24  claim, while New York law does not. *Enigma II*, 69 F.4th at 677–78. Accordingly, an "actual conflict

25  exists" because "the applicable law from each jurisdiction provides different substantive rules . . .

26  relevant to the issue at hand [which] have a significant *possible* effect on the outcome of the trial."

27  *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) (cleaned up)

28  (emphasis in original).

6511259

1   Enigma's at-issue intentional interference with business relations claim which, as discussed, fails to

2   allege interference with any prospective customers within the state of New York.  *See Babcock v.*

3   *Jackson*, 12 N.Y.2d 473, 481 (1983) (the choice of law inquiry is determined by reference to the

4   forum that "has the greatest concern with the *specific issue* raised in the litigation" (emphasis added)).

5            Because California has the greatest interest in regulating the at-issue conduct, New York

6   choice-of-law rules dictate that California substantive law should apply.  *See GlobalNet*

7   *Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 385 (2d Cir. 2006) (affirming that

8   the state where the defendant "maintain[ed] its principal place of business" and engaged in the

9   allegedly tortious conduct had the "greater interest . . . in regulating the conduct of [actors] within

10  the state").   And under California law, Enigma's tortious interference claim fails: As the Court

11  previously held, California's tortious interference standard requires the plaintiff to plead an

12  "independently wrongful act." (Dkt. 162 at 19.)  As explained above, "Enigma's Lanham Act and

13  NYGBL § 349 claims fail, Enigma's tortious interference claim must also fail because Enigma does

14  not allege any other independently wrongful conduct." (Dkt. 162 at 19.)

## IV.      CONCLUSION

16           Enigma seeks a radical and unprecedented expansion of the Lanham Act and related statutory

17  claims.  Accepting Enigma's argument, any company that dislikes what is said about it can drag its

18  opponent into federal court, irrespective of whether the challenged statements propose a commercial

19  transaction, are intended to attract new customers, or are objectively deceptive to consumers. That is

20  not the law, and this case illustrates why.  Malwarebytes respectfully requests that Enigma's SAC be

21  dismissed.

23  Dated: October 16, 2023                    HUESTON HENNIGAN LLP

25                                              By: _____

26                                                  Michael H. Todisco
                                                    Hueston Hennigan LLP
27                                                  Attorneys for Defendant
                                                    MALWAREBYTES INC.

6511259