Terry Budd (*Admitted Pro Hac Vice*)
BUDD LAW, PLLC
120 Lyndhurst Circle
Wexford, PA 15090
Telephone: 412.613.2541
terry.budd@buddlawglobal.com

Edward P. Sangster (SBN 121041)
Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA  94111
Telephone: 415 882 8200
Facsimile: 415 882 8220
edward.sangster@klgates.com
daniel.fox@klgates.com

Christopher M. Verdini (*Admitted Pro Hac Vice*)
Anna Shabalov (*Admitted Pro Hac Vice*)
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: 412.355.6500
Facsimile: 412.355.6501
christopher.verdini@klgates.com
anna.shabalov@klgates.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENIGMA SOFTWARE GROUP USA, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> MALWAREBYTES INC., <br><br> Defendant. | Case No. 5:17-cv-02915-EJD <br><br> **PLAINTIFF ENIGMA SOFTWARE GROUP USA, LLC'S OPPOSITION TO DEFENDANT MALWAREBYTES INC.'S RENEWED MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** <br><br> **DATE: January 17, 2024** <br> **TIME: 9:00 AM** <br> **COURTROOM: Courtroom 4** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ISSUES TO BE DECIDED ....................................................................................3

III.  ALLEGATIONS AND PROCEDURAL BACKGROUND ....................................3

    A.    Allegations ...................................................................................................3

    B.    Procedural Background..................................................................................6

    C.    2023 Ninth Circuit Opinion .........................................................................6

IV.   LAW AND ARGUMENT .......................................................................................7

    A.    Malwarebytes' Statements Constitute Commercial Advertising and Promotion. ......7

    B.    Malwarebytes' False Statements of Fact Are Materially Deceptive. .......................12

    C.    New York Law Applies to ESG's Claims. ................................................16

    D.    ESG's Interference with Prospective Economic Advantage Claim Survives...........19

    E.    If Necessary, ESG Should Be Granted Leave to Amend.........................................20

CONCLUSION.................................................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Allied Prop. & Cas. Ins. Co. v. Matthews*,

5
    2018 WL 1737534 (S.D.N.Y. Mar. 20, 2018) ........................................................17

6

*Ariix, LLC v. NutriSearch Corp.*,

7
    985 F.3d 1107 (9th Cir. 2021) ...............................................................................9

8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................7

9

*Ashmore v. N.E. Petroleum Div. of Cargill, Inc.*,

10
    925 F. Supp. 36 (D. Me. 1996) .............................................................................17

11

*Avid Identification Sys., Inc. v. Schering-Plough Corp.*,
    33 Fed. Appx. 854 (9th Cir. 2002).........................................................................13

12

*Bailey v. Morales*,

13
    190 F.3d 320 (5th Cir. 1999) .................................................................................12

14

*Bell v. Publix Super Markets, Inc.*,

15
    982 F.3d 468 (7th Cir. 2020) ................................................................................16

16

*Bolger v. Youngs Drug Prod. Corp.*,

17
    463 U.S. 60 (1983)........................................................................................2, 8, 9

18

*Broder v. MBNA Corp.*,
    281 A.D.2d 369 (N.Y. App. Div. 2001) ................................................................15

19

*Carafano v. Metrosplash.com Inc.*,

20
    207 F. Supp. 2d 1055, 1074-75 (C.D. Cal. 2002)...................................................12

21

*Condit v. Dunne*,
    317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004)............................................................18

22

*CrossFit, Inc. v. Nat'l Strength and Conditioning Assn.*,

23
    2016 WL 5118530 (S.D. Cal. Sept. 21, 2016).....................................................8, 9

24

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,

25
    69 F.4th 665 (9th Cir. 2023) ......................................................................... *passim*

26

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,
    938 F.3d 1026 (9th Cir. 2019) ...............................................................................6

27

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,

28
    946 F.3d 1040 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 13 (2020)....................3, 6, 12

ii

*F.T.C. v. NCH, Inc.*,
   106 F.3d 407 (9th Cir. 1997) .................................................................16

*First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*,
   52 F. Supp. 3d 625 (S.D.N.Y. 2014).......................................................17

*Hoang v. Bank of Am., N.A.*,
   910 F.3d 1096 (9th Cir. 2018) ...............................................................20

*Homelight, Inc. v. Shkipin*,
   2022 WL 16528142 (N.D. Cal. Oct. 28, 2022).........................................9

*Hunt v. City of L.A.*,
   638 F.3d 703 (9th Cir. 2011) ...................................................................8

*Int'l Bus. Mach. Corp. v. Bajorek*,
   191 F.3d 1033 (9th Cir. 1999) ...............................................................17

*Jordan v. Jewel Food Stores, Inc.*,
   743 F.3d 509 (7th Cir. 2014) ...................................................................8

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171, 176 (2d Cir. 2021).....................................................17, 18

*Lebetkin v. Giray*,
   2020 WL 1445752, at *5 n.3 (S.D.N.Y. Mar. 25, 2020), *aff'd*, 2021 WL 2965323
   (2d Cir. July 14, 2021) ..........................................................................18

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
   880 F. Supp. 1005 (S.D.N.Y. 1994).......................................................11

*New.Net, Inc. v. Lavasoft*.
   356. F. Supp. 2d 1090, 1118 (C.D. Cal. 2004) .......................................12

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013)....................................................................15

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
   193 F.3d 781 (3d Cir. 1999)......................................................................9

*PAX Water Techs., Inc. v. Medora Corp.*,
   2019 WL 4390567 (C.D. Cal. Aug. 5, 2019)............................................9

*PC Drivers Headquarters, LP v. Malwarebytes, Inc.*,
   No. 1:18-cv-234, Dkt. 28 (W.D. Tex. May 12, 2018) ..............................7

*Peterka v. Setter*,
   2020 WL 12604754 (W.D. Pa. Feb. 5, 2020) .........................................10

iii

*Pimental v. Google Inc.*,
   2012 WL 691784 (N.D. Cal. Mar. 2, 2012)...............................................................................9

*Porous Media Corp. v. Pall Corp.*,
   173 F.3d 1109 (8th Cir. 1999) ..................................................................................................11

*Prince v. Intercept*,
   634 F. Supp. 3d 114, 133 (S.D.N.Y. 2022)..............................................................................18

*Rice v. Fox Broad. Co.*,
   330 F.3d 1170 (9th Cir. 2003) ..................................................................................................11

*Salustri v. Dell, Inc.*,
   2010 WL 11596554 (C.D. Cal. Apr. 27, 2010) ........................................................................20

*Skydive Arizona, Inc. v. Quattrocchi*,
   673 F.3d 1105 (9th Cir. 2012) ..................................................................................................13

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ..................................................................................................10

*U.S. v. Houser*,
   804 F.2d 565 (9th Cir. 1986) ....................................................................................................19

*U.S. v. Miller*,
   822 F.2d 828 (9th Cir. 1987) ....................................................................................................19

*UGG Holdings, Inc. v. Severn*,
   2005 WL 5887187 (C.D. Cal. Feb. 23, 2005)...........................................................................15

*Vidillion, Inc. v. Pixalate, Inc.*,
   2019 WL 13071961 (C.D. Cal. Mar. 15, 2019).........................................................................11

*Watison v. Carter*,
   668 F.3d 1108 (9th Cir. 2012) ....................................................................................................7

*Woodard v. Labrada*,
   2016 WL 3436434 (C.D. Cal. May 12, 2016) ............................................................................9

*Zetes v. Stephens*,
   108 A.D.3d 1014, 969 N.Y.S.2d 298 (4th Dep't 2013) ............................................................19

**Statutes**

15 U.S.C. § 1125(a)(1)(b) ...............................................................................................................8, 10

Cal. Bus. & Prof. Code § 17200 .........................................................................................................20

Lanham Act............................................................................................................................... *passim*

New York General Business Law ............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 15(a)(2)....................................................................................................20

Fed. R. Civ. P. 12(b)(6).............................................................................. *passim*

Plaintiff Enigma Software Group USA, LLC ("ESG") files this Opposition to Defendant Malwarebytes Inc.'s ("Malwarebytes") Renewed Motion to Dismiss the Second Amended Complaint ("Motion," Dkt. 179).

## I.   INTRODUCTION

Determined to avoid accountability for its targeted anticompetitive campaign against direct competitor ESG, Malwarebytes has filed its ***third*** motion to dismiss in this Court.  This latest motion follows two successive reversals on appeal, in which the Ninth Circuit first rejected Malwarebytes' Section 230 immunity argument that it could unilaterally block competitor products with impunity, even in bad faith, and then rejected its assertion that labeling ESG's programs and domains as "threats" and "malicious," using terms with understood, factual meanings in the cybersecurity industry, could be excused as mere opinion.  Incredibly, Malwarebytes now attempts to recast its losses on appeal as wins that compel dismissal of claims whose viability the Ninth Circuit has twice upheld.

In support of this unfounded position, Malwarebytes baselessly accuses ESG of having "shifted" its story. *See* Dkt. 179 at 5.  In fact, ESG's allegations have been entirely consistent since day one of this litigation.  As detailed in its extensive Second Amended Complaint ("SAC," Dkt. 140)—based on, *inter alia*, evidence from Malwarebytes' own products, documents and executives' emails and internal communications—Malwarebytes has engaged in malicious, targeted interference with its direct competitor, ESG, an established, respected cybersecurity company.  Specifically, after eight years of co-existence as competitors in the market for cybersecurity software, Malwarebytes abruptly chose for the first time to designate ESG's programs as "threats" and block their download and operation.  ¶¶ 10-11.  Malwarebytes did this through its flagship MBAM product, whose free versions serve as advertising for the paid "premium" version, and its free anti-adware program, AdwCleaner, which in turn promotes MBAM.  ¶¶ 64-66.  Malwarebytes then compounded its interference by responding to ESG's harm mitigation measures by designating ESG's website and domains as "malicious" and gratuitously blocking them, thereby preventing users from accessing basic information about ESG, receiving critical software updates, and contacting ESG technical support.  ¶¶ 165-68.  Consumers understood Malwarebytes' false "threat" and "malicious"

1

designations exactly as Malwarebytes intended and in line with their commonly understood industry meanings—as complaints quoted in the SAC reflect, users believed the labels meant that ESG's products and domains contained malware and viruses.  ¶¶ 143-64.  Through Malwarebytes' false designation and blocking of ESG's programs, Malwarebytes induced consumers not to do business with ESG and to instead become paying Malwarebytes customers or renew existing subscriptions, thereby harming ESG and shoring up its own market position.  ¶¶ 164, 209-10.

Faced with those allegations, Malwarebytes launches a last-ditch attempt to avoid being held accountable.  Its arguments, which ignore the pleadings and governing law and demand the Court adjudicate disputed facts that are a jury question, should be rejected.

***First***, Malwarebytes' argument that its statements cannot be "commercial speech" because they do more than merely propose a commercial transaction flies in the face of the U.S. Supreme Court's *Bolger* test and ignores how the anti-malware business operates.  ESG alleges that (i) Malwarebytes makes its statements in products that function as advertising to induce purchase of Malwarebytes' paid offerings, including through prominent "BUY NOW," "RENEW NOW," and "UPGRADE NOW" in-app buttons, (ii) Malwarebytes' speech directly references, indeed falsely labels, specific ESG products, and (iii) Malwarebytes' speech is economically motivated by its desire to increase its sales, profits, and market position at ESG's expense.  Those allegations, which must be taken as true and satisfy the *Bolger* test, preclude dismissal on commercial speech grounds.

***Second***, Malwarebytes asserts that cherry-picked, isolated language buried in blog posts and lengthy user guides somehow constitute an "open disclosure" sufficient to overcome the deceptiveness of its statements compel dismissal of ESG's claims.  But the Ninth Circuit already ruled that consumers plausibly understand Malwarebytes' "threat" and "malicious" labels to mean ESG's programs and domains contain malware.  And Malwarebytes' own cited case law makes clear its claimed "open disclosures" are nothing of the sort; the law states that disclosures are only effective to counteract deceptiveness if in close proximity to the statements themselves.  Here, Malwarebytes' product screens where its false designations are displayed contain no "disclosures." To the contrary, they underscore what the Ninth Circuit held—that the labels communicate designated programs and domains contain malware.

***Third***, Malwarebytes' request that California substantive law be applied to the entire dispute is foreclosed by the Ninth Circuit's most recent ruling.  Under that ruling, at a minimum, New York substantive law applies to ESG's state law claims based on sales to New York users, and New York has sufficiently significant interests overall to apply its substantive law to the entire dispute.

***Finally***, Malwarebytes' attacks on ESG's tortious interference with prospective economic advantage claim fail, because (i) ESG's Lanham Act and NYGBL claims survive and thus constitute "independently wrongful" conduct under New York and California law, and (ii) the Ninth Circuit already held that ESG identified lost prospective customers with sufficient specificity.

Accordingly, Malwarebytes' Motion should be denied in full.

## II.   ISSUES TO BE DECIDED

1.   Whether ESG has properly pled that Malwarebytes' statements constitute commercial speech for purposes of its Lanham Act and New York General Business Law ("NYGBL") claims?

2.   Whether ESG has properly pled that Malwarebytes' statements are materially deceptive under the Lanham Act and NYGBL, notwithstanding Malwarebytes' supposed "disclosures"?

3.   Whether New York substantive law applies to ESG's state law claims?

4.   Whether ESG has properly pled its tortious interference with prospective business relations claim (i) under New York law because it sufficiently identifies lost prospective customers and (ii) under California law because it sufficiently alleges an independently wrongful act?

## III.   ALLEGATIONS AND PROCEDURAL BACKGROUND

### A.   Allegations

ESG is an established cybersecurity company whose products have protected millions of users for two decades.  SAC ¶¶ 2, 52.  ESG's offerings have included a flagship anti-malware program, SpyHunter 4, and an advanced PC privacy and optimizer program, RegHunter 2, which have received top industry certifications and/or test scores.  ¶¶ 48-49, 53-59.

As the Ninth Circuit twice previously held, ESG and Malwarebytes are direct competitors in the anti-malware and cybersecurity market.  ¶¶ 7-8, 68; *Enigma Software Grp. USA, LLC v. Malwarebytes Inc.* ("*ESG I*"), 946 F.3d 1040, 1045, 1047 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 13 (2020); *Enigma Software Grp. USA, LLC v. Malwarebytes Inc.* ("*ESG II*"), 69 F.4th 665, 668, 669

(9th Cir. 2023).  Malwarebytes' flagship product, MBAM, competed directly with SpyHunter 4, and now competes directly with ESG affiliate EnigmaSoft Limited's SpyHunter 5.  ¶¶ 7, 61, 71.  AV-Test—an independent testing lab whose results Malwarebytes itself touts as evidence of its products' quality—found SpyHunter 4 more effective in combatting malware than MBAM in head-to-head testing.  ¶ 72.  And like ESG's RegHunter, Malwarebytes offers privacy and performance optimization features through MBAM, Privacy VPN, and AdwCleaner.  ¶¶ 73-74.

Consumers can download free versions of Malwarebytes' products, which Malwarebytes uses to market and promote its paid offerings.  ¶¶ 64-66.  For its MBAM product, Malwarebytes offers both a free limited-functionality version and a free 14-day full-functionality trial to induce users to purchase a paid "Premium" MBAM subscription.  Malwarebytes also offers its free AdwCleaner product to drive users to its flagship MBAM offering.  *Id.*  Malwarebytes products prominently feature in-app "Buy Now," "Renew Now," and "Upgrade Now" buttons, encouraging free users to convert to paying customers.  ¶¶ 118-20; Dkt. 140-15 at 47.

Malwarebytes markets and promotes MBAM through, *inter alia*, a sales affiliate program of which Bleeping Computer LLC ("Bleeping Computer") is a member.  ¶¶ 11, 22, 69, 200.  In early 2016, ESG sued Bleeping Computer in the U.S. District Court for the Southern District of New York ("SDNY"), seeking redress for Bleeping Computer's deliberate dissemination of false information about ESG and SpyHunter 4.  ¶ 75.  Bleeping Computer operated a website claiming to be an independent, objective source of cybersecurity information, including anti-malware product reviews, but in reality acted as a commissioned sales arm of Malwarebytes.  ¶¶ 22, 76-78.  Bleeping Computer undertook a concerted smear campaign of defamatory postings against ESG to drive business to Malwarebytes and to earn commissions.  ¶¶ 23, 79.  In recognition of their long-standing profiteering partnership, Malwarebytes even offered Bleeping Computer strategic litigation advice from its CEO and General Counsel and funded a portion of Bleeping Computer's defense costs.  ¶¶ 21-22, 85-95.

Consequently, ESG served Malwarebytes with a subpoena seeking documents about the Malwarebytes- Bleeping Computer relationship and collaboration to divert ESG sales ("Subpoena").  ¶¶ 20, 24, 99.  ***Less than a week before its Subpoena response was due***—facing having to produce

documents and testify under oath regarding its involvement in Bleeping Computer's smear campaign and at risk of losing competitive advantages from the campaign—Malwarebytes began, for the first time ever, to designate ESG's programs as "threats" and to block their download, installation, and use by consumers.  ¶¶ 11, 25, 102, 111, 117.  Malwarebytes did so under the pretense of newly announced "amended" criteria for "potentially unwanted programs" ("PUPs"), tracking Bleeping Computer's defenses and counterclaims in the SDNY case.  ¶¶ 11, 20, 25, 100-02, 108-10.  Notably, from Malwarebytes' inception in 2008 until October 6, 2016—during eight years of direct competition—Malwarebytes never designated or blocked ESG's programs.  ¶¶ 10, 106.  Once the blocking began, users attempted unsuccessfully to opt out of it to use ESG's products, but were trapped by MBAM in unproductive cycles of repeated blocking.  ¶¶ 118-24.  Malwarebytes did not simply provide a cautionary list or review of programs it looks upon unfavorably, as Consumer Reports might do.  Malwarebytes purposefully electronically disabled, *i.e.* rendered unusable, ESG's programs.  Malwarebytes' designation and blocking of ESG's products created a substantial risk that other anti-malware companies would follow suit, causing exponentially greater harm to ESG.  ¶ 19.

Malwarebytes escalated its anticompetitive targeting after ESG released an alternative installer for SpyHunter 4 to assist its customers in overcoming MBAM's blocking.  ¶ 165.  Immediately after ESG issued a press release announcing this option, ***Malwarebytes began to block access to ESG website domains***—including the publicly available company website and domains ESG's products used to communicate with back-end servers to ensure users received automatic product and malware detection list updates and could access the customer support interface—and to display to users messages calling those ESG domains "malicious websites."  ¶¶ 166-68.  This domain blocking, which could not have any practical impact on user safety since Malwarebytes was already blocking ESG's programs, was gratuitous retaliation.  ¶¶ 169-70.

Malwarebytes' anticompetitive targeting of ESG has caused substantial harm to ESG's business and reputation.  ESG has received hundreds of user complaints about Malwarebytes' interference, and even Malwarebytes itself has received such complaints from its users.  ¶¶ 143-63.  Users reported believing, based on Malwarebytes' statements and blocking, that ESG's products constituted serious cybersecurity threats and were viruses or malware.  *Id.*  Users also reported

finding it impossible or too difficult to get around Malwarebytes' blocking.  *Id.*  In various instances, users canceled or declined to renew their ESG subscriptions and/or demanded refunds.  *Id*. Malwarebytes' predatory conduct caused ESG's sales and reputation to decline.  *Id.*  ¶¶ 209-11.

## B.  Procedural Background

ESG originally filed this case in the SDNY.  The SDNY Court then granted a transfer for convenience, "declin[ing] to reach [Malwarebytes'] motion to dismiss," including the personal jurisdiction challenge.  Dkt. 67 at 2, 11.  Following transfer, this Court granted Malwarebytes' renewed Rule 12(b)(6) motion to dismiss on Section 230 immunity grounds.  Dkt. 105.  The Ninth Circuit reversed and remanded, holding that Section 230 does not immunize blocking a competitor for anticompetitive reasons.  938 F.3d 1026 (9th Cir. 2019).  The Ninth Circuit then denied Malwarebytes' petition for rehearing *en banc* and entered an amended opinion, reversing and remanding on the same reasoning.  *ESG I*, 946 F.3d at 1040.  Following Malwarebytes' unsuccessful petition for a writ of certiorari, *see* 141 S. Ct. 13 (2020), the case was remanded to this Court.

## C.  2023 Ninth Circuit Opinion

After ESG filed the SAC, Malwarebytes filed another Rule 12(b)(6) motion to dismiss, raising the same grounds (other than Section 230) as in its prior motion.  Dkt. 147.  This Court granted the motion, dismissing the SAC without leave to amend and finding (i) "because New York lacked personal jurisdiction over Malwarebytes, California law applies," (ii) ESG failed to plead "that Malwarebytes' alleged labels are verifiably false rather than just subjective opinions," (iii) ESG failed to identify a contractual obligation for its interference with contract claim, and (iv) ESG identified no independent wrongful act for its interference with prospective economic advantage claim.  Dkt. 162 at 15, 17-19.

On appeal, the Ninth Circuit reversed all but one of those determinations, upholding the dismissal of the tortious interference with contract claim but reviving all of ESG's other claims. *ESG II*, 69 F.4th at 678.  In doing so, the Ninth Circuit held, *inter alia*, that:

- Malwarebytes' designations of ESG's products and domains as "threats" and "malicious" are "actionable statements of fact" under the Lanham Act, because they "employ terminology that is substantively meaningful and verifiable in the cybersecurity context" and "a reasonable person would plausibly interpret

6

[them] as the identification of malware," *id.* at 672;[1]

- "Malwarebytes is subject to personal jurisdiction in New York," including because it "'transacts business'" there through an "interactive" website on which "New York-based users buy and download products" and ESG's claims "arise at least in part out of Malwarebytes' transaction of business in New York," *id.* at 675-76;

- ESG's NYGBL claim must be "reinstate[d]" because "New York law applies and … [ESG's] Lanham Act claim is actionable," *id.* at 676; and

- ESG's "complaint plausibly demonstrated each of [the] factors" of a tortious interference with business relations claim, including specifically identifying impacted business relationships, *id.* at 677.

## IV.    LAW AND ARGUMENT

On a Rule 12(b)(6) motion, a court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the plaintiff," *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012), denying the motion when the plaintiff states a claim "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    Malwarebytes' Statements Constitute Commercial Advertising and Promotion.

Malwarebytes, a for-profit business, makes its false statements regarding ESG's programs and domains in (i) its flagship MBAM software product, including in a limited functionality free version and a time-limited free-trial version (both used as advertising to induce sales of MBAM's

---

[1] As the majority opinion recognizes, the dissent's position that Malwarebytes' false labels are "inherently subjective" ignores ESG's allegations and the reality of the cybersecurity industry. *Compare ESG II*, 69 F.4th at 672-73 *with id.* at 679, 683-84. ESG pled that (i) Malwarebytes' own programs and materials communicated that the "threat" and "malicious" labels meant programs and domains were dangerous to a user's system and contained malware; (ii) Malwarebytes blocked ES"s programs and domains on the basis of those labels, underscoring their purported dangerousness, and (iii) as the SAC's quoted user complaints reflect, users understood Malwarebytes' intended message and believed ESG's programs and domains contained malware and viruses. SAC ¶¶ 117-24, 132-34, 143-64; *ESG II*, 69 F.4th at 672-73, 672 n.4. Although the dissent cites generic "threat" definitions to suggest the term has multiple meanings, *ESG II*, 69 F.4th at 684, the key is the understood meaning the labels have in the context of cybersecurity. *Id.* at 672. As discovery will further demonstrate, Malwarebytes' own statements, and those of other anti-malware companies, confirm that meaning is verifiable. *See, e.g.*, *PC Drivers Headquarters, LP v. Malwarebytes, Inc.*, No. 1:18-cv-234, Dkt. 28 (W.D. Tex. May 12, 2018) (Malwarebytes executive testifying that "malware" is "any malicious software … with the intent of destroying or disrupting the system or extorting the user in some way so basically full-on malicious functionality with the intent of hurting the user in some way."); www.forbes.com/sites/forbestechcouncil/2018/09/28/breaking-down-malware-why-its-still-one-of-the-biggest-threats-facing-businesses/?sh=2d06b830fe1a (article by Malwarebytes CEO in *Forbes* defining malware); https://www.mcafee.com/en-us/antivirus/malware.html (McAfee malware definition stating "malicious website" is one "infected by malware"); us.norton.com/blog/malware/what-are-malicious-websites (Norton "malicious website" definition).

paid "premium" version), and (ii) in its free AdwCleaner product, which serves as marketing for MBAM.  SAC ¶¶ 17, 64-66, 215.  Yet Malwarebytes suggests this does not qualify as "commercial speech" because "Malwarebytes's 'threat' and 'malicious' designations communicate negative information to consumers about [ESG's] products" and so do "more than propose a commercial transaction."  Dkt. 179 at 11-12.  If this were the governing standard, it would render impossible *nearly all* false advertising claims, in the face of a half-century of established law imposing liability for false advertising.  After all, a company's advertising statements regularly convey "factual information," either about the company's own products or the products of a competitor, in order to influence purchasing decisions.  That is why the Lanham Act expressly makes actionable "false or misleading" "description[s]" and "representation[s] of fact."  15 U.S.C. § 1125(a)(1)(b).

The proper legal test demonstrates Malwarebytes' position does not hold water.  The Supreme Court has confirmed that speech that "cannot be characterized merely as proposals to engage in commercial transactions"—even speech involving "important public issues"—can nonetheless be commercial speech.  *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983).  "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation."  *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66–67).

ESG has amply pled that Malwarebytes' statements satisfy the *Bolger* test.  For the first factor, ESG alleges that the products through which Malwarebytes makes its statements function as advertising to induce purchase/renewal of Malwarebytes' paid offerings, and prominently display "BUY NOW," "RENEW NOW, and "UPGRADE NOW" buttons to users.  SAC ¶¶ 64-66, 118-20, 215; Dkt. 140-15 at 47.  But even if one were to accept Malwarebytes' claims that it does not specifically ask the audience to purchase its products, it would be of little moment.  *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("The notion that an advertisement counts as 'commercial' only if it makes an appeal to purchase a particular product makes no sense today, and we doubt that it ever did.");  *CrossFit, Inc. v. Nat'l Strength and Conditioning Assn.*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016) ("Because the injury data disparage a competitor's product

and there is some evidence that those behind the injury data knew the data were false and stood to gain from their publication, this factor weighs in favor of a finding of commercial speech.").  For the second factor, even Malwarebytes admits its speech references specific ESG products.  *See, e.g.*, Dkt. 179 at 11.  For the third factor, ESG identifies Malwarebytes' direct economic motivation for its false commercial speech—to increase its sales and profits and improve its market position by encouraging users not to buy ESG's products and to buy or renew subscriptions to Malwarebytes' competing products instead.  SAC ¶¶ 1, 111, 219; *see also PAX Water Techs., Inc. v. Medora Corp.*, 2019 WL 4390567, at *8 (C.D. Cal. Aug. 5, 2019) ("The FAC adequately alleges economic motivation through Defendant's financial interest in generating more sales of its product based on the statements about it and Plaintiffs' product in the White Paper."); *CrossFit*, 2016 WL 5118530, at *7 ("[T]he NSCA had an economic motive … in preserving or expanding its market share in the fitness industry and curtailing the burgeoning popularity of CrossFit.").  And even if one of the *Bolger* factors were absent, this would not be dispositive.  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021).  As the Supreme Court has explained, "each of the characteristics" need not "necessarily be present in order for speech to be commercial."  *Bolger*, 463 U.S. at 67 n.14.

Under the Rule 12(b)(6) standard, Malwarebytes' speech cannot be deemed non-commercial in the face of ESG's allegations.  Those allegations must be taken as true, and, standing alone, preclude dismissal.  *See, e.g.*, *Pimental v. Google Inc.*, 2012 WL 691784, at *3 (N.D. Cal. Mar. 2, 2012) (because the allegations in the complaint "clearly allege that the text message are commercial," "Defendants' argument that its Disco service sent non-commercial text messages deserving of First Amendment protection disputes the facts, [and] is unavailing on a 12(b)(6) motion"); *Homelight, Inc. v. Shkipin*, 2022 WL 16528142, at *3 (N.D. Cal. Oct. 28, 2022) ("Taking the allegations in the complaint as true, plaintiff has plausibly alleged that the reviews are commercial speech"); *Woodard v. Labrada*, 2016 WL 3436434, at *8 fn.6 (C.D. Cal. May 12, 2016).  Any quibbling with ESG's allegations at best results only in a dispute of fact that cannot be resolved at this stage.  *See, e.g.*, *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 793-94 (3d Cir. 1999) (finding "a sufficient factual dispute about the nature of the seminars to preclude granting defendants' motion to dismiss," including "what portion of the seminars, if any, consisted of a sales

9

pitch to the attendees and what portion was non-commercial medical discussion"); *Peterka v. Setter*, 2020 WL 12604754, at *3, 7-8 (W.D. Pa. Feb. 5, 2020) ("Whether the Consumer Alerts constitute commercial speech is a question of fact that cannot be decided at this juncture," because "[d]iscovery must occur and a record be developed" and "[m]ore context is required").

Malwarebytes raises a host of unavailing arguments in a bid to avoid that conclusion.  For instance, Malwarebytes claims that "even if the challenged designations about [ESG] could be considered some sort of advertising or promotion by Malwarebytes, they are not actionable because they do not promote *Malwarebytes'* own products." Dkt. 179 at 10.  That simply is not the law. False advertising about a competitor's products is indisputably actionable.  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("The elements of a Lanham Act § 43(a) false advertising claim [include] a false statement of fact by the defendant … about its own ***or another's product****.*" (emphasis added)).  That fundamental precept is enshrined in the very statutory language of the Lanham Act, which makes actionable "any … false or misleading description of fact, or false or misleading representation of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her ***or another person's goods, services, or commercial activities***[.]"  15 U.S.C. § 1125(a)(1)(b) (emphasis added).

Even leaving aside Malwarebytes' misstatement of the law, Malwarebytes' claim that its statements about ESG do not promote its own products is inconsistent with the reality of the anti-malware business.  As an initial matter, anti-malware companies like Malwarebytes that hold themselves out as cybersecurity experts depend on having robust detection lists to appear effective and thorough to consumers, so inclusion of ESG's programs and domains on its detection lists generally boosts the appearance of the quality of Malwarebytes' offerings (and explains why Malwarebytes lists 73 separate "threat" detections for just one SpyHunter 4 program on a user's computer).  *See* SAC ¶¶ 21, 118, 146.  Moreover, when Malwarebytes denigrates a specific competitor through detections and blocking meant to demonstrate Malwarebytes' ability to protect users from "threats" and "malicious" domains, that speech plainly promotes Malwarebytes' own products as against the competitor's.  And by taking away from a user a layer of protection provided by ESG's software, Malwarebytes makes it more likely that user will decide to pay for

Malwarebytes' "premium" level of protection to make up the difference.  Contrary to Malwarebytes' assertions, ESG's allegation that Malwarebytes engaged in this speech for the "sole purpose of inflicting intentional harm" upon ESG does not render merely "incidental" corresponding promotion of Malwarebytes.  *See* Dkt. 179 at 12.  To the contrary, in a direct competitor situation, inflicting harm upon a competitor has the necessary and integral effect of also benefitting Malwarebytes.

Malwarebytes also falsely argues that it made its statements "only to a subset of ***existing Malwarebytes customers***."  Dkt. 179 at 11 n.5.  This is directly contrary not only to ESG's pleading, but also to the sworn testimony of Malwarebytes' own executive that the majority of Malwarebytes users are "free users," *i.e.* ***not yet paying customers***.  SAC ¶ 66.  Malwarebytes' sales model relies on free versions of MBAM and AdwCleaner functioning as advertisements for product capabilities to induce free users to upgrade to paid "Premium" MBAM.  ¶¶ 64-66, 220.  Even for existing paid customers, Malwarebytes' statements propose a commercial transaction; because its time-limited subscriptions expire, Malwarebytes must convince customers to renew.  Demonstrating the efficacy of Premium MBAM through robust detections lists (artificially bloated through false designation of ESG's programs and domains) is critical to ensuring subscription renewals.  ¶¶ 65, 220.[2]

Finally, Malwarebytes asserts that statements made in products cannot qualify as advertising or promotion.  Dkt. 179 at 8-10.  But Malwarebytes' cases announce no such categorical rule, and instead indicate that courts must look to the specific context at issue.  *See, e.g.*, *Vidillion, Inc. v. Pixalate, Inc.*, 2019 WL 13071961, at *1 (C.D. Cal. Mar. 15, 2019) (explaining that "***generally***" in-product statements do not function as advertising because they do not propose a commercial transaction and are not for purposes of influencing consumers); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003) (holding statement made by host ***during*** a show did not promote or

---

[2] For these same reasons, Malwarebytes is wrong in claiming its statements about ESG were not "disseminated sufficiently to the relevant purchasing public."  Dkt. 179 at 11 n.5.  The relevant purchasing public Malwarebytes was targeting with its statements about ESG does not consist of all Malwarebytes users.  To the contrary, Malwarebytes' statements target the specific class or category of its users that seek to simultaneously deploy both Malwarebytes and ESG products; as ESG has pled, Malwarebytes disseminated the offending statements to ***all*** such users during the relevant period (SAC ¶¶ 222-23) – more than enough coverage to satisfy the Lanham Act's requirement.  *Cf. Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (alert published to only five recipients had sufficient dissemination under the Lanham Act); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1020 (S.D.N.Y. 1994) (letter sent to one purchaser was "disseminated sufficiently" to meet Lanham Act requirements).

market the already underway show).  Here, as ESG alleged, Malwarebytes, a direct competitor of ESG, affirmatively designated and blocked ESG's products and domains as "threats" and "malicious," including in its free products, in order to convince users not to do business with ESG and to promote the purchase of Malwarebytes' products instead.  It is common sense that "free samples and risk-free trials of products are common marketing tools."[3]  *Bailey v. Morales*, 190 F.3d 320, 325 (5th Cir. 1999).  Yet, Malwarebytes insists on erroneously analogizing this case to *New.Net, Inc. v. Lavasoft*.  Dkt. 179 at 9.  Key differences render *New.Net* distinguishable:

- The *New.Net* complaint "does not, and indeed, cannot allege that Defendant is one of its competitors."  356 F. Supp. 2d 1090, 1118 (C.D. Cal. 2004).  This case, on the other hand, indisputably involves direct competitors.  SAC ¶¶ 7-8, 68; *ESG I*, 946 F.3d at 1045, 1047; *ESG II*, 69 F.4th at 668, 669.

- The *New.Net* court reasoned that consumers encountered the objected-to labels when "they are managing the content of their computer's hard drive," and are not at that time "making a decision to purchase anything."  356 F. Supp. 2d at 1111.  ESG, however, has expressly pled that free and free-trial users encounter Malwarebytes' statements when assessing whether to upgrade to paid Malwarebytes products – something they are encouraged by Malwarebytes to do from inside the product itself, through prominent "BUY NOW" and "UPGRADE NOW" buttons.  SAC ¶¶ 64-66, 118-20; Dkt. 140-15 at 47.

- *New.Net*'s holding is specific to software that gives users the ***option*** of whether to delete or leave in place products detected by the software.  356 F. Supp. 2d at 1116 n.8.  ESG expressly pled, however, that Malwarebytes providers users no such option; it automatically quarantines and blocks ESG's programs and domains, without offering a meaningful workaround.  SAC ¶¶ 117-24, 127-36.

- *New.Net* finds Lavasoft's speech to be non-commercial based on an analogy to ratings systems, evaluations, and subjective reviews from consumer protection groups.  356 F. Supp. 2d at 1118.  The Ninth Circuit has already rejected such analogies as applied to Malwarebytes' statements.  *ESG II*, 69 F.4th at 673-74.

Accordingly, ESG has sufficiently alleged that Malwarebytes' statements constitute commercial speech in advertising or promotion, and Malwarebytes' arguments to the contrary should be rejected.

### B.   Malwarebytes' False Statements of Fact Are Materially Deceptive.

Again ignoring ESG's pleading and governing law, Malwarebytes erroneously argues ESG's Lanham Act and NYGBL claims must be dismissed because Malwarebytes' statements about ESG,

---

[3] Malwarebytes cites just one case for its claim that "courts have squarely held that [ESG's] 'free trial' theory is without merit."  Dkt. 179 at 12.  *Carafano v. Metrosplash.com Inc.*'s reasoning, however, rests on the fact that the Matchmaker.com profiles at issue consisted of "information posted by members about themselves."  207 F. Supp. 2d 1055, 1074-75 (C.D. Cal. 2002).  Here, there is no dispute that Malwarebytes, not users, applies the "threat" and "malicious" designations.

which the Ninth Circuit has already held to be "actionable statements of fact," *ESG II*, 69 F.4th at

672, are nonetheless "not materially deceptive."  Dkt. 179 at 14.  Here, Malwarebytes' statements,

alleged to be literally false (*ESG II*, 69 F.4th at 672), "carry with them the presumption that

consumers relied on and were deceived by them."  *Avid Identification Sys., Inc. v. Schering-Plough

Corp.*, 33 Fed. Appx. 854, 856 (9th Cir. 2002).  That deception is "material" where "it is likely to

influence the purchasing decision."  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th

Cir. 2012).

      Here, ESG has met the standard for "material deception" by alleging, *inter alia*, that:

- Malwarebytes' statements were "likely to deceive consumers as to the nature, quality, and efficacy" of ESG's programs and domains, "including causing consumers to believe that [they] are malicious or a threat," SAC ¶ 216;

- Malwarebytes made its false statements to eight different categories of users of Malwarebytes' products: (1) users who had downloaded free versions of Malwarebytes' products and tried to install the free versions of ESG products; (2) users who had downloaded free versions of Malwarebytes' products and tried to install the paid versions of ESG products; (3) users who subscribed to paid versions of MBAM products and then tried to install the free version of ESG products; (4) users who subscribed to paid versions of MBAM products and then tried to install the paid version of ESG products; (5) users who downloaded the free version of ESG products and then installed free versions of Malwarebytes' products; (6) users who downloaded the free version of ESG products and then installed paid versions of MBAM products; (7) users who subscribed to the paid version of ESG products and then downloaded free versions of Malwarebytes' products; and (8) users who subscribed to the paid version of ESG product and then downloaded paid versions of MBAM products, *id.* ¶ 220;

- ESG received hundreds of complaints from users regarding Malwarebytes' statements and blocking, including complaints reflecting that users were actually deceived by Malwarebytes into believing ESG's programs and domains were cybersecurity threats and even malware, ¶¶ 143-64; and

- Malwarebytes' false statements influenced user purchasing decisions, as impacted users chose not to install, purchase, or renew ESG's products, cancelled subscriptions and/or demanded refunds, ¶¶ 164, 209-11.

Those specific, non-conclusory allegations establish the plausibility that a substantial segment of

users faced with Malwarebytes' designations of ESG's products and domains as "threats" and

"malicious" would be—and in fact were—misled.  *See Skydive,* 673 F.3d at 1111 (finding actual

consumer deception demonstrated material deceptiveness on summary judgment).

Malwarebytes asks this Court to ignore evidence of the ***actual deception*** of ***actual consumers***, solely based on supposed "disclosures" it claims to have made.  Those "disclosures," however, come nowhere near excusing Malwarebytes' pervasive false statements under the law.

***First***, Malwarebytes continues to point to its PUP criteria as a relevant "disclosure."  *See* Dkt. 179 at 15.  As Malwarebytes admits, however, the PUP criteria in question is solely for PUP designations, making it irrelevant to whether Malwarebytes disclosed information regarding its separate designation of ESG's programs and domains as "threats" and "malicious."

***Second***, even for the supposed "disclosures" Malwarebytes claims as to its "threat" and "malicious" labels, Malwarebytes points to isolated language on its website and in user guides.  *See* Dkt. 179 at 15.  Those locations are indisputably disconnected from the programs in which Malwarebytes actually makes its deceptive statements.  For instance, Malwarebytes cites to a single webpage as evidence of a disclosure as to its "malicious" label – an obscure post from 2016 on the blog portion of Malwarebytes website, titled "Explained: the Malwarebytes Website Protection module."  *See* Dkt. 179 at 15 (citing RJN Ex. 1); Dkt. 179-3.  There is no suggestion in the record of what portion, if any, of MBAM users would go out of their way, when encountering an in-app detection, to navigate to Malwarebytes' website, search for and manage to locate the specific one-off blog post in question, and then review it in full.  Common sense indicates this population, if it exists, is vanishingly small, particularly since there are no links to an overall definitions or disclosure page on Malwarebytes' homepage and it is unclear how a user would even know to try to navigate to that specific blog post.[4]  Malwarebytes also cites to isolated pages of certain MBAM User Guides as evidence of a disclosure as to "threat" or "malicious" – pages buried in lengthy documents that display "notification window examples" are missing any substantive detail as to Malwarebytes' labels.  *See* Dkt. 179 at 15, 16 (citing Dkt. 140-15 at 17, 41, 42; Dkt. 140-16 at 36, 41).  Again, there is no indication in the record of what portion of MBAM users ever consult a user guide, let alone

---

[4] If a user searches "malicious" from Malwarebytes' homepage, the user gets over 400 pages of results; the blog post to which Malwarebytes points does not appear in at least the first 10 pages. www.malwarebytes.com/?s=malicious.  Yet the second hit on the very first page is a Malwarebytes webpage directly contradicting its cherry-picked blog-post; that "Malicious Website" webpage explains, "Malicious Website is Malwarebytes' generic detection name for websites that were found to be involved in malware campaigns."  www.malwarebytes.com/blog/detections/malicious-website.

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**

read to the end of the document, and no link to user guides appears on Malwarebytes' homepage.

Malwarebytes' own cited case law indicates "disclosures" entirely disconnected from the location where the statements at issue are made fall far short of the kind of disclosure that could obviate deceptiveness.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013) ("[W]hen the conclusions reached by experiments are ***presented alongside*** an accurate description of the data taken into account and the methods used, the validity of the authors' conclusions ***may be assessed on their face*** by other members of the relevant discipline…" (emphasis added)); *UGG Holdings, Inc. v. Severn*, 2005 WL 5887187, at *10 (C.D. Cal. Feb. 23, 2005) (finding use of UGG Australia mark with products not made in Australia not deceptive because every ***product*** bore a tag identifying the actual country of manufacture); *see also Broder v. MBNA Corp.*, 281 A.D.2d 369, 370-71 (N.Y. App. Div. 2001) (finding question of fact as to deceptiveness of promotional offer given defendant's method of credit card payment allocation, even where separate credit card agreement expressly stated defendant would determine payment allocation).

***Third***, as the SAC's product screenshots reflect, the screens where Malwarebytes displays its false designations of ESG's programs and domains do not explain those designations, do not disclose criteria Malwarebytes now claims to use to assign them, and do not link to or reference the existence of the materials Malwarebytes claims as "disclosures."  *See* SAC ¶¶ 118-20, 167.  Indeed, as to the "threat" label, Malwarebytes' detection results often display hundreds of entries, none of which explain the detection or even offer an ⓘ icon to click for additional information.  ¶¶ 9, 118-19.  Malwarebytes also lists dozens of items for a single program, burying any given detection in a long, dense list.  *Id.*  Indeed, the only substantive information Malwarebytes' products provide about the "threat" or "malicious" labels convey that "threats" and "malicious" websites contain malware; after all, the screen on which users select the scan for MBAM to perform states that the default ***"Threat Scan" "scans all the places malware is known to hide."*** ¶ 132 (emphasis added).

It simply is not credible, especially in a Rule 12(b)(6) context, for Malwarebytes to claim that it has fulsomely disclosed to users that it applies the "threat" and "malicious" designations to ESG's products and domains for some reason other than that Malwarebytes has determined they contain malware.  Indeed, Malwarebytes already argued to the Ninth Circuit that its supposed disclosures

foreclose liability.  *ESG II*, No. 21-16466, Dkt. 17 at 24, 34-35 (9th Cir. Apr. 12, 2022).  The Ninth

Circuit rejected that position and instead held that "a reasonable person would plausibly interpret"

Malwarebytes' "threat" and "malicious" labels "as the identification of malware."  69 F.4th at 672.

Ultimately, Malwarebytes' desperate parsing of supposed "disclosures," entirely divorced

from its actual display of its false designations, simply does not reflect how reasonable consumers—

which MB admits is the lodestone of the analysis, Dkt. 179 at 14—would understand Malwarebytes'

statements.  The best evidence of the understanding of a reasonable consumer is the understanding of

actual consumers.  *See F.T.C. v. NCH, Inc*., 106 F.3d 407, at *3 (9th Cir. 1997) (discussing the "only

reasonable conclusion consumers" could draw being "the only conclusion that the actual consumers

in fact drew"); *Bell v. Publix Super Markets, Inc*., 982 F.3d 468, 480 (7th Cir. 2020) (explaining that

for the "reasonable consumer" standard under deceptive advertising statutes, "courts focus on how

real consumers understand the carefully crafted messages aimed at them," and applying the statute

"based on how consumers actually understand defendants' labels").  In its SAC, ESG quoted directly

from numerous users whose complaints make clear they were materially deceived by Malwarebytes'

false labeling of ESG products and domains, notwithstanding any "disclosures" Malwarebytes now

claims to have made.  *See* ¶¶ 143-64 (including consumer statements that Malwarebytes, through its

"threat" detection, was calling SpyHunter and RegHunter "malware," "malware threats," or

"viruses").  On a Rule 12(b)(6) motion, those allegations foreclose a finding that Malwarebytes'

supposed "disclosures" excuse the deceptiveness of its false statements.

### C.    New York Law Applies to ESG's Claims.

Malwarebytes' choice-of-law argument proceeds on a fundamentally flawed premise – that

the Ninth Circuit did not determine which state's substantive law applies to *any* of ESG's claims.

Dkt. 179 at 17-19.  The Ninth Circuit found Malwarebytes subject to personal jurisdiction in New

York, and explained that as a result "New York law applies to Enigma's state-law claims based on"

"sales to New York-based customers." 69 F.4th at 675-76.  That decision remanded only the "choice

of law question" as to whether New York substantive law also "applies to Malwarebytes'

transactions with other customers outside the state." *Id.* at 676.  The concurrence explained that the

parties "appear[ed] to agree [in briefing] that if [personal] jurisdiction existed, then New York

substantive law would govern." *Id.* at 678-79.  Indeed, through three rounds of motion to dismiss briefing and two appeals, Malwarebytes never raised a choice of law analysis, and plainly assumed that if New York jurisdiction existed, then New York substantive law would apply across the board.

Yet now, in a last ditch effort to escape claims the Ninth Circuit has upheld and stated must proceed at least in part under New York substantive law, *id.* at 676-78, Malwarebytes for the first time asserts that New York choice of law analysis compels application of California substantive law to ***all*** ESG claims.  This contravenes the Ninth Circuit's ruling and is legally incorrect.

Because the Court should find that ESG's Lanham Act and/or NYGBL claims survive, there is no conflict between New York and California law, and as a result, New York law would apply to the entire dispute.  *First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 633 (S.D.N.Y. 2014).  The ***only*** conflict Malwarebytes purports to identify is that California "requires independently wrongful conduct to sustain an intentional interference with business relations claim, while New York law does not."  Dkt. 179 at 19 n.6.  If ESG's Lanham Act and NYGBL claims survive, there is "independently wrongful conduct" under both states' laws, and consequently "no actual conflict" of laws.  *See Allied Prop. & Cas. Ins. Co. v. Matthews*, 2018 WL 1737534, at *5 (S.D.N.Y. Mar. 20, 2018) (finding "actual conflict" exists only where difference in applicable law is "relevant to the issue at hand and has a significant possible effect on the outcome of the case.").

But even if a conflict exists, New York substantive law still would apply under New York choice-of-law rules.  *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021).  In tort cases, New York uses an "interest analysis" to determine "the law of the state with the most significant interest in the litigation."  *Id.*[5]  In instances like "multi-state defamation cases" with "national publication," "the state with the most significant relationship is not necessarily readily apparent"; factors to be considered include plaintiff's domicile, where plaintiff suffered injury, where statements emanated

---

[5] Malwarebytes suggests SDNY's transfer of the case for convenience requires finding California to have the most significant interest.  Dkt. 179 at 19-20.  But "[c]hoice of law is a separate consideration that should not be confused with a venue analysis."  *Ashmore v. N.E. Petroleum Div. of Cargill, Inc.*, 925 F. Supp. 36, 39 (D. Me. 1996); *Int'l Bus. Mach. Corp. v. Bajorek*, 191 F.3d 1033, 1037 (9th Cir. 1999) ("There should not be a change of law as a bonus for a change of venue").

from or were broadcast, where activities to which the statements refer took place, and state policy

interests. *Id. at* 176-77.

For purposes of that analysis, the following are relevant here:

- Malwarebytes does significant business in New York, a major U.S. market;[6]

- Through products distributed in New York, for over five straight years Malwarebytes reached on a daily basis into users' computers to display false designations and block ESG programs and domains that New York users sought to access and had even paid for;

- Malwarebytes' false designation and blocking of ESG programs and domains arises directly from its collaboration with its sales affiliate, Bleeping Computer, on a smear campaign against ESG that appeared on Bleeping Computer's website;

- Bleeping Computer is a New York limited liability company; and

- Malwarebytes deployed its anticompetitive campaign against ESG to assist Bleeping Computer's defense of a lawsuit brought by ESG in SDNY and to avoid disclosing in New York court its profiteering partnership with Bleeping Computer.

SAC ¶¶ 11, 20-25, 37-42, 75-102, 110-13, 159, 162; Dkt. 140-12 at ¶ 17.  Given Malwarebytes'

anticompetitive campaign arises directly out of activities by Bleeping Computer, a New York-based

media outlet, and from an SDNY litigation, New York a significant interest in the application of its

law to this case.  *See, e.g.*, *Prince v. Intercept*, 634 F. Supp. 3d 114, 133 (S.D.N.Y. 2022) (New York

has "strong policy interests in regulating the conduct of its citizens and its media"); *Condit v. Dunne*,

317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004) (New York interest in regulating its media persists "even

when the target of the [defamatory] statement lives in another state"); *Lebetkin v. Giray*, 2020 WL

1445752, at *5 n.3 (S.D.N.Y. Mar. 25, 2020), *aff'd*, 2021 WL 2965323 (2d Cir. July 14, 2021)

(noting New York interest because underlying litigation "was conducted in New York courts").

Given New York's substantial interest, and the fact that under the binding Ninth Circuit

decision at least part of ESG's claims must proceed under New York substantive law, for the sake of

efficiency, the Court should apply New York substantive law to all of ESG's state law claims.

---

[6] If necessary, choice of law discovery would establish, *inter alia*, that Malwarebytes (i) has been registered to do business in New York even before the Court ordered dismissal of Enigma's First Amended Complaint in 2017, (ii) engages in targeted advertising to New York residents, including promotional programs specifically for Columbia and NYU faculty, staff, and students, and (iii) sells its products in brick-and-mortar New York locations of stores like Staples and Best Buy.

18

**D.    ESG's Interference with Prospective Economic Advantage Claim Survives.**

Ultimately, whether New York or California law is held to apply, ESG's tortious interference with prospective economic advantage claim survives.  Under both New York and California law, ESG has adequately pled that Malwarebytes acted with "independent wrongful means."  *ESG II*, 69 F.4th at 677 ("Enigma's reinstated claims under the Lanham Act and NYGBL § 349 could serve as independent wrongful acts if such a showing were necessary.").  As detailed above, Malwarebytes' only remaining attacks ESG's Lanham Act and NYGBL claims fail.  *See supra* at §§ IV.A-B.  Because ESG's predicate counts survive, so too does its tortious interference claim.

Malwarebytes' only other argument as to ESG's tortious interference claim has been squarely foreclosed by the Ninth Circuit.  Malwarebytes, citing only *Zetes v. Stephens* in support, asserts that ESG fails to adequately "identify a specific [prospective customer] *in New York* who would have purchased [ESG's] products but for [Malwarebytes' conduct]."  Dkt. 179 at 18 (internal quotations omitted).  The Ninth Circuit, however, has ***already explicitly held*** that ESG sufficiently identified lost prospective customers, citing the very same *Zetes* case:

> ***Enigma alleged the prospective relationships with the requisite specificity to establish a claim for tortious interference with business relations***.  New York requires that "plaintiff ... identify a specific customer that the plaintiff would have obtained 'but for' the defendant's wrongful conduct," *Zetes v. Stephens*, 108 A.D.3d 1014, 969 N.Y.S.2d 298, 304 (4th Dep't 2013) … For this, Enigma asserted that certain customers downloaded its software before paying for a full subscription.  SAC ¶¶ 244–46.  Because ***Enigma points to identifiable customers whose business it lost***, its complaint plausibly alleges that it had business relationships with third parties.

*ESG II*, 69 F.4th at 677 (emphasis added).[7]  The Ninth Circuit's ruling is binding law of the case, precluding dismissal of ESG's tortious interference with prospective economic advantage claim.  *See U.S. v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987); *U.S. v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986).

---

[7] Malwarebytes cannot pretend its argument goes beyond what the Ninth Circuit decided.  The Ninth Circuit considered the same case law on the same question and found ESG met its pleading burden.  Moreover, Malwarebytes is wrong when it claims ESG fails to identify lost prospective customers "in New York."  Dkt. 179 at 18.  ESG alleged two prospective customer categories: (i) new users seeking to try out ESG software before converting to paid customers, and (ii) existing paid users considering subscription renewal for their next subscription cycle.  SAC ¶¶ 50-52, 244.  ESG alleged that it lost those prospective customers both generally and as to New York specifically.  *See* ¶ 162.

19

**E.      If Necessary, ESG Should Be Granted Leave to Amend.**

In the event that the Court dismisses any ESG claim, or decides to apply the law of a state other than New York, ESG should be given leave to amend.  Leave to amend a complaint should be "freely give[n]."  *See* Fed. R. Civ. P. 15(a)(2); *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (policy allowing amendment of pleading "is to be applied with extreme liberality").

To the extent there are any defects in the SAC, ESG could plead additional facts to cure such defects given the fact-intensive nature of Malwarebytes' arguments.  For commercial speech, ESG could further detail how Malwarebytes' statements function as advertising and promotion within its business model and the anti-malware industry generally.  For material deception, ESG could elaborate on: (i) additional user complaints beyond the SAC's representative sample, (ii) the myriad limitations, inadequacies, and contradictions in Malwarebytes' supposed website, forum, and user guide "disclosures" regarding its designations (*e.g.*, those identified *supra* in § IV.B), (iii) the complete dearth of any such descriptive explanations of designations in Malwarebytes' products themselves, and (iv) typical user behavioral patterns demonstrating the low probability that impacted users ever viewed Malwarebytes' supposed website, forum, and user guide "disclosures."  And for tortious interference, ESG could present additional evidence of lost prospective business through (i) sales, subscriptions, and renewals data and conversion rate statistics and (ii) a more specific identification of lost prospective customers in New York who demanded and received refunds.

Amendment also is particularly appropriate where a court determines that a different state's law applies than the law under which plaintiff pled.  *See, e.g.*, *Salustri v. Dell, Inc.*, 2010 WL 11596554, at *7 (C.D. Cal. Apr. 27, 2010).  If the Court were to apply California law, ESG could raise new California law claims, such as violation of the California Unfair Competition Law.  *See, e.g.*, Cal. Bus. & Prof. Code § 17200 (prohibiting "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising").

## <u>CONCLUSION</u>

ESG respectfully requests that the Court deny Malwarebytes' Motion.  If, however, the Court finds any of ESG's claims insufficiently alleged, ESG requests leave to amend its pleading.

Dated:   November 17, 2023                    Respectfully submitted,

                                         By:   /s/ Terry Budd
                                               Terry Budd (*Admitted Pro Hac Vice*)
                                               BUDD LAW, PLLC
                                               120 Lyndhurst Circle
                                               Wexford, PA 15090
                                               Telephone: 412-613-2541
                                               terry.budd@buddlawglobal.com

                                               Edward P. Sangster (SBN 121041)
                                               Daniel W. Fox (SBN 268757)
                                               K&L GATES LLP
                                               Four Embarcadero Center, Suite 1200
                                               San Francisco, CA 94111
                                               Telephone: (415) 882-8200
                                               Facsimile: (415) 882-8220
                                               ed.sangster@klgates.com
                                               daniel.fox@klgates.com

                                               Christopher M. Verdini  (*Admitted Pro Hac
                                               Vice*)
                                               Anna Shabalov  (*Admitted Pro Hac Vice*)
                                               K&L GATES LLP
                                               K&L Gates Center
                                               210 Sixth Avenue
                                               Pittsburgh, PA 15222
                                               Telephone: (412) 355-6500
                                               Facsimile: (412) 355-6501
                                               christopher.verdini@klgates.com
                                               anna.shabalov@klgates.com

                                               *Attorneys for Plaintiff*

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-02915-EJD**

1

## **NOTICE OF SERVICE**

2

3        I certify that on November 17, 2023, the foregoing was filed electronically using CM/ECF.

4   Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

5

6                    */s/ Terry Budd*
                    Terry Budd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**CASE NO. 5:17-CV-02915-EJD**